## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, TAMPA BAY WATERKEEPER, SUNCOAST WATERKEEPER, MANASOTA-88, *and* OUR CHILDREN'S EARTH FOUNDATION, | Case No. 8:21-cv-1521-WFJ-CPT |
|      *Plaintiffs,* | FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
|      *v.* | |
| GOVERNOR RON DeSANTIS, | |
| *and* | |
| SHAWN HAMILTON, *in his official capacity as* ACTING SECRETARY, FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION, | |
| *and* | |
| HRK HOLDINGS, LLC, | |
| *and* | |
| MANATEE COUNTY PORT AUTHORITY, | |
|      *Defendants.* | |

## I.     INTRODUCTION

**1.**     For decades, Defendants have known that the Piney Point Phosphate Facility

("Piney Point") threatens imminent and substantial endangerment to Floridians'

lives, health, and environment. Described as a "ticking time bomb" by Senator

FIRST AMENDED COMPLAINT
*Case No. 8:21-cv-1521*

Marco Rubio, the wastewater infrastructure at Piney Point is inadequate and incapable of treating all the wastewater and stormwater accumulating at the site; the impoundments (sometimes referred to as "reservoirs") retaining hundreds of millions of gallons of wastewater are leaking and are at risk of further catastrophic failure; and the single, inadequate plastic liner overlaying the hazardous phosphogypsum stacks is tearing, cracking, ripping, and failing, creating direct pathways for dredged material from the Port Manatee Berth 12 expansion project and precipitation to leach beneath the liner, where it mixes and comingles with radioactive and toxic waste.

2.      Defendants correctly predicted that the impoundments at Piney Point could not safely retain anticipated precipitation and stormwater. Nevertheless, Defendants took no corrective action to redress this known risk. As such, in April 2021, Defendants chose to discharge at least 215 million gallons of untreated, hazardous wastewater directly into Tampa Bay. As of the filing of this complaint, that nutrient-laden pollution in the form of nitrogen and phosphorous has triggered harmful algae blooms with associated fish kills, putting Tampa Bay, neighboring waterways, and all Floridians that make use of these impacted waterways in jeopardy.

3.      Defendants' malfeasance must stop. Plaintiffs are public interest organizations focused on securing and safeguarding Floridians' health and the environment. They bring this lawsuit to ensure Piney Point is operated and closed in a manner that complies with the Resource Conservation and Recovery Act and abates the present

FIRST AMENDED COMPLAINT          2
*Case No. 8:21-cv-1521*

imminent and substantial endangerment to human health and the environment,

including endangered species such as manatees and sea turtles.

## II.   JURISDICTION AND VENUE

4.     This Court has jurisdiction pursuant to the Resource Conservation and

Recovery Act ("RCRA"), 42 U.S.C. § 6972(a), and the Federal Water Pollution

Control Act, commonly referred to as the Clean Water Act ("Clean Water Act"), 33

U.S.C. § 1365(a). This Court also has jurisdiction under 28 U.S.C. § 1331 (federal

question) and 28 U.S.C. §§ 2201-2202 (declaratory judgments and further relief).

5.     As required by RCRA, 42 U.S.C. § 6972(b)(2)(A) and the Clean Water Act, 33

U.S.C. § 1365(b)(1), Plaintiffs provided pre-suit notice of their intent to sue on

Defendants via Registered Mail, return receipt requested. That notice was served on

May 17, 2021. A copy of Plaintiffs' Notice of Intent to Sue is attached hereto as

Exhibit A.

6.     Pursuant to 42 U.S.C. § 6972(b), Plaintiffs bring this suit prior to expiration of

RCRA's statutory 90-day notice period. *Id.* ("No action may be commenced under

subsection (a)(1)(B) of this section prior to ninety days after the plaintiff has given

notice of the endangerment…except that such action may be brought immediately

after such notification in the case of an action under this section respecting a

violation of subchapter III of this chapter."). Plaintiffs allege herein that Defendants'

FIRST AMENDED COMPLAINT          3
*Case No. 8:21-cv-1521*

actions and omissions at Piney Point have caused solid and otherwise exempt[1] hazardous waste to mix and comingle, creating a new material that satisfies the statutory and regulatory definitions of hazardous waste.

7.    More than sixty days have passed since Plaintiffs served their May 17, 2021 Notice of Intent to Sue on Defendants and on state and federal agencies. 33 U.S.C. § 1365(b)(1)(A). *See* 40 C.F.R. § 135.2(c) (pre-suit notice under the Clean Water Act "shall be deemed to have been served on the postmark date if mailed[.]").

8.    Neither the United States Environmental Protection Agency ("EPA") nor the State of Florida has commenced and is diligently prosecuting a civil or criminal action in court to require compliance with the Clean Water Act as requested by Plaintiffs herein and in the Notice of Intent to Sue. 33 U.S.C §1365(b)(1)(B).

9.    Neither the EPA nor the State of Florida has commenced an administrative penalty action under the Clean Water Act, 33 U.S.C. § 1319(g), or under a comparable state law, to redress and correct the Clean Water Act violations Plaintiffs have identified herein and in the Notice of Intent to Sue.

10.    This Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*.

11.    Venue is proper in this district under 42 U.S.C. § 6972(a) and 33 U.S.C. §

---

[1] Pursuant to the "Bevill" amendment, phosphogypsum stacks and related process wastewater are typically exempt from RCRA's hazardous waste regulations. *See* 40 C.F.R. § 261.4(b)(7)(D). Defendants' actions and omissions at Piney Point, as alleged herein, vitiate that exemption.

FIRST AMENDED COMPLAINT          4
*Case No. 8:21-cv-1521*

1365(c)(1) because the alleged violations occurred in the United States District Court for the Middle District of Florida. Piney Point is located at 13300 Highway 41 North, Palmetto, FL 34221.

12.     Neither the United States Environmental Protection Agency nor the State of Florida has commenced an action concerning Piney Point under RCRA, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9604, incurred costs to initiate a Remedial Investigation and Feasibility Study under Section 104 of the CERCLA, or obtained a court order or issued an administrative order under Section 106 of CERCLA. *See* 42 U.S.C. § 6972(b)(2)(B) & (C).

### III.   PARTIES

*Plaintiffs*

13.     Plaintiffs are not-for-profit, public interest organizations whose members who live, work, and recreate in the State of Florida. Plaintiffs share similar interests in improving, protecting, and preserving regional water bodies and groundwater.

14.     Plaintiff Center for Biological Diversity (the "Center") is a national, not-for-profit conservation organization with offices throughout the United States. The Center has more than 84,000 members nationwide, and thousands in Florida, with many living near and recreating in Tampa Bay. The Center is dedicated to the protection of native species and their habitats through science, policy, and law. The

Center has an office in St. Petersburg, Florida.

15.     The Center and its members are directly injured and harmed by Defendants'
violations of RCRA and the Clean Water Act. The Center has members that live,
work, and recreate in proximity to Piney Point. These members also make use of the
waterways and natural areas in proximity to Piney Point for recreational, aesthetic,
and related purposes. These members' aesthetic, recreational, and other
constitutionally-protected interests are injured by Defendants' actions and omissions
at Piney Point.

    a.  For instance, the Center has two members who routinely recreate in
        Tampa Bay and its wild areas, and know first-hand how devastating a
        harmful algae bloom can be for these fragile ecosystems. These
        members are long-term volunteers for Tampa Bay's National Wildlife
        Refuges, something they do for recreational enjoyment and in
        furtherance of their after-retirement professional pursuits. They have a
        deep appreciation for Tampa Bay and the diverse wildlife that inhabits
        it. They conduct monthly bird inventories for the Refuges and have
        together donated in excess of 15,000 hours of time protecting and
        preserving these critical places for Tampa Bay. They are significantly
        impacted by the pollution discharged from Piney Point because the
        marine wildlife they hold dear and enjoy watching, such as manatees,

FIRST AMENDED COMPLAINT          6
*Case No. 8:21-cv-1521*

sea turtles, sea birds, and dolphins are dying. These members witnessed birds, fish, and other wildlife suffer during the red tide event in Tampa Bay in 2018. These members are harmed because the pollution from Piney Point has created additional harmful algae blooms. One of these members has their health impacted by harmful algae blooms, which cause respiratory and sinus problems in addition to their offensive odors. As a result, this member has reluctantly curtailed their monthly trips to the Refuges and ceased recreating in Tampa Bay due to the red tide persisting in the area. The other member is also a lifelong boater and angler. The member no longer consumes fish that they obtain from Tampa Bay because of the pollution at Piney Point; their enjoyment of fishing is also lessened knowing that Defendants discharged millions of gallons of harmful pollution into Tampa Bay. These members would like to take their 22-foot, shallow-draft boat into and around Tampa Bay, both for recreating by bird and other wildlife watching and for taking friends and family out on the water, but refrain from doing so because of the pollution at Piney Point. These members' constitutionally-protected interests have been injured by the pollution originating at Piney Point.

b. The Center has another member that lives near waters impacted by

pollution from Piney Point and experienced the devastating algae blooms in Tampa Bay in 2018. This member and her family enjoy recreating in Tampa Bay, including kayaking and paddle boarding. The member's enjoyment of these activities in and around Tampa Bay has been lessened due to the discharges and environmental catastrophe threated by Piney Point. The member has already noticed high levels of *lyngbya* in the areas where the member paddles and kayaks, lessening her enjoyment of those activities. The member finds the smell of the *lyngbya* mats offensive and does not want to paddle in waters impacted by *lyngbya* or harmful algae blooms for fear of the impacts they could have on the member's health and wellbeing and therefore has avoided doing so. The member is involved in a turtle watch organization and knows that sea turtles can be injured by additional pollution and harmful algae blooms caused by Piney Point's discharges. The member volunteers doing inventories for horseshoe crabs, and has started observing *lyngbya* and other algae bloom precursors in Robinson Preserve and elsewhere. The member also volunteers for a wildlife rescue organization, where the member has witnessed first-hand the impacts of harmful algae blooms on seabirds and other wildlife. This member's constitutionally-protected recreational and aesthetic interests

FIRST AMENDED COMPLAINT          8
*Case No. 8:21-cv-1521*

are injured by Defendants' violations of RCRA and discharges into Tampa Bay in violation of the Clean Water Act.

  c. The Center has a member that routinely recreates in close proximity to Piney Point. This member canoes the marine waters near Piney Point that have been directly impacted by the discharges from Piney Point. The member enjoys the aesthetic beauty of the area and particularly likes birdwatching. This member previously volunteered during the last red tide event cleaning up dead fish from the beaches of the area. The member's recreational and aesthetic interests are injured by Defendants' violations of RCRA and the Clean Water Act at Piney Point, because this member's enjoyment of canoeing and birdwatching is lessened knowing there are harmful pollutants in the water caused by Defendants' actions and omissions at Piney Point. This member had definite plans to canoe the area this year, but has modified those plans because the discharges from Piney Point resulting in a loss of the member's recreational and aesthetic enjoyment. Additionally, this member is concerned that a catastrophic collapse could cause the member serious bodily injury or death.

**16.** Plaintiff Tampa Bay Waterkeeper ("TBWK") is a Florida not-for-profit corporation with members throughout Tampa Bay. TBWK is dedicated to protecting

FIRST AMENDED COMPLAINT   9
*Case No. 8:21-cv-1521*

and improving the Tampa Bay watershed while ensuring swimmable, drinkable, and fishable water for all. TBWK's approach combines sound science, policy advocacy, grassroots community engagement, and education to stand up for clean water together as a community, ensuring a clean and vibrant future for the Tampa Bay watershed. To further its mission, TBWK actively seeks federal and state implementation of environmental laws, and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

17.   TBWK has been registered as a not-for-profit corporation in Florida since 2017. TBWK is a licensed member of Waterkeeper Alliance, Inc., an international not-for-profit environmental organization, made up of some 350 separate Waterkeeper programs, such as TBWK.

18.   Tampa Bay Waterkeeper and its members are injured and harmed by Defendants' violations of RCRA and the Clean Water Act. Tampa Bay Waterkeeper has members that live, work, and recreate in proximity of Piney Point. These members also make use of the waterways and natural areas in proximity to Piney Point for recreational, aesthetic, and related purposes. These members' aesthetic, recreational, and other constitutionally-protected interests are injured by Defendants' actions and omissions at Piney Point.

      a.   For instance, Tampa Bay Waterkeeper has a member that routinely utilizes Tampa Bay, Bishop Harbor, and other waters near Piney Point

FIRST AMENDED COMPLAINT     10
*Case No. 8:21-cv-1521*

that are impacted by Defendants' pollution. This member recreates in these waterways by boating, fishing, and otherwise enjoying and observing the marine wildlife that are endemic to Tampa Bay. This member's constitutionally-protected recreational and aesthetic interests are injured by Defendants' violations of RCRA and the Clean Water Act, because this member fears how the pollution from Piney Point degrades water quality and threatens significant health risks. Because of Defendants' violations of RCRA and the Clean Water Act, this member has curtailed their use and enjoyment of impacted waters.

b. Tampa Bay Waterkeeper has another member that operates a leasehold in Tampa Bay close to Piney Point, where the member raises and harvests oysters for commercial and personal consumption. The member's individual and business interests are injured as a result of Defendants' violations of RCRA and the Clean Water Act caused by the pollution from Piney Point. The member was required to cease all shellfish operations by the State of Florida due to impaired water quality, including exceedances for the organisms that are responsible for harmful algae blooms. The member has suffered business losses as a result. Additionally, this member is a life-long Floridian and routinely recreates in and around Tampa Bay, including boating. The member's

FIRST AMENDED COMPLAINT          11
*Case No. 8:21-cv-1521*

recreational interests are injured, as the member's recreational

enjoyment of the waters of Tampa Bay are lessened knowing that

Defendants' pollution from Piney Point has contaminated its waters

and contributed nutrients that will lead to additional harmful algae

blooms.

19.    Plaintiff ManaSota-88 is a Florida not-for-profit, public interest corporation.

ManaSota-88 has spent over 50 years fighting to protect Florida's environment. It is

dedicated to protecting the public's health and preservation of the environment.

ManaSota-88's is committed to safeguarding Floridians' air, land, and water quality.

20.    ManaSota-88 has members that work, live, and recreate in proximity of Piney

Point. These members also make use of the waterways and natural areas in

proximity to Piney Point for recreational, aesthetic, and related purposes. These

members' aesthetic, recreational, and other constitutionally-protected interests are

injured by Defendants' actions and omissions at Piney Point.

a.    For instance, ManaSota-88 has a member who routinely recreates in

close proximity to Piney Point. This member canoes the marine waters

near Piney Point that have been directly impacted by the discharges

from Piney Point. The member enjoys the aesthetic beauty of the area

and particularly likes birdwatching. This member previously

volunteered during the last red tide event cleaning up dead fish from the

FIRST AMENDED COMPLAINT          12
*Case No. 8:21-cv-1521*

beaches of the area. The member's recreational and aesthetic interests are injured by Defendants' violations of RCRA and the Clean Water Act at Piney Point because this member's enjoyment of canoeing and birdwatching is lessened knowing there are harmful pollutants in the water caused by Defendants' actions and omissions at Piney Point. This member had definite plans to canoe the area this year, but has modified those plans because the discharges from Piney Point reduce his recreational and aesthetic enjoyment. Additionally, this member is concerned that a catastrophic collapse could cause the member serious bodily injury or death.

b. ManaSota-88 has another member who lives on Anna Maria Island in proximity to Piney Point and routinely recreates on the Island and nearby. This member is extremely concerned about how pollution from Piney Point will impact the member's health and recreational interests. The member experienced the devastating 2018 red tide event in Tampa Bay, and developed health problems as a result. The member witnessed the large fish kill that was caused by that event and suffered from offensive odors inside the member's home. The member is an avid painter, a recreational pursuit from which the member derives substantial enjoyment, and prefers to paint the natural world and beauty

FIRST AMENDED COMPLAINT         13
*Case No. 8:21-cv-1521*

that surrounds Tampa Bay. The member's health and recreational interests are injured by Defendants violations of RCRA and the Clean Water Act and the pollution from Piney Point. The member is afraid to go to the beach to paint and is deeply concerned that the member's health will be negatively affected by Piney Point's pollution.

21.    Plaintiff Suncoast Waterkeeper ("SCWK") is a Florida not-for-profit, public interest organization with members throughout Southwest Florida. SCWK is dedicated to protecting and restoring the Florida Suncoast's waterways and water resources through fieldwork, advocacy, environmental education, and enforcement, for the benefit of the communities and SCWK's members who rely upon these precious coastal resources.

22.    SCWK aims to protect local waterways and resources for use for water contact recreation, aesthetic enjoyment, fishing, boating, wildlife observation, educational study, potable consumption, and spiritual contemplation. To further its mission, SCWK actively seeks federal and state implementation of environmental laws, and, where necessary, directly initiates enforcement actions on behalf of itself and its members. SCWK has been registered as a not-for-profit corporation in Florida since 2012 and has maintained its good and current standing in Florida since that time. Like TBWK, SCWK is a licensed member of Waterkeeper Alliance, Inc.

23.    Suncoast Waterkeeper has members that work, live, and recreate in proximity

FIRST AMENDED COMPLAINT        14
*Case No. 8:21-cv-1521*

of Piney Point. These members also make use of the waterways and natural areas in proximity to Piney Point for recreational, aesthetic, and related purposes. These members' aesthetic, recreational, and other constitutionally-protected interests are injured by Defendants' actions and omissions at Piney Point.

    a.   For instance, one member is a fishing guide who regularly is employed to guide recreational fishermen in the vicinity of Piney Point, including Joe Bay, Cockroach Bay, and Bishop Harbor. The pollution discharged from Piney Point and the potential for additional environmental harm have impaired his business interests, because customers do not wish to engage his services for fishing in polluted water. The member's own personal aesthetic and recreational interests are also negatively impacted, as the member's use and enjoyment of Joe Bay, Cockroach Bay, Bishop Harbor, and other waters is lessened as a result of Defendants' violations of RCRA and the Clean Water Act.

    b.   SCWK has another member that owns residential property upon which she resides within two miles of Piney Point. This member previously utilized her HOA community's irrigation water for her yard and garden, but has ceased doing so for fear of pollution, including from Piney Point, making it is unsafe to use on the member's garden and fruit trees. This member's interests are injured by Defendants' violations

FIRST AMENDED COMPLAINT     15
*Case No. 8:21-cv-1521*

of RCRA and the Clean Water Act, because they have injured her use and enjoyment of private property and threaten her health and welfare.

24.     Plaintiff Our Children's Earth Foundation ("OCE") is a not-for-profit public benefit corporation with members throughout the United States including the Tampa Bay Area. OCE's mission is to promote public awareness of domestic and international human rights issues and environmental impacts through education and private enforcement actions for the benefit of children and other populations that are the most vulnerable to pollution. OCE seeks to prevent environmental damage wherever possible and ensure that appropriate environmental protection statutes are being followed. Throughout its 20-year history, OCE has regularly initiated environmental enforcement actions on behalf of itself and its members. OCE has been registered as a not-for-profit corporation in Florida since 2016, and has more members in Florida than any other state.

25.     Since 2016, OCE has focused its environmental enforcement activities related to water quality in Florida, and specifically in the Tampa Bay and Sarasota Bay areas. OCE members have repeatedly requested that OCE take legal action to effectively address water pollution problems impacting their communities, as well as sources of pollution that exacerbate harmful algae blooms. OCE members have expressed concern and fear regarding their exposure to nutrient pollution as well as the impacts of nutrient pollution to waters and wildlife in and around Tampa Bay

FIRST AMENDED COMPLAINT          16
*Case No. 8:21-cv-1521*

and the Gulf of Mexico.

26.     OCE has members that work, live, and recreate in proximity of Piney Point. These members also make use of the waterways and natural areas in proximity to Piney Point for recreational, aesthetic, and related purposes. These members' aesthetic, recreational, and other constitutionally-protected interests are injured by Defendants' actions and omissions at Piney Point.

    a.  For instance, OCE has a member who routinely utilizes Tampa Bay and other waters near Piney Point that are impacted by Defendants' pollution. This member is a photographer who regularly meets with clients for events and celebratory photo shoots, usually outdoors. This member is also a landscape photographer and environmental enthusiast, who enjoys taking photos and videos of beautiful outdoor scenes in the Tampa Bay Area. The member's enjoyment of photographing Tampa Bay and its wildlife is negatively impacted by Defendants' violations of RCRA and the Clean Water Act. The member enjoys recreating in areas in proximity to Piney Point, including kayaking, and the member's enjoyment of these activities is lessened knowing that Defendants discharged millions of gallons of pollution into surface waters the member utilizes. This member is also a parent to a young child, and fears for how Piney Point's pollution could

impact the child's health and wellbeing. This member's constitutionally-protected interests are injured by Defendants' violations of RCRA and the Clean Water Act because this member avoids professional or recreational activities in or near waters that have been degraded by pollution from Piney Point. This member has suffered financial injuries to their business through cancellations in previous red tide and other algae bloom events, and anticipates losing future bookings this year. This member fears the potential health impacts resulting from contact or proximity to waters that have been polluted by Piney Point. This member has lost trust in government due to their observation of inaction and ineffective action by governmental entities including the Defendants.

b. OCE has another member that is a musician who regularly plays gigs on beaches and at beachside venues. This member has been impacted by Defendants' pollution and has curtailed their use and enjoyment of impacted waters. This member has had fewer gigs with fewer attendees in the weeks following the April 2021 pollution events at Piney Point because business owners and beachgoers avoid being near the impacted waters when harmful algae blooms are present. This member is concerned about the health impacts of harmful algae blooms and

exposure to water pollution. This member fears the ecosystem impacts

caused by Piney Point's nutrient pollution in Tampa Bay. This member

is concerned about the long-term health of Tampa Bay and the health of

wildlife that utilizes local water.

27.     At all relevant times, Plaintiffs were and are "persons" within the meaning of

RCRA, 42 U.S.C. § 6903(15), and the Clean Water Act. 33 U.S.C. § 1362(5).

28.     The illegal discharges of pollutants degrade water quality and harm aquatic

life in Tampa Bay and the waters near Piney Point, and thus threaten or impair each

of the uses described above or contribute to such threats and impairments, ultimately

impairing Plaintiffs' members' use and enjoyment of these waters.

29.     The illegal discharges of pollutants threaten or impair each of the uses

described above or contribute to such threats and impairments. Thus, the interests of

Plaintiffs' members have been, are being, and will continue to be adversely affected

by the illegal discharges from Piney Point. The relief sought herein will redress the

harms to Plaintiffs' members caused by illegal discharges from Piney Point.

Continuing commission of the acts and omissions alleged herein will irreparably

harm Plaintiffs' members, for which harm they have no plain, speedy, or adequate

remedy at law.

30.     Plaintiffs bring this action on behalf of their members to address and remedy

the injuries in fact suffered by these members as a result of the illegal discharges

FIRST AMENDED COMPLAINT          19
*Case No. 8:21-cv-1521*

described herein. The interests of Plaintiffs' members at stake are germane to the purposes for which the Center, TBWK, SCWK, Manasota-88 and OCE have been created. Plaintiffs' organizational purposes all include protecting surface waters from pollution and degradation to promote their members' and the public's abilities to use surface waters for water contact recreation, aesthetic enjoyment, fishing, wildlife observation, educational study, and spiritual contemplation.

*Defendants*

**31.**   Defendant Ron DeSantis is Governor of the State of Florida. Governor DeSantis is the head of the executive branch of the State of Florida, under which the Florida Department of Environmental Protection operates. Governor DeSantis is ultimately responsible for ensuring that Florida's executive agencies operate in compliance with federal law, including RCRA. Governor DeSantis is sued in his official capacity.

**32.**   Defendant Shawn Hamilton is the Acting Secretary of the Florida Department of Environmental Protection (hereinafter referred to as "FDEP," inclusive of Defendant Shawn Hamilton). He is responsible for ensuring that FDEP operates in compliance with federal law, including RCRA. Since 2001, FDEP has been tasked with overseeing the operations, decisions, and closure of Piney Point. Mr. Hamilton is sued in his official capacity.

**33.**   Defendant HRK Holdings, LLC is a Florida for-profit corporation, with a

FIRST AMENDED COMPLAINT          20
*Case No. 8:21-cv-1521*

principal address of 13500 Scale Ave., Palmetto, FL 34221. HRK Holdings, LLC ("HRK") owns and operates the Piney Point facility under the direct supervision, control, and oversight of FDEP and Defendants Shawn Hamilton and Governor DeSantis.

34.     Defendant Manatee County Port Authority ("MCPA") is an independent body that owns and operates Port Manatee.

35.     MCPA has autonomy from the State of Florida in its operation of Port Manatee.

36.     MCPA has the capacity to sue and be sued without prior approval or oversight from the State of Florida.

37.     MCPA has the authority to manage its finances and incur debt without prior approval or oversight by the State of Florida.

38.     MCPA's governing body is composed entirely of the Board of County Commissioners of Manatee County.

39.     The Board of County Commissioners of Manatee County is an autonomous political body that is not an arm of the State of Florida.

40.     At all relevant times, Defendants were and are "persons" within the meaning of RCRA, 42 U.S.C. § 6903(15).

## IV.   LEGAL FRAMEWORK

*The Resource Conservation and Recovery Act*

FIRST AMENDED COMPLAINT          21
*Case No. 8:21-cv-1521*

41.    Congress enacted RCRA in 1976, amending the Solid Waste Disposal Act, *see* Pub. L. No. 89-272, 79 Stat. 997-1001 (1965), to establish a comprehensive federal program to regulate the handling and disposal of solid and hazardous waste. *See* Pub. L. No. 94-580, 90 Stat. 2795 (1976) (codified as amended at 42 U.S.C. § 6901 et seq). In so doing, Congress recognized that industries were generating more toxic sludge and other pollution treatment residues that required proper disposal. 42 U.S.C. § 6901(b)(3). Further, Congress recognized that "inadequate and environmentally unsound practices" for the disposal of such wastes were responsible for air and water pollution that posed an unacceptable threat to human health and the environment. *See id.* RCRA was meant to ensure that such wastes were handled responsibly and did not reenter the environment.

42.    The goal of RCRA is to promote the protection of health and the environment and to conserve valuable material and energy resources by ensuring the safe treatment, storage, and disposal of solid and hazardous waste. *See id.* § 6902. To achieve this goal, RCRA prohibits "open dumping" on the land and the closure of existing open dumps; provide for the management and disposal of hazardous waste in a manner that protects human health and the environment; and prohibits solid and hazardous waste management that may present an imminent and substantial endangerment to health or the environment.

FIRST AMENDED COMPLAINT         22
*Case No. 8:21-cv-1521*

43.     Section 7002(a)(1)(B) of RCRA provides that citizens may commence a citizen suit against "any person (including…any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment)," "including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility who has contributed or who is contributing to the past or present handling, storage, treatment, or transportation, or disposal of any solid or hazardous waste which may present and imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

44.     EPA has promulgated regulations and permitting requirements for hazardous waste facilities. *See generally* 40 C.F.R. Parts 260-272.

45.     RCRA defines "solid waste" as "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities." 42 U.S.C. § 6903(27).

46.     Under RCRA, hazardous waste is a subset of solid waste. "[H]azardous waste means a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial present or

FIRST AMENDED COMPLAINT        23
*Case No. 8:21-cv-1521*

potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5).

47.   EPA regulations provide a set of criteria for determining whether a solid waste should also be classified as hazardous waste. 40 C.F.R. Part 261, Subparts B & C.

48.   In 1980 the "Bevill Amendment" suspended EPA's authority to regulate "special wastes," including mining and mineral processing wastes, as hazardous under Subtitle C until six months after EPA's completion of a detailed study on the adverse human health and environmental effects and a published Bevill determination for each particular category of special waste. *See* 42 U.S.C. § 6921(b)(3)(A).

49.   In 1990, EPA completed its study of phosphogypsum under RCRA and submitted the required report to Congress for 20 mineral processing special wastes, including phosphogypsum and process wastewater. EPA, *Report to Congress on Special Wastes from Mineral Processing* (1990); Special Wastes From Mineral Processing (Mining Waste Exclusion), Final Regulatory Determination and Final Rule, 56 Fed. Reg. 27300 (June 13, 1991).

50.   The 1990 study found widespread groundwater contamination at phosphogypsum stack sites including contaminated off-site wells, the potential for drinking water source exposures, several documented damage cases that impacted both ground and surface waters and threatened and harmed aquatic life, increased air

FIRST AMENDED COMPLAINT          24
*Case No. 8:21-cv-1521*

pathway cancer risk for those living near stacks, and varied and inadequate state regulation.

51.     Constituents of most concern that present a hazard to human health and included radionuclides, arsenic, chromium, selenium, cadmium, radium-226, lead, vanadium, copper, antimony, thallium, fluoride, and selenium.

52.     The report also found an increased hazard and contaminant release potential should the industry expand in the absence of Subtitle C regulation.

53.     Nevertheless, due to costs to the industry in complying with a Subtitle C program, EPA's determination published the following year exempted phosphogypsum and process wastewater (as well as all other special wastes) from Subtitle C regulation. Special Wastes From Mineral Processing (Mining Waste Exclusion), Final Regulatory Determination and Final Rule, 56 Fed. Reg. 27300 (June 13, 1991).

54.     EPA stated it planned to use existing authorities under either RCRA §7003 or CERCLA §106 to address site-specific phosphogypsum and process wastewater groundwater contamination problems that pose substantial and imminent endangerment to human health or the environment. EPA, *Risks Posed by Bevill Wastes* at 7 (1997).

55.     As a result, phosphogypsum and process wastewater from phosphoric acid production is exempt from regulation as hazardous waste. *See* 40 C.F.R.

FIRST AMENDED COMPLAINT          25
*Case No. 8:21-cv-1521*

§§ 261.4(b)(7)(ii)(D), 261.4(b)(7)(ii)(P); Special Wastes From Mineral Processing (Mining Waste Exclusion), Final Regulatory Determination and Final Rule, 56 Fed. Reg. 27300 (June 13, 1991).

56.     Phosphogypsum and process wastewater is instead regulated as "solid waste" under RCRA.

57.     Exempt hazardous waste, such as phosphogypsum and process wastewater from phosphoric acid production, loses its exempt status when it is comingled or intermixed with other solid waste, where the new waste material exhibits the characteristics of hazardous waste. 42 U.S.C. § 6903(5); 40 C.F.R. Part 261, Subparts B & C.

58.     Monoammonium and/or diammonium phosphate production processes are not within the scope of the Bevill amendment. 40 C.F.R. § 261.4(b)(7).

59.     Comingling of Bevill-exempt phosphoric acid production wastes with wastes from monoammonium and/or diammonium phosphate production processes vitiates the hazardous waste exclusions under 40 C.F.R. §§ 261.4(b)(7)(ii)(D) and 261.4(b)(7)(ii)(P).

60.     Comingling of Bevill-exempt phosphoric acid production wastes with any other solid or hazardous waste vitiates the hazardous waste exclusions under 40 C.F.R. 261.4(b)(7).

*The Clean Water Act*

FIRST AMENDED COMPLAINT          26
*Case No. 8:21-cv-1521*

**61.**   Congress enacted the Clean Water Act "to restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Clean Water Act prohibits the discharge of any pollutant from a point source into navigable waters, unless the discharge is authorized by and complies with a lawfully-issued National Pollution Discharge Elimination System ("NPDES") permit. 33 U.S.C. §§ 1311(a), 1342.

**62.**   The Clean Water Act is implemented in part through the NPDES permit program. 33 U.S.C. § 1342 and 40 C.F.R. Parts 122 and 123. NPDES permits impose effluent limitations and standards on the discharger, which are designed to protect water quality. EPA may delegate this program to the states, *id*. § 1342(b) and 40 C.F.R. § 123.61.

**63.**   In 1995, EPA delegated authority to FDEP to issue permits and enforce Florida's NPDES permitting program. FLORIDA STAT. § 403.0885 (Establishment of federally approved state [NPDES] Program) ("The state NPDES permit shall be **the sole permit issued by the state under this chapter regulating the discharge of pollutants or wastes into surface waters within the state** for discharges covered by the United States Environmental Protection Agency approved state NPDES program.") (emphasis added). In 2007, EPA and FDEP entered into a Memorandum of Agreement, which sets forth a process for FDEP's administration of the NPDES Program under the EPA 1995 delegation.

FIRST AMENDED COMPLAINT          27
*Case No. 8:21-cv-1521*

**64.**     The Clean Water Act authorizes citizens to commence enforcement actions against any person "who is alleged to be in violation" of "an effluent standard or limitation." 33 U.S.C. § 1365(a). An "effluent standard or limitation" includes permit terms, conditions, limits, and requirements. *Id*. § 1365(f)(6).

**65.**     To advance its goals, Congress established in the Clean Water Act that all discharges of pollutants are prohibited "except in compliance" with specified provisions of the Clean Water Act including, most importantly, the NPDES permitting program. 33 U.S.C. §1311(a); 33 U.S.C. §1342(a); 40 CFR §§122.1 *et seq*. Discharges that violate an NPDES permit also violate the Clean Water Act. 33 U.S.C. § 1311(a); 33 U.S.C. § 1342(k); 40 C.F.R. § 122.41(a).

**66.**     Pursuant to the Clean Water Act, a discharge of a pollutant means "any addition of any pollutant to navigable waters from any point source," and "any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft." 33 U.S.C. § 1362(12); *see also* 33 U.S.C. § 1362(7) (definition of "navigable waters").

**67.**     The Clean Water Act specifies a number of materials and wastes that, if discharged into water, render them pollutants, including, but not limited to, solid waste, chemical wastes, industrial waste, biological materials, sand, and rock. 33 U.S.C. § 1362(6).

**68.**     Under the Clean Water Act, the term "point source" means "any discernible,

FIRST AMENDED COMPLAINT          28
*Case No. 8:21-cv-1521*

confined and discrete conveyance. . .from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

69.     Violations of the Clean Water Act are subject to civil penalties of up to $56,460 per day, per violation. 33 U.S.C. § 1319(d), § 1365(a), 40 C.F.R. §§ 19.1-19.4. Additionally, the court is empowered to award the prevailing or substantially prevailing parties their litigation costs, including expert witnesses' fees and attorneys' fees.

## V.    FACTS

*FDEP Becomes Owner and Operator of Piney Point*

70.     Piney Point was a phosphate fertilizer plant owned and operated by multiple, different corporations from 1966 until operations ceased in 1999. Historically, Piney Point consisted of an acid plant, a phosphoric acid plant, an ammoniated phosphate fertilizer plant with storage for ammonia, phosphoric acid, and other products necessary for the manufacture of fertilizer, phosphogypsum stacks with process wastewater ponds situated on top of them, and related facilities. All were located within an approximately 670-acre parcel of land, which itself lies within thousands of feet of the Tampa Bay Estuarine Ecosystem Rock Ponds area, the Terra Ceia Preserve State Park, and Tampa Bay.

71.     Phosphoric acid is produced by the digestion of phosphate rock with sulfuric acid. The resulting waste is phosphogypsum and process wastewater.

FIRST AMENDED COMPLAINT          29
*Case No. 8:21-cv-1521*

**72.**     Nitrogen does not occur in process wastewater from phosphoric acid production.

**73.**     Ammonia does not occur in process wastewater from phosphoric acid production.

**74.**     The process wastewater retained at Piney Point's impoundments contains ammonia and nitrogen.

**75.**     In 1989, citing concern that the radium-rich phosphogypsum would be incorporated into other products and diffused throughout the country such that EPA would be unable to ensure phosphogypsum radon emissions do not present an unacceptable risk to public health, EPA promulgated a National Emissions Standards for Hazardous Air Pollutants (NESHAP) rule in the form of a work practice standard that required all phosphogypsum be disposed into stacks or old phosphate mines. National Emission Standards for Hazardous Air Pollutants; National Emissions Standards for Radon Emissions from Phosphogypsum Stacks; Final Rule, 54 Fed. Reg. 51654, 51675 (Dec.19, 1989).

**76.**     At Piney Point, waste from fertilizer manufacturing was formed over nearly 40 years into large stacks, which rose as high as 70-80 feet and encompassed 457 acres, with ponds of process wastewater placed atop them.

**77.**     The phosphogypsum stacks at Piney Point were created on top of bare ground. There is no engineered liner underneath the stacks.

FIRST AMENDED COMPLAINT          30
*Case No. 8:21-cv-1521*

**78.**   At Piney Point, this waste also included "ponds" of process wastewater that accumulated on top of the phosphogypsum stacks.

**79.**   As of February 2001, millions of gallons of "pore" process wastewater was stored within the phosphogypsum stacks at Piney Point.

**80.**   Pore wastewater is a type of process wastewater that is interspersed with the gypsum in the phosphogypsum stacks.

**81.**   As of the date of filing of this complaint, there remains substantial quantities of pore process wastewater stored within the phosphogypsum stacks at Piney Point.

**82.**   Phosphogypsum is radioactive and can contain uranium, thorium, and radium. Over time, uranium and thorium decay into radium, and radium subsequently decays further into radioactive radon, the second-leading cause of lung cancer in the United States. Radium-226, found in phosphogypsum, has a 1,600-year radioactive decay half-life.

**83.**   Phosphogypsum and process wastewater can contain carcinogens and heavy toxic metals like antimony, arsenic, barium, cadmium, chromium, copper, fluoride, lead, mercury, nickel, silver, sulfur, thallium, and zinc.

**84.**   Process wastewater is highly acidic and can contain heavy metals such as arsenic, cadmium, chromium, and fluoride, and dissolved solids. Like phosphogypsum, process wastewater is also radioactive.

FIRST AMENDED COMPLAINT          31
*Case No. 8:21-cv-1521*

**85.**   Piney Point's wastewater infrastructure, including its single-lined impoundments, monitoring network, wastewater treatment, and phosphogypsum stacks and related process wastewater are not compliant with RCRA's hazardous waste requirements. *See* 40 C.F.R. Parts 260-272.

**86.**   Piney Point Phosphates, Inc., a wholly-owned subsidiary of Mulberry Corporation, was the owner and operator of Piney Point in 2001. In February 2001, Mulberry Corporation filed for bankruptcy and provided Florida State officials with 48 hours' notice that it was abandoning the property.

**87.**   FDEP became the owner and operator of Piney Point through a court-ordered receivership in February 2001.

**88.**   FDEP thereafter retained contractors to investigate the Piney Point site and propose a means of treating and handling the remaining process wastewater and addressing issues with the existing phosphogypsum stacks.

**89.**   As part of that investigation, FDEP determined that closure of Piney Point was required.

**90.**   FDEP instituted a closure plan that involved converting the existing phosphogypsum stacks into impoundments capable of storing precipitation that fell onto the site.

**91.**   That closure plan also involved the placement of a single, High Density Polyethylene ("HDPE") liner over the existing phosphogypsum stacks.

FIRST AMENDED COMPLAINT          32
*Case No. 8:21-cv-1521*

92.    Between 2001 and 2004, FDEP hired contractors to implement its closure plan

at Piney Point. Through that process, FDEP installed approximately 2,593,000

square feet of HDPE liner at the "New Gypsum Stack-North" or "NGS-N" stack

and at the two other stacks existing at the facility at this time – the "Old Gypsum

Stack South," and "Old Gypsum Stack North."

93.    The image below is an aerial depiction of Piney Point:



94.    Between February 2001 and February 2004, FDEP discharged approximately

1.1 billion gallons of stormwater and process wastewater from Piney Point into

Bishop Harbor and Tampa Bay.

95.    In February 2004, discharges from Piney Point helped trigger an algae bloom

in Tampa Bay.

FIRST AMENDED COMPLAINT          33
*Case No. 8:21-cv-1521*

96.     In February 2004, discharges from Piney Point contributed to an algae bloom in Tampa Bay.

97.     Additionally in 2001, FDEP discharged approximately 50 million gallons of wastewater into Bishop Harbor as part of its plan to dewater the stack impoundments.

98.     FDEP was the real property owner of Piney Point from February 2001 until August 2006.

99.     FDEP was the operator of Piney Point from February 2001 until August 2006.

100.    In August 2006, FDEP transferred its ownership of Piney Point to Defendant HRK.

101.    As part of that purchase, FDEP and HRK entered into an Administrative Agreement, FDEP OGC No. 06-1685.

102.    In Administrative Agreement FDEP OGC No. 06-1685, FDEP represented that it would continue working with its contractors to complete FDEP's closure plans and to address the "imminent hazard related to the Phosphogypsum Stack System[.]"

103.    In Administrative Agreement FDEP OGC No. 06-1685, FDEP represented that its contractors "prepared conceptual closure plans for the entire Phosphogypsum Stack System at the Site and detailed plans and specifications for specific portions of" the site, and made clear that "HRK had no role in the development of the design,

FIRST AMENDED COMPLAINT        34
*Case No. 8:21-cv-1521*

drawings, specifications, and phased Closure construction of the entire

Phosphogypsum Stack System."

104.   In Administrative Agreement FDEP OGC No. 06-1685, FDEP and HRK

agreed that "HRK was not an owner or operator of the Phosphogypsum Stack

System or any other part or component at or on the Site, nor was HRK a generator

of any Solid Waste or Hazardous Substances at or on the Site."

105.   In Administrative Agreement FDEP OGC No. 06-1685, HRK was required to

allow FDEP and its contractors access to complete FDEP's closure plan at the site,

and agreed that FDEP "shall continue to exercise regulatory control" over the

closure and "any post-closure activities at the Site...such as the final cover, liners,

monitoring system and process water management and stormwater controls."

106.   In Administrative Agreement FDEP OGC No. 06-1685, HRK was required to

provide $2.5 million in an account for the long-term operation and maintenance of

Piney Point. Expenditures from that account required FDEP's prior approval.

*Defendants Approve Use of Piney Point for Dredged Material Storage*

107.   In 2005, as part of Phase III of the Manatee Harbor Navigation Project,

Defendant MCPA began exploring plans to create a deepwater berth suitable for use

by large shipping vessels and to reduce vessel congestion within Port Manatee.

108.   MCPA developed a plan to create an access channel to a new berthing area.

The project involved impacts to 11.92 acres of shallow bay bottoms, primarily caused

by dredging, and was expected to produce 1,170,000 cubic yards of dredged material. Additional annual maintenance dredging was anticipated to produce 300,000 cubic yards of dredged material.

109.   Overall, MCPA determined it needed a disposal area sufficient to handle 3,220,000 cubic yards of material over a twenty-year maintenance period.

110.   The MCPA developed a plan involving the pumping of dredged materials from the Port expansion into Piney Point's HDPE-lined impoundments.

111.   FDEP approved the permit necessary for MCPA to begin the dredging process in Environmental Resource Permit No. 0129291-0090-EM, as modified by FDEP.

112.   MCPA thereafter entered into a "Dredged Materials Containment Agreement" or "DMCA" with HRK on April 19, 2007.

113.   The DMCA specifically identified the Administrative Agreement between HRK and FDEP and noted that performance of the obligations under the DMCA "shall be of material benefit to [FDEP], and as a result of said material benefit, the severance fee for dredging material from sovereignty submerged lands should be eliminated or waived by [FDEP]."

114.   Within six months of execution of the DMCA, FDEP waived the aforementioned severance fee.

115.   FDEP and HRK thereafter entered into the First Amendment to the Administrative Agreement (hereinafter "Amended Agreement") on August 20, 2007.

FIRST AMENDED COMPLAINT          36
*Case No. 8:21-cv-1521*

116.   The Amended Agreement stated that, since HRK's purchase of Piney Point, FDEP "has continued to conduct [c]losure work and related tasks at the Site[.]"

117.   FDEP represented its position in the Amended Agreement that "storage of dredged materials" to be generated by MCPA's dredging project would be "compatible with the design and purpose of the lined reservoirs constructed by the Department[,]" and would "be of benefit to the Department."

118.   FDEP agreed in the Amended Agreement "to establish a process for [FDEP] review of plans for work under the DMCA[.]" Specifically, FDEP and HRK agreed that:

> Work to be performed by HRK and MCPA, respectively, under the DMCA in accordance with the conditions specified by this Amendment constitutes a use which is compatible with the design and purpose of the lined reservoirs constructed by [FDEP] and others at the existing Phosphogypsum Stack System and with the ongoing Closure of the Phosphogypsum Stack System at the Site conducted by [FDEP] as well as constituting a beneficial use of the Site which is in the public interest.

119.   FDEP further agreed in the Amended Agreement not to place a protective soil cover over the three impoundments to be initially used for dredged material storage: the OGS-N, OGS-S, and NGS-S (defined as the "lined DMCA Reservoir Compartments"). These impoundments would instead be used for the storage of dredged material from MCPA's Berth 12 expansion project. FDEP retained control over the "NGS-N" impoundment to "freely utilize" it "for storage and management of process water[.]"

FIRST AMENDED COMPLAINT          37
*Case No. 8:21-cv-1521*

**120.**   FDEP represented in the Amended Agreement that placement of dredged

materials from MCPA's Berth 12 expansion "constitutes a use that is compatible

with the design and purpose of the lined reservoirs" that were constructed by FDEP.

**121.**   Finally, FDEP stated in the Amended Agreement that MCPA's transportation

and storage of dredged material within the lined "DMCA Reservoir Compartments"

constitutes "a beneficial use of the Site which is in the public interest."

**122.**   FDEP provided a mortgage note to HRK such that HRK could complete the

purchase of Piney Point.

**123.**   FDEP has, at multiple times, agreed to limit HRK's mortgage payments and

delayed the maturity date on the mortgage note.

*Defendants Reject the Army Corps' Warning that the Use of Piney Point for Disposal of*
*Dredged Materials Carries Unnecessary Risks to the Public and the Environment*

**124.**   In August 2008, the Army Corps of Engineers ("Corps") issued its "Draft

Phase IIII General Revaluation Report and Environmental Assessment Addendum"

(the "Report"). The Report warned that:

> The Corps of Engineers would need to perform analyses to determine if
> the disposal facility meets the design and construction criteria
> established in Corps of Engineers guidance such as EM 1110-2-5027
> and others as appropriate. In the case of the Piney Point site, there is a
> heightened level of concern with regard to the integrity of the gypsum
> stack which forms the foundation of the dredged material handling
> facility. The heightened level of concern follows from the following
> considerations:
>
> • The gypsum stack itself is not an engineered structure. There are no
> design plans and specifications, nor as built drawings, nor construction

FIRST AMENDED COMPLAINT          38
*Case No. 8:21-cv-1521*

documentation to support the assertion of structural integrity of the stack for the purpose of supporting a material handling facility to be constructed on top of the stack.

• The gypsum stack itself contains hazardous and toxic material.

• There is documentation of past slope stability and piping issues experienced at the site.

The local sponsor, the site owner, and the State of Florida Department of Environmental Protection (DEP) have supplied data and have asserted that the site is approved for the use intended. However, the Corps of Engineers has found the data to be inconclusive.

125.   The Report further warned that "the worst case scenario for Piney Point being used as dredged material disposal facility would be a breach in the liner. Such a breach would allow water to saturate and cause a failure to the gypsum stack, enabling the mixing of large volumes of dredged material with large volumes of phosphogypsum."

126.   The Report also cautioned that storage of dredged materials could vitiate RCRA's hazardous waste exemption for phosphogypsum stacks and their related process wastewater. In particular, the Corps stated that:

Water from rain and the placement of dredged slurry could percolate into [the] phosphogypsum stack releasing a leachate that could be corrosive and toxic. If leachate meets the characteristics according to 40 CFR 261.22 and 40 CFR 261.24, then the leachate would be designated as hazardous waste. Then the mixture of a solid waste, with hazardous waste is considered a hazardous waste. The addition of dredged material to a hazardous waste will increase the probability of contaminating the surrounding surface and groundwater.

127.   Based on these foreseeable and unacceptable risks, the Corps objected to

FIRST AMENDED COMPLAINT         39
*Case No. 8:21-cv-1521*

Defendants' use of Piney Point for storage of dredged material from the Berth 12 expansion.

128.   Instead, the Corps required FDEP to certify "Piney Point as a Dredged Material Disposal Site," which would provide assurances that the arrangements for use of Piney Point to store the dredged materials would be safe, including extensive testing to ensure "that there is no hazardous material that will enter the site."

129.   Defendants did not heed the Corps' warning.

130.   FDEP instructed one of its contractors at Piney Point, Ardaman & Associates ("Ardaman"), to prepare a risk report responding to the Corps' concerns. That risk assessment was completed in July 2009, and found that the risk of liner failure at Piney Point was low, but that the possibility of such a failure could not be conclusively ruled out.

131.   Ardaman, however, investigated a liner leak at the Plant City Phosphate Complex site just days after it sent FDEP its risk assessment. The liner in question was nearly identical to the HDPE liner installed at Piney Point.

132.   The HDPE liner at the Plant City Phosphate Complex was significantly compromised in numerous ways: there were large fissures and cracks in the phosphogypsum subsurface, which forms the foundation of the liner system; the liner showed numerous large tears and punctures; and the liner evidenced both linear tears and tears associated conventional wind ballast anchor trenches.

FIRST AMENDED COMPLAINT          40
*Case No. 8:21-cv-1521*

133.   Ardaman informed FDEP through formal reports and meetings that a plan of action was necessary at the site to quickly remediate the failing 80-mil HDPE liner.

134.   FDEP knew by at least April 8, 2010, that the HDPE liner at Piney Point was likely to experience the same problems identified by Ardaman at the Plant City Phosphate Complex.

135.   Undeterred, Defendants continued with their plan to store dredged materials at Piney Point.

136.   On April 8, 2010, FDEP wrote to the Corps restating its support for the use of Piney Point to store dredged materials from the Berth 12 expansion.

137.   The Corps again objected, citing Engineer Regulation 1165-2-132, "Hazardous Toxic Radioactive Waste for Civil Works Projects," which specifically directs that construction in such areas should be avoided where practicable.

138.   The Corps then reaffirmed its position that the use of Piney Point for disposal of dredged materials carries unnecessary risks to the public and the environment.

139.   The Corps thereafter requested, and FDEP provided, a formal covenant not to sue relative to the use of the closed Piney Point phosphogypsum stacks for storage and disposal of dredged material.

140.   The Corps also required assurances from FDEP that the Corps would not be considered a potentially responsible party for purposes of environmental clean-up in the event of a leak or discharge at Piney Point.

141.   FDEP thereafter officially approved the use of Piney Point for storage and disposal of the dredged materials.

*Defendants Transport Dredged Materials to Piney Point*

142.   In February 2011, as the Piney Point site was being prepared by Defendants for the dredging and disposal operations, a crane collapsed and punctured the HDPE liner in the NGS-S.

143.   FDEP's contractor, Ardaman, drained the NGS-S and visually inspected the floor of the liner. Approximately 150 feet from the location where the crane impacted the liner, Ardaman discovered a breach in the liner six inches in length, located along an extruded ballast trench seam. Beneath the liner breach, there was a "solution cavity" four feet in diameter and at least four feet deep.

144.   The liner breach and "solution cavity" are evidence that material stored in the NGS-S prior to it being drained had leaked through the HDPE liner, including dredged material from the Port Manatee expansion that had already been placed into the impoundment before the breach occurred.

145.   The liner breach and "solution cavity" are evidence that material stored in the NGS-S prior to it being drained had commingled and intermixed with the phosphogypsum waste and process wastewater located beneath the liner.

146.   Defendants knew or should have known through the exercise of reasonable care and due diligence that the liner breach discovered by Ardaman in February 2011

FIRST AMENDED COMPLAINT          42
*Case No. 8:21-cv-1521*

indicated that the phosphogypsum foundation underlying the HDPE liner was not suitable for storage of dredged materials.

147.  FDEP thereafter approved all remaining state permits for MCPA to begin the dredging project, and dredging began on April 22, 2011.

148.  MCPA was responsible for the dredging of the Berth 12 expansion project.

149.  MCPA was also responsible for transporting dredged material from the Berth 12 expansion to Piney Point.

150.  Weeks into the dredging project, HRK reported to FDEP increased flows, conductivity, and chloride concentrations in the buried drains based on monitoring that was required specifically for the approved dredge disposal operations at the site.

151.  On May 29, 2011, FDEP issued an Emergency Final Order (EFO No. 11-0813) that ordered HRK to take actions to help prevent the collapse of the phosphogypsum stack system and its impoundments, and authorized controlled emergency discharges as needed to protect the integrity of the stack system or its impoundments and protect waters of the state.

152.  On June 4, 2011, dredging operations were directed to be fully suspended by FDEP based on decreasing water levels in the NGS-S.

153.  Available information suggested a leak at the NGS-S of at least 12,000 gallons per minute.

FIRST AMENDED COMPLAINT          43
*Case No. 8:21-cv-1521*

**154.**   On June 6, 2011, a strong vortex was identified near the water's edge in the southwest corner of the NGS-S.

**155.**   This vortex was similar to what FDEP's contractor, Ardaman, identified in the NGS-N in a 2001 Geotechnical Study prepared by Ardaman for FDEP.

**156.**   Ardaman's 2001 Geotechnical Study identified three whirlpools located in the NGS-N. It stated those whirlpools were examples of a well-developed system of interconnected cracks in the subsurface, which can create concentrated flows and/or preferential pathways in the foundational soils.

**157.**   Initial attempts to repair the liner hole discovered on June 4, 2011 were unsuccessful and, consequently, the flow rate increased to 35,000 gallons per minute. This created another vortex by the toe of the slope of the impoundment, meaning the pressure being exerted on the gypsum walls of the impoundment threatened catastrophic failure.

**158.**   On June 7, 2011, FDEP required HRK to perform a controlled breach to the NGS-S, specifically an area identified as the "OGS-S stormwater ditch and dike system," to relieve stack pressures onsite, and to prevent an uncontrolled loss of containment from the stack system to offsite property and Buckeye Road, located south of Piney Point.

159.  HRK conducted the controlled breach as FDEP required, which caused the immediate and continuous discharge of untreated wastewater into nearby surface water. This discharge occurred continuously until it was ceased on June 16, 2011.

160.  Through the controlled breach, FDEP required HRK to discharge at least 169 million gallons of wastewater, consisting of dredged seawater mixed with process wastewater, into Tampa Bay.

161.  That discharge contained significant amounts of phosphorus and cadmium.

162.  That discharge helped trigger a harmful algae bloom in Bishop Harbor in 2011.

163.  That discharge contributed to a harmful algae bloom in Bishop Harbor in 2011.

164.  Following the breach and discharge, FDEP and Ardaman inspected the liner at the NGS-S and identified 29 stress cracks in the liner.

165.  In October 2011, an additional five stress cracks in the liner of the NGS-S were identified and disclosed to FDEP.

166.  Ardaman concluded that a tear at the edge of the extrusion weld in the southwest corner of the NGS-S propagated, and the leakage found its way through preexisting preferential flow paths at the base of the reservoir into the foundation sand and/or earthen starter dike 12-15 feet below, inducing erosion of the sandy soils under the elevated hydraulic head in the reservoir.

FIRST AMENDED COMPLAINT          45
*Case No. 8:21-cv-1521*

167.   FDEP, HRK, and MCPA knew, or should have known through the exercise of reasonable care and due diligence, that the stress cracks identified by Ardaman meant the integrity of the HDPE liner and foundational subsurface were seriously compromised and at risk of failure.

168.   HRK completed grouting and repair operations to the phosphogypsum stack system and its impoundments by July 19, 2011, and the dredging project was allowed to resume thereafter.

169.   The Berth 12 dredging project was completed on October 21, 2011. An estimated 1,170,000 cubic yards of dredged material was initially placed into Piney Point as a result of the Berth 12 project.

170.   Dredged materials placed by MCPA, FDEP, and HRK into Piney Point's lined impoundments have been leaking, leaching, and otherwise moving down through the HDPE liner and into the phosphogypsum material underlaying the liner.

171.   This leaking, leaching, and downward movement of dredged materials has been continuous and ongoing since the completion of the Berth 12 dredging project on October 21, 2011.

172.   Since October 21, 2011 MCPA has routinely transported and placed additional, newly-dredged materials from maintenance dredging of Port Manatee into Piney Point. It is estimated that each three-year dredging maintenance cycle

produces an additional 300,000 cubic yards of dredged material that is transported

and disposed of by MPCA into Piney Point.

173.    The dredged materials pass through the liner at the locations where the HDPE

liner has become compromised, such as through tears, rips, cracks, broken seams,

and other areas where the liner is no longer structurally intact.

174.    When the dredged materials pass through the HPDE liner, they mix,

comingle, and/or interact with the phosphogypsum stack and process wastewater in

such a manner that creates a leachate waste that satisfies all requirements for being

regulated as hazardous waste under RCRA. 42 U.S.C. § 6903(5); 40 C.F.R. Part 261,

Subparts B & C. In particular:

> a.   The leachate waste created through the comingling and/or mixing of
>
>       dredged material and phosphogypsum waste and related process
>
>       wastewater exhibits the "characteristic of ignitability" under 40 C.F.R. §
>
>       261.21;
>
> b.   The leachate waste created through the comingling and/or mixing of
>
>       dredged material and phosphogypsum waste and related process
>
>       wastewater exhibits "characteristics of corrosivity" under 40 C.F.R. §
>
>       261.22;
>
> c.   The leachate waste created through the comingling and/or mixing of
>
>       dredged material and phosphogypsum waste and related process

FIRST AMENDED COMPLAINT          47
*Case No. 8:21-cv-1521*

wastewater exhibits "characteristics of reactivity" under 40 C.F.R. §

261.23; and

  d. The leachate waste created through the comingling and/or mixing of

dredged material and phosphogypsum waste and related process

wastewater exhibits "characteristics of toxicity" under 40 C.F.R. §

261.24.

175. HRK filed for bankruptcy on June 27, 2012, after the Port Manatee expansion

and dredging project was complete.

176. Beginning in August 2012, HRK, under the supervision of FDEP, transferred

72-107 million gallons of process water from NGS-N to NGS-S, followed by

subsequent smaller transfers.

177. HRK emerged from bankruptcy March 20, 2017.

*Piney Point Continues to Deteriorate, Presenting an Imminent and Substantial Endangerment*
*to Floridians and the Environment*

178. On or about March 13, 2020, an engineering firm hired by HRK again warned

FDEP in writing of serious problems with the integrity of the site and its HDPE

liner.

179. Glen Anderson, an engineer with Wood Environmental & Infrastructure

Solutions ("Wood"), explained that the risk of an uncontrolled release or breach

from the site was elevated due to the deteriorating liner conditions above the water

line, compromised conditions below the water line, and voids in the dikes that hold the water at the NGS-S impoundment.

180.  This letter and warning from Wood were provided to FDEP in direct response to FDEP's request for an annual inspection of the system.

181.  FDEP claimed in its May 15, 2020 response to the Wood letter that the Piney Point system "is generally in good condition[.]"

182.  On or about March 25, 2021, HRK reported to FDEP increased flow and conductivity measurements in the drains that surround the phosphogypsum impoundments.

183.  HRK's report to FDEP indicated that over a 24-hour period, flow in the buried seepage interceptor drains increased over 30 gallons per minute ("gpm") without any associated rainfall.

184.  HRK's report to FDEP also indicated that conductivity measurements from the drain system had gone up from previous readings of up to 6,800 umhos/cm$^2$ to readings of up to 9,960 umhos/cm on March 25, 2021.

185.  FDEP conducted a site visit on March 25, 2021. Based on the reported readings and the site visit on March 25, 2021, FDEP concluded that the NGS-S compartment was leaking below the water level in the impoundment.

---

[2] Conductivity is a measure of water's capability to pass electrical flow. The amount of electrical flow that water can pass is a function of the concentration of ions in the water. It is measured in "umhos/cm," which measures electrical resistance (the ohm) over a set distance (the centimeter).

FIRST AMENDED COMPLAINT          49
*Case No. 8:21-cv-1521*

**186.**   At that time, FDEP estimated the volume of wastewater in the NGS-S compartment to be approximately 480 million gallons.

**187.**   HRK thereafter began transferring water from the 10-acre lined process water sump (the LPWS) overnight in order to accommodate the increased drains flows that are routinely pumped from the NGS-S drains to the LPWS.

**188.**   On March 26, 2021, FDEP determined that the increased flow in the interceptor drains showed that leakage emanating from the NGS-S compartment was being intercepted by the buried silica-gravel drain system that surrounds the system.

**189.**   The drain conductivity on March 26, 2021 was 10,520 umhos/cm, and the drain flow had increased to 215 gpm.

**190.**   The drain conductivity of 10,520 umhos/cm is evidence that wastewater had leaked, leached, or otherwise moved below the HDPE liner at the NGS-S.

**191.**   The following image depicts drain flows and conductivities at the time:



**192.**   On March 26, 2021 HRK began discharging wastewater from Piney Point into Piney Point Creek.

**193.**   Discharges were at a rate of 10,000 to 13,000 gpm.

FIRST AMENDED COMPLAINT          50
*Case No. 8:21-cv-1521*

**194.**   On March 27, 2021 drain conductivity increased to 11,440 umhos/cm, and the drain flow from the interceptor drain increased to 216 gpm.

**195.**   The drain conductivity of 11,440 umhos/cm is evidence that wastewater had leaked, leached, or otherwise moved below the HDPE liner at the NGS-S.

**196.**   On March 28, 2021 drain flow increased to approximately 236 gpm, and conductivity increased to 13,480 umhos/cm. HRK reported to FDEP significantly increases in drain flows at "Structure No. 1," in response to the increased pumping.

**197.**   The drain conductivity of 13,480 umhos/cm is evidence that wastewater had leaked, leached, or otherwise moved below the HDPE liner at the NGS-S.

**198.**   The drain conductivity of 13,480 umhos/cm identified on March 28, 2021 was approaching the conductivity of the wastewater in the NGS-S impoundment.

**199.**   On March 28, 2021, FDEP and HRK reported that a "boil," or an upwelling of water, had been observed along the east wall of the NGS-S.

**200.**   HRK placed an earthen berm to provide initial containment within the stormwater ditch, through which contamination was seeping.

**201.**   The presence of a "boil" along the east wall of the NGS-S is evidence that the structural integrity of the NGS-S was compromised.

**202.**   The presence of a "boil" along the east wall of the NGS-S is evidence that wastewater had leached, leaked, or otherwise moved below the HDPE liner in the NGS-S.

FIRST AMENDED COMPLAINT         51
*Case No. 8:21-cv-1521*

203.   On March 29, 2021, FDEP reported that there was continuous pumping from the drains around the NGS-S and that the presence of "boils/openings and associated releases" from the drain system into the east and north stormwater ditches meant there was an increase in total drain rates.

204.   At the location of the drain cleanouts at the northwest corner of the phosphogypsum stack system, the water was "pressurized" and discharging at a rate of 50-100 gpm.

205.   The leakage in this vicinity of the property was outside of the containment berms. That polluted water was discharging directly into Piney Point Creek. Piney Point Creek discharges directly into Tampa Bay.

206.   The presence of additional boils/openings and associated releases of "pressurized" water discharging from the drain cleanouts is evidence that the structural integrity of the NGS-S was compromised.

207.   The presence of additional boils/openings and associated releasees of "pressurized" water discharging from the drain cleanouts is evidence that wastewater had leached, leaked, or otherwise moved below the HDPE liner in the NGS-S.

208.   Additionally, on March 29, 2021, FDEP and HRK reported that the toe of the stack had been pressurized along the east and north walls of the NGS-S. This pressurizing had caused "bulging" of the toe.

209.   The "bulging" of the toe of the impoundment is evidence that wastewater had

FIRST AMENDED COMPLAINT          52
*Case No. 8:21-cv-1521*

leached, leaked, or otherwise moved beneath the HDPE liner at the NGS-S.

210. To address the issue, HRK punctured relief holes through the soil and the liner.

211. On March 30, 2021, FDEP indicated that the "pressurized" discharge point had increased to 100 gpm and continued to discharge into Piney Point Creek.

212. On March 30, 2021, along the northern wall of the NGS-S, HRK's engineer reported that pressure on the wall continued to build despite the drilling of relief holes.

213. On March 30, 2021, HRK and FDEP reported increased flows from the boils/openings in the stormwater ditch system along the east and northern toe of the NGS-S impoundment.

214. On March 30, 2021, HRK and FDEP reported that pressure was returning along the north wall despite the drilling of relief holes on March 29, 2021. As such, HRK chose to drill more relief through the soil and liner in the east wall toe ditch to try to relieve additional pressure.

215. On March 30, 2021, at approximately 2 pm EST, HRK began discharging wastewater from the NGS-S into Port Manatee via one of two available siphon lines.

216. Piney Point's discharge into Tampa Bay at Port Manatee started with an initial discharge rate of 11,000 gallons per minute.

**217.** On March 31, 2021, FDEP and HRK reported that the seepage collection system at Piney Point continued to be pressurized with underground water flow, causing heaving of the surface water collection ditch and liner system along the east side of the NGS-S and the north side of the NGS-N. This caused additional discharge of process water from Cleanout Number 3 into Piney Point Creek.

**218.** On March 31, 2021, FDEP and HRK also reported that the liner along the eastern stormwater ditch was bulging from pressure within the seepage collection system.

**219.** On March 31, 2021, FDEP and HRK reported that there were currently three boils and openings in the liner along the stormwater ditch. The first one was seen on the east face and two were created on the northeast quadrant to relieve pressure from the toe of the impoundment. Two other relief holes were drilled and were flowing under a static flow condition.

**220.** On March 31, 2021, HRK staff reported that the flow of wastewater from cleanout #3 to Piney Point Creek was still estimated to be around 100 gpm. The water chemistry had a conductivity of 19,240 umhos/cm along with a pH of 5.11 s.u.[3]

---

[3] In chemistry, pH is used to measure the acidity or basicity of an aqueous solution. Acidic solutions have a lower pH. The pH scale is logarithmic and inversely indicates the concentration of hydrogen ions in a given solution.

FIRST AMENDED COMPLAINT          54
*Case No. 8:21-cv-1521*

221.   Water chemistry of a conductivity of 19,240 umhos/cm and a pH of 5.11 s.u. is similar to the process wastewater stored at Piney Point.

222.   On April 1, 2021, HRK attempted to stop the discharge to Piney Point Creek from cleanout #3. While the flow was temporarily mitigated, it became backed up and began discharging out of cleanout #5.

223.   On April 1, 2021, HRK made additional "relief punctures" along the east lined stormwater ditch to relieve pressure from the seepage collection system and the toe of the stack.

224.   On April 1, 2021, the original "boil" on the eastern wall of the NGS-S was still active.

225.   On April 1, 2021, HRK made five additional punctures along the east face of the stack, and pressurized flow was still being observed along the east storm water ditch.

226.   On April 1, 2021, FDEP and HRK reported that the "south walls" of the OGS-S and NGS-S compartments "appear to be retaining structural integrity at this time."

227.   On April 1, 2021, FDEP and HRK knew that the north and east walls of the OGS-S and NGS-S compartments had compromised structural integrity.

FIRST AMENDED COMPLAINT          55
*Case No. 8:21-cv-1521*

**228.**   On April 1, 2021, the wastewater that was being pumped from the NGS-S and LPWS into "Structure No. 1" had a conductivity of 16,890 umhos/cm, along with a pH of 4.10 s.u.

**229.**   Water chemistry of a conductivity of 16,890 umhos/cm and a pH of 4.10 s.u. is similar to the process wastewater stored at Piney Point.

**230.**   On April 1, 2021, HRK reported that flow to Piney Point Creek from the facility had temporarily ceased.

**231.**   On April 2, 2021, HRK reported that flow of process wastewater into Piney Point Creek had resumed at a rate of 40-50 gpm.

**232.**   On April 2, 2021, there were four new boils along the eastern stormwater ditch from the stack. Boil numbers "6, 7, and 9 and the original boil" were all "still bubbling" at the time. Boils 4 and 5 were also activity running.

**233.**   On April 2, 2021, concentrated seepage was identified by HRK and FDEP "at the southern third of the NGS-S stack eastern wall, located at approximately 30 NGVD."

**234.**   The presence of concentrated seepage at the NGS-S stack eastern wall is evidence that wastewater had leached, leaked, or otherwise moved beneath the HDPE liner at the NGS-S.

**235.**   The presence of concentrated seepage at the NGS-S stack eastern wall is evidence that the structural integrity of the NGS-S was compromised.

FIRST AMENDED COMPLAINT          56
*Case No. 8:21-cv-1521*

**236.**   On April 2, 2021, Manatee County Emergency Management issued mandatory evacuation orders for Buckeye Road, Bud Rhoden Road, Chimichanga Pathway, 31st Terrace E, and Onell Road, all in Palmetto.

**237.**   On April 3, 2021, FDEP and HRK reported that the concentrated seepage located on the eastern wall, southern third of the NGS-S "widened overnight."

**238.**   On April 3, 2021, FDEP and HRK reported that, at approximately 11:20 AM, the "seepage outbreak about a third way up the slope" continued, and that the "southern portion of the NGS-S dam (where the seepage is occurring) has shifted by approximately 10 feet."

**239.**   Consequently, on April 3, 2021, FDEP and HRK evacuated Piney Point.

**240.**   That the southern portion of the NGS-S dam had shifted 10 feet by April 3, 2021 is evidence that the NGS-S impoundment had compromised structural integrity.

**241.**   That the southern portion of the NGS-S dam had shifted 10 feet by April 3, 2021 is evidence that wastewater had leached, leaked, or otherwise moved beneath the HDPE liner at the NGS-S.

**242.**   On April 4, 2021, discharges from Piney Point into Port Manatee continued.

**243.**   By April 5, 2021, HRK and FDEP reported that the two siphons discharging wastewater from the NGS-S into Port Manatee were running at 24,000 gallons combined per minute.

FIRST AMENDED COMPLAINT          57
*Case No. 8:21-cv-1521*

**244.** On April 5, 2021, HRK and FDEP reported that they could no longer observe the boils along the NGS-S walls due to safety concerns and site conditions.

**245.** By April 5, 2021, FDEP took emergency efforts to address uncontrolled flooding from the northern toe of the NGS-N.

**246.** Uncontrolled flooding at the toe of wastewater impoundment is evidence that the impoundment's structural integrity is compromised.

**247.** At some point between April 5 and April 10, 2021, HRK utilized a remotely operated vehicle within the NGS-S to identify the source of the leak.

**248.** That remotely operated vehicle identified the source of the leak to be a ruptured seam in the HDPE liner, namely Seam 21.

**249.** HRK attempted to repair that leak by placing a 10 ft. x 10 ft., one-inch thick steel plate on top of Seam 271.

**250.** Discharges of wastewater from Piney Point to Port Manatee continued non-stop through April 9, 2021.

**251.** The total amount of wastewater discharged from Piney Point to Tampa Bay is approximately 215 million gallons.

**252.** On April 14, 2021, FDEP and HRK reported that the flow coming from the concentrated seepage location had finally ceased.

**253.**   On April 14, 2021, FDEP and HRK reported that "upwelling" was occurring in the areas where the relief boils drilled into the east side of the seepage collection system. One boil was observed, and the flow velocities had slightly increased.

**254.**   The upwelling identified on April 14, 2021 is evidence that the structural integrity of the NGS-S was compromised.

**255.**   On April 15, 2021, FDEP and HRK reported that upwelling continued on the east side of the seepage collection system, and that flow velocities remained constant from April 13, 2021 onward, demonstrating that the steel plate installed at Seam 271 was not a permanent solution.

**256.**   In fact, on April 13, 2021, FDEP reported that it had discovered "a small detachment underneath" the steel plate placed over Seam 271. This "small detachment" caused additional seepage to move out of the NGS-S.

**257.**   FDEP reported that "low-level" flow continued from the location where the steel plate was placed. Upon information and belief, flow continues to date.

**258.**   On April 17, 2021, FDEP stated that water quality testing in the localized area where discharges occurred showed "bloom conditions" along with trace levels of cyanotoxins.

**259.**   By April 20, 2021, FDEP reported that the upwelling continued on the east side of the seepage system, and that flow velocities continued to remain constant.

FIRST AMENDED COMPLAINT          59
*Case No. 8:21-cv-1521*

260. On April 22, 2021, FDEP identified red tide conditions in lower Tampa Bay, southwest of the Manatee River.

261. On April 23, 2021, FDEP began placing "stone aggregate" underneath the steel plate covering the liner seam separation on the east wall of the NGS-S impoundment.

262. The purpose of this aggregate was to slow the flow of wastewater out of the impoundment.

263. Beginning in April 2021, FDEP "methodically" relocated water among the lined storage basins onsite to "safely manage water, respond to rainfall events and prepare for water treatment."

264. FDEP's relocation of water among and between lined storage basins demonstrates FDEP's role as an operator of Piney Point and its wastewater treatment and storage system.

265. By April 29, 2021, FDEP reported that FDEP and its dive teams determined that no further additions of stone aggregate were necessary, and that "flow continues to be minimized" as a result of the repairs. Flows had not ceased, however, at that time.

266. On April 30, 2021, FDEP placed a layer of geo-composite material over the steel plate at the NGS-S impoundment. FDEP stated that this material will "further

stabilize the liner seam-separation." On May 1, 2021, FDEP called this a "temporary repair."

**267.**   On May 11, 2021, FDEP decided to add sand around the liner separation at Seam 271 in an attempt to continue to minimize leakage from the NGS-S. The image below was reported by FDEP on May 12, 2021, showing sand being "incorporated" in the NGS-S impoundment.



**268.**   Despite the addition of the sand, seepage continued to leak through the HDPE liner.

**269.**   By May 16, 2021, FDEP reported that it had placed 7,100 cubic yards of sand in the NGS-S compartment in an attempt to reduce the leaking of material through the HDPE liner. The image below was publicly reported by FDEP on May 16, 2021,

and shows the amount of sand FDEP dumped into the NGS-S in an attempt to stop the seepage:



270.    On May 24, FDEP reported that it concluded its placement of sand into the NGS-S, eventually putting approximately 16,400 cubic yards of sand into the impoundment in an attempt to stop the seepage of wastewater through the HDPE liner.

271.    Despite FDEP's efforts to stop the leak, wastewater within the NGS-S continues to seep through the liner breach at Seam 271.

272.    Wastewater that leached, leaked, seeped, or otherwise moved below the HDPE liner at Seam 271 mixed and comingled with the phosphogypsum stack and process wastewater underlying the HDPE liner.

FIRST AMENDED COMPLAINT          62
*Case No. 8:21-cv-1521*

273.   Wastewater that continues to leach, leak, seep or otherwise move below the HDPE liner at Seam 271 continues to mix and comingle with the phosphogypsum stack and process wastewater underlying the HDPE liner.

274.   As recently as June 4, 2021, FDEP publicly stated that it continues its work at Piney Point, including its oversight of FDEP and HRK efforts to manage water within the impoundments and prepare for upcoming precipitation.

275.   FDEP publicly stated in a June 4, 2021 letter to HRK that the repair work completed in the NGS-S compartment was "temporary" and does not bring Piney Point into regulatory compliance.

*The Discharges From Piney Point Contribute to Harmful Algae Blooms*

276.   It is estimated that the Piney Point discharge put 100 tons of phosphorous and 205 tons of nitrogen into Tampa Bay.

277.   Lower Tampa Bay has received less than 200 tons of nitrogen per on year on average since 2005.

278.   The nitrogen from the Piney Point discharge was at a concentration of 230 mg/l, significantly higher than the worst performing wastewater treatment plant in the region. The nitrogen from the Piney Point discharge was also more volatile and biologically active than the nitrogen that typically enters Tampa Bay, meaning that the nitrogen from the Piney Point discharge was more readily available for consumption by the algae that leads to HABs.

FIRST AMENDED COMPLAINT        63
*Case No. 8:21-cv-1521*

**279.**   Nitrogen and phosphorous provide nutrients that cause an overabundance of red tide, therefore nutrient pollution from nitrogen and phosphorous makes red tide much worse, causing it to bloom longer and more densely.

**280.**   Red tide substantially intensified within Tampa Bay shortly after the Piney Point discharge event.



**281.**   The discharges of nutrient-laden wastewater from Piney Point have contributed and are contributing to Harmful Algae Blooms or "HABs," in and near Tampa Bay.

**282.**   HABs occur when too many nutrients exist within a marine environment, causing the rapid growth of algae, such as cyanobacterial "blue-green algae" and *Karenia brevis*, or "red tide." As the algae blooms, it depletes the oxygen in the marine environment, threatening other marine species. The algae can also release harmful toxins that cause illness in humans and animals.

283.   According to the Centers for Disease Control and Prevention, cyanotoxin exposure can cause conjunctivitis, rhinitis, earache, sore throat, and swollen lips. Respiratory effects can include atypical pneumonia and a hay fever-like syndrome. Exposure can also cause electrolyte imbalances, headache, malaise, and muscle weakness/ pain in joints and limbs.

284.   Similarly, red tide produces a neurotoxin called brevetoxin, which can cause respiratory irritation, coughing, and more serious illness for people with severe or chronic respiratory conditions such as emphysema or asthma. It can also cause neurotoxic shellfish poisoning if consumed in oysters and clams.

285.   Red tide abundance of less than 1,000 cells per liter is interpreted to mean there is no red tide present, or that it is present at "background" levels. Red tide abundance of 1,000-10,000 cells/L is considered "very low," but can lead to possible respiratory irritation and shellfish harvesting closures.

286.   Red tide abundance of 10,000-100,000 cells/L is considered "low," 100,000-1,000,000 cells/L is considered "medium," and above 1,000,000 cells/L is considered "high," but at all three levels can cause respiratory irritation, shellfish harvesting closures, and fish kills.

287.   In 2017-2019, a major red tide event occurred in Southwest Florida. The 5-county region of Sarasota Bay and Tampa Bay experienced devastating effects including the killing of thousands of fish, injured dolphins and manatees, and

FIRST AMENDED COMPLAINT          65
*Case No. 8:21-cv-1521*

resulted in a major economic downturn for an economy partially fueled by tourism dollars.

288.    The blend of acidic and nutrient-laden pollution discharged from Piney Point contributes to the likelihood that HABs will result.

289.    The blend of acidic and nutrient-laden pollution discharged from Piney Point in 2021 is presently contributing to HABs in Tampa Bay.

290.    FDEP sampling in response to the Piney Point wastewater discharge shows algae was detected in 12 water samples taken in Tampa Bay from April 8-14, 2021, according to an FDEP blue-green algae report. Some samples have also contained trace levels of cyanotoxins.

291.    On May 26, 2021, aquaculture (oyster) farming was closed in the area due to red tide concerns.

292.    On June 3, 2021, Hillsborough County issued a health advisory for the area near Piney Point due to red tide blooms detected in the area.

293.    During the week of June 9, 2021, red tide was detected in bloom concentrations of greater than 100,000 cells/liter in Pinellas, Manatee, and Hillsborough counties, and fish kills suspected to be related to red tide were reported in the same counties.

294.    In June 2021, a *Lyngbya* bloom was identified in Anna Maria Sound and in Upper Sarasota Bay.

FIRST AMENDED COMPLAINT          66
*Case No. 8:21-cv-1521*

295.   *Lyngbya* is a cyanobacteria that can cause skin irritation and potentially lethal if ingested, even indirectly by eating fish that have fed on *Lyngbya*.

296.   As *Lygnbya* decomposes it removes oxygen from the water, leading to fish kills.

297.   The red tide currently blooming in the lower and middle Tampa Bay has not been in such high concentrations in 50 years.



298.   Since Plaintiffs filed their original complaint on June 4 (Dkt. 1), the red tide situation in Tampa Bay has become extreme. More than 1,450 tons of dead fish have been removed throughout the Tampa Bay and Sarasota Bay estuaries and beaches along the Gulf Coast and endangered manatees dying from red tide. The image below is available to the public on the Florida Fish and Wildlife Conservation Commission and depicts the current presence of red tide in the Tampa Bay and Sarasota Bay areas.

FIRST AMENDED COMPLAINT          67
*Case No. 8:21-cv-1521*





Red Tide Status Map (July 21, 2021)

299.  The 2021 discharges from Piney Point have contributed and are contributing to the HABs and *Lyngbya* bloom presently occurring in and around Tampa Bay.

*Facts Concerning Clean Water Act Violations*

FIRST AMENDED COMPLAINT          68
*Case No. 8:21-cv-1521*

**300.**   On October 29, 1999, acting under its delegation of authority from EPA of the NPDES program, FDEP issued NPDES Wastewater Permit No. FL0000124-001 to Piney Point Phosphates, Inc., the previous corporate owner of Piney Point. That permit had an expiration date of March 25, 2001.

**301.**   On September 22, 2000, Piney Point Phosphates, Inc. submitted an application for renewal of that permit. On December 4, 2000, FDEP denied the permit's renewal. Piney Point Phosphates, Inc. subsequently filed two extensions for its deadline to file an administrative appeal from FDEP's denial decision, but never filed an administrative appeal. Piney Point Phosphates, Inc. declared bankruptcy on February 8, 2001.

**302.**   NPDES Wastewater Permit No. FL0000124-001 expired on March 25, 2001.

**303.**   By the date of the filing of Plaintiffs' first amended complaint FDEP has never renewed NPDES Wastewater Permit No. FL0000124-001.

**304.**   FDEP has never lawfully issued NPDES permit for the discharge of pollutants from Piney Point to any owner or operator of Piney Point since March 25, 2001.

**305.**   Neither FDEP nor HRK possess a lawfully issued NPDES permit for point source discharges from Piney Point.

**306.**   In the absence of a lawfully-issued NPDES permit, any discharge of any pollutant from a point source at Piney Point to navigable waters is in violation of the Clean Water Act, 33 U.S.C. § 1311(a).

307.    In the absence of a lawfully-issued NPDES permit, each and every discharge from each and every point source at Piney Point violates the Clean Water Act. Upon information and belief, such discharges are ongoing and continuous.

308.    Upon information and belief, between March 26 and April 9, 2021, HRK discharged approximately 215 million gallons of wastewater from Piney Point through multiple point sources into Tampa Bay, a navigable water (hereinafter referred to as the "2021 Discharge."

309.    HRK and FDEP knew, or should have known through the exercise of due diligence and reasonable care, that the impoundments at Piney Point were incapable of retaining all of the precipitation falling onto the site, in addition to the millions of gallons of process wastewater and dredged material stored at Piney Point.

310.    The 2021 Discharge follows a pattern of unlawful discharges from Piney Point. Similar voluminous discharges from Piney Point occurred in 1998, 2001, 2003, and 2011.

311.    FDEP and HRK were aware for at least the year prior to the 2021 Discharge that the impoundments at Piney Point were fast approaching their maximum storage capacity. In a February 2, 2021 public presentation, HRK explained that Piney Point was quickly losing its ability to safely retain precipitation and process wastewater. The presentation concluded that, "[b]ased on current water volumes, action is needed ASAP."

312.   There is no method utilized by FDEP or HRK to safely handle and lawfully dispose of the process wastewater and precipitation at Piney Point. Previous systems, such as spray evaporation, have proved inadequate. Thus, it is reasonably certain and foreseeable that unlawful discharges from Piney Point without an NPDES permit will recur in the future.

313.   On July 7, 2021, with Hurricane Elsa impacting Tampa Bay, Manatee County Administrator Dr. Scott Hopes stated that Piney Point was pumping precipitation falling onto Piney Point into the county's stormwater system, further demonstrating that the wastewater infrastructure at Piney Point is incapable of retaining precipitation.

314.   *In the alternative*, if the Court determines that a document titled "Administrative Agreement" between FDEP and HRK dated January 28, 2021 is a lawfully-issued NPDES permit under the Clean Water Act and all applicable federal regulations as required under EPA's 1995 delegation of the NPDES program to the State of Florida, then the 2021 Discharge violated its terms. The discharges were not authorized in the amounts or at the point sources from which discharges occurred and were not a lawful "bypass" under F.A.C. 62-620.610(22)(a), 40 C.F.R. § 122.41(m)(4), 40 C.F.R. § 123.25(a)(12), or FLORIDA STAT. § 403.0885 ("[t]he provisions governing upset and bypass conditions contained in 40 C.F.R. § 122.41 shall apply to the state National Pollutant Discharge Elimination System

FIRST AMENDED COMPLAINT          71
*Case No. 8:21-cv-1521*

Program") because there were feasible alternatives to the 2021 Discharge, and because HRK never provided prior notice to FDEP that there were "no feasible alternatives to the bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal periods of equipment downtime."

315.   On March 13, 2020, HRK's environmental engineer, Wood, provided a letter to FDEP explaining that a "higher annual discharge rate" would be required to keep Piney Point's impoundments below their maximum operating level. Wood recommended that HRK and FDEP institute a series of alternatives to draw down the level of the ponds, "[g]iven the proximity of the upcoming tropical hurricane season, the current pond levels and the potential high risk of an uncontrolled release."

316.   The Administrative Agreement requires Defendant to properly operate and maintain the treatment and disposal facilities at Piney Point. HRK violated and remains in violation of this aspect of the Administrative Agreement because HRK has failed to adequately ensure the operation and maintenance of Piney Point is compliant with the applicable requirements of F.A.C. 62-672 and 62-673. Defendants violated ground and surface water quality standards subsequent to the 2021 Discharge, and those discharges violated the effluent limitations specified in the Administrative Agreement. The discharges were anticipated, the cause known, and yet HRK failed to act with the measures and urgency needed to correct the situation

or ensure proper operation and maintenance of Piney Point's wastewater infrastructure.

## VI.    CAUSES OF ACTION

### COUNT I

### VIOLATION OF THE RESOURCE CONSERVATION AND RECOVERY ACT: IMMINENT AND SUBSTANTIAL ENDANGERMENT

**317.**   Plaintiffs incorporate Paras. 1-6, 10-27, 31-60, and 70-299.

**318.**   Defendant Ron DeSantis is Governor of the State of Florida. He is ultimately responsible for ensuring all agencies under the executive branch of Florida act consistent with federal law, including RCRA.

**319.**   Defendant Shawn Hamilton is the acting Secretary of FDEP. Defendant Shawn Hamilton is responsible for ensuring that all actions taken by FDEP are consistent with federal law, including RCRA.

**320.**   Defendant HRK is a Florida for-profit corporation. Actions taken by HRK at Piney Point are under the direct supervision, oversight, and control of FDEP.

**321.**   Defendant MCPA is an independent political body in the State of Florida. MCPA is subject to RCRA.

**322.**   At all relevant times, Defendants were and are "persons" within the meaning of RCRA, 42 U.S.C. § 6903(15).

**323.**   The phosphogypsum stacks and process wastewater at Piney Point are discarded "solid waste" under RCRA, 42 U.S.C. § 6903(27).

FIRST AMENDED COMPLAINT          73
*Case No. 8:21-cv-1521*

**324.**   When retained at Piney Point, the discarded solid wastes are not industrial discharges which are point sources subject to permits under section 1342 of title 33. 40 C.F.R. § 261.4(a)(2) (Comment: This exclusion applies only to the actual point source discharge. It does not exclude industrial wastewaters while they are being collected, stored or treated before discharge, nor does it exclude sludges that are generated by industrial wastewater treatment.).

**325.**   The dredged material transported by MCPA to Piney Point's HDPE-lined impoundments is discarded "solid waste" under RCRA, 42 U.S.C. § 6903(27).

**326.**   When that dredged material leaks, leaches, or otherwise moves below the HDPE liners at Piney Point, it mixes, comingles, and otherwise interacts with the solid waste located beneath the liners.

**327.**   The dredged material has been leaking, leaching, and otherwise moving below the HDPE liners at Piney Point since at least February 2011.

**328.**   The dredged material has been mixing, comingling, and otherwise interacting with the solid waste located beneath the HDPE liners since at least February 2011.

**329.**   The mixing and comingling of the dredged material with the phosphogypsum waste and process wastewater underneath the HDPE liners has created a new leachate waste that satisfies statutory and regulatory requirements for being characterized as "hazardous waste" under RCRA, 42 U.S.C. § 6903(5); 40 C.F.R. Part 261, Subparts B & C.

**330.**   Because dredged material has mixed, comingled, and otherwise interacted with the phosphogypsum waste and process wastewater and created a new hazardous waste, the hazardous waste exclusion under 40 C.F.R. §§ 261.4(b)(7)(ii)(D), 261.4(b)(7)(ii)(P) is vitiated and no longer applicable.

**331.**   Additionally, the presence of nitrogen and ammonia in the process wastewater at Piney Point demonstrates that wastes from a phosphoric acid production process were comingled with wastes from a monoammonium phosphate and/or diammonium phosphate production process, or some other waste stream not from phosphoric acid production.

**332.**   Monoammonium and/or diammonium phosphate production processes are not within the scope of the Bevill amendment.

**333.**   Comingling of Bevill-exempt phosphoric acid production wastes with wastes from monoammonium and/or diammonium phosphate production processes vitiates the hazardous waste exclusions under 40 C.F.R. §§ 261.4(b)(7)(ii)(D) and 261.4(b)(7)(ii)(P).

**334.**   Comingling of Bevill-exempt phosphoric acid production wastes with any other solid or hazardous waste vitiates the hazardous waste exclusions under 40 C.F.R. 261.4(b)(7).

**335.**   Piney Point is a treatment, storage, and disposal facility for solid waste.

**336.**   Piney Point is a treatment, storage, and disposal facility for hazardous waste.

FIRST AMENDED COMPLAINT          75
*Case No. 8:21-cv-1521*

337.   Defendants are the past and present owners and operators of a treatment, storage, or disposal facility, namely Piney Point.

338.   Defendant HRK is a past and present owner of Piney Point, and is also a past and present operator of Piney Point. 42 U.S.C. § 6972(a)(1)(B).

339.   Defendant HRK has contributed and is contributing to the past and present handling, storage, treatment, transportation, and/or disposal of solid and hazardous waste at Piney Point. Specifically:

   a.   HRK is responsible for the physical operation and maintenance of the wastewater treatment and storage facilities at Piney Point, under the direct supervision of FDEP;

   b.   HRK's handling and storage of solid and hazardous waste resulted in the discharge of millions of gallons of wastewater from Piney Point in April 2021;

   c.   HRK publicly stated that the storage impoundments at Piney Point are incapable of retaining the dredged material and process wastewater at the site, yet failed to take timely corrective action;

   d.   HRK has retained contractors, agents, and engineers that work on, evaluate, and maintain the wastewater infrastructure at Piney Point, as evidenced by, *inter alia*, the Wood Report.

   e.   HRK shares in a measure of control over the solid and hazardous waste

FIRST AMENDED COMPLAINT          76
*Case No. 8:21-cv-1521*

at Piney Point.

340.   Defendant Shawn Hamilton, as Acting Secretary of FDEP and in his official capacity as the chief executive of FDEP, is a past and present owner of Piney Point, and is also a past and present operator of Piney Point. *Id*. Specifically:

    a.   Between 2001 and 2006, FDEP was the real property owner of Piney Point.

    b.   From 2006 to the present, FDEP is a past and present operator of Piney Point. FDEP's status as an "operator" is evidenced by, *inter alia*:

        i.   The original and Amended Agreement between FDEP and HRK, wherein FDEP was expressly allowed to continue its work on its flawed closure plans for Piney Point;

        ii.   FDEP maintained direct control, oversight, and had prior approval over all expenditures of the money HRK deposited into an account for certain activities related to Piney Point;

        iii.   FDEP maintained direct control, oversight, and had prior approval over all actions taken by HRK at Piney Point, including HRK's development plans;

        iv.   FDEP's permitting approvals for the Port Manatee expansion project, express representations[4] made in the Amended

---

[4] *See, e.g.,* Amended Agreement WHEREAS clauses (unnumbered) ("WHEREAS, the storage of dredged materials to be generated by MCPA in a fashion consistent with the Operation and

FIRST AMENDED COMPLAINT            77
*Case No. 8:21-cv-1521*

Agreement with HRK, and representations to the Corps that the

site was suitable for storage of dredged materials from the

expansion project;

v.   FDEP's control of actions by HRK and others concerning the

liner leak, impoundment breach, and massive discharge event in

2011;

vi.   FDEP's involvement, oversight, supervision, and control of

actions by HRK and others concerning the liner leak and massive

discharge event in 2021; and

vii.   FDEP's agreement to limit HRK's mortgage payments and

delaying the maturity date on the mortgage note numerous times.

341.   Defendant Shawn Hamilton, as Acting Secretary of FDEP and in his official

capacity as the chief executive of FDEP, has contributed and is contributing to the

past and present handling, storage, treatment, transportation, and/or disposal of

solid and hazardous waste at Piney Point. In particular:

a.   In both the original and later Amended Agreements between FDEP and

---

Management Plan to be developed and approved under Paragraph 9 below will be compatible with
the design and purpose of the lined reservoirs constructed by the Department and others as part of
the Closure of Phosphogypsum Stacks at the Site and will be of benefit to the Department") & Para.
4 ("the Department hereby agrees to modify the Closure plan by eliminating the planned future
placement of soil cover on the interior lined slopes and bottom areas of the Piney Point
Phosphogypsum Stack System reservoir compartments as referenced in paragraph 3 of this
Amendment and by revising reservoir drainage and outlet structure designs for such
Phosphogypsum Stack System compartments, as part of the work to be performed by the
Department under Section III of the Agreement.").

HRK, FDEP expressly was allowed to continue its work on its flawed closure plans for Piney Point, including site access and construction activities;

b.   Those agreements also made clear that HRK "was not an owner or operator of the Phosphogypsum Stack System or any other part or component at or on the Site;" this is because FDEP was the operator of the Phosphogypsum Stack System;

c.   FDEP maintained direct control, oversight, and had prior approval over all expenditures of money that HRK deposited into an account for certain activities at Piney Point;

d.   FDEP approved permits for the Port Manatee expansion project over the Corps' objection, and represented to the public that the site was suitable for the storage of dredged materials despite having prior notice that other phosphogypsum stacks with single HDPE-liners had experienced substantial liner failures;

e.   FDEP's control, oversight, and direction of actions by HRK and others concerning the liner leak, impoundment breach, and discharge event in 2011;

f.   FDEP's control, oversight, and direction of actions by HRK and others concerning the liner leak, impoundment breach, and discharge event in

FIRST AMENDED COMPLAINT          79
*Case No. 8:21-cv-1521*

2021;

g.  FDEP's agreement to limit HRK's mortgage payments and delay maturity of HRK's mortgage note; and

h.  FDEP's sharing of a measure of control over the solid and hazardous waste at Piney Point.

**342.**   Defendant Governor Ron DeSantis, as Governor of the State of Florida and in his official capacity and the chief executive of the executive branch of the State of Florida, is a past and present owner of Piney Point, and is also a past and present operator of Piney Point. *Id.*

**343.**   As chief executive of the executive branch of the State of Florida, Defendant Ron DeSantis is ultimately responsible for the actions of FDEP and its Secretary.

**344.**   As such, Defendant Ron DeSantis shares in a measure of control over the solid and hazardous waste at Piney Point and has therefore contributed and is contributing to the past and present handling, storage, treatment, transportation, and/or disposal of solid and hazardous waste at Piney Point.

**345.**   Defendant MCPA is a past generator of solid waste and has contributed and is contributing to the past or present handling, storage, transportation, or disposal of solid waste and hazardous waste.

**346.**   In particular, MCPA is a past generator and transporter of solid waste to Piney Point, through the dredging and subsequent disposal of dredged material from

FIRST AMENDED COMPLAINT         80
*Case No. 8:21-cv-1521*

Port Manatee Berth 12 expansion project into Piney Point's HDPE-lined impoundments. 42 U.S.C. § 6972(a)(1)(B).

347.   MCPA shared in a measure of control over the dredged materials entering Piney Point, as evidenced by the DMCA and MCPA's active role in dredging and transporting dredged materials to Piney Point, including subsequent maintenance dredging.

348.   MCPA also shares in a measure of control over the hazardous waste that has since been created consequent to the disposal of dredged material at Piney Point.

349.   MCPA knew or should have known through the exercise of reasonable care and due diligence following the crane collapse in 2011 into one of the HDPE-lined impoundments and the subsequent investigation by FDEP that the liners at Piney Point were in disrepair and incapable of preventing the downward migration of the dredged materials into the underlaying phosphogypsum stack and process wastewater.

350.   MCPA is also contributing to the present handling, treatment, transportation, and disposal of solid and hazardous waste at Piney Point, because the MCPA is planning to dispose of the remaining dredged material and comingled process wastewater into one of Florida's deep aquifers through deep well injection.

351.   Utilizing deep well injection as a means of disposing of the solid and hazardous waste at Piney Point presents an imminent and substantial endangerment

to health and the environment. The hazardous constituents of the waste will interact with otherwise clean groundwater, fouling that water and preventing its beneficial use by Floridians for a variety of purposes, including agriculture.

352.   Defendants' past and present handling, storage, treatment, transportation, and disposal of solid and hazardous waste at Piney Point may, and does, present an imminent and substantial endangerment to health and the environment.

353.   FDEP publicly admitted that Piney Point presents an imminent and substantial endangerment to health and the environment:

> The conditions being reported as of March 29, 2021, appear to indicate an imminent threat of a potential loss of containment and a catastrophic release of from portions of the stack systems and its impoundments... Failure of the NGS-S lined compartment, containing ~ 480 MGal of a mixture of seawater and process water, along with phosphogypsum embankment materials would likely result in flooding. Flooding may occur, either to the south across Buckeye Road, and would require evacuation of residential areas further south of Buckeye Road, or if a failure were to occur along the eastern wall of the NGS-S, it would likely impact property east of the site including a Williams Gas Company natural gas compressor station. An uncontrolled failure and release impacting the integrity of the NGS-S compartment would release the nutrients into freshwater systems leading from the Site prior to the drainage entering Bishop Harbor, an OFW that south and east of the Piney Point Site... The ongoing leak at the Site and the resulting pressures that are impacting the drains surrounding the Site's phosphogypsum stack system could also threaten the integrity of the Stack System along the northern wall at the toe of the NGS-N lined pond that contains an additional 240 MGal of process water. While the conductivity of that water is less than the conductivity of the leaking NGS-S compartment, the water quality in the NGS-N is generally closer to aged process water in its other water quality parameters and presents potentially a greater acute water quality impact to Bishop

FIRST AMENDED COMPLAINT          82
*Case No. 8:21-cv-1521*

Harbor and Tampa Bay, if discharged in an uncontrolled fashion due to failure of the Site's stack system.

354. A catastrophic failure of the impoundments and/or stack system at Piney Point presents an imminent and substantial endangerment to human health and the environment. Such failure would cause the uncontrolled release of hazardous and radioactive pollution, along with significant devastation to public and private property caused by millions of gallons of wastewater being suddenly released from the site. Piney Point is also located in close proximity to Tampa Bay, including Bishop Harbor, and a catastrophic failure will cause incalculably damage to the estuarine and marine ecosystem.

355. Piney Point presents an imminent and substantial endangerment because FDEP has owned and operated the Piney Point site in a manner that has created the endangerment described above, as follows:

    a. FDEP's decision(s) in its closure plan to use single HDPE liners at Piney Point, when FDEP knew or should have known through the exercise of reasonable care and due diligence that such liners had failed at other similar phosphogypsum stacks being monitored by FDEP's own contractor, Ardaman;

    b. FDEP's decision(s) in its closure plan to use single HDPE liners at Piney Point, when FDEP knew or should have known through the exercise of reasonable care and due diligence that the phosphogypsum

FIRST AMENDED COMPLAINT          83
*Case No. 8:21-cv-1521*

stack is not an engineered structure, meaning that it was an inadequate and dangerous foundational material upon which HDPE liners could be placed;

c.  FDEP's decision(s) in its closure plan to use single HDPE liners at Piney Point, when FDEP knew or should have known through the exercise of reasonable care and due diligence that the existing erosional features, vertical cracks, existence of whirlpools, and other information identified in its 2001 Geotechnical Study meant the site was compromised and could not be returned to beneficial use even if HDPE liners were installed;

d.  FDEP's and MCPA's decision(s), permitting, regulatory approval, and representations that the Piney Point site's impoundments, including the NGS-N and NGS-S, were appropriately designed and engineered to store dredged material from the Port Manatee expansion project, especially in light of the Corps' stated concerns;

e.  Liner breaches occurring in 2011 and 2021 caused precipitation, dredged materials, and process wastewater to comingle and intermix with phosphogypsum stack material, creating a leachate that satisfies the statutory and regulatory requirements for classification as a hazardous waste;

FIRST AMENDED COMPLAINT        84
*Case No. 8:21-cv-1521*

f.  FDEP's decision(s) to continue to approve the use of Piney Point for the storage of dredged materials when FDEP knew, or should have known through the exercise of reasonable care and due diligence, that the site presented unacceptable risks of failure; and

g.  FDEP and HRK's knowledge that the monitoring wells at Piney Point have shown consistent violations of the regulatory groundwater quality standards and demonstrate that dangerous levels of pollution have migrated into the underlying aquifer, putting the environment and human health at grave risk.

h.  FDEP and MCPA's current plan for addressing the remaining process wastewater and other pollution at the site calls for injecting that pollution deep into Florida's aquifer through deepwell injection. This plan presumes that the process wastewater and other pollution is exempt hazardous waste, which it is not. Deepwell injection of RCRA hazardous wastes presents an imminent and substantial endangerment to the environment because such hazardous waste will irreparably contaminate the aquifer.

356.  Piney Point also presents an imminent and substantial endangerment by releasing, leaking, leaching, or otherwise causing solid and hazardous waste to enter

groundwaters, where it is then transported off-site into nearby groundwaters and the underlying aquifer.

357.   Past and present groundwater sampling results from the monitoring wells indicates significant levels of pollution – in excess of regulatory groundwater quality standards – are being released from Piney Point into the underlying aquifer, where it impacts both the environment and human health.

358.   Upon information and belief, residents and businesses located in close proximity to Piney Point utilize the underlying aquifer for drinking water, irrigation water, and other uses. The wells these residents and businesses use to draw groundwater have been impacted and contaminated to unsafe levels.

359.   Additionally, groundwater contamination levels at the Piney Point site, and down-gradient and off-site from the border of Piney Point's property, have contamination levels that exceed the maximum safe consumption limits established under state and federal law, further creating an imminent and substantial endangerment to public health and the environment.

360.   Piney Point also presents an imminent and substantial endangerment consequent to the 2021 discharge of approximately 215 million gallons of dredged material, process wastewater, and other nutrient-laden pollution into Tampa Bay.

361.   The dredged material, process wastewater, and nutrient-laden water was discharged by HRK directly into Tampa Bay on FDEP's authority and order.

FIRST AMENDED COMPLAINT          86
*Case No. 8:21-cv-1521*

362.   The discharge of such nutrient-laden water creates an environment in which harmful algae will thrive. The harmful toxins produced as a result of this algae bloom threatens severe human health consequences, as well as harm to the environment, as evidenced by the large quantity of marine wildlife that is killed during red tide events – wildlife such as fish, manatees, and dolphins. *See* 40 C.F.R. § 257.1 (defining "which solid waste disposal facilities and practices pose a reasonable probability of adverse effects on health or the environment"); 40 C.F.R. § 257.3-2 (prohibiting solid waste disposal practices which cause or contribute to a taking of a threatened or endangered species or resulting in destruction or adverse modification of critical habitat).

363.   Pursuant to RCRA Section 7002, Defendants are subject to an injunction under RCRA ordering them to cease and abate any past or present handling, storage, treatment, and/or transportation of any solid waste or hazardous waste that may present an imminent and substantial endangerment to health and/or the environment.

364.   Plaintiffs' interests and Plaintiffs' members' constitutionally-protected interests are injured and will continue to be injured by this imminent and substantial endangerment and by Defendants' failure to abate the endangerment unless the Court grants the relief herein sought.

FIRST AMENDED COMPLAINT          87
*Case No. 8:21-cv-1521*

## COUNT II

## VIOLATIONS OF THE CLEAN WATER ACT: UNPERMITTED DISCHARGES

**365.**   Plaintiffs incorporate Paras. 1-40, 61-69, 276-313.

**366.**   Plaintiffs and Defendants are "person[s]" under the Clean Water Act, 33 U.S.C. § 1362(5).

**367.**   The discharge of pollutants from point sources without a lawfully-issued NPDES permit authorizing such discharges violates the Clean Water Act. 33 U.S.C. § 1311(a).

**368.**   There is no lawfully-issued NPDES permit for point source discharges from Piney Point.

**369.**   In the absence of a lawfully-issued NPDES permit, each and every discharge from each and every point source at Piney Point violates the Clean Water Act, 33 U.S.C. § 1311(a). Upon information and belief, such unlawful discharges have occurred daily and continuously for at least the past five years and sixty days.

**370.**   The wastewater discharged during the 2021 Discharge contains "pollutant[s]" under the Clean Water Act. 33 U.S.C. § 1362(6).

**371.**   The 2021 Discharge amounted to the "discharge of a pollutant" and "discharge of pollutants" under the Clean Water Act, because it added pollutants to navigable waters from point sources. 33 U.S.C. § 1362(12).

372.   The outfalls from which wastewater was discharged during the 2021 Discharge are "point sources" under the Clean Water Act, because they are discernible, confined, and discrete conveyances from which pollutants are and may be discharged. 33 U.S.C. § 1362(14).

373.   All discharges from Piney Point since May 17, 2016 to navigable waters without an NPDES permit are violations of the Clean Water Act. The various outfalls from which wastewater has been discharged to Tampa Bay are "point sources" under the Clean Water Act, because they are discernible, confined, and discrete conveyances from which pollutants are and may be discharged. 33 U.S.C. § 1362(14).

374.   Tampa Bay, Bishop Harbor, and all other waters into which discharges occurred are "navigable waters" subject to the Clean Water Act because they are waters of the United States.

375.   Defendants HRK and FDEP are the owner and operator of Piney Point and its point sources.

376.   Defendants HRK and FDEP and are jointly and severally liable under the Clean Water Act for the unpermitted discharge of pollutants from Piney Point. HRK is the owner of Piney Point and exercises a measure of control over the site's wastewater infrastructure. FDEP is the operator of Piney Point and exercises a

measure of control over the site's infrastructure. FDEP ordered the unpermitted discharges at Piney Point, and HRK initiated the discharges.

377.   HRK and FDEP's unlawful discharges from Piney Point without an NPDES permit are ongoing and continuous. HRK and FDEP are liable for violating the Clean Water Act, and HRK is liable for civil penalties for each day discharges occurred, for each point source from which pollutants were discharged into navigable waters. The maximum daily civil penalty per point source is $56,460.

## COUNT III

### *In the Alternative*

### VIOLATIONS OF THE CLEAN WATER ACT: DISCHARGES IN VIOLATION OF TERMS OF NPDES PERMIT & VIOLATIONS OF OPERATION AND MAINTENANCE REQUIREMENTS

378.   Plaintiffs incorporate Paras. 1-40, 61-69, 276-299, and 313-316.

379.   Plaintiffs and Defendants are "person[s]" under the Clean Water Act, 33 U.S.C. § 1362(5).

380.   Lawful discharges under the Clean Water Act must comply with the terms of a lawfully-issued NPDES permit. Violations of the terms of such a permit are violations of the Clean Water Act. 33 U.S.C. § 1311(a).

381.   Defendants' discharge of pollutants from Piney Point to navigable waters during the 2021 Discharge were not compliant with the terms of HRK's Administrative Agreement with FDEP.

FIRST AMENDED COMPLAINT          90
*Case No. 8:21-cv-1521*

**382.**   Nowhere does HRK's Administrative Agreement with FDEP authorize millions of gallons of wastewater to be discharged directly into navigable waters.

**383.**   The 2021 Discharge violated each and every effluent limitation contained in HRK's Administrative Agreement with FDEP.

**384.**   HRK's discharge of pollutants during the 2021 Discharge was not a "bypass" under the Clean Water Act or Florida law. Such a bypass is prohibited under state and federal law, unless a permittee provides prior notice of the discharge and demonstrate that "[t]here were no feasible alternatives to the bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal periods of equipment downtime." F.A.C. 62-620.610(22)(a)(1). No such prior notice occurred prior to the 2021 Discharge.

**385.**   Based on HRK's public statements concerning Piney Point's inability to retain precipitation falling on the site, and that Piney Point was forced to rely upon Manatee County's stormwater system during Hurricane Elsa in order to safely handle precipitation falling at the site without discharging, it is reasonably certain and foreseeable that discharges from the site will recur in the future.

**386.**   Additionally, HRK has violated and remains in violation of the Operations and Maintenance requirements of its Administrative Agreement with FDEP. Para. 8(a)(1) of the Administrative Agreement requires HRK to "ensure that the operation and maintenance of the phosphogypsum stack system during closure and long-term

care of the facility is in accordance with Rule 62-673, F.A.C." Para. 8(a)(3) requires HRK to "ensure that all aboveground impoundments are operated, maintained and inspected in accordance with Rule 62-672, F.A.C." Florida Rule 62-673.340 states that phosphogypsum stacks "shall be...operated, maintained, closed, and monitored throughout its design period to control the movement of waste and waste constituents into the environment so that ground water and surface water quality standards and criteria of Chapters 62-302 and 62-520, F.A.C., will not be violated beyond the applicable zone of discharged specified for the system."

387.   The discharges from Piney Point during the 2021 Discharge violated surface water quality standards and criteria of Chapters 62-302 and 62-620, F.A.C.

388.   The foreseeable and preventable 2021 Discharge establishes HRK's failure to properly operate and maintain conditions at Piney Point, including, without limitation, neglect and mismanagement of the ponds and ignoring best engineering practices with regard to the integrity of the stack and/or the HDPE liner.

389.   The discharges from Piney Point during the 2021 Discharge would not have occurred had HRK complied with the Operations and Maintenance requirement of its Administrative Agreement with FDEP.

390.   HRK knows, and has known for years, that the wastewater infrastructure at Piney Point, including the site's impoundments, were incapable of adequately treating and storing the process wastewater and precipitation falling on the site.

Despite this knowledge, HRK took no corrective action, maintenance, or other operational modifications at Piney Point to prevent discharges.

**391.**   HRK's failure to properly operate and maintain the wastewater infrastructure subject to its Administrative Agreement with FDEP is ongoing and continuous. Each day that HRK has failed to properly operate and maintain the wastewater infrastructure subject to its Administrative Agreement with FDEP is a distinct violation of the Clean Water Act, subjecting HRK to maximum civil penalties of $56,460 per day.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

**1.**   Declare that Defendants past and/or present generation, handling, storage, treatment, transportation, and/or disposal of solid and hazardous waste may present an imminent and substantial endangerment to health and/or the environment.

**2.**   Issue injunctive and remedial relief requiring Defendants to abate the present imminent and substantial endangerment to health and/or the environment at Piney Point.

**3.**   Issue injunctive and remedial relief requiring Defendants to undertake a RCRA corrective action study to diagnose, evaluate, monitor, and abate all sources of contamination and endangerment at Piney Point.

FIRST AMENDED COMPLAINT        93
*Case No. 8:21-cv-1521*

**4.** Exercise close supervision over Defendants as they implement a remedial investigation and closure plan that will fully abate the imminent and substantial endangerment threatened by Piney Point.

**5.** Issue temporary and/or permanent injunctive relief against Defendants, ordering Defendants to cease all activities constituting the imminent and substantial endangerment to health and/or the environment.

**6.** Declare that Defendants HRK and FDEP violated the Clean Water Act by discharging pollutants into navigable waters from point sources at Piney Point without first obtaining a lawfully-issued NPDES permit or, in the alternative, declare that Defendant HRK violated the terms of its NPDES permit by discharging pollutants during the 2021 Discharge and continues to violate its NPDES permit's Operation and Maintenance requirements.

**7.** Issue temporary and/or permanent injunctive relief against HRK and FDEP, requiring those Defendants to either: *(a)* comply with the Clean Water Act and cease all discharges from Piney Point unless and until a lawful NPDES permit is obtained; or *(b)* in the alternative, comply with the terms of Piney Point's NPDES permit, including its effluent limitations and operation and maintenance requirements.

**8.** Determine the number of Clean Water Act violations committed by HRK and/or FDEP, and assess appropriate civil penalties for those violations, as

FIRST AMENDED COMPLAINT          94
*Case No. 8:21-cv-1521*

authorized and required by the Clean Water Act, 33 U.S.C. § 1319(d).

  **9.**  Issue injunctive relief requiring Defendants to take immediate corrective action at Piney Point that will eliminate the possibility of future discharges, such as maintaining the impoundments at Piney Point at no more than 50% of their total storage capacity unless and until Piney Point is permanently closed.

  **10.**  Award Plaintiffs their reasonable attorneys' and expert witnesses' fees, and costs, incurred in bringing this litigation under 42 U.S.C. § 6972(e) and 33 U.S.C. § 1365(d).

  **11.**  Grant any such further relief as the Court may deem just and proper.

Dated this 12th Day of August, 2021.

Respectfully submitted,

/s/ Daniel C. Snyder
Daniel C. Snyder, *pro hac vice*
Charles M. Tebbutt
B. Parker Jones
Law Offices of Charles M. Tebbutt, P.C.
941 Lawrence St.
Eugene, OR 97401
Tel: (541) 344-3505
Fax:(541)344-3516
charlie@tebbuttlaw.com
dan@tebbuttlaw.com
parker@tebbuttlaw.com

/s/ Justin Bloom
Justin Bloom, Florida Bar No. 89109
PO Box 1028
Sarasota, FL 34230
Tel: (941) 275-2922

/s/ Jaclyn Lopez
Jaclyn Lopez, Florida Bar No. 96445
Center for Biological Diversity
PO Box 2155
St. Petersburg, FL 33731
Tel: (727) 490-9190
jlopez@biologicaldiversity.org

FIRST AMENDED COMPLAINT  95
*Case No. 8:21-cv-1521*

bloomesq1@gmail.com

*Attorneys for Plaintiffs*

FIRST AMENDED COMPLAINT        96
*Case No. 8:21-cv-1521*