# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

CENTER FOR BIOLOGICAL
DIVERSITY, TAMPA BAY
WATERKEEPER, SUNCOAST
WATERKEEPER, MANASOTA-88, *and*
OUR CHILDREN'S EARTH
FOUNDATION,

     *Plaintiffs,*

     *v.*

GOVERNOR RON DeSANTIS,

SHAWN HAMILTON, *in his official
capacity as* ACTING SECRETARY,
FLORIDA DEPARTMENT OF
ENVIRONMENTAL PROTECTION,

HRK HOLDINGS, LLC, *and*

MANATEE COUNTY PORT
AUTHORITY,

     *Defendants.*

Case No.  8:21-cv-1521

**FDEP'S MOTION TO DISMISS
PLAINTIFFS' SECOND
AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................. iii

INTRODUCTION ..........................................................................1

BACKGROUND AND PLAINTIFFS' ALLEGATIONS ........................... 2

I.      THE PINEY POINT PHOSPHATE FACILITY............................... 2

    A.      A Brief History Of Piney Point............................................ 2

    B.      The 2021 Emergency........................................................ 5

II.     THE STATE ENFORCEMENT ACTIONS. ................................... 6

    A.      Announcement And Appropriation...................................... 6

    B.      State Court Proceedings....................................................7

III.    PLAINTIFFS' CLAIMS. ......................................................... 8

LEGAL STANDARDS .................................................................. 9

ARGUMENT...............................................................................10

I.      PLAINTIFFS' CLAIMS ARE MOOT. ......................................10

II.     PLAINTIFFS' CWA CLAIM AGAINST FDEP SHOULD BE DISMISSED. .14

    A.      Plaintiffs' CWA Claim Is Barred By FDEP's Diligent Prosecution
        In State Court. ................................................................14

    B.      Plaintiffs Fail To State A Claim That FDEP Engaged In An
        Unlawful Discharge Under The CWA. ..............................19

    C.      Plaintiffs Fail To State A Claim Of Ongoing Discharge Into Waters
        Of The United States. ......................................................21

    D.      Plaintiffs Fail To State A Valid CWA Claim Against FDEP Because
        An NPDES Permit Was In Force. ..................................... 23

III.    PLAINTIFFS' RCRA CLAIM SHOULD BE DISMISSED. .......................... 24

    A.      Plaintiffs' RCRA Claim Is Barred By Plaintiffs' Failure To Comply
        With The Statute's Notice Requirements. ....................................... 24

i

1.     Plaintiffs Did Not Sufficiently Identify a "Hazardous Waste" to Avoid the Ninety-Day Delay Period.................................. 26

2.     Plaintiffs Did Not Sufficiently Identify a Violation of a "Specific Regulation" under Subchapter III to Avoid the Ninety-Day Delay Period...................................................... 30

B.     Plaintiffs Fail To State A Claim For RCRA Endangerment.............. 32

CONCLUSION................................................................... 40

CERTIFICATE OF SERVICE.............................................. 41

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Aiello v. Town of Brookhaven,*
136 F. Supp. 2d 81 (E.D.N.Y. 2001) ................................................................22, 25

*AM Int'l, Inc. v. Datacard Corp.,*
106 F.3d 1342 (7th Cir. 1997) .......................................................................... 35

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .................................................................................*passim*

*Associated Indus. Ins. Co. v. Advanced Mgmt. Servs., Inc.,*
2013 WL 1176252 (S.D. Fla. Mar. 20, 2013) .................................................... 22

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007) .....................................................................9, 20, 22, 33

*Black Warrior Riverkeeper, Inc. v. Cherokee Mining, LLC,*
637 F. Supp. 2d 983 (N.D. Ala. 2009) .........................................................10, 11

*Bldg. & Constr. Trades Council of Buffalo, New York & Vicinity v. Downtown
Dev., Inc.,*
448 F.3d 138 (2d Cir. 2006) ...............................................................30, 33, 35

*Brod v. Omya, Inc.,*
653 F.3d 156 (2d Cir. 2011) ..............................................................26, 28, 29

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York,*
273 F.3d 481 (2d Cir. 2001) ........................................................................... 26

*Cebollero-Bertran v. Puerto Rico Aqueduct & Sewer Auth.,*
4 F.4th 63 (1st Cir. 2021) ....................................................................15, 16, 18

*City of Fresno v. United States,*
709 F. Supp. 2d 888 (E.D. Cal. 2010) ............................................................. 11

*Clark v. Ashland, Inc.,*
2017 WL 468213 (M.D. Fla. Feb. 3, 2017) ........................................................12

*Cmty. Ass'n for Restoration of the Env't, Inc. v. George & Margaret LLC,*
954 F. Supp. 2d 1151 (E.D. Wash. 2013) ..........................................................27

*Coon v. Willet Dairy, LP,*
2007 WL 2071746 (N.D.N.Y. July 17, 2007) .................................................... 22

*Cooper v. Armstrong Rubber Co.,*
     1989 WL 60338 (S.D. Miss. Feb. 1, 1989) ........................................................ 36

*Coosa Riverkeeper, Inc. v. Oxford Water Works & Sewer Bd.,*
     2017 WL 2619087 (N.D. Ala. June 16, 2017)......................................................15

*Davis Bros. v. Thornton Oil Co.,*
     12 F. Supp. 2d 1333 (M.D. Ga. 1998)............................................................. 1, 11

*Day, LLC v. Plantation Pipe Line Co.,*
     315 F. Supp. 3d 1219 (N.D. Ala. 2018)..............................................................12

*Ellis v. Gallatin Steel Co.,*
     390 F.3d 461 (6th Cir. 2004) ............................................................................16

*Envirowatch, Inc. v. Fukino,*
     2007 WL 1933132 (D. Haw. June 28, 2007).................................................... 33

*Env't Conservation Org. v. City of Dallas,*
     529 F.3d 519 (5th Cir. 2008)..................................................................... 10, 13

*Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab.
     Servs.,*
     225 F.3d 1208 (11th Cir. 2000) ........................................................................ 11

*Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.,*
     382 F.3d 743 (7th Cir. 2004).............................................................................18

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,*
     629 F.3d 387 (4th Cir. 2011) ........................................................................... 29

*Gwaltney Of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,*
     484 U.S. 49 (1987) .......................................................................... 10, 21, 25

*Hallstrom v. Tillamook Cty.,*
     493 U.S. 20 (1989) ...................................................................................14, 25

*Hinds Invs., L.P. v. Angioli,*
     654 F.3d 846 (9th Cir. 2011) .......................................................................... 38

*Hinds Invs., L.P. v. Team Enters., Inc.,*
     2010 WL 1663986 (E.D. Cal. Apr. 22, 2010)................................................... 38

*Holding Co. of the Vills., Inc. v. Little John's Movers & Storage, Inc.,*
     2017 WL 6319549 (M.D. Fla. Dec. 11, 2017).................................................. 22

*In re Chira*,
  343 B.R. 361 (S.D. Fla. 2006)..................................................................... 36

*Jackson v. Blue Star Recycling, LLC*,
  2021 WL 1164827 (N.D. Tex. Mar. 26, 2021) .....................................10

*LAJIM, LLC v. Gen. Elec. Co.*,
  917 F.3d 933 (7th Cir. 2019).........................................................12, 13

*Liebhart v. SPX Corp.*,
  998 F.3d 772 (7th Cir. 2021) .......................................................12, 13

*Merchant v. U.S. Dep't of Ed.*,
  2021 WL 3738835 (M.D. Fla. Aug. 24, 2021)...............................9, 10

*Michalares-Owens v. Greenwood of SC, Inc.*,
  2020 WL 2494496 (M.D. Fla. May 14, 2020) ................................... 9

*N. Am. Broadcasting, LLC v. United States*,
  306 F.Appx. 371 (9th Cir. 2008) ..................................................... 36

*N. Ill. Gas Co. v. City of Evanston, Ill.*,
  162 F. Supp. 3d 654 (N.D. Ill. 2016)............................................... 29

*Nat'l Parks & Conservation Ass'n, Inc. v. Tenn. Valley Auth.*,
  502 F.3d 1316 (11th Cir. 2007) .................................................*passim*

*North and South Rivers Watershed Ass'n, Inc. v. Town of Scituate*,
  949 F.2d 552 (1st Cir. 1991) ...........................................................18

*Ohio Valley Env't Coal., Inc. v. Hobet Mining, LLC*,
  2008 WL 5377799 (S.D.W. Va. Dec. 18, 2008)................................ 11

*Paolino v. JF Realty, LLC*,
  710 F.3d 31 (1st Cir. 2013).............................................................. 29

*Rapanos v. U.S.*,
  547 U.S. 715 (2006).........................................................................21

*S. River Watershed All., Inc. v. DeKalb Cnty., Georgia*,
  484 F. Supp. 3d 1353 (N.D. Ga. 2020)......................................*passim*

*Sycamore Indus. Park Assocs. v. Ericsson, Inc.*,
  546 F.3d 847 (7th Cir. 2008)........................................................... 39

v

*Taylor v. Sternberg*,
   293 U.S. 470 (1935)..................................................................... 36

*The Piney Run Pres. Ass'n v. The Cnty. Comm'rs of Carroll Cnty., MD*,
   523 F.3d 453 (4th Cir. 2008) ......................................................18

*Troiano v. Supervisor of Elections in Palm Beach Cnty., Fla.*,
   382 F.3d 1276 (11th Cir. 2004).....................................................10

*United States v. Metro. Water Reclamation Dist. of Greater Chicago*,
   792 F.3d 821 (7th Cir. 2015).........................................................16

*Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC*,
   141 F. Supp. 3d 428 (M.D.N.C. 2015)..........................................15

## **Statutes**

§ 120.52(7), Fla. Stat. (2021) ..................................................... 23

§ 403.0885(3), Fla. Stat. (2021) .................................................. 24

33 U.S.C. § 1311(a) ................................................................19, 20

33 U.S.C. § 1362(5) ......................................................................19

33 U.S.C.A. § 1362(7) ..................................................................21

33 U.S.C. § 1365(a)(1) ................................................................. 8

33 U.S.C. §  1365(b)(1)(b) ...........................................................14

42 U.S.C. § 6921(b)(1) .................................................................27

42 U.S.C. §§ 6921-6939e .......................................................... 35

42 U.S.C. §§ 6921-6939f ............................................................ 24

42 U.S.C. § 6924 ..................................................................30, 31

42 U.S.C. § 6924(a) .............................................................. 31, 36

42 U.S.C. § 6972(a)(1)(B) ....................................................24, 32, 38, 39

## Rules

Fed. R. Civ. P. 12(b)(1) ..................................................................... 1, 9, 10, 14

Fed. R. Civ. P. 12(b)(6) ....................................................................1, 3, 9, 14

Fed. R. Civ. P. 15(a)(1) ................................................................................14

## Regulations

40 C.F.R. Part 60...........................................................................................31

40 C.F.R. Part 264.................................................................................30, 31

40 C.F.R. § 60.40a-49a ...............................................................................31

40 C.F.R. § 254.3(a).................................................................................*passim*

40 C.F.R. § 257.3-2 .................................................................................... 35

40 C.F.R. § 260.10.................................................................................36, 37

40 C.F.R. § 261.3(2)(i) ................................................................................ 35

40 C.F.R. § 261.3(a)(2)(i) ........................................................................... 35

40 C.F.R. § 261.4(b)(7) .........................................................................34, 35

40 C.F.R. § 261.4(b)(7)(ii)(D) & (P)...........................................................28

40 C.F.R. § 261.4(g)....................................................................................28

40 C.F.R. §§ 261.20−.24.............................................................................27

40 C.F.R. § 264.1(b)................................................................................... 36

Fla. Admin. Code § 62-673.600(3)(b) ....................................................... 4

Fla. Admin. Code § 62-673.780 (8)−(10) ................................................... 4

**INTRODUCTION**

The Piney Point facility will be closed as swiftly and safely as possible. Mobilizing all three branches of state government, the State of Florida is making considerable progress toward this goal.  In April 2021, shortly after a near-failure of a containment dike at Piney Point, the Florida Legislature appropriated $100 million to remediate the site.  In August 2021, the Florida Department of Environmental Protection ("FDEP") brought enforcement proceedings in state court against HRK Holdings, LLC ("HRK")—the reservoir system's private owner and a defendant in this action.  Further, also in August, FDEP secured, through another state court action, the appointment of a receiver to manage and close the Piney Point facility.  The receiver's efforts will be funded by the Florida Legislature's recent appropriation and overseen by the state court.

Notwithstanding the State's comprehensive response, Plaintiffs ask this federal court to superintend the closure of Piney Point.  Such a step will only complicate and delay the efforts already underway.  FDEP respectfully requests that the Court reject this invitation to intercede and dismiss this action pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

All of Plaintiffs' claims should be dismissed as moot because the relief Plaintiffs seek—and more—is encompassed by the relief the court-appointed receiver is already charged with providing.  *See, e.g.*, *Davis Bros. v. Thornton Oil Co.*, 12 F. Supp. 2d 1333, 1338 (M.D. Ga. 1998) (where remediation is funded and already underway, citizen suit is moot).

1

Even if the Plaintiffs' claims are not moot, they fail on the merits.  The Clean Water Act ("CWA") claim should be dismissed, first, because it is barred by statute due to FDEP's diligent prosecution in state court.  Second, Plaintiffs fail to allege that FDEP has engaged in an unlawful discharge, or an ongoing discharge into the waters of the United States.  Third, Plaintiffs fail to state a claim for discharging water without a permit because such a permit was in place.

Plaintiffs' claim under the Resource Conservation and Recovery Act ("RCRA") is equally flawed and should also be dismissed for multiple reasons.  First, Plaintiffs failed to comply with the statutory notice requirements on both procedural and substantive grounds.  Second, Plaintiffs fail to state a RCRA endangerment claim.  They allege non-hazardous waste was commingled with other non-hazardous waste, and simply assume that the ensuing mixture was hazardous—without alleging any facts to support that bald assumption.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Nor do Plaintiffs explain how the mixture can produce a hazardous waste under the controlling regulation.  In short, Plaintiffs' RCRA claim collapses as a matter of law because the complaint is devoid of necessary factual and legal support.

## BACKGROUND AND PLAINTIFFS' ALLEGATIONS

## I.   THE PINEY POINT PHOSPHATE FACILITY.

### A.   A Brief History Of Piney Point.

From 1966 to 1999, operators of a phosphate fertilizer plant at Piney Point in Manatee County piled phosphogypsum into "stacks," which formed reservoirs

that are semi-saturated with "pore" water that drains over time.  Second Amended Complaint ("SAC"), Doc. 50, ¶¶ 70–71, 76–80 (hereinafter "SAC").¹  The reservoirs also hold other "process wastewater" produced from fertilizer manufacturing.  *Id.* ¶¶ 71, 78.  The system at Piney Point comprises four stacks and multiple reservoirs, up to 80 feet tall, spanning 457 acres, and with storage capacity of hundreds of millions of gallons (collectively, the "Facility").  *Id.* ¶¶ 76, 93, 185.  The stacks are: New Gypsum Stack-North ("NGS-N"), New Gypsum Stack-South ("NGS-S"), Old Gypsum Stack-North ("OGS-N"), and Old Gypsum Stack South ("OGS-S").  *Id.* ¶ 92.  In October 1999, FDEP issued National Pollutant Discharge Elimination System ("NPDES") Wastewater Permit No. FL0000124 (the "NPDES Permit") to the then-owner and operator of Piney Point.  *See* Request for Judicial Notice ("RJN") Ex. H.

After manufacturing operations ceased, the Facility's private owner filed for bankruptcy and abandoned the Facility in 2001.  SAC ¶ 86.  Pursuant to a court-ordered receivership, a High Density Polyethylene ("HDPE") liner was installed in several of the Facility's reservoirs.  *Id.* ¶ 92.  In 2006, Defendant HRK assumed ownership of the Facility.  *Id.* ¶ 100.  In 2007, HRK entered into an agreement with Defendant Manatee County Port Authority ("MCPA") regarding use of the lined reservoirs to store dredge spoil from the Port's expansion.  *Id.* ¶¶ 107–112.  Dredge

---

¹ Much of this Background section is drawn from Plaintiffs' Second Amended Complaint, the allegations of which, for purposes of a motion under Fed. R. Civ. P. 12(b)(6), are treated as true.  FDEP does not admit any such allegations.

spoil was placed into the lined reservoirs from April to October 2011. *Id*. ¶¶ 147, 169.

Since January 28, 2011, HRK's operation of the Facility has been subject to terms and conditions set forth in the NPDES Permit and a regulatory agreement with FDEP (the "2011 Administrative Agreement"). *See* RJN Ex. F.  In addition to specifically enumerated discharge standards in the NPDES Permit, the 2011 Administrative Agreement requires HRK to operate the Facility consistent with Florida's comprehensive scheme for management and safe operation of phosphogypsum stacks. *Id*. § 8.  In 2011, a major leak occurred at the NGS-S reservoir, and FDEP issued an emergency order allowing HRK to redirect flows to prevent a total collapse. SAC ¶¶ 150–60; RJN Ex. L.

FDEP brought an administrative action against HRK to enforce the terms of the Administrative Agreement and provisions of Fla. Admin. Code 62-673, resulting in a Consent Order, dated March 17, 2014 ("2014 CO").  RJN Ex. E. Among other compliance, the 2014 CO requires HRK to develop a plan and to empty the NGS-N and NGS-S reservoirs and provide a long-term care plan and associated financial assurance for the Facility. *Id*. ¶ B (citing Fla. Admin. Code §§ 62-673.780 (8)–(10), 62-673.600(3)(b)).

HRK's ownership of the property encompassing the Facility is subject to a mortgage held by Fortress 2020 Landco, LLC ("Fortress"), as assignee of Regions Bank.  On November 17, 2020, Fortress commenced a foreclosure action in state

court (the "Foreclosure Action"), seeking to take possession of certain non-Facility portions of the property. *See* RJN Ex. A.

### B.    The 2021 Emergency.

From March 25 to March 30, 2021, observation of increased drain flow, increased pressure readings at certain points along the impoundments, and visible bulges indicated that the contents of NGS-S were leaking through the liner and seeping through the stack. SAC ¶¶ 181–213. These observations indicated that the structural integrity of the NGS-S impoundments was in danger. *Id.* ¶ 205. FDEP issued an emergency order, directing HRK "to take immediate emergency actions as necessary to ensure the stability" of the system, allowing, if necessary, emergency temporary wastewater discharges "solely to preserve the integrity of the system." RJN Ex. M. On March 30, 2021, HRK began controlled wastewater discharges from NGS-S directly into Port Manatee in Tampa Bay. SAC ¶ 214. On April 2, 2021, local authorities issued evacuation orders for certain areas near Piney Point. *Id.* ¶ 235. Emergency response activities at Piney Point identified a ruptured seam in NGS-S's HDPE liner as the source of the leak, and efforts were attempted to repair the leak by placing a steel plate over the ruptured seam. *Id.* ¶¶ 246–48. Discharges from NGS-S directly into Port Manatee continued until April 9, 2021. *Id.* ¶ 249. The severely increased drain flows ceased on April 14, 2021. *Id.* ¶¶ 251–56.

To carry out its duties as the State's environmental regulator, and to ensure public safety in these circumstances, FDEP took emergency actions at NGS-S

during April and May 2021.  FDEP placed stone, geo-composite material, and sand around the steel plate to minimize further leakage through the ruptured seam.  *Id.* ¶¶ 260–61, 264–69.   FDEP also transferred water among the Facility's lined reservoirs to ensure safe water levels in the event of rainfall.  *Id.* ¶ 262.

Plaintiffs allege that the steel plate and earthen fills have not fully stopped seepage of the reservoir into the stack.  *Id.* ¶ 270.  Plaintiffs further allege that the structural integrity of NGS-S is compromised, threatening catastrophic release of its contents.  *Id.* ¶¶ 1, 351.

## II.   THE STATE ENFORCEMENT ACTIONS.

### A.   Announcement And Appropriation.

On April 13, 2021, Governor DeSantis stated that the "problems at Piney Point must end," directed FDEP to "develop a plan to close Piney Point," and committed "$15.4 million for innovative technologies to pre-treat water at the site." RJN Ex. J.  The Governor further stated that "[F]DEP's team of engineers and scientists, who are critical to response efforts, will develop a plan for site closure, which moves the state forward with a science-focused and thoughtful approach," and that "[t]his plan will ensure this closure is the last chapter in the long history of Piney Point."  *Id.*  In the same announcement, the Florida Senate President "expressed the Senate's support to supplement these immediate actions with future funding appropriations, starting with an estimated $100 million in the coming fiscal year."  *Id.*  The Florida Legislature fulfilled that commitment, appropriating $100 million for remediation and closure efforts.  RJN Ex. K.

### B.   State Court Proceedings.

On August 5, 2021, FDEP filed a petition in state court, *FDEP v. HRK Holdings, LLC*, Case No. 2021-CA-003192-AX (Fla. 12th Cir. Ct. Aug. 5, 2021) (the "Enforcement Action"), seeking judicial (1) enforcement of the 2014 CO, (2) enforcement of the 2011 Administrative Agreement, and (3) appointment of a receiver to close the Facility.  *See* RJN Ex. D.  Concurrently, FDEP moved in the Foreclosure Action for appointment of a receiver.[2]  *See* RJN Ex. B.  On August 25, 2021, the state court in the Foreclosure Action appointed a Receiver to take control of the Facility and oversee its expeditious closure. *See* RJN Ex. C.[3]  By order of the state court, the Receiver is charged and empowered to "maintain, manage and close as efficiently and expeditiously as possible the Facility in accordance with all applicable State and Federal laws." *See id*. at 11; *see also id*. at 5 ("[T]he Receiver shall have the following specific powers and authority: (a) to provide and maintain the Facility, including making structural changes, for as long as necessary to complete closure; (b) to make extensions, expansions, repairs, replacements, and improvements to the Facility as necessary to complete closure.").  The Receiver filed his first status report on November 2, 2021.  *See* RJN Ex. G.  In it, he outlined the work he has done to date, including conducting a site visit, preparing an inventory of the property, meeting with key stake holders, and addressing a host of logistical issues.  *Id*. at 4–5.  Prior to the Receiver's appointment, FDEP had

---

[2] *See infra* note 11.

[3] The Enforcement Action and FDEP's concurrent efforts in the Foreclosure Action are hereinafter referred to collectively as the "State Actions."

engaged an engineering firm to initiate: preparation of design drawings and specifications, bid packages, the bidding process, review of proposals, and contract-selection recommendations. *Id.* at 3. In his report, the Receiver said he is "currently negotiating assignment of the FDEP contract as well as confirmation of the description of the assigned tasks." *Id.* The Receiver stated that assuming the contract is assigned and the "design is approved by the FDEP pursuant to regulations, the Receiver will solicit bids pursuant to appropriate procurement rules for the final construction phase of the project." *Id.*

## III.   PLAINTIFFS' CLAIMS.

On May 18, 2021, Plaintiffs served FDEP a Notice of Intent to Sue. Doc. 50-1 (hereinafter "Notice Letter"). The Notice Letter generally alleged that (1) contents of NGS-S continue to leak through the liner and (2) continued storage of dredge spoil and process water in the lined reservoirs risks catastrophic failure of the impoundments. Plaintiffs filed this suit on June 24, 2021, initially bringing only their "imminent and substantial endangerment" claim under RCRA, 42 U.S.C. § 6972(a)(1)(B). Doc. 1 ¶¶ 274–320. Plaintiffs filed the First Amended Complaint on August 12, 2021, adding a claim under the CWA, 33 U.S.C. § 1365(a)(1). Doc. 32 at ¶¶ 365–91. Plaintiffs filed the SAC on November 19, 2021. Plaintiffs plead their CWA claim as two alternative (and mutually-exclusive) theories of liability: either (1) there is no operative NPDES permit governing discharges from Piney Point, in which case Plaintiffs claim HRK and FDEP are both liable for unpermitted discharges; or, (2) there is an operative NPDES permit issued to HRK, in which

case Plaintiffs claim HRK is solely liable for breaching the terms of that permit. *Compare* SAC ¶¶ 362–74 (Count II), *with id*. ¶¶ 375–88 (Count III).

## LEGAL STANDARDS

"A motion to dismiss because the case is moot is an attack on the court's subject matter jurisdiction and is brought pursuant to Rule 12(b)(1)." *Michalares-Owens v. Greenwood of SC, Inc.*, 2020 WL 2494496, at *1 (M.D. Fla. May 14, 2020). Where a defendant attacks "the facts that allegedly support subject-matter jurisdiction," "a court may consider extrinsic evidence" and is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case without presuming the truthfulness of the plaintiff's allegations." *Id*.

"When considering a Rule 12(b)(6) motion, a court must determine whether the allegations contained in the plaintiff's complaint state a facially plausible claim for relief." *Merchant v. U.S. Dep't of Ed.*, 2021 WL 3738835, at *3 (M.D. Fla. Aug. 24, 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Plausibility" requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. (quoting *Twombly*, 550 U.S. at 550). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. "When the

allegations … despite being accepted true, do not raise a claim for relief, the court should dismiss the complaint." *Merchant*, 2021 WL 3738835, at *3.

## ARGUMENT

### I.   PLAINTIFFS' CLAIMS ARE MOOT.

Plaintiffs' requested relief is encompassed by the State Actions. Therefore, this federal action cannot provide "meaningful relief," the case is moot, and it should be dismissed pursuant to Rule 12(b)(1). *Troiano v. Supervisor of Elections in Palm Beach Cnty., Fla.*, 382 F.3d 1276, 1282 (11th Cir. 2004). "The primary function of a citizen suit is to spur agency enforcement of law." *Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 528 (5th Cir. 2008). Where the government is addressing the alleged violations, RCRA and CWA citizen suits seeking injunctive relief are moot unless the plaintiff can demonstrate "a realistic prospect that the violations alleged in its complaint will continue" notwithstanding the government's efforts. *Id.* at 528; *Black Warrior Riverkeeper, Inc. v. Cherokee Mining*, LLC, 637 F. Supp. 2d 983, 990 (N.D. Ala. 2009) (finding request for injunctive relief to be moot). "This standard for determining whether a CWA citizen suit has been mooted by a subsequent government enforcement action respects Congress's intent that citizen suits 'supplement rather than supplant government action.'" *City of Dallas*, 529 F.3d at 528 (quoting *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987)).

Importantly, citizen suits are moot even before the government's remedial efforts are finished, so long as an enforceable plan is in place. *See Jackson v. Blue*

*Star Recycling, LLC*, 2021 WL 1164827, at *6 (N.D. Tex. Mar. 26, 2021) (collecting cases and noting "federal courts have often dismissed a plaintiff's RCRA claim prior to the completion of agreed or mandated cleanup activity.").[4]  In evaluating mootness, federal courts are highly deferential to state-run remediation plans. *See Davis Bros. v. Thornton Oil Co.*, 12 F. Supp. 2d 1333, 1338 (M.D. Ga. 1998) ("[T]he proposed remedy of injunctive relief is moot because … the state is overseeing the cleanup more effectively than the court ever could.").[5]  Here, a Receiver has been appointed, funding is in place, and the Receiver is doing preparatory work with an engineering firm that will draw up plans to close the facility.  Plaintiffs are not entitled to anything further from this Court.

The contrast between the narrow relief available in this federal action and the comprehensive closure of the Facility being implemented through the State Actions is an additional indication of mootness.  The Eleventh Amendment would limit any federal order against FDEP to prospective injunctive relief necessary to cure an ongoing violation of federal law.  *See Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1219–20 (11th Cir.

---

[4] *See also Black Warrior Riverkeeper*, 637 F. Supp. 2d at 988 ("An [administrative] order, if it provides meaningful relief of the sort being sought by the citizen, can and does preempt the citizen suit.").

[5] *See also City of Fresno v. United States*, 709 F. Supp. 2d 888, 906–07 (E.D. Cal. 2010) (finding RCRA suit moot because California "has the scientific understanding and resources necessary to investigate and remediate alleged hazards" and "[c]onversely, the district court has neither the resources nor expertise necessary"); *Ohio Valley Env't Coal., Inc. v. Hobet Mining, LLC*, 2008 WL 5377799, at *7 (S.D.W. Va. Dec. 18, 2008) ("[T]he agency employs environmental experts and engineers far better suited to understand the problem than this Court.").

2000).   Similarly, RCRA and the CWA provide relief against FDEP only for presently occurring hazards and discharges, and any relief from this Court against FDEP will be so cabined.[6]   Thus, while the State Actions provide for total closure beyond abatement of the RCRA and CWA hazards and discharges alleged here, this Court is not empowered to award closure—even if Plaintiffs prevail.   Indeed, the SAC alleges severe deterioration of NGS-S, but says nothing about the other reservoirs.   Unless Plaintiffs can prove that *all* reservoirs present ongoing violations of federal law, any federal injunctive relief will be limited to—at most—a *partial* closure of the Facility.

Moreover, any injunctive relief from this Court will be further limited by principles of prudence, equity, and discretion that counsel district courts to issue injunctions only where absolutely necessary to address ongoing violations of federal law.   In two recent cases very similar to this one, the Seventh Circuit upheld district courts' decisions *not to issue any injunctive relief* despite the defendants' liability under federal environmental statutes.   *LAJIM*, 917 F.3d at 942–44; *Liebhart v. SPX Corp.*, 998 F.3d 772, 774 (7th Cir. 2021).   In both cases, the courts

---

[6] *See LAJIM, LLC v. Gen. Elec. Co.*, 917 F.3d 933, 949 (7th Cir. 2019) ("RCRA does not require a court-ordered cleanup where the court has not found such action necessary to prevent harm to the public or the environment."); *Day, LLC v. Plantation Pipe Line Co.*, 315 F. Supp. 3d 1219, 1239 (N.D. Ala. 2018) (finding no "ongoing" violation and dismissing CWA claim where alleged pipeline leak had been repaired, even "[w]hile some effects remain from the leak"); *Clark v. Ashland, Inc.*, 2017 WL 468213, at *10 (M.D. Fla. Feb. 3, 2017) (dismissing RCRA cause of action where "Plaintiff's request for injunctive relief mostly seeks relief outside the scope of the RCRA").

cited state remediation efforts as key reason not to award injunctive relief. *LAJIM*, 917 F.3d at 948–49; *Liebhart*, 998 F.3d at 774–75. As articulated in *Liebhart*:

> When a suitable remedy is available under state law, it becomes harder to establish the irreparable harm required for injunctive relief. In such cases there is a risk that additional relief imposed by the federal court may turn out to be duplicative or inconsistent with the ongoing remedy.... To obtain alternative or supplemental injunctive relief under a federal environmental statute when a state environmental plan already addresses the precise relief sought, a private plaintiff normally must establish either some substantive flaw in the state plan (*e.g.*, that it violates federal law or leaves certain hazards unaddressed) or that the state agency tasked with managing and overseeing the plan is unequipped to handle the task or lacks adequate authority to compel compliance.

*Liebhart*, 998 F.3d at 779–80; *see also LAJIM*, 917 F.3d at 944 ("[T]he remedy of an injunction does not issue as a matter of course upon a finding of liability but only as necessary to protect against otherwise irremediable harm.").

The same result should follow here. The State Actions are already fully addressing Plaintiffs' allegations (and more), and any injunction from this Court is more likely to hinder than to help; so the case is moot. *See City of Dallas*, 529 F.3d at 530 ("Because ECO is not *entitled* to any particular form of injunctive relief under the CWA—and, therefore, was not guaranteed to achieve any other form of relief in its citizen suit than that imposed under the consent decree [entered in the administrative enforcement action]—its claims for injunctive relief are moot.").

## II.    PLAINTIFFS' CWA CLAIM AGAINST FDEP SHOULD BE DISMISSED.[7]

### A.    Plaintiffs' CWA Claim Is Barred By FDEP's Diligent Prosecution In State Court.[8]

The CWA bars citizen suits where the "State has commenced and is diligently prosecuting a civil or criminal action in a court of ... a State to require compliance with the standard, limitation, or order" allegedly violated.    33 U.S.C. § 1365(b)(1)(b).  The Enforcement Action, filed August 5, 2021, predates the filing of Plaintiffs' CWA claims.[9]  The Court should therefore dismiss Plaintiffs' CWA claims with prejudice because FDEP is already pursuing the same relief—and more—in its own suit.

---

[7] Count III includes the generalized allegation that "*Defendants'* discharge of pollutants from Piney Point to navigable waters during the 2021 Discharge were not compliant with the terms of HRK's Administrative Agreement with FDEP," SAC ¶ 378 (emphasis added), but subsequently includes specific allegations regarding *only* Defendant HRK, SAC ¶¶ 381, 383, 385–88.  And Plaintiffs seek relief on Count III only against HRK.  *See* SAC Request for Relief ¶ 6 ("declare that Defendant HRK violated the terms of its NPDES permit by discharging pollutants during the 2021 Discharge").  Accordingly, FDEP addresses only the first CWA count (Count II) in this motion, and opposes any attempt to assert Count III against FDEP.  If, however, the Court deems Count III to run against FDEP, then FDEP requests supplemental briefing as to why that count must be dismissed.

[8] Regardless of whether the statutory prerequisites to RCRA and CWA citizen suits are viewed through the lens of Rule 12(b)(1) or 12(b)(6), *S. River Watershed All., Inc. v. DeKalb Cnty., Georgia*, 484 F. Supp. 3d 1353, 1363 (N.D. Ga. 2020), they are "mandatory, not optional, condition[s] precedent" to commencing suit, and failure to fulfill those conditions requires dismissal. *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 26 (1989).

[9] The CWA claim against FDEP was first included in the First Amended Complaint ("FAC").  Plaintiffs would not have been permitted to file the FAC by right until August 16, 2021 (the stipulated deadline for responses to the initial Complaint).  *See* Fed. R. Civ. P. 15(a)(1).  Defendants consented to the earlier filing of the FAC only on the condition that such consent did "not in any way waive or impair ... any defense, challenge, or claim that could have been raised had the First Amended Complaint been filed at the time permitted by Fed. R. Civ. P. 15(a)(1)."  Doc. 30 at 2.  Likewise, Defendants consented to the filing of the SAC only on these same conditions.  Doc. 48 at 2.  Accordingly, for purposes of assessing defenses to claims in the SAC, the proper date is August 16, 2021.  Regardless, the State Actions were filed even prior to the filing of the FAC.

A first-filed state prosecution bars a CWA claim so long as the former "is capable of requiring compliance with the CWA and is in good faith calculated to do so." *Coosa Riverkeeper, Inc. v. Oxford Water Works & Sewer Bd.*, 2017 WL 2619087, at *6 (N.D. Ala. June 16, 2017).  If the actions overlap, "[d]iligence is presumed" on the part of the State. *S. River Watershed All., Inc. v. DeKalb Cnty., Georgia*, 484 F. Supp. 3d 1353, 1367 (N.D. Ga. 2020).  Plaintiffs can overcome this presumption only by "demonstrate[ing] a pattern of conduct in [the state's] prosecution of the [violations] that could be considered dilatory, collusive or otherwise in bad faith." *Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC*, 141 F. Supp. 3d 428, 441 (M.D.N.C. 2015) (first alteration in original).  To circumvent a state action with a citizen suit, "Plaintiffs must [] show that the government's actions are *incapable* of requiring compliance with the applicable standards." *S. River Watershed*, 484 F. Supp. at 1367 (emphasis added).  Here, Plaintiffs do not even approach this high bar.

<u>First</u>, as a threshold matter, Plaintiffs "ha[ve] not made a plausible allegation that the [State] never commenced an action regarding [their] concerns." *Cebollero-Bertran v. Puerto Rico Aqueduct & Sewer Auth.*, 4 F.4th 63, 74 (1st Cir. 2021).  The SAC does not even mention the State Actions, much less say that the State Actions are incapable of curing the alleged CWA violations.  Rather, the SAC contains only the conclusory (and inaccurate) allegation that the State has not commenced a diligent prosecution.  SAC ¶ 8.  Plaintiffs cannot avoid the legal import of the State Actions by simply ignoring them.

Second, the Court need look no further than "a comparison of the pleadings filed in the two actions" to see that the State Actions are capable of requiring the CWA compliance Plaintiffs seek. *S. River Watershed*, 484 F. Supp. at 1366. This "comparison need not reveal identical claims for the action to cover the same standards and limitations" but rather must show "substantial overlap" and that the CWA claim is "within the scope of a broader agency enforcement action." *Id.*; *see also Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 476 (6th Cir. 2004) ("[W]hen the contours of a private plaintiff's suit and the Government's suit coincide … the former must be dismissed."); *Cebollero-Bertran*, 4 F.4th at 63 ("The [State] suit is sufficiently analogous if the alleged unlawful discharges are within the ambit of its causes of action."). In short, the diligent-prosecution bar applies if a state's suit is "about the same matter the private litigant wants to raise." *United States v. Metro. Water Reclamation Dist. of Greater Chicago*, 792 F.3d 821, 824 (7th Cir. 2015).

The State Actions readily meet these requirements. Plaintiffs' CWA claim against FDEP boils down to two categories of allegedly wrongful discharges: (1) leakage and seepage through tears in one reservoir's liner, and (2) potential breaches of the reservoirs' walls.[10]  *See* SAC ¶¶ 1, 271, 354. Regardless of whether such discharges actually amount to CWA violations *by FDEP*, *see infra* Part II.B–II.D, both categories are plainly within the ambit of the State Actions because the

---

[10] The Enforcement Action also nullifies Count III, even though it is not pled against FDEP, because it plainly seeks to enforce such CWA standards, through enforcement of both the 2014 Consent Order and the Administrative Agreement itself. *See* RJN Ex. D ¶¶ 27–40 (Count I – Enforcement of Consent Order); *id.* ¶¶ 41–77 (Count II – Enforcement of Administrative Agreement).

State Actions seek to empty the reservoirs and fully close the Facility.  *See* RJN Ex. D ¶ 77 ("[T]he Department by this Petition seeks to prevent all future unpermitted discharges through the emptying of the System and complete closure of the Facility."); *id.* at 17–18 (receiver would "treat, discharge or otherwise dispose of process water" and "contract with [] entities as appropriate to design, construct and close the phosphogypsum stack system."); *id.* ¶ 23 ("[T]he Department has or will soon move for the appointment of a receiver to manage the Facility and oversee its complete closure, including removing the process water, sealing the System and preventing further discharges.").

Third, looking beyond the face of the pleadings, FDEP has *already obtained* appointment of a receiver to accomplish the closure.[11]  Once the Facility is closed, (*i.e.*, the reservoirs are drained, filled, and capped), there will be no more discharges.  Hence, Plaintiffs do not—and cannot—allege an ongoing violation of any standard, limitation, or order that is not being addressed by FDEP's analogous State Action.

Plaintiffs cannot overcome "the heavy presumption of diligence afforded to the government" in prosecuting the State Action.  *S. River Watershed*, 484 F. Supp. at 1368.  "This presumption is due not only to the intended role of the government

---

[11] Demonstrating FDEP's diligence in installing a receiver and closing the Facility as quickly as possible, FDEP moved for appointment of the Receiver under § 403.4154(5)(b), Fla. Stat., in the Foreclosure Action, where the numerous necessary parties were already joined, *see* RJN Ex. B, instead of in the Enforcement Action where parties had not yet been served.  The State sought parallel relief in both the Foreclosure Action and Enforcement Action, and plans to move to consolidate those actions if necessary to promote a more rapid closure.

as the primary enforcer of the [CWA], but also to the fact that courts are not in the business of designing, constructing or maintaining sewage treatment systems." *The Piney Run Pres. Ass'n v. The Cnty. Comm'rs of Carroll Cnty., MD*, 523 F.3d 453, 459 (4th Cir. 2008) (alteration in original); *see also North and South Rivers Watershed Ass'n, Inc. v. Town of Scituate*, 949 F.2d 552, 557 (1st Cir. 1991) ("[D]eference to the agency's plan of attack should be particularly favored."). The State need not have actually remedied the alleged violations to invoke the bar on citizen suits; FDEP need only take a deliberate, measured approach toward that goal. *See Cebollero-Bertran*, 4 F.4th at 75 ("Diligent prosecution is something less than far-reaching or zealous prosecution.").[12]  Here, mere months after a near-catastrophic failure demonstrated that the Facility's owner/operator is unwilling or unable to fulfill its obligation, FDEP brought a comprehensive enforcement action to close the facility.  In a little less than four months since the State Actions were filed, FDEP or the Receiver have already (1) obtained appointment of a receiver to oversee closure of the Facility—backed by a $100-million appropriation from the Florida Legislature; (2) facilitated interim repairs, cleanup activities, and water-management efforts that have enabled the Facility to safely manage over 30 inches of rainfall, while also reducing concentrations of nutrients in the remaining

---

[12] *See also Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743, 759 (7th Cir. 2004) ("[T]he statute does not require that the State succeed; it requires only that the State try, diligently."); *S. River Watershed*, 484 F. Supp. at 1367 ("Plaintiffs must do more than show that the agency's prosecution strategy is less aggressive than they would like.").

water in the NGS-S by greater than 85%;[13] and (3) commenced negotiations with an engineering firm that will be tasked with drawing up plans to close the facility. The record demonstrates that the State is pressing to close the Facility, and the CWA requires Plaintiffs to allow FDEP to fulfill its enforcement mission.

### B.   Plaintiffs Fail To State A Claim That FDEP Engaged In An Unlawful Discharge Under The CWA.

Plaintiffs' CWA claim alleges a violation of 33 U.S.C. § 1311(a), which prohibits "the discharge of any pollutant by any person" if not in compliance with the CWA.  *See* SAC ¶¶ 305, 364, 366, 377.  While "person" is defined in the CWA to include a state or political subdivision of a state, 33 U.S.C. § 1362(5), Plaintiffs do not once allege a "discharge ... by" FDEP during the five-year limitations period. Instead, each and every specific allegation mentioning a discharge from Piney Point after 2011—all in 2021—states that HRK, not FDEP, discharged the alleged pollutant.[14]  Indeed, for all discharges "between March 26 and April 9, 2021," the SAC alleges that "***HRK*** discharged approximately 215 million gallons of wastewater from Piney Point through multiple point sources into Tampa Bay."

---

[13] Updates on developments at Piney Point are available at https://protectingfloridatogether.gov/PineyPointUpdate.

[14] *See* SAC ¶ 191 ("On March 26, 2021 HRK began discharging water from Piney Point into Piney Point Creek."), ¶ 210 ("HRK punctured relief holes through the soil and the liner."), ¶ 213 ("HRK chose to drill more relief through the soil and liner in the east wall toe ditch to try to relieve additional pressure"); ¶ 214 ("On March 30, 2021, at approximately 2 pm EST, HRK began discharging  wastewater from the NGS-S into Port Manatee via one of two available siphon lines."), ¶ 221 ("On April 1, 2021, HRK attempted to stop the discharge to Piney Point Creek from cleanout #3.  While the flow was temporarily mitigated, it became backed up and began discharging out of cleanout #5."), ¶ 224 ("On April 1, 2021, HRK made five additional punctures...."), ¶ 381 ("HRK's discharge of pollutants during the 2021 Discharge....").

SAC ¶ 307 (emphasis added).[15]   Accordingly, Plaintiffs have not alleged facts sufficient to state a section 1311(a) claim against FDEP.  *See Iqbal*, 556 U.S. at 664 ("While legal conclusions can provide the complaint's framework, they must be supported by factual allegations."); *Twombly*, 550 U.S. at 555 ("[f]actual allegations must be enough to raise a right to relief above the speculative level").

Because Plaintiffs cannot credibly allege that FDEP discharged pollutants from Piney Point, they instead include two allegations that these discharges occurred on FDEP's "order."  SAC ¶¶ 358, 373.  But Plaintiffs offer no further elaboration regarding this "order" or how it transforms FDEP into a "person" that "discharge[ed] any pollutant."  33 U.S.C. § 1311(a).  In fact, the "order" to which Plaintiffs seemingly refer said no such thing.  In the spring of 2021, HRK alerted FDEP—the State's environmental regulator—that HRK was about to engage in an uncontrolled discharge through a catastrophic breach of the containments at Piney Point.  *See* FDEP Emergency Final Order No. 21-0323 ¶¶ 5, 11, 13.  FDEP was thus faced with standing by and allowing flooding of local communities from an uncontrolled discharge—with attendant "personal injury or severe property or

---

[15] The SAC alleges that FDEP "discharged ... wastewater" in 2004 and 2011, SAC ¶¶ 94, 97, but these alleged actions fall well outside of the CWA's five-year statute of limitations, 28 U.S.C. § 2462, and also cannot serve as a basis for injunctive relief.  While the second paragraph of the SAC broadly alleges that in April 2021, "Defendants chose to discharge at least 215 million gallons of untreated, hazardous wastewater directly into Tampa Bay," subsequent allegations make clear that discharge was by HRK.  The SAC also contains two allegations of discharges made in the passive voice, neither of which mention FDEP.  *See* SAC ¶ 241 ("On April 4, 2021, discharges from Piney Point into Port Manatee continued."), ¶ 249 ("Discharges of wastewater from Piney Point to Port Manatee continued nonstop through April 9, 2021.").

environmental damage," *id*. ¶ 13—or approving, as a regulator reacting to an emergency, a controlled release that would avoid the potential loss of life and property from a sudden flood.  Accordingly, if all other mitigation measures failed, FDEP "approved" HRK to "begin temporarily discharging the Mixed Seawater through the NGS-S decant structure to Class-III marine waters." *Id*. ¶ 19.  If the CWA imposes federal liability on state regulators for such actions, the consequences will be dire, creating an incentive for regulators to simply avoid taking emergency measures in situations in which they are most needed.

### C.    Plaintiffs Fail To State A Claim Of Ongoing Discharge Into Waters Of The United States.

Citizen-plaintiffs cannot bring a CWA suit for wholly past violations. *Gwaltney of Smithfield, Ltd*., 484 U.S. at 59.  Rather, they must "allege a state of either continuous or intermittent—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Id*. at 57.  And to constitute a violation, a discharge must be into the "waters of the United States," 33 U.S.C.A. § 1362(7), which "include only relatively permanent, standing or flowing bodies of water." *Rapanos v. United States*, 547 U.S. 715, 732 (2006).  Plaintiffs fail to meet those pleading requirements.

First, Plaintiffs admit that the alleged violation has not been continuous, SAC ¶ 251 ("FDEP and HRK reported that the flow coming from the … seepage location had finally ceased."), and they acknowledge that extensive remedial measures were taken.  SAC ¶¶ 260–62, 265–66, 268–69.  Plaintiffs allege on information and belief that the "flow continues to date" where the steel plate was

placed, *id.* ¶ 256, and also that that "wastewater within the NGS-S continues to seep through the liner breach at Seam 271," *id.* ¶¶ 270–72, but they do not allege any facts to support their suggestion of continuing seepage.  They also allege upon information and belief that such discharges "are ongoing and continuous," SAC ¶ 306, and that "such unlawful discharges have occurred daily and continuously for at least the past five years and sixty days," SAC ¶ 366.  But such bald allegations, devoid any factual support, do not state a claim under *Iqbal* and *Twombly*.  *See Holding Co. of the Vills., Inc. v. Little John's Movers & Storage, Inc.*, 2017 WL 6319549, at *7 (M.D. Fla. Dec. 11, 2017) (citing *Iqbal* and not accepting as true an allegation made "upon information and belief" that was merely a legal conclusion); *Associated Indus. Ins. Co. v. Advanced Mgmt. Servs., Inc.*, 2013 WL 1176252, at *3 (S.D. Fla. Mar. 20, 2013) (Marra, J.) ("The *Twombly* plausibility standard" requires information and belief pleading be "based on factual information that makes the inference of culpability plausible.").

Second, Plaintiffs ignore the State Actions and the state court's appointment of a receiver to oversee the closure of Piney Point.  Under such circumstances, Plaintiffs fail to plausibly allege a likelihood of continuing violations.[16]

---

[16] *See Coon v. Willet Dairy, LP*, 2007 WL 2071746, at *2–3 (N.D.N.Y. July 17, 2007) (dismissing CWA claims because the defendant had entered into a consent order with the state environmental agency prior to the lawsuit, and the plaintiffs presented no evidence that the violation was ongoing or likely to recur); *Aiello v. Town of Brookhaven*, 136 F. Supp. 2d 81, 120 (E.D.N.Y. 2001) (holding CWA does not allow citizen suit against a past polluter "for the ongoing migrating leachate plume").

Third, Plaintiffs do not make *any allegations at all* (on "information and belief or otherwise) to establish that the supposedly ongoing seepage reaches the waters of the United States.

### D.    Plaintiffs Fail To State A Valid CWA Claim Against FDEP Because An NPDES Permit Was In Force.

Plaintiffs' CWA claim against FDEP (Count II) rests on a single legal conclusion: that the NPDES Permit "expired on March 25, 2001." SAC ¶ 301; *see also* SAC ¶ 365 ("[t]here is no lawfully-issued NPDES permit for point source discharges from Piney Point"). However, the 2011 Administrative Agreement and 2014 Consent Order show on their face that the permit did not expire on March 25, 2001.

First, the Administrative Agreement states that the then-holder of the permit, Piney Point Phosphates, timely filed an application for the renewal of the NPDES Permit. RJN Ex. F § 1(f). This timely filing for the renewal of the NPDES Permit tolled expiration of the Permit. *See* § 403.0885(3), Fla. Stat. ("[A] permit issued under this section shall not expire until the application has been finally acted upon."); § 120.52(7), Fla. Stat. (defining "final order" to include "final agency actions" and mean, among other things, a written final decision on petition for formal administrative proceedings). Plaintiffs do not allege facts to plausibly establish that FDEP took final action with respect to such proceedings.

Second, the 2011 Administrative Agreement states that the NPDES Permit was transferred to HRK on September 8, 2009, RJN Ex. D § 1(k), and the Consent Order indicates that HRK submitted a revised application for the renewal of the

NPDES Permit on September 28, 2009, RJN Ex. E ¶ D.  *See* § 403.0885(3), Fla. Stat.  Plaintiffs do not allege facts to plausibly establish that HRK did not submit such an application; nor do they plausibly allege that FDEP has taken final action on that application.   Indeed, the 2011 Administrative Agreement itself contemplates the NPDES Permit remaining in force until further action from FDEP.  RJN Ex. F § 2 ("This Administrative Agreement will continue in-force until the Department takes Final Agency Action on re-issuance of the NPDES Wastewater Permit No. FL0000124.").  Accordingly, Plaintiffs cannot escape the fact that the NPDES Permit continues by operation of law and is still in force.  Therefore, Count II should be dismissed.

### III.   PLAINTIFFS' RCRA CLAIM SHOULD BE DISMISSED.

#### A.   Plaintiffs' RCRA Claim Is Barred By Plaintiffs' Failure To Comply With The Statute's Notice Requirements.

Plaintiffs' RCRA "endangerment claim" (Count I), brought pursuant to 42 U.S.C. § 6972(a)(1)(B), is improper because it failed to meet mandatory notice requirements.  As a matter of timing, citizen-plaintiffs generally cannot file a RCRA claim "prior to ninety days after the plaintiff has given notice of the endangerment," though such a claim can be filed "immediately after such notification" only "in the case of an action … respecting a violation" of the subchapter regulating hazardous waste.  42 U.S.C. § 6972(b)(2)(A).  *See also* 42 U.S.C. §§ 6921-6939f (Subchapter III, "Hazardous Waste Management").  Regardless of whether the 90-day delay period applies, the "[n]otice regarding an alleged violation of a permit, standard, regulation, condition, requirement, or

order which has become effective under [RCRA] shall include sufficient information to permit the recipient to identify the specific permit, standard, regulation, condition, requirement, or order which has allegedly been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, and the date or dates of the violation." 40 C.F.R. § 254.3(a).  *See Aiello*, 136 F. Supp. at 106 n.25 (requiring proof of notice where plaintiff brought hazardous-waste endangerment claim).

Compliance with the notice requirements—both as to timing and substance—is a "mandatory, not optional, condition precedent" to commencing suit, and failure to do so requires dismissal.  *Hallstrom*, 493 U.S. at 26; *see also Brod v. Omya, Inc.*, 653 F.3d 156, 165 (2d Cir. 2011).  The notice requirement is "strictly construed to give the alleged violator the opportunity to correct the problem before a lawsuit is filed."  *Nat'l Parks & Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 502 F.3d 1316, 1330 (11th Cir. 2007); *see also Hallstrom*, 493 U.S. at 29 (notice requirement "allows Government agencies to take responsibility for enforcing environmental regulations, thus obviating the need for citizen suits," and "gives the alleged violator 'an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit.'") (quoting *Gwaltney of Smithfield, Inc.*, 484 U.S. at 60).

Plaintiffs served the Notice Letter on May 18, 2021, and filed their RCRA endangerment claim on June 24, 2021, before the ninety-day delay period had elapsed. In an effort to bypass this requirement, Plaintiffs seek to invoke the

hazardous-waste exemption.  *See* Notice Ltr. 2, 19–21; SAC ¶¶ 328–33.  But the allegations in the Notice Letter do not satisfy this exemption.

       1.    <u>Plaintiffs Did Not Sufficiently Identify a "Hazardous Waste" to Avoid the Ninety-Day Delay Period.</u>

As just explained, a notice letter must contain "sufficient information" regarding any alleged RCRA violation.  40 C.F.R. § 254.3(a).  "[T]he information provided must include the pollutant alleged to be the basis of a violation subsequently alleged in the complaint" and "the [notice] letter must differentiate pollutants from nonpollutants and one pollutant from another." *Brod*, 653 F.3d at 166-68.  *See also Nat'l Parks*, 502 F.3d at 1330 (holding, under analogous CWA requirement, "[t]o provide adequate notice of each violation that will be targeted in the citizen suit, the [notice] letter must differentiate ... one pollutant from another"); *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 488 (2d Cir. 2001) ("[A] [notice] letter must identify with reasonable specificity each pollutant that the defendant is alleged to have discharged unlawfully.  Failure to do so will justify a district court's dismissing claims based on pollutants not properly noticed.").

Plaintiffs' Notice Letter did not reasonably identify the specific hazardous waste allegedly at issue.  The Notice Letter repeatedly invokes the bald terms "hazardous waste," "new waste material," "pollution," or "toxic leachate," Notice Ltr. 2, 19, 21, 23; alleges that "comingling of all these waters render them 'hazardous waste,'" *id*. at 20; alleges that "dredged material ... mix[ed] with existing solid waste, creating a new waste material that ... [is] a hazardous waste,"

*id.* at 21; and alleges that "precipitation, dredged materials, and process wastewater ... comingle[d] and intermix[ed] with phosphogypsum stack material, creating a leachate that ... [is] a hazardous waste," *id.* at 23.  But not once does the Notice Letter identify with specificity the allegedly hazardous waste, nor explain how that alleged waste exhibits characteristics that would render it "hazardous" under RCRA.  *See* 42 U.S.C. § 6921(b)(1) (directing EPA to "promulgate regulations identifying the characteristics of hazardous waste and listing particular hazardous wastes"); 40 C.F.R. Subpart D (listing more than 100 hazardous wastes by name); 40 C.F.R. §§ 261.20–.24 (identifying characteristics that render a solid waste "hazardous").[17]  Instead, the Notice Letter baldly asserts that the alleged unnamed waste "satisfies all regulatory requirements for being deemed a hazardous waste." Notice Ltr. at 2.  This *ipse dixit* did not meaningfully apprise FDEP of the hazardous waste at issue.

The letter is also deficient in that it does not mention either monoammonium or diammonium phosphate even though the amended complaint alleges that it is the "[c]ommingling of Bevill-exempt phosphoric acid production

---

[17] The Notice Letter includes an exhibit detailing monitoring well data in the groundwaters surrounding Piney Point.  Yet the Notice Letter fails to tie any of these specific pollutants to the exempt solid wastes present in the stacks at Piney Point and, more importantly, to the alleged new waste that is the subject of Plaintiffs' notice. Further, as the Notice Letter concedes, this well data is "[h]istorical," while Plaintiffs' substantial-endangerment claim centers on "the liner breach *in 2021* that ... creat[ed] a new waste material that satisfies the regulatory requirements for categorization as hazardous waste."  Notice Ltr. 21, 25 (emphasis added).  In any event, the mere listing of certain hazardous pollutants, without more, is not enough information for FDEP to identify and correct the violation.  *See Cmty. Ass'n for Restoration of the Env't, Inc. v. George & Margaret LLC*, 954 F. Supp. 2d 1151, 1162 (E.D. Wash. 2013).

wastes with wastes from monoammonium and/or diammonium production processes" that vitiates the Bevill exemption. *See* SAC ¶¶ 59, 331.

Underscoring the Notice Letter's deficiency is the fact that all of the component parts of the alleged new waste are exempt from classification as hazardous wastes. Phosphogypsum and process wastewater are exempt pursuant to 40 C.F.R. § 261.4(b)(7)(ii)(D) & (P), as the Notice Letter concedes. *See* Notice Ltr. at 6, 9, 20. Likewise, "[d]redged material that is subject to the requirements of a permit that has been issued under 404 of the Federal Water Pollution Control Act … is not a hazardous waste." 40 C.F.R. § 261.4(g). The dredged material stored at Piney Point is covered by a 404 permit issued by the U.S. Army Corps of Engineers. *See* RJN Ex. I. Because the constituents of Plaintiffs' alleged "new waste material" are all exempt, Plaintiffs must affirmatively show—with particularity—how the "new" "mixture" satisfies the legal criteria for such "hazardous" waste.[18]

The instant case is on all fours with the Second Circuit's decision in *Brod v. Omya*, 653 F.3d 156. There, the plaintiffs brought a RCRA endangerment claim alleging that (i) aminoethylethanolamine ("AEEA"), a hazardous waste, was seeping into groundwater, and (ii) open dumping of arsenic was occurring. *Id.* at 158. But the plaintiffs' notice letter did not mention either AEEA or arsenic, and

---

[18] The SAC alleges that ammonia and nitrogen are present in process wastewater. SAC ¶ 330. Plaintiffs never referred to these substances in their Notice Letter and thus these belated allegations cannot satisfy RCRA's notice requirement, including because neither nitrogen nor ammonia is listed as a hazardous waste.

instead only stated that "the wastes are contaminated with numerous chemicals, including hazardous chemicals listed under Subchapter III of RCRA." *Id*. at 159. Emphasizing the "sufficient information" requirement of 40 C.F.R. § 254.3(a), the court dismissed the RCRA endangerment claims, holding that the notice letter was deficient for failing to specifically name the hazardous wastes at issue. *Id*. at 168–69.   The court held that "when an alleged violation of RCRA depends on the presence or release of a particular contaminant, the [notice letter] must identify the contaminant alleged to be the basis of the violation with sufficient specificity to permit the recipient to identify the specific legal provision alleged to be violated and the activity alleged to constitute the violation." *Id*.

*Brod*'s rule—that a notice letter must specify the hazardous waste at issue—is followed by the Eleventh Circuit and across the circuits and courts to have addressed the issue.   *See Nat'l Parks*, 502 F.3d at 1329–30 (notice letter inadequate where the plaintiffs' "ultimate . . . claim alleged only that [the defendants] violated the standards for sulfur dioxide—a much narrower claim than the [notice] letter's broad allegations of constant violations of the entirety of Subpart D"); *Paolino v. JF Realty, LLC*, 710 F.3d 31, 37 (1st Cir. 2013) ("only those discharges for which the notice identifies a particular pollutant will withstand a sufficiency challenge"); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 401 (4th Cir. 2011) (notice letter inadequate because of "plaintiffs' failure to allege Phase II violations for cadmium, zinc, iron, or oil and grease," which were basis of district court finding of liability); *N. Ill. Gas Co. v. City*

29

*of Evanston, Ill.*, 162 F. Supp. 3d 654, 665 (N.D. Ill. 2016) (notice letter inadequate where "allegations in the notice about 'coal tar' ... would not have alerted the [defendants] to the widespread release of Lowe Process waste oil alleged in the complaint"); *Bldg. & Constr. Trades Council of Buffalo, New York & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 158 (2d Cir. 2006) (RCRA notice letter was "sufficient" to state a claim for solid and hazardous waste disposal because it specified the "[g]roundwater contaminants [disposed of at the site]").

Because Plaintiffs' endangerment theories of improper disposal and leakage rely on the presence of a hazardous waste that was not sufficiently noticed to avoid the mandatory delay period, their RCRA claim should be dismissed.

2.   Plaintiffs Did Not Sufficiently Identify a Violation of a "Specific Regulation" under Subchapter III to Avoid the Ninety-Day Delay Period.

The Notice Letter also failed to provide "sufficient information to permit the recipient to identify *the specific permit, standard, regulation, condition, requirement, or order* which has allegedly been violated." 40 C.F.R. § 254.3(a) (emphasis added). It is fatally vague with respect to the requirement that is allegedly being violated, stating only: "The Piney Point impoundments and wastewater infrastructure are not compliant with any of the requirements under RCRA subchapter III (also known as RCRA Subtitle C) for hazardous waste storage, treatment, and disposal facilities. *See generally* 42 U.S.C. § 6924; 40 C.F.R. Part 264." Notice Ltr. at 2; *see also id.* at 6 (FDEP's "closure plan was not compliant with any aspect of RCRA Subtitle C, pertaining to hazardous waste

treatment, storage, and disposal requirements. *See generally* 42 U.S.C. § 6924; 40 C.F.R. Part 264."). The Notice Letter's broad citation to an entire subtitle of RCRA did not enable FDEP to identify the specific standard or regulation violated.

First, section 6924 does not provide standards for hazardous-waste storage, treatment, and disposal, but instead directs the EPA to "promulgate regulations establishing such performance standards, applicable to owners and operators of facilities for the treatment, storage, or disposal of hazardous waste." 42 U.S.C. § 6924(a). Second, while the EPA has done so in Part 264, that part, in turn, is comprised of thirty-two subparts—each subpart, in turn, consisting of many more standards and regulations for the treatment of hazardous wastes. *See* 40 C.F.R. § 264. For instance, these subparts range from "General Facility Standards," to "Preparedness and Prevention," to "Releases from Solid Waste Management Units," to "Land Treatment," and more. *See id.*, Subparts B, C, F, M. Thus, the Notice Letter's sweeping citation to "Part 264" hardly put FDEP on notice of the "specific" requirement at issue. And this uncertainty over the specific legal requirement at issue is compounded by the Notice Letter's failure to identify the hazardous waste allegedly at issue.

*National Parks* is instructive. There, the plaintiffs alleged a New Source Performance Standards claim, and "identified Subpart Da (40 C.F.R. §§ 60.40a-49a) out of the 80 subparts of 40 C.F.R. Part 60 as the governing regulations." 502 F.3d 1316, 1329 (11th Cir. 2007). The Eleventh Circuit held that merely pointing to a subpart was insufficient to apprise the defendants of the regulation violated

31

because that subpart, in turn, was comprised of various emission standards for various pollutants. *Id*. Instead, the Eleventh Circuit stressed that a notice letter must detail the "specific standard" violated. *Id*. at 1329–30. The Notice Letter here, citing only a Part, is even more deficient than the one in *National Parks*, which pointed to a subpart. As in *National Parks*, "[a]iming for breadth of coverage, the [Notice Letter] substitutes sweeping language for the particularity required by" section 254.3(a). *Id*. at 1330.

Moreover, RCRA subchapter III applies only to "owners and operators" of facilities, and the Notice Letter fails to explain how FDEP is a present owner or operator of Piney Point, and thus further fails to identify the specific permit, standard, regulation, condition, or order that could be at issue.

### B.   Plaintiffs Fail To State A Claim For RCRA Endangerment.

Plaintiffs' RCRA claim (Count I) is that, under 42 U.S.C. § 6972(a)(1)(B), FDEP, as a "past or present owner or operator of a treatment, storage, or disposal facility[,] … has contributed or … is contributing to the past or present handling, storage, treatment, transportation, or disposal of any … hazardous waste which may present an imminent and substantial danger to health or environment." *See* SAC ¶ 6 (invoking jurisdiction based solely on "violation of subchapter III" of RCRA, which concerns hazardous wastes); *id*. ¶ 316 (incorporating ¶ 6 into Count I); *id*. ¶ 339 (alleging that FDEP "is a past and present owner of Piney Point"); *id*. ¶ 340 (alleging contribution); *id*. ¶¶ 351–53, 356–57, 360 (alleging "imminent and substantial endangerment"). But Plaintiffs fail to adequately plead such a

violation; their conclusory allegations fall well short of the bar set by Rule 8(a)(2), *Twombly*, and *Iqbal*.

<u>First</u>, to adequately plead an endangerment claim based on hazardous waste, a plaintiff must identify the hazardous waste at issue and explain whether and how it exhibits the legal requirements for hazardous waste. *See Trades Council of Buffalo*, 448 F.3d at 155 (plaintiff "must do more than allege generally that 'hazardous waste' has been disposed of by a defendant or that the defendant is somehow regulated by RCRA's hazardous waste management provisions."); *Envirowatch, Inc. v. Fukino*, 2007 WL 1933132, at *5 (D. Haw. June 28, 2007) (RCRA complaint insufficient where it "does not specify what type of hazardous waste has been deposited").  Here, the SAC fails to name a specific hazardous waste and alleges only "a new leachate waste." SAC ¶ 328; *see also id*. ¶ 173 (alleging "a leachate waste" without naming it); *id*. ¶ 329 (alleging a "new hazardous waste" without naming it or explaining its hazardous characteristics).[19]  The SAC further provides only conclusory statements that this "new leachate waste ... satisfies statutory and regulatory requirements for being characterized as 'hazardous waste' under RCRA." *Id*. ¶ 328; *see also id*. ¶ 173 (alleging a "leachate waste that satisfies all requirements for being regulated as hazardous waste" and baldly stating that it "exhibits" the "characteristic of ignitability," "characteristics of corrosivity,"

---

[19] The SAC alleges the presence of ammonia and nitrogen in the process wastewater at Piney Point, SAC ¶¶ 74, 330–32, but this allegation was not in the Notice Letter and thus cannot form the basis of Plaintiffs' hazardous-waste claim.  In any event, the SAC fails to allege that such wastes are hazardous, and neither ammonia nor nitrogen in itself, and without more, is deemed a hazardous waste.

"characteristics of reactivity," and "characteristics of toxicity"). Plaintiffs provide no factual support for, or elaboration of, these conclusory statements. These are precisely the kind of "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, [that] do not suffice" to state a claim. *Iqbal*, 556 U.S. at 678.

Moreover, the SAC alleges that this unidentified "new leachate waste" was created from the mixture of "dredged material with the phosphogypsum waste and process wastewater." SAC ¶ 328; *see also id.* ¶ 173 ("dredged materials ... mix, comingle, and/or interact with the phosphogypsum stack and process wastewater in such a matter that creates a leachate waste"); *id.* ¶ 332 (alleging "[c]ommingling of Bevill-exempt phosphoric acid production wastes with wastes from monoammonium and/or diammonium phosphate production processes"). As Plaintiffs concede, phosphogypsum, process wastewater, and dredged material are exempt from categorization as hazardous wastes. *See id.* ¶¶ 6, 53, 55, 111. Plaintiffs make the legal claim that "[c]omingling of Bevill-exempt phosphoric acid production wastes with any other solid or hazardous wastes vitiates the hazardous waste exclusions under 40 C.F.R. [§] 261.4(b)(7)." *Id.* ¶ 333. But Plaintiffs ignore the specific regulation addressing the mixture of exempt solid wastes, which provides, in relevant part:

> any mixture of a waste from the extraction, beneficiation, and processing of ores and minerals excluded under § 261.4(b)(7) and any other solid waste exhibiting a characteristic of hazardous waste under subpart C is a hazardous waste only if it exhibits a characteristic that would not have been exhibited by the excluded waste alone if such

34

mixture had not occurred, or if it continues to exhibit any of the characteristics exhibited by the non-excluded wastes prior to mixture.

40 C.F.R. § 261.3(a)(2)(i).[20]   The SAC offers no description of how a non-excluded waste may itself have been a hazardous waste, or how the alleged mixture of the "waste … excluded under § 261.4(b)(7)" with other alleged wastes results in a hazardous waste under this rule.   Accordingly, the SAC's "'naked assertion[s]' devoid of 'further factual enhancement'" regarding the loss of exempt status are insufficient to state a claim for imminent and substantial endangerment from hazardous waste.   *Iqbal*, 556 U.S. at 678.

<u>Second</u>, the SAC fails to allege an adequate violation of Subchapter III because it only references broad swaths of regulations without articulating specific violations.   *See* SAC ¶¶ 15, 18, 20, 23, 26, 85, 328, 360.[21]   Such shotgun pleading is insufficient to state a claim of imminent and substantial endangerment from a hazardous waste.   *See Trades Council of Buffalo*, 448 F.3d at 155 ("the amended complaint fails to specify any of the provisions of subchapter III itself, 42 U.S.C. §§ 6921-6939e, or to allege explicitly a violation of any of the regulations promulgated thereunder"); *AM Int'l, Inc. v. Datacard Corp.*, 106 F.3d 1342, 1350 (7th Cir. 1997) (only claims involving specific violations of Subchapter III, and not

---

[20]   Plaintiffs allege that "[e]xempt hazardous waste … loses its exempt status when it is comingled or intermixed with other solid waste, where the new waste material exhibits the characteristics of hazardous waste."   SAC ¶ 57.   As noted, this is a flat misstatement of the law and ignores entirely the text of 40 C.F.R. § 261.3(2)(i).

[21]   Plaintiffs cite one specific regulation in their RCRA claim, 40 C.F.R. § 257.3-2, but that regulation involves solid—not hazardous—waste disposal.   *See* SAC ¶ 359.

those generally "involving" hazardous waste, "respect[ ] a violation of RCRA's hazardous waste management regulations.").[22]

    <u>Third</u>, the SAC fails to state a claim for a violation of RCRA subchapter III because it fails to allege facts sufficient to show FDEP is a current owner or operator of Piney Point, and Subchapter III applies only to "owners and operators of hazardous waste treatment, storage, and disposal facilities."   42 U.S.C. § 6924(a); *see also* 40 C.F.R. § 264.1(b) ("The standards in this part apply to owners and operators of all facilities which treat, store, or dispose of hazardous waste.").   An owner is "the person who owns a facility or part of a facility."   40 C.F.R. § 260.10.   Although Plaintiffs offer the conclusory allegation that FDEP "is a ... present owner of Piney Point," SAC ¶ 339, the SAC concedes that by 2006 FDEP had no ownership interest in Piney Point.   *Id.* ¶ 100.[23]

---

[22] *See also Cooper v. Armstrong Rubber Co.*, 1989 WL 60338, at *7 (S.D. Miss. Feb. 1, 1989) ("The complaint in this case contains no allegation of specific violations of subchapter III.   Rather, plaintiffs charge generally that [defendant] 'used unsafe and improper methods of disposing of both solid and liquid hazardous waste' and that its activities constituted 'an imminent hazard under the [RCRA].'   This, in the court's view, does not sufficiently allege a violation of subchapter III; the reference to hazardous waste does not put defendant on notice of what violations are claimed to have occurred."); *cf. Nat'l Parks*, 502 F.3d at 1328 (analogizing a notice letter that "broadly alleged daily violations of an entire set of regulations without specifically identifying the individual alleged violations and dates" to be "the notice equivalent of a 'shotgun complaint.'").

[23] While the question of prior ownership is immaterial because of sovereign immunity, *Florida Ass'n*, 225 F.3d at 1219, FDEP is not a prior owner either.   Plaintiffs allege that FDEP became the owner in February 2001 through a court-ordered receivership. SAC ¶ 87.   That assertion is wrong.   A receiver acts as an agent of the court, and "[t]he property in his hands is not, in a legal sense, in his possession. It is in the possession of the court, whose appointee he is, by him as its officer."   *Taylor v. Sternberg*, 293 U.S. 470, 472 (1935); *see also N. Am. Broadcasting, LLC v. United States*, 306 F.Appx. 371, 373 (9th Cir. 2008) ("The property in his hands [the receiver] is in *custodia legis*; it is the court itself that has the care of the property in dispute."); *In re Chira*, 343

An operator is "the person responsible for the overall operation of a facility." 40 C.F.R. § 260.10.  The historical record confirms HRK—not FDEP—was the party responsible for the Facility at all relevant times.[24]   All of Plaintiffs' allegations regarding FDEP's status as an operator of Piney Point, SAC ¶ 339b., improperly conflate government *regulation and oversight* with *operation.*  If Plaintiffs' theory is correct, then any RCRA claim against the private owner/operator of a waste facility could also be brought against the state (or federal) entity *regulating* the alleged disposal violations.  Indeed, if FDEP's alleged current activities at Piney Point transform it into an operator, then *this Court* itself will be transformed into an operator of Piney Point if it grants the relief and undertakes the ongoing supervision of the facility that Plaintiffs request.  *See* SAC Request for Relief ¶¶ 4, 9 ("Plaintiffs pray that this Court … [e]xercise close supervision over Defendants as they implement a remedial investigation and closure plan," and "require[e] Defendants to take immediate corrective action at Piney Point that will eliminate the possibility of future discharges.").

---

B.R. 361, 368 (S.D. Fla. 2006) ("Florida law is clear that a receiver is the custodian for the court, through which the court controls the receivership estate.").

[24] *See, e.g.*, RJN Ex. E ¶ 8 ("By virtue of its acquisition and ownership of the Stack System … HRK assumed responsibility for providing and conducting long-term care, maintenance, monitoring, and uses of the closed portions of the Stack System."); *id.* ¶ 13 ("Pursuant to the terms of the Settlement Agreement on January 28, 2011, HRK assumed responsibility for those administrative and physical activities associated with the operation, maintenance, and management of the Stack System."); *see also* RJN Ex. F (defining HRK as "Responsible Authority" and describing its responsibility for management and operation of the Facility).

Fourth, Plaintiffs fail to show how FDEP "has contributed or ... is contributing to the past or present handling, storage, treatment, transportation, or disposal of ... hazardous waste which may present an imminent and substantial endangerment." 42 U.S.C. § 6972(a)(1)(B). The SAC essentially alleges three phases of FDEP's involvement at Piney Point, but FDEP's asserted role in each was that of regulator, not a "contributor."

**(1)** The SAC alleges that FDEP was hands-on for the installation of the liner and conversion of the stack into a reservoir. *See* SAC ¶¶ 91–92. But these activities could not "contribute" to the storage of the later-added waste (*i.e.*, the dredge spoil) that the SAC alleges presents a danger because these activities pre-dated the alleged existence of that waste and contemplation that such waste would be stored in the reservoir. *See Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 852 (9th Cir. 2011) ("[T]o state a claim predicated on RCRA liability for 'contributing to' the disposal of hazardous waste, .... [m]ere design of equipment that generated waste, which was then improperly discarded by others, is not sufficient.").[25]

**(2)** The SAC alleges that FDEP *approved* the storing of dredged material in the reservoir. *See* SAC ¶¶ 111, 117, 120–21, 141, 147, 340, 352. But again, the SAC does not contend that FDEP itself had an active role in depositing the waste there—instead, the SAC asserts that MCPA and HRK played this role, and that "MCPA was

---

[25] *See also Hinds Invs., L.P. v. Team Enters., Inc.*, 2010 WL 1663986, at *12 (E.D. Cal. Apr. 22, 2010) ("For RCRA purposes, the SAC reveals Hoyt's passive conduct limited to manufacture of the Hoyt Sniffer which was operated by others. Hoyt did not generate or dispose of a hazardous substance or engage in waste management activities.").

responsible for the dredging of the Berth 12 expansion project," and "also responsible for transporting dredged material" there. *Id*. ¶¶ 148–49; *see also id*. ¶¶ 110–12, 147–49. FDEP's "approval" as a regulator is not tantamount to the "control" necessary to create RCRA liability. *See Sycamore Indus. Park Assocs. v. Ericsson, Inc.*, 546 F.3d 847, 854 (7th Cir. 2008) ("A plain reading of the 'has contributed or is contributing' language of § 6972(a)(1)(B) [means] that RCRA requires active involvement in handling or storing of materials for liability.").

**(3)** Plaintiffs focus on FDEP's emergency measures in 2021, when FDEP, as a regulator and first responder, took action to avoid imminent harm arising from HRK's mismanagement of the facility. But, here again, Plaintiffs' claims do not demonstrate FDEP was a contributor. Plaintiffs describe HRK as the lone actor that discharged wastewater from Piney Point to avoid the catastrophic failure of the reservoir, explaining HRK "punctured relief holes through the soil and the liner." *See* SAC ¶ 209; *see also id*. ¶¶ 213, 222, 224. Meanwhile, Plaintiffs claim FDEP's role throughout was to "plac[e] 'stone aggregate' underneath the steel plate covering the liner seam separation" in order to "slow the flow of wastewater out of the impoundment." *Id*. ¶¶ 260–61. FDEP also allegedly "decided to add sand around the liner separation at Seam 271 in an attempt to continue to minimize leakage from the NGS-S." *Id*. ¶ 266. These allegations do not show FDEP acting as contributor; rather, they demonstrate FDEP acting as regulator to mitigate the discharges caused by HRK. Holding RCRA liability for such efforts would create perverse incentives for regulators and first responders to let dangers persist.

## <u>CONCLUSION</u>

For the foregoing reasons, all claims against FDEP should be dismissed in their entirety.

Dated: December 3, 2021    Respectfully submitted,

           By: <u>s/ *Jesse Panuccio*   </u>
             Jesse Panuccio
             Fla. Bar No. 31401
             jpanuccio@bsfllp.com
             Carl Goldfarb
             Fla. Bar No. 125891
             cgoldfarb@bsfllp.com
             BOIES SCHILLER FLEXNER LLP
             401 East Las Olas Blvd., Suite 1200
             Fort Lauderdale, FL  33301
             Telephone: (954) 356-0011
             Facsimile: (954) 356-0022

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this third day of December, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.


<u>s/ *Jesse Panuccio*  </u>
Jesse Panuccio

41