## IN THE UNITED STATE DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

CENTER FOR BIOLOGICAL
DIVERSITY, TAMPA BAY
WATERKEEPER, SUNCOAST
WATERKEEPER, MANASOTA-88,
and OUR CHILDREN'S EARTH
FOUNDATION,

    *Plaintiffs,*

*v.*                        Case No. 8:21-cv-1521

GOVERNOR RON DESANTIS;
SHAWN HAMILTON, in his official
capacity as Acting Secretary, Florida
Department of Environmental
Protection; HRK HOLDINGS, LLC;
and MANATEE COUNTY PORT
AUTHORITY,

    *Defendants.*

---

## GOVERNOR DESANTIS'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT OR, IN THE ALTERNATIVE, TO STAY THE ACTION AND INCORPORATED MEMORANDUM OF LAW

Defendant Ron DeSantis ("Governor DeSantis"), in his official capacity as Governor of Florida, by and through his undersigned counsel and pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and Local Rule 3.01, files this Motion to Dismiss Plaintiffs' Second Amended Complaint or, in the Alternative, to Stay the Action and Incorporated Memorandum of Law ("Motion"). In support, Governor DeSantis states:

## **INTRODUCTION**

This is an action for declaratory and injunctive relief under the Resource Conservation and Recovery Act ("RCRA") and the Clean Water Act ("CWA") against Governor DeSantis and Secretary Shawn Hamilton ("Secretary Hamilton") in their official capacities as the Governor of Florida and Secretary of the Florida Department of Environmental Protection ("FDEP"), respectively, and against HRK Holdings, LLC ("HRK") and the Manatee County Port Authority ("Port Authority").

Plaintiffs ask this Court to declare that Defendants'[1] production and handling of allegedly hazardous waste at the Piney Point Phosphate Plant ("Piney Point") presents an imminent and substantial threat to the environment and public health. In addition, Plaintiffs seek an injunction ordering Defendants to (1) cease all activities at Piney Point that allegedly endanger the environment and public health; (2) conduct a scientific study to determine the sources of the alleged contamination at Piney Point, (3) abate the contamination to prevent the allegedly imminent environmental disaster, (4) take immediate corrective action(s) to prevent all future discharges, and (5)

---

[1] These requests for relief apply to all Defendants. Plaintiffs also ask this Court to declare that HRK and FDEP violated the Clean Water Act by discharging pollutants into navigable waters without an NPDES permit, or violated the terms of their permit by discharging those pollutants. Further, Plaintiffs request an injunction (1) requiring HRK and FDEP to either comply with the Clean Water Act by ending all discharges from Piney Point until obtaining a NPDES permit, or complying with the terms of their NPDES permit, and (2) assessing appropriate civil penalties for HRK and FDEP's alleged CWA violations.

closely supervise Defendants as they perform each requirement and close Piney Point.

This Court, however, does not have subject matter jurisdiction over this action because Plaintiffs lack standing on their claims against Governor DeSantis and their claims are moot as to all Defendants. Moreover, even if this Court had jurisdiction, and even accepting their unfounded allegations as true, Plaintiffs' claims are barred by the diligent prosecution doctrine and fail to state a claim upon which relief can be granted under both the CWA and RCRA. Accordingly, this Court should dismiss the Second Amended Complaint in its entirety. Alternatively, it should abstain and stay this action in favor of the parallel State Actions.

## BACKGROUND[2]

### I.   Piney Point Facility

From 1966 to 1999, Piney Point manufactured phosphate fertilizer on its 670-acre parcel in Manatee County, Florida. Second Amended Complaint ("SAC"), Doc. 50, ¶ 70. The facility stored the phosphogypsum and process wastewater produced during the manufacturing process in large vertical reservoirs, or "stacks," that rise as high as 80 feet and cover more than 450

---

[2] Governor DeSantis draws part of this section from Plaintiffs' Second Amended Complaint, Doc. 50, whose allegations are taken as true for purposes of the Motion. But Governor DeSantis does not admit any of those allegations.

acres.[3] *Id.*, ¶¶ 70–71, 76. In October 1999, FDEP issued Piney Point a National Pollutant Discharge Elimination System (NPDES) Wastewater Permit (the "NPDES Permit") allowing it to discharge specific pollutants into surrounding bodies of waters.[4] *Id.*, ¶¶ 299, 303-05; *see* Motion for Judicial Notice in Support of Motion to Dismiss or, in the Alternative, to Stay ("MJN"), Doc. 52, Ex. H, p. 1. Shortly after ending its manufacturing operations in February 2001, the previous owner filed for bankruptcy and abandoned Piney Point. SAC, ¶ 86.

HRK assumed ownership and control of Piney Point in 2006. *Id.*, ¶ 100. HRK also owns the land surrounding and encompassing the facility subject to a mortgage held by Fortress 2020 Landco, LLC ("Fortress 2020"), as assignee of Regions Bank. MJN, Ex. A, p. 2. In 2007, HRK signed an agreement allowing the Port Authority to store dredge spoil collected while expanding the Manatee County Port in Piney Point's stacks. *Id.,* ¶¶ 107–112. The Port Authority primarily deposited spoil in the stacks from April to October 2011, with lesser amounts added in subsequent years. *Id.*, ¶¶ 147, 169, & 172.

On January 28, 2011, HRK signed a regulatory agreement ("2011 Administrative Agreement") with FDEP requiring HRK to operate Piney Point consistent with Florida's comprehensive scheme for phosphogypsum stacks,

---

[3] In total, Piney Point contains four stacks: New Gypsum Stack-North ("NGS-N"), New Gypsum Stack-South ("NGS-S"), Old Gypsum Stack-North ("OGS-N"), and Old Gypsum Stack South ("OGS-S"). SAC, ¶ 92.
[4] NPDES Permit No. FL0000124. MJN, Ex. H.

which includes discharge standards. MJN, Ex. F, § 8. FDEP brought an administrative action against HRK to enforce the Administrative Agreement, which resulted in a March 17, 2014 Consent Order ("2014 Consent Order") that, among other things, required HRK to develop a plan to empty the stacks and close Piney Point. MJN, Ex. E, ¶ B (citing Fla. Admin. Code §§ 62-673.780 (8)–(10), 62-673.600(3)(b)).

On November 17, 2020, Fortress 2020 brought a foreclosure action in the Twelfth Circuit Judicial Court in and for Manatee County (the "Foreclosure Action") to take possession of certain non-facility portions of the property surrounding Piney Point. MJN, Ex. A. That action is ongoing.

## II. The March 2021 Emergency

On March 25, 2021, HRK notified FDEP that Piney Point's monitoring system detected a leak in the NGS-S stack's liner. SAC, ¶¶ 182–214. On March 29, 2021, FDEP issued an Emergency Final Order declaring "an imminent threat of a potential loss of containment and a catastrophic release [at Piney Point] … [that] could result in personal injury or severe property damage." MJN, Ex. M, p. 2. The Emergency Final Order authorized HRK, "as a last option" and "solely to preserve the integrity of the System," to "discharge . . . to avoid or reduce the amount of an uncontrolled release that may otherwise result from a loss of containment and unpermitted discharge." *Id.*

On March 30, 2021, HRK began controlled discharges from NGS-S. SAC, ¶ 214. In addition, HRK identified a ruptured seam in its liner as the source of the leak and placed a steel plate over the seam. *Id*., ¶¶ 246–48. On April 2, 2021, Manatee County authorities issued evacuation orders for areas near Piney Point. *Id*., ¶ 235. Discharges from NGS-S continued until April 9, 2021, while the stack's primary leak into the surrounding reservoir ceased on April 14, 2021. *Id*., ¶¶ 249 & 251.

FDEP took additional emergency actions to repair the NGS-S throughout April and May 2021. *Id*., ¶¶ 260-269. These included placing stone, geo-composite material, and sand around the steel plate to minimize further leakage through the ruptured seam. *Id*. FDEP also transferred water among Piney Point's lined reservoirs to maintain safe water levels in the event of rainfall. *Id*., ¶ 262. Plaintiffs allege that the steel plate and earthen fills have not completely stopped the leak into the surrounding reservoir, and ultimately into Tampa Bay. *Id*., ¶ 270-72. As a result, Plaintiffs allege that the leak compromised NGS-S's structural integrity and threatens further catastrophic release of its contents. *Id*., ¶¶ 1, 200, 205, 226, 234, 239.

## III.   Citizen Suit Proceedings

On May 17, 2021, Plaintiffs sent FDEP a Notice of Intent to Sue ("Notice Letter") alleging that (1) the contents of NGS-S continued to leak through its liner and (2) continued storage of dredge spoil and process water in the lined

6

reservoirs risked catastrophic failure. Doc. 50-1, p. 23-24. Plaintiffs filed this action thirty-eight (38) days later, on June 24, 2021, alleging a single claim of "imminent and substantial endangerment" under the Resources Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972(a)(1)(B). Doc. 1, ¶¶ 274–320.

Plaintiffs amended their complaint on August 12, 2021, adding two claims under the Clean Water Act ("CWA"), 33 U.S.C. § 1365(a)(1). First Amended Complaint ("FAC"), Doc. 32, ¶¶ 365–88. Plaintiffs plead them as two alternative (and mutually exclusive) theories of liability. *Id*. The first theory alleges that because neither FDEP nor HRK possessed a current NPDES permit for Piney Point, HRK and FDEP are both liable for unpermitted discharges. *Id.*, ¶¶ 362-77. The second claims that HRK is solely liable for the discharges because it did not possess an operative NDPES permit. *Id.*, ¶¶ 378-91.

Plaintiffs filed their Second Amended Complaint on November 19, 2021. Doc. 50. This revision removed three paragraphs and amended a fourth to correct two alleged factual inconsistencies concerning the Port Authority. *Id*; *compare* FAC, ¶¶ 172, 238, 350, & 355 *with* SAC, ¶¶ 173, 239, 353, & 358.

## IV.   State Enforcement Actions

On August 5, 2021, FDEP filed a petition in Florida's Twelfth Judicial Circuit ("Enforcement Action") seeking to (1) enforce the 2014 Consent Order,

(2) enforce the 2011 Administrative Agreement, and (3) appoint a receiver to close Piney Point. MJN, Ex. D.

Concurrently, FDEP filed a Motion for Appointment of Receiver in the Foreclosure Action to take control of Piney Point and oversee its closure. MJN, Ex. B.[5] On August 25, 2021, the Twelfth Circuit granted FDEP's motion and appointed a receiver with the power to "maintain, manage[,] and close as efficiently and expeditiously as possible Piney Point in accordance with all applicable State and Federal laws." MJN, Ex. C, ¶ 11.

## LEGAL STANDARDS

Motions to dismiss for lack of standing and mootness challenge a federal court's subject matter jurisdiction, which it reviews pursuant to Fed. R. Civ. P. 12(b)(1). *Sheely v. MRI Radiology Network, P.A.,* 505 F.3d 1173, 1182 (11th Cir. 2007) ("We have repeatedly said that when a district court disposes of a case on justiciability (mootness) grounds we will treat the district court's determination as if it was ruling on a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) . . ."); *Region 8 Forest Svc. Timber Purchasers Council v. Alcock,* 993 F.2d 800, 807 n.8 (11th Cir. 1993) ("Because a motion to dismiss for lack of standing is one attacking the district court's subject matter jurisdiction, it is brought pursuant to Rule 12(b)(1).").

---

[5] The Enforcement Action and FDEP's concurrent efforts in the Foreclosure Action are hereinafter referred to collectively as the "State Actions."

Plaintiff, as the party invoking the court's subject matter jurisdiction, bears the burden of establishing that jurisdiction. *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994).

Rule 12(b)(1) challenges to a court's subject matter jurisdiction can be "facial" or "factual." *Makro Capital of Am., Inc. v. UBS AG*, 543 F.3d 1254, 1258 (11th Cir. 2008). Facial attacks consider only the complaint's allegations, which they accept as true for purposes of the motion, when reviewing subject matter jurisdiction. *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990).

Factual attacks, on the other hand, question the facts allegedly supporting subject-matter jurisdiction. *Makro Capital*, 543 F.3d at 1258. Accordingly, courts considering such challenges "may consider extrinsic evidence, such as affidavits and testimony," and are "free to weigh the evidence and satisfy [them]sel[ves] as to the existence of [their] power to hear the case without presuming the truthfulness of the plaintiff's allegations." *Id.* (quoting *Morrison v. Amway Corp.*, 323 F.3d 920, 925 n.5 (11th Cir. 2003) (internal quotation marks omitted)).

In addition, to withstand a motion to dismiss under Rule 12(b)(6), "a complaint must include 'enough facts to state a claim to relief that is plausible on its face.'" *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Courts considering a Rule 12(b)(6) motion accept these well-pleaded facts as true and construe them in the light most favorable to plaintiffs, but "a plaintiff's obligation to provide 'the grounds' of his 'entitle[ment] to relief' requires more than mere labels or conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Twombly*, 550 U.S. at 555. In fact, pleadings that are "no more than conclusions . . . are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

## ARGUMENT

The Court should dismiss this action because (1) Plaintiffs do not have standing as to Governor DeSantis; (2) Plaintiffs' claims are moot as to all Defendants; and (3) Plaintiffs' claims are barred by the diligent prosecution doctrine and fail to state a claim under the CWA and RCRA. Alternatively, this Court should abstain under the *Colorado River* abstention doctrine and stay the action in favor of the parallel State Actions.

## I.   Plaintiffs do not have standing to bring their claims against Governor DeSantis.

Article III of the United States Constitution limits the subject-matter jurisdiction of federal courts to "Cases" and "Controversies."  U.S. Const. art. III, § 2. "To have a case or controversy, a litigant must establish that he has

standing," which requires proof of three elements. *United States v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019). For each of his claims, the litigant must allege facts proving (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision in this Court. *Jacobson v. Fla Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020).

The second element, known as "causation" or "traceability," requires a "causal connection between the injury and the conduct complained of [such that] the injury is 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.' " *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 41–42 (1976)). In other words, when pleading his case, a plaintiff must make "general factual allegations of injury resulting from the defendant's conduct." *Lujan*, 504 U.S. at 561.[6]

On this element, the Eleventh Circuit's opinions in *Lewis v. Governor of Alabama*, 944 F.3d 1287, 1296 (11th Cir. 2019) (en banc), *Hollywood Mobile Ests. Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1265–66 (11th Cir. 2011),

---

[6] Such general factual allegations may suffice at the pleading stage because, on a motion to dismiss, courts "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 889 (1990).

and *Doe v. Pryor*, 344 F.3d 1282, 1285 (11th Cir. 2003) are on point and instructive.

In *Lewis*, two employees of the City of Birmingham, Alabama sued the state's Attorney General over a state law preempting the city's ordinance that raises its minimum wage. 944 F.3d at 1297. Plaintiffs offered two theories of standing. *Id.*, at 1296-1301. First, they cited several Alabama code provisions that require the Attorney General to offer his legal opinion and alleged that his failure to discharge that duty by informing the Legislature and Governor that the statute was unconstitutional allowed it to pass and thereby precluded the minimum wage increase. *Id.*, at 1296-97. Second, plaintiffs alleged the Attorney General's efforts and threats to enforce the statute precluded Birmingham from implementing the ordinance and imposing the wage increase. *Id.*, 1296 & 1928.

The Eleventh Circuit rejected both theories. It noted that the first theory misstated the law, the second confused the facts, and as a result neither established wrongdoing by the Attorney General. Specifically, it explained that the Attorney General (1) had no duty to inform the Legislature or Governor that the statute was unlawful, and (2) had neither attempted nor threatened to enforce the law, which itself did not include an enforcement mechanism, much less one tailored to the Attorney General. *Id.*, at 1296-1301. And without wrongful conduct, the Court found that plaintiffs could not trace their injuries

(lower wages) to the Attorney General. *Id.*, at 1296 ("But what, exactly, do they say the Attorney General did wrong –how, exactly, do they trace their injuries to his conduct?") (internal quotation marks omitted).

Likewise, in *Hollywood*, a lessee of real property owned by the Seminole Tribe of Florida brought an action against the Tribe and the Secretary of the Department of the Interior to enjoin the Tribe from repossessing the leased property. 641 F.3d at 1263. The complaint cited some of the Secretary's official responsibilities, but "failed to allege an action of the Secretary that had caused Hollywood any injury." *Id.*, at 1265-66. Accordingly, the Eleventh Circuit found that the plaintiff failed to satisfy its burden to plead and prove causation. *Id.*, at 1266.

Finally, in *Doe v. Pryor,* several plaintiffs sued the Alabama Attorney General to enjoin him from enforcing a state statute prohibiting "deviant sexual intercourse." 344 F.3d at 1283–84 (citing Ala. Code § 13A–6–65(a)(3)). The United States Supreme Court, however, struck down the statute in *Lawrence v. Texas*, 539 U.S. 558 (2003), between the filing of the action and the appeal. And the Attorney General subsequently conceded the statute was unconstitutional and neither attempted nor threatened to enforce it. *Id.*, at 1285. Thus, because the Attorney General took no "challenged action" regarding the Alabama statute, the Eleventh Circuit found that "[plaintiffs'] injuries are not 'fairly traceable' to the only defendant before the Court." *Id.*

13

The same is true here. Indeed, Plaintiffs' Second Amended Complaint makes only three general allegations regarding Governor DeSantis.[7] SAC, ¶¶ 31, 33, 317, & 341. First, it states that Governor DeSantis is the head of Florida's Executive Branch, which includes FDEP. *Id.*, ¶31. Second, it claims that, as Chief Executive, Governor DeSantis is "ultimately responsible for ensuring that Florida's executive agencies operate in compliance with federal law, including RCRA." *Id.*, ¶¶ 31 & 317. Third, it alleges that this role also makes Governor DeSantis the "past and present owner of Piney Point, and . . . also a past and present operator of Piney Point." *Id.*, ¶ 341.

None of these general statements allege, much less prove, causation or traceability. First, the third allegation is plainly incorrect. Governor DeSantis is not, and has never been, an owner or operator of Piney Point.[8] Plaintiffs make this allegation based solely on their claim that FDEP is a past and present owner and operator of Piney Point, but without any evidence that either the agency or Governor DeSantis had any operational control or ownership interest in Piney Point. Moreover, Plaintiffs' conclusory allegations regarding Governor DeSantis and FDEP's role over Piney Point improperly

---

[7] Indeed, the Second Amended Complaint mentions Governor DeSantis by name only seven (7) times in its ninety-five (95) pages. *See* SAC, ¶¶ 31, 33, 317, & 341.
[8] For a deeper discussion of why HRK, not Governor DeSantis or FDEP, is the owner and operator of Piney Point, see FDEP's Motion to Dismiss, Doc. 52, p. 36-37.

conflate government *regulation* and *oversight* with *ownership* and *operation*. *See* SAC, ¶ 340.[9]

The Code of Federal Regulations defines an owner as "the person who owns a facility or part of a facility," and an "operator" as "the person responsible for the overall operation of a facility." 40 C.F.R. § 260.10. The Second Amended Complaint does not allege, much less prove, that FDEP or Governor DeSantis were responsible for the overall operations of, or had any ownership stake in, Piney Point. That is because neither did. In fact, the Second Amended Complaint concedes that, by August 2006, FDEP, and by extension Governor DeSantis, had no ownership interest in Piney Point. SAC, ¶ 100 ("In August 2006, FDEP transferred its ownership of Piney Point to Defendant HRK."). In addition, Plaintiffs' allegations that FDEP is an operator of Piney Point conflict with agency documents – upon which the Notice Letter and Second Amended Complaint rely – that repeatedly and explicitly identify HRK as the operator of Piney Point.[10]

---

[9] If regulatory authority were sufficient to transform an agency into an owner/operator of a waste facility, then plaintiffs could bring RCRA claims against any state agency regulating alleged disposal violations at a state or federal facility. And taking that theory to its logical conclusion, *this Court* could be transformed into an operator if it grants the relief and ongoing supervision Plaintiffs request. *See* SAC Request for Relief, ¶¶ 4, 9 ("Plaintiffs pray that this Court … [e]xercise close supervision over Defendants as they implement a … closure plan," and "require[e] Defendants to take immediate corrective action at Piney Point that will eliminate the possibility of future discharges").

[10] *Compare* Notice Letter, p. 28 (referencing Administrative Agreement FL0000124-003-AA), *with* MJN, Ex. E, ¶ 8 ("By virtue of its acquisition and ownership of the Stack System, and pursuant to the terms of the Administrative Order, HRK assumed responsibility for providing and conducting long-term care, maintenance, monitoring, and uses of the closed portions of the Stack System"); *compare* SAC, ¶ 151 (invoking EFO No. 11-0813), *with* MJN, Ex. F (defining HRK as "Responsible Authority" and describing its responsibility for management and operation of the Facility); *compare* SAC, ¶ 313

Second, FDEP, not Governor DeSantis, administers Florida's NPDES permit program with the Federal government. The Memorandum of Agreement ("MOA") between the Environmental Protection Agency ("EPA") and FDEP establishing the NPDES program clearly states that "FDEP will administer an NPDES program in accordance with the CWA Section 402, this MOA, applicable Florida legal authority, and the annual State Section 106 Program Plan (State 106 Workplan)," and that "[i]n order to conform with new or revised promulgations of federal regulations, [FDEP] must revise its program within one year of promulgation of the new or revised federal regulations." NPDES Memorandum of Agreement between FDEP and EPA Region 4, attached hereto as Exhibit A.[11] Furthermore, the Clean Water Act and the Code of Federal Regulations both make clear that a state's chief legal officer – in this case, the Florida Attorney General, *see* Fla. Constitution, Art. IV, §4(b) – is the official responsible for certifying that a state's NPDES permit

(invoking Administrative Agreement dated January 28, 2021), *with* MJN, Ex. C, § 6, p. 9 (wherein HRK stipulates that it is the "current owner and operator of the Facility").

[11] Further, the MOA states that FDEP has primary responsibility for ensuring: (1) Enforcement against sources introducing pollutants prohibited by 40 C.F.R. § 403.5; (2) Application and enforcement of Chapter 62-625 of the Florida Administrative Code and the National Categorical Pretreatment Standards (NPS) established by EPA in accordance with Section 307 of the CW A; (3) Review, approval, denial and oversight of POTW Pretreatment Programs to see that Chapter 62-625 of the Florida Administrative Code is enforced in accordance with procedures outlined in that Chapter and federal regulations; (4) Incorporation of POTW Pretreatment Program conditions in permits issued to POTWs as required in Chapter 62-625 of the Florida Administrative Code to be in conformance with Section 402(b)(8) of the CW A and 40 C.F.R. § 403.8: (5) Review and, as appropriate, approval of POTW requests for autho1ity to modify categorical pretreatment standards to reflect removal of pollutants by a POTW in accordance with 40 C.F.R. §§ 403.7, 403.9, and 403.1 J and enforcement or related conditions in the municipal permit; (6) POTW Pretreatment Programs comply with requirements specified in 40 C.F.R. § 403.8 and the POTW's FDEP permit[.]" Exhibit A, p. 24.

program is adequate under federal law. *See* 33 U.S.C. § 1342(b); 40 CFR 123.23(a).[12]

Third, even assuming all three are correct, Plaintiffs' allegations do not come close to establishing a causal connection between Governor DeSantis's conduct and Plaintiffs' alleged harm. Indeed, similar to the pleadings in *Hollywood* and *Lewis*, the Second Amended Complaint recites Governor DeSantis's alleged duties as Florida's Chief Executive and Piney Point's owner and operator. SAC, ¶¶ 31, 33, 317, & 341. But it does not allege what, if anything, Governor DeSantis did wrong in either role. *See Lewis*, 944 F.3d at 1301; *Hollywood*, 641 F.3d at 1265-66. Nor does it allege, much less establish, that Governor DeSantis' actions caused harm at Piney Point.

As a result, just like in *Lewis, Hollywood*, and *Doe*, Plaintiffs' alleged injuries are not "fairly traceable" to Governor DeSantis. *See Lewis*, 944 F.3d at 1301 ("Because the Attorney General didn't do (or fail to do) anything that contributed to plaintiffs' harm, plaintiffs cannot meet Article III's traceability requirement."); *Hollywood*, 344 F.3d at 1265 ("Although Hollywood alleged an imminent injury, Hollywood failed to allege that its injury was fairly traceable

---

[12] 33 U.S.C. § 1342(b) ("In addition, such State shall submit a statement from the attorney general . . . or from the chief legal officer in the case of an interstate agency, that the laws of such State, or the interstate compact, as the case may be, provide adequate authority to carry out the described program."); 40 CFR 123.23(a) ("Any State that seeks to administer a program under this part shall submit a statement from the State Attorney General (or the attorney for those State or interstate agencies which have independent legal counsel) that the laws of the State, or an interstate compact, provide adequate authority to carry out the program described under § 123.22 and to meet the requirements of this part.").

to the Secretary."); *Doe*, 344 F.3d at 1286 ("Because there is no challenged action by the Attorney General, [plaintiffs'] injuries are not fairly traceable to the only defendant before the Court.") (internal quotation marks omitted).

Because Plaintiffs neither alleged that Governor DeSantis did anything wrong regarding Piney Point, nor connected his actions to the harm that occurred there, the Second Amended Complaint plainly does not plead or prove causation. Accordingly, Plaintiffs do not have standing to bring their claims against Governor DeSantis, and this Court must dismiss them. *See Jacobson*, 974 F.3d at 1269.

## II.    Plaintiffs' claims are moot.

Governor DeSantis adopts and incorporates Secretary Hamilton's arguments on mootness as set forth in his Motion to Dismiss Plaintiffs' Second Amended Complaint or, in the Alternative, to Stay the Action.

## III.    Plaintiffs' claims are barred by the diligent prosecution doctrine and fail to state a claim under the CWA and RCRA.

Governor DeSantis adopts and incorporates Secretary Hamilton's arguments on the diligent prosecution doctrine and Plaintiffs' failure to state a claim as set forth in his Motion to Dismiss Plaintiffs' Second Amended Complaint or, in the Alternative, to Stay the Action.

**IV.    Alternatively, this Court should abstain under *Colorado River* and stay this action in favor of the parallel State Actions.**

Governor DeSantis adopts and incorporates Secretary Hamilton's arguments on *Colorado River* abstention as set forth in his Motion to Dismiss Plaintiffs' Second Amended Complaint or, in the Alternative, to Stay the Action.

## CONCLUSION

For the foregoing reasons, this Court should dismiss all claims against Defendants. In the alternative, it should abstain and stay this action in favor of the parallel State Actions.

Dated: December 3, 2021.                    Respectfully submitted,

**RON DESANTIS**
**GOVERNOR**

/s/ *Nicholas J.P. Meros*
NICHOLAS J.P. MEROS (FBN 0120270)
*Deputy General Counsel*
EXECUTIVE OFFICE OF THE GOVERNOR
The Capitol, PL-5
400 S. Monroe Street
Tallahassee, FL 32399
Phone: (850) 717-9310
Facsimile: (850) 488-9810
Nicholas.Meros@eog.myflorida.com
Gov.legal@eog.myflorida.com

*Counsel for Governor Ron DeSantis*

## LOCAL RULE 3.01(g) CERTIFICATION

Pursuant to Local Rule 3.01(g), undersigned counsel conferred with Plaintiffs' counsel in a good faith effort to resolve the issues raised in this Motion. Plaintiffs' counsel does not consent to the relief sought in the Motion.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of December, 2021 a true and correct copy of this document was filed electronically with the Clerk of Court through the CM/ECF filing system, which provides notice to all counsel of record.

/s/ *Nicholas J.P. Meros*
NICHOLAS J.P. MEROS
*Deputy General Counsel*