# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, TAMPA BAY WATERKEEPER, SUNCOAST WATERKEEPER, MANASOTA-88, *and* OUR CHILDREN'S EARTH FOUNDATION, <br><br>    *Plaintiffs*, <br><br>    *v.* <br><br>GOVERNOR RON DeSANTIS, <br><br>*and* SHAWN HAMILTON, *in his official capacity as* ACTING SECRETARY, FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION, *and* HRK HOLDINGS, LLC, *and* MANATEE COUNTY PORT AUTHORITY, <br><br>    *Defendants*. | Case No. 8:21-cv-1521 <br><br>**EXHIBIT 6 TO PLAINTIFFS' RESPONSE AND CROSS-MOTION FOR JUDICIAL NOTICE** |



# Update

Number: 199801210

Conversion services provided by:



The Information and Image Managers
1925-A NW Second Street
Gainesville, FL 32609
Phone: (352) 372-6039   -   Fax: (352) 378-6039
On-line: www.micrographicsinc.com

April 17, 2009

Regulatory Division
South Permits Branch
Tampa Permits Section
SAJ-1998-1210(IP-MN)

David McDonald, Executive Director
Manatee County Port Authority
300 Tampa Bay Way
Palmetto, Florida 34221

Dear Mr. McDonald:

    Reference is made to the U.S. Army Corps of Engineers (Corps) letter of November 14, 2007, that served to modify Department of the Army (DA) Permit SAJ-1998-1210(IP-MN), issued on February 22, 2001, to the Manatee County Port Authority, to include the Piney Point phosphogypsum storage site as an alternative disposal site for dredge material from the Berth 12 expansion. Reference is also made to a meeting held in the district office on September 3, 2008, concerning use of this spoil site for the federal portion of the work at the port.

    The purpose of this letter is to clarify the November 14, 2007, modification letter and to reinforce statements made at the September 3, 2008, meeting concerning use of this spoil site when federal dollars are involved.

    1. The November 14, 2007, letter was written at the request of the port to clarify that a proposed spoil site (Piney Point) was an upland site that did not contain wetlands and was not jurisdictional under Section 404 of the Clean Water Act. The port wanted to show this site as a disposal area in the drawings sets for future port work.

    2. The letter did not contemplate federal cost-share implication as it was intended as a letter identifying lack of Section 404 jurisdiction only.

    3. If the port wanted the Corps to do the work or the port wanted to seek reimbursement of funds expended from the federal government for the work (if it was done by the port), then the port would have to meet whatever standards that GRR#6 would impose.

    4. If Piney Point was not recommended by GRR#6, the port could use Piney Point provided the port did the work, funded the work, and did not seek federal reimbursement funding.

    A copy of the September 4, 2008, Memorandum for Record that documented the involvement by the Regulatory Division, is enclosed with this letter.

    If you have any questions, please contact Mike Nowicki at the letterhead address or by telephone at 904-232-2171.

                            Sincerely,

                            David S. Hobbie
                            Chief, Regulatory Division

Enclosure

Copy Furnished:

James D. Moore, Senior Project Manager
Ch2M Hill
1905 Intermodal Circle, Suite 330
Palmetto, Florida  34221

George Isiminger, P.E.
Port Engineer
Manatee County Port Authority
300 Tampa Bay Way
Palmetto, Florida 34221

                       Nowicki/CESAJ-RD-SW
                         mn/2171  4/14/2009
                     Rodriguez/CESAJ-DP-C
                     Griffith/CESAJ-PD
                     Kinard/CESAJ-RD-P

**September 4, 2008**

CESAJ-RD-SW
SAJ-1998-1210(IP-MN)

MEMORANDUM FOR RECORD

SUBJECT:  Meeting with Port Manatee (Port) on 3 September 2008

1. Reason for the Meeting:  The Port disputes the findings of draft GRR #6 with regard to using Piney Point as a disposal site for the federal project.

2. Background:

   a.  The Port received a COE permit for the non-federal part of the Port expansion on 22 February 2001 with and expiration date of 22 February 2011.  The non-federal part included berths 4 and 5 bulkhead work and the creation of berth 12.  A COE permit, for projects that involve both federal and non-federal components, is required when the sponsor would do the work outside the federal project and either fund that work entirely or seek federal funds reimbursement at a later date.  The federal project itself when done by the COE using COE contracts, contractors, and federal funds does not have to obtain a COE permit.

   b.  The Port received a modification to the COE permit on 15 May 2006, to add to the existing spoil site and that expansion included 0.49 acres of wetland impacts.

   c.  The Port wants to add an upland site to the available spoil sites at a place called Piney Point.  Piney Point is a former phosphate area.

   c.  At the request of the Port, the COE issued a modification letter on 14 November 2007, adding an upland site, Piney Point, to the permit.  Piney Point has no wetland impacts associated with the site.

   d.  Also at the request of the Port, the COE processed a standard permit that involved the 10-year maintenance dredging of the entire port regardless of whether or not it was in the federal or non-federal portions.  The reason was to allow the Port to perform any necessary maintenance dredging even if federal dollars were not yet available and seek reimbursement of funds expended. An intent to issue the COE permit was sent to the Port's consultant on 1 May 2008.

3. The COE Planning, Engineering, and Project Management Divisions are processing a document known as a GRR to justify using Piney Point as a disposal site for the federal project (GRR#6).  The Port

CESAJ-RD-SW (SAJ-1998-1210(IP-MN)
Subject:  Meeting with Port Manatee (Port) on 3 September 2008.

objected to the conclusions in the draft GRR#6 as those conclusions related to perceived contaminants and hazardous wastes at the Piney Point site and most of the meeting was concerned with aspects of the GRR that pertained to that and to the cost estimate.

4.  The question was raised on correspondence by the Port as to whether the Port had tacit authorization to use Piney Point because of the COE modification letter of 14 November 2007, that the Port characterized as a "permit".

5.  The following statements were made to the Port at this meeting:

    a.  The Piney Point site has no wetland impacts and did not really need a Regulatory modification to the original COE permit but, since the Port wanted documentation, the modification letter was sent.  The modification letter says the addition of an additional upland spoil site.  Upland means no wetland impact.

    b.  The modification letter covers only the non-federal part of the work that the Port would do.  Non-federal means no federal dollars would be spent or reimbursed.

    c.  If the Port wanted the COE to do the work or the Port wanted to seek re-imbursement of funds expended from the federal government, then the Port would have to meet whatever standards that GRR#6 would encompass.  If GRR#6 ultimately does not allow the use of Piney Point as a disposal site for federally funded work, then that site could not be used.

    d.  If Piney Point is not recommended by GRR#6, the Port could use Piney Point provided the Port did the work, funded the work, and DID NOT seek federal reimbursement funding.

PREPARED BY:

*[signature]*

MIKE NOWICKI
Project Manager, Tampa Permits Section

2



**Port Manatee**

The *right* turn on Tampa Bay

April 25, 2008

Mr. Jerry Scarborough, P.E.  
Director, Navigational Branch  
U.S. Army Corps of Engineers  
Prudential Building  
701 San Marco Blvd.  
Jacksonville, FL 32207-8175

Mr. Osvaldo Rodriguez  
Project Manager  
U.S. Army Corps of Engineers  
Prudential Building  
701 San Marco Blvd.  
Jacksonville, FL 32207-8175

Re: Manatee Harbor Dredging – Evaluation of upland dredge disposal site at Port Manatee DMMA

Gentlemen:

A review of the history of the Port Manatee Upland DMMA since 2002 reveals that this dredge material site is suspect as to capacity adequacy and integrity as brought out by the following factors.

1. The disposal site integrity and capacity was questioned by several prospective bidders during the Phase II pre-bid conferences at Port Manatee on 27 June 2002.
2. The Corps GRR of February 2001, table 1, page 9 indicated a total dredge material quantity of 4,895,000 cubic yards based on a 900-foot diameter turn basin. Port Manatee provided to the Corps dredge material estimates from the Port's consulting engineers, Gee & Jenson on 16, December 1999 of 5,102,867 cubic yards. The Port estimate incorporated extra cubic yards requested by Corps' Waterways Experimentation Station (WES), Vicksburg, MS. (Copy enclosed)
3. By letter of 6 January 2003 to the Corps, the Port raised the question whether the site capacity was being designed to accommodate the Phase III-South Channel Extension in addition to the Phase II widener/turn basin and maintenance dredging. (Copy enclosed)
4. In 2005 the dike at the dredge material site was breached and had to be repaired on an emergency basis.
5. At the conclusion of Phase II dredging in December 2005, the Port site could barely accommodate the Phase II dredging with approximately two (2) feet of freeboard.
6. Finally, the current plans for this disposal site is to convert the land area for waterborne cargo as identified in the Port Manatee Master Plan accepted by the Port Authority in February 2008. (Copy of Extract enclosed)

The Port disposal site land area will be needed as upland cargo area to support future additional vessel berth developments to meet anticipated market demands.

In summation as the Phase II dredging in 2004/2005 was proceeding it became evident that the Port Upland DMMA would have capacity limitation along with questionable integrity after the dike breach. The substantially high cost estimate of the expanded Port DMMA dictated the need for a readily available alternate site such as Piney Point, which was mentioned to the Corps in November 2006 and previously in Port responses to other Phase III GRRs.

Under the above described circumstances the Port Authority entered into an agreement to use the Piney Point/HRK dredge material disposal site on April 19, 2007 with its greater capacity (6.5 million cubic yards) and integrity as monitored by the Florida Department of Environmental Protection (FDEP) in accordance with a separate agreement between FDEP and Piney Point/HRK. Further, the Piney Point/HRK and Port Authority agreement requires insurance coverage on that site; whereas, the Port site has no insurance coverage.

In conclusion, the Piney Point DMMA has capacity and insured integrity. In contrast the Port site capacity and integrity is suspect without extensive and expensive expansion modifications for an area that will be needed for waterborne cargo use and not dredge material disposal. Finally in accordance with the above-cited Port/Piney Point-HRK Agreement the dredge material containment is entirely the insured responsibility of Piney Point-HRK and not the Port or Federal Government.

The above is provided in the spirit of cooperation with the Corps for an overall view of upland disposal sites to enhance their evaluation in the Manatee Harbor Phase III-South Channel extension GRR and for future realistic utilization dredging operations at Port Manatee

Sincerely,

Joseph W. Gontarski
Sr. Director and Special Assistant to Executive Director

JWG/mlb

cc: David McDonald, PPM ®
    George Isiminger, P.E.
    Bory Steinberg, Steinberg & Associates
    Lois Moore, Alcalde & Fay

Enclosures