IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, TAMPA BAY WATERKEEPER, SUNCOAST WATERKEEPER, MANASOTA-88, *and* OUR CHILDREN'S EARTH FOUNDATION,<br><br>    *Plaintiffs*,<br><br>    *v.*<br><br>GOVERNOR RON DeSANTIS,<br><br>*and* SHAWN HAMILTON, *in his official capacity as* SECRETARY, FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION, *and* HRK HOLDINGS, LLC, *and* MANATEE COUNTY PORT AUTHORITY,<br><br>    *Defendants*. | Case No. 8:21-cv-1521-WFJ-CPT<br><br>**EXHIBIT C**<br><br>*TO*<br><br>**DECLARATION OF DANIEL C. SNYDER IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT MANATEE COUNTY PORT AUTHORITY'S MOTION FOR SANCTIONS, ECF NO. 67** |

# To Law Offices of Charles M. Tebbutt, P.C.
**941 Lawrence Street**
**Eugene, OR 97401**
**Ph: 541-344-3505 Fax: 541-344-3516**

November 18, 2021

Kevin Hennessy
Nicole Poot
Lewis, Longman & Walker, P.A.
*Via E-mail to: khennessy@llw-law.com*
     *npoot@llw-law.com*

RE:   **PLAINTIFFS' RESPONSE TO MANATEE COUNTY PORT AUTHORITY'S OCTOBER 29, 2021 SAFE HARBOR LETTER**

Dear Counsel,

This letter responds to Manatee County Port Authority's ("MCPA") October 29, 2021 safe harbor letter and draft Rule 11 Motion for Sanctions ("motion"). Plaintiffs in *Center for Biological Diversity, et al. v. Manatee County Port Authority*, No. 8:21-cv-01521-WFJ-CPT, have reviewed your letter and the motion. Based on the limited evidence in support of your letter — information you did not provide until November 9, 2021 upon Plaintiffs' request — Plaintiffs will seek leave or your stipulation pursuant to Fed. R. Civ. P. 15(a)(2) to file a second amended complaint addressing the two factual allegations raised in your motion. Specifically, the second amended complaint, provided herewith, deletes paragraphs 172, 238, and 350, and makes a corresponding edit to paragraph 355(h). These allegations were made in good faith based on the evidence available to Plaintiffs at the time of filing, and are not central to Plaintiffs' case in chief or MCPA's liability. Please let us know at your earliest convenience your client's position, and whether you will stipulate to amendment and withdraw your motion. Additionally, Plaintiffs are amenable to a two-week extension to Defendants' motion to dismiss filing deadlines.

Plaintiffs disagree with the remaining legally and factually unsupported assertions in your letter and motion for the reasons detailed below. We would welcome an opportunity to meet and confer by telephone to discuss the matter further.

***First***, the motion argues that the dredged materials disposed of at Piney Point are not "solid waste" under the Resource Conservation and Recovery Act ("RCRA"). Motion ¶17. Not so. Under EPA regulation, dredged materials are included within the scope of "solid waste." *See* 40 C.F.R. 261.4(g) ("dredged material that is not hazardous waste."); 42 U.S.C. § 6903(5) (hazardous waste includes all solid waste).

MCPA further asserts that the dredged materials were placed at Piney Point for a beneficial purpose, and thus do not fall within the ambit of discarded material under the

1 / 7

definition of solid waste, 42 U.S.C. § 6903(27). The entirety of MCPA's argument on this point is: "the dredged materials were placed at Piney Point for the beneficial purpose of providing cover for the exposed liners." Motion ¶ 17. No evidentiary support or legal citation is included.

Upon request by Plaintiffs' counsel, MCPA provided one document on Nov. 9, 2021 from FDEP to the Army Corps, dated September 26, 2007, suggesting that the "use of the lined reservoirs for dredged material disposal would also serve a direct beneficial purpose by providing a suitable protective cover once placed over the HDPE lined material." However, on April 25, 2008, nearly six months after this letter from FDEP, MCPA wrote to the Army Corps explaining the actual reason why MCPA wanted to use Piney Point: the MCPA's original land disposal area had run out of room for additional disposal, and MCPA wanted to use the remaining portions "as upland cargo area to support future additional vessel berth developments to meet anticipated market demands." Exhibit A hereto. Indeed, the letter continues:

> In summation as the Phase II dredging in 2004/2005 was proceeding it became evident that the Port Upland DMMA would have capacity limitation along with questionable integrity after dike breach. The substantially high cost estimate of the expanded Port DMMA dictated the need for a readily available alternate site such as Piney Point, which was mentioned to the Corps in November 2006 and previously in Port responses to other Phase III GRRs.
>
> Under the above described circumstances the Port Authority entered into an agreement to use the Piney Point/HRK dredge material disposal site on April 19, 2007 with its greater capacity (6.5 million cubic yards) and integrity as monitored by [FDEP] in accordance with a separate agreement between FDEP and Piney Point/HRK...In conclusion, the Piney Point DMMA has capacity and insured integrity. In contrast the Port site capacity and integrity is suspect without extensive and expensive expansion modifications for an area that will be needed for waterborne cargo use and not dredge material disposal.

Exhibit A at 2. Thus, contrary to the representations made in the motion, the reason why dredged material was placed at Piney Point was because MCPA had nowhere else to put its waste. MCPA has provided no other evidence proving the dredged materials will serve a beneficial purpose in protecting the liners at Piney Point. Furthermore, the fact that MCPA paid HRK Holdings, LLC *millions of dollars* to dispose of its dredged material at Piney Point further undercuts MCPA's argument that the material is not discarded solid waste. In essence, MCPA paid HRK for the ability to use Piney Point as a landfill for its dredged material, meaning MCPA never intended to reuse or put that material to any subsequent beneficial use.

MCPA's citation to *Oklahoma v. Tyson Foods, Inc.* 2010 WL 653032, at *10 (N.D. Okla. Feb. 17, 2010) is misplaced. In that case, poultry litter was alleged to be a

discarded solid waste under RCRA. The Court recited the general rule that material is "discarded" under RCRA when it is "disposed of, thrown away, or abandoned," or when the materials are "destined for beneficial reuse or recycling in a continuous process by the generating industry itself." *Id*. at *41. The Court found that farmers "value poultry litter and pay a market value to obtain it…[t]hey do so for the purpose and with the effect of using the litter as a fertilizer and soil amendment to support their agricultural enterprises." *Id*. at *42. Because the poultry litter had market value and was put to beneficial use, it was not considered a RCRA solid waste. *Id*. at *43-44.

   Here, HRK Holdings, LLC did not pay MCPA for its dredged materials. To the contrary, it was MCPA that had to pay HRK millions of dollars to utilize Piney Point for disposal – something that was a direct benefit to MCPA, as it allowed for the disposal of the dredged material at a location that would make expansion of the original DMMA area into cargo storage possible. *See* motion, Exhibit A, ¶ 11 (outlining compensation from MCPA to HRK); ¶ 10 ("The parties hereto recognize that the containment of the dredged materials from the Anticipated Project is beneficial to the Authority."). Moreover, MCPA's April 25, 2008 letter directly refutes the motion's assertion that the reason Piney Point was chosen was to effectuate any type of beneficial purpose concerning the liners or other reuse. Instead, it lays bare MCPA's true motivation: locating a cheap alternative to dispose of its solid waste.

   Additionally, the Corps — for years prior to and following the deposit of MCPA's waste at Piney Point — directly refuted the MCPA and FDEP position that disposal of the dredged material at Piney Point would be beneficial. The Corps found that using Piney Point for disposal presented unacceptable risks to the environment, because the HDPE liners at Piney Point were never intended to store the weight of the dredged material being deposited on top of it. The subsurface foundation of the liners was also not designed nor engineered to withstand that degree of hydraulic head and weight.

   *Second*, the motion states that dredged materials present no imminent and substantial endangerment to health or the environment "at the time they were placed at the site." This is false. At the time MCPA disposed of dredged materials at Piney Point, it knew or should have been aware through the exercise of reasonable care and due diligence that the liners at Piney Point were significantly compromised, and that the site itself had suffered serious integrity issues with embankments, dikes, and settling. The investigation following the large liner breach in 2011 revealed numerous solution cavities and other significant structural issues. The Army Corps explicitly warned that the deposition of millions of pounds of dredged material onto these liners presented a serious risk of environmental harm.

   The Court's discussion in *Crandall v. City & County of Denver*, one of the cases the motion cites, aptly illustrates this point. The key question is not when the harm will occur, but when the endangerment began. "For instance, buried solid waste may present an endangerment if toxic chemicals from the waste will eventually seep into the water table and be consumed by humans. No *harm* will result for years, but the *endangerment* already exists because that harm can result if 'remedial action is not taken' in the

interim." 594 F.3d 1231, 1238 (10th Cir. 2010); *see also Maine People's Alliance & Natural Res. Def. Council v. Mallinckrodt, Inc.,* 471 F.3d 277, 279 n.1 (1st Cir. 2006) ("[I]f there is a reasonable prospect that a carcinogen released into the environment today may cause cancer twenty years hence, the threat is near-term even though the perceived harm will only occur in the distant future.").

  In this case, the endangerment at Piney Point existed at the time MCPA disposed of its solid waste. Groundwater monitoring showed contamination from the site exceeding water quality standards and primary drinking water standards, the site contained hazardous and toxic materials under the liner, and documented problems with past slope stability, settling, and piping issues show the endangerment existed in 2011, if not earlier. Furthermore, the Corps specifically warned that disposal of dredged materials at Piney Point could cause a breach in the liner, allowing water to saturate and cause a failure of the gypsum stack, enabling the mixing of large volumes of the two materials and threatening the risk of catastrophic collapse. This is why the Corps took the position that use of Piney Point carried unnecessary risks to the public and the environment – far more than the "*de minimis*" risk the motion states the Corps adopted, again without evidentiary support.

  ***Third***, the motion makes reference to the Dredged Materials Containment Agreement ("DMCA") between HRK and MCPA, which states that once the dredged materials were transported to Piney Point, HRK became the exclusive owner of the materials. However, RCRA liability attaches to generators and transporters of solid waste. 42 U.S.C. § 6972(a)(1)(B) (authorizing suit against "any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment"). It does not matter whether the DMCA purported to transfer "ownership" of the dredged materials to HRK, because MCPA's liability is dependent upon its role as a contributor to the handling, transportation, and disposal of solid waste at Piney Point. Nowhere does the motion state that MCPA did not actually effectuate the transportation of the dredged material to Piney Point and, indeed, the DMCA expressly states that MCPA maintained control over the dredged materials during their transportation, handling, and disposal at Piney Point. The motion provides no legal support or citation for the notion that MCPA can insulate itself from RCRA liability as a generator or transporter of solid waste by virtue of a contractual agreement.

  ***Fourth***, the motion states at Para. 18 that the "MCPA cannot be liable under RCRA where it acted pursuant to the direction of the state environmental regulatory agency as part of the State's remedial efforts at the site." Plaintiffs' counsel requested documentation from MCPA wherein FDEP "directed" MCPA to utilize Piney Point for the disposal of dredged material. No records were provided, nor any legal support cited.

  Similarly, the motion states, without citation or support, that "the dredged materials were part of the solution to close the site." MCPA's letter to the Corps extolling

its financial need to use Piney Point for disposal in lieu of expanding its existing DMMA, such that the DMMA could be used for future cargo storage, directly contradicts this claim.

*Fifth*, Para. 19 of the motion references RCRA's anti-duplication provision and claims that this situation "is expressly regulated under section 404 of the Clean Water Act." 42 U.S.C. § 6905(a) instructs that RCRA is not to be applied to activities or substances that are subject to the Clean Water Act, except to the extent that such application is not inconsistent with requirements of that statute. Imposing RCRA liability on MCPA for its contribution to the transportation, handling, and disposal of solid waste at Piney Point is not inconsistent with the Clean Water Act, nor is the disposal of dredge spoil in a non-jurisdictional upland site such as Piney Point an activity subject to the Clean Water Act. The Corps explicitly informed MCPA that its November 14, 2007, modification of the 404 dredging permit SAJ-1998-1210 (IP-MN) "was written at the request of the port to clarify that a proposed spoil site (Piney Point) was an upland site that did not contain wetlands *and was not jurisdictional under Section 404 of the Clean Water Act*." Exhibit B (emphasis added). That is, the modification letter "was intended as a letter identifying lack of Section 404 jurisdiction only," and not Clean Water Act regulatory approval of the use of Piney Point for dredge spoil disposal.

Counsel for Plaintiffs requested information from MCPA supporting its position that it had a valid 404 permit for the disposal of dredged material at Piney Point. MCPA selectively provided a November 14, 2007, § 404 permit modification, but did not provide the subsequent letter from the Corps to MCPA which explicitly disavows Clean Water Act jurisdiction over the Piney Point disposal activities. As such, MCPA's representation in the motion that the disposal of dredged material at Piney Pont "is expressly regulated under section 404" is incorrect, as is footnote 2, which claims "The MCPA had a valid 404 permit for the dredging activity that resulted in materials being placed at Piney Point." While MCPA did have a valid 404 permit for the *dredging* activity that, contrary to MCPA's false representation of expiration, remains in effect to this day, it never had a valid 404 permit for dredge materials disposal at Piney Point. The disposal at Piney Point did not result from the regulated 404 dredge activity or permit, but from MCPA's own actions outside the scope of the Clean Water Act. That you likely possessed these records and chose not to provide them in response to Plaintiffs' request is of serious concern and further calls into question the merit of MCPA's representations.

*Sixth*, Para. 20 of the motion alleges that the dredged material was not solid waste, and as such, its disposal at Piney Point could not act to vitiate the Bevill amendment. This argument directly hinges upon the merits of MCPA's claim that its dredged material was not a solid waste. For the reasons described herein, MCPA's claim on this point is wrong: MCPA desired to use Piney Point to dispose of its solid waste so that it could use the existing DMMA for future cargo storage; it paid HRK Holdings, LLC millions of dollars to use Piney Point as a landfill for that waste; and arguments about the dredged material serving some beneficial purpose at Piney Point are without support and are directly contradicted by MCPA's stated intentions to the Corps and the Corps' repeated and ignored warnings that the dredge material actually presented an

unreasonable risk to the liner and phosphogypsum stack integrity rather than a benefit. To the extent the Parties have a disagreement about the interpretation of these facts, or the application of law, those are matters that should be resolved through motions for summary judgment, not improperly wielded as the basis for a threatened motion for sanctions.

**Seventh**, Para. 21 alleges, again without any legal citation, that the injunctive relief requested by the FAC "is not available against the MCPA." But RCRA expressly allows for injunctive and remedial relief against any person who is found to contribute to an imminent and substantial endangerment by virtue of their handling, transportation, and disposal of solid waste. The statute makes this plain:

> The district court shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties…to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), to order such person to take such other action as may be necessary, or both[.]

Here, MCPA "has contributed…to the past or present handling, storage, treatment, transportation, or disposal of any solid…waste." The District Court was provided jurisdiction by Congress to ensure that those who share in a measure of control over solid waste are required to "take such other action as may be necessary" to redress the imminent and substantial endangerment threatened by that waste. Nothing in the statute suggests that MCPA, as a handler, transporter, and disposer of solid waste, is somehow insulated from liability merely because MCPA does not own Piney Point. The FAC requests injunctive and remedial relief requiring MCPA and other Defendants to abate the imminent and substantial endangerment, and to undertake a RCRA corrective action study to diagnose, evaluate, monitor, and abate all sources of contamination and endangerment. MCPA has cited no authority showing why RCRA's remedial scheme somehow exempts MCPA from liability merely because MCPA does not own Piney Point.

**Finally**, Para. 22 of the motion alleges that Plaintiffs are engaged in a collateral attack concerning the siting or permitting of a waste treatment, storage, or disposal facility. FDEP's certification that Piney Point was suitable for dredged material storage was not made under RCRA, and Plaintiffs have no information suggesting that FDEP ever considered, let alone issued, a permit determining Piney Point is a hazardous waste treatment, storage or disposal facility within the meaning of 42 U.S.C. § 6972(d). In fact, MCPA requested that "CESAJ statements in GRR #6 that Piney Point is a contaminated area has to be corrected in order for Piney Point not to have the stigma of being a contaminated site." Exhibit C. Such requests refute the motion's unsupported assertion that Plaintiffs are challenging the siting and permitting of a hazardous waste facility.

For the reasons stated herein, MCPA's Rule 11 motion is without merit. Nonetheless, in the interest of narrowing any remaining areas of disagreement, we welcome the opportunity to meet and confer at your earliest convenience.

Sincerely,

/s/ Daniel C. Snyder
Daniel C. Snyder
Law Offices of Charles M. Tebbutt, P.C.
*Admitted Pro Hac Vice*

Counsel for Plaintiffs



**Port Manatee**
The *right* turn on Tampa Bay

April 25, 2008

Mr. Jerry Scarborough, P.E.  Mr. Osvaldo Rodriguez
Director, Navigational Branch  Project Manager
U.S. Army Corps of Engineers  U.S. Army Corps of Engineers
Prudential Building  Prudential Building
701 San Marco Blvd.  701 San Marco Blvd.
Jacksonville, FL 32207-8175  Jacksonville, FL 32207-8175

Re: Manatee Harbor Dredging – Evaluation of upland dredge disposal site at Port Manatee DMMA

Gentlemen:

A review of the history of the Port Manatee Upland DMMA since 2002 reveals that this dredge material site is suspect as to capacity adequacy and integrity as brought out by the following factors.

1. The disposal site integrity and capacity was questioned by several prospective bidders during the Phase II pre-bid conferences at Port Manatee on 27 June 2002.
2. The Corps GRR of February 2001, table 1, page 9 indicated a total dredge material quantity of 4,895,000 cubic yards based on a 900-foot diameter turn basin. Port Manatee provided to the Corps dredge material estimates from the Port's consulting engineers, Gee & Jenson on 16, December 1999 of 5,102,867 cubic yards. The Port estimate incorporated extra cubic yards requested by Corps' Waterways Experimentation Station (WES), Vicksburg, MS. (Copy enclosed)
3. By letter of 6 January 2003 to the Corps, the Port raised the question whether the site capacity was being designed to accommodate the Phase III-South Channel Extension in addition to the Phase II widener/turn basin and maintenance dredging. (Copy enclosed)
4. In 2005 the dike at the dredge material site was breached and had to be repaired on an emergency basis.
5. At the conclusion of Phase II dredging in December 2005, the Port site could barely accommodate the Phase II dredging with approximately two (2) feet of freeboard.
6. Finally, the current plans for this disposal site is to convert the land area for waterborne cargo as identified in the Port Manatee Master Plan accepted by the Port Authority in February 2008. (Copy of Extract enclosed)

The Port disposal site land area will be needed as upland cargo area to support future additional vessel berth developments to meet anticipated market demands.

In summation as the Phase II dredging in 2004/2005 was proceeding it became evident that the Port Upland DMMA would have capacity limitation along with questionable integrity after the dike breach. The substantially high cost estimate of the expanded Port DMMA dictated the need for a readily available alternate site such as Piney Point, which was mentioned to the Corps in November 2006 and previously in Port responses to other Phase III GRRs.

Under the above described circumstances the Port Authority entered into an agreement to use the Piney Point/HRK dredge material disposal site on April 19, 2007 with its greater capacity (6.5 million cubic yards) and integrity as monitored by the Florida Department of Environmental Protection (FDEP) in accordance with a separate agreement between FDEP and Piney Point/HRK. Further, the Piney Point/HRK and Port Authority agreement requires insurance coverage on that site; whereas, the Port site has no insurance coverage.

In conclusion, the Piney Point DMMA has capacity and insured integrity. In contrast the Port site capacity and integrity is suspect without extensive and expensive expansion modifications for an area that will be needed for waterborne cargo use and not dredge material disposal. Finally in accordance with the above-cited Port/Piney Point-HRK Agreement the dredge material containment is entirely the insured responsibility of Piney Point-HRK and not the Port or Federal Government.

The above is provided in the spirit of cooperation with the Corps for an overall view of upland disposal sites to enhance their evaluation in the Manatee Harbor Phase III-South Channel extension GRR and for future realistic utilization dredging operations at Port Manatee

Sincerely,

Joseph W. Gontarski
Sr. Director and Special Assistant to Executive Director

JWG/mlb

cc: David McDonald, PPM ®
    George Isiminger, P.E.
    Bory Steinberg, Steinberg & Associates
    Lois Moore, Alcalde & Fay

Enclosures

April 17, 2009

Regulatory Division
South Permits Branch
Tampa Permits Section
SAJ-1998-1210(IP-MN)

David McDonald, Executive Director
Manatee County Port Authority
300 Tampa Bay Way
Palmetto, Florida 34221

Dear Mr. McDonald:

    Reference is made to the U.S. Army Corps of Engineers (Corps) letter of November 14, 2007, that served to modify Department of the Army (DA) Permit SAJ-1998-1210(IP-MN), issued on February 22, 2001, to the Manatee County Port Authority, to include the Piney Point phosphogypsum storage site as an alternative disposal site for dredge material from the Berth 12 expansion.  Reference is also made to a meeting held in the district office on September 3, 2008, concerning use of this spoil site for the federal portion of the work at the port.

    The purpose of this letter is to clarify the November 14, 2007, modification letter and to reinforce statements made at the September 3, 2008, meeting concerning use of this spoil site when federal dollars are involved.

    1.  The November 14, 2007, letter was written at the request of the port to clarify that a proposed spoil site (Piney Point) was an upland site that did not contain wetlands and was not jurisdictional under Section 404 of the Clean Water Act.  The port wanted to show this site as a disposal area in the drawings sets for future port work.

    2.  The letter did not contemplate federal cost-share implication as it was intended as a letter identifying lack of Section 404 jurisdiction only.

    3.  If the port wanted the Corps to do the work or the port wanted to seek reimbursement of funds expended from the federal government for the work (if it was done by the port), then the port would have to meet whatever standards that GRR#6 would impose.

-2-

    4. If Piney Point was not recommended by GRR#6, the port could use Piney Point provided the port did the work, funded the work, and did not seek federal reimbursement funding.

    A copy of the September 4, 2008, Memorandum for Record that documented the involvement by the Regulatory Division, is enclosed with this letter.

    If you have any questions, please contact Mike Nowicki at the letterhead address or by telephone at 904-232-2171.

                            Sincerely,


                            David S. Hobbie
                            Chief, Regulatory Division

Enclosure

Copy Furnished:

James D. Moore, Senior Project Manager
Ch2M Hill
1905 Intermodal Circle, Suite 330
Palmetto, Florida  34221

George Isiminger, P.E.
Port Engineer
Manatee County Port Authority
300 Tampa Bay Way
Palmetto, Florida 34221

                        Nowicki/CESAJ-RD-SW
                          mn/2171   4/14/2009
                        Rodriguez/CESAJ-DP-C
                        Griffith/CESAJ-PD
                        Kinard/CESAJ-RD-P

**September 4, 2008**

CESAJ-RD-SW
SAJ-1998-1210(IP-MN)

MEMORANDUM FOR RECORD

SUBJECT: Meeting with Port Manatee (Port) on 3 September 2008

1. Reason for the Meeting: The Port disputes the findings of draft GRR #6 with regard to using Piney Point as a disposal site for the federal project.

2. Background:

   a. The Port received a COE permit for the non-federal part of the Port expansion on 22 February 2001 with and expiration date of 22 February 2011. The non-federal part included berths 4 and 5 bulkhead work and the creation of berth 12. A COE permit, for projects that involve both federal and non-federal components, is required when the sponsor would do the work outside the federal project and either fund that work entirely or seek federal funds reimbursement at a later date. The federal project itself when done by the COE using COE contracts, contractors, and federal funds does not have to obtain a COE permit.

   b. The Port received a modification to the COE permit on 15 May 2006, to add to the existing spoil site and that expansion included 0.49 acres of wetland impacts.

   c. The Port wants to add an upland site to the available spoil sites at a place called Piney Point. Piney Point is a former phosphate area.

   c. At the request of the Port, the COE issued a modification letter on 14 November 2007, adding an upland site, Piney Point, to the permit. Piney Point has no wetland impacts associated with the site.

   d. Also at the request of the Port, the COE processed a standard permit that involved the 10-year maintenance dredging of the entire port regardless of whether or not it was in the federal or non-federal portions. The reason was to allow the Port to perform any necessary maintenance dredging even if federal dollars were not yet available and seek reimbursement of funds expended. An intent to issue the COE permit was sent to the Port's consultant on 1 May 2008.

3. The COE Planning, Engineering, and Project Management Divisions are processing a document known as a GRR to justify using Piney Point as a disposal site for the federal project (GRR#6). The Port

CESAJ-RD-SW (SAJ-1998-1210(IP-MN)
Subject:  Meeting with Port Manatee (Port) on 3 September 2008.

objected to the conclusions in the draft GRR#6 as those conclusions related to perceived contaminants and hazardous wastes at the Piney Point site and most of the meeting was concerned with aspects of the GRR that pertained to that and to the cost estimate.

4.  The question was raised on correspondence by the Port as to whether the Port had tacit authorization to use Piney Point because of the COE modification letter of 14 November 2007, that the Port characterized as a "permit".

5.  The following statements were made to the Port at this meeting:

   a.  The Piney Point site has no wetland impacts and did not really need a Regulatory modification to the original COE permit but, since the Port wanted documentation, the modification letter was sent.  The modification letter says the addition of an additional upland spoil site.  Upland means no wetland impact.

   b.  The modification letter covers only the non-federal part of the work that the Port would do.  Non-federal means no federal dollars would be spent or reimbursed.

   c.  If the Port wanted the COE to do the work or the Port wanted to seek re-imbursement of funds expended from the federal government, then the Port would have to meet whatever standards that GRR#6 would encompass.  If GRR#6 ultimately does not allow the use of Piney Point as a disposal site for federally funded work, then that site could not be used.

   d.  If Piney Point is not recommended by GRR#6, the Port could use Piney Point provided the Port did the work, funded the work, and DID NOT seek federal reimbursement funding.

PREPARED BY:

*[signature: Mike Nowicki]*

MIKE NOWICKI
Project Manager, Tampa Permits Section

2

Subject: South Channel Extension GRR #6 – Limited Liability Approach

Introduction: Currently modification of the Port Manatee HRK Agreement on Piney Point is being accomplished. This modified agreement can serve as a basis for limited liability for the Corps on the use of the Piney Point DMMA as a dredge material placement facility. The following stipulations would have to be considered for full execution of this agreement.

1. HRK and Manatee County Port Authority approval
2. CESAJ statements in GRR #6 that Piney Point is a contaminated area has to be corrected in order for Piney Point not to have a stigma of being a contaminated site.
3. During Port Manatee's construction dredging of the South Channel Extension the cost of this dredging is comparable or less than the ODMDS. The Piney Point locally preferred plan will become the base NED plan.
4. Based on market demands for Port Manatee to increase vessel berth capacity with uplands to accommodate water borne cargo, the existing Port Manatee DMMA can be phased out by the Manatee County Port Authority in the future which currently is projected to be ten to fifteen years or a further time frame from fifteen to twenty years.