# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, TAMPA BAY WATERKEEPER, SUNCOAST WATERKEEPER, MANASOTA-88, *and* OUR CHILDREN'S EARTH FOUNDATION,<br><br>        *Plaintiffs*,<br><br>        *v.*<br><br>GOVERNOR RON DeSANTIS,<br><br>*and* SHAWN HAMILTON, *in his official capacity as* SECRETARY, FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION, *and* HRK HOLDINGS, LLC, *and* MANATEE COUNTY PORT AUTHORITY,<br><br>        *Defendants*. | Case No. 8:21-cv-1521-WFJ-CPT<br><br>**EXHIBIT 9**<br><br>*To*<br><br>**PLAINTIFFS' SECOND MOTION FOR JUDICIAL NOTICE** |

August 2008

# Manatee Harbor Federal Navigation Project
## Manatee County, Florida

## Draft Phase III General Reevaluation Report and Environmental Assessment Addendum





**US Army Corps
of Engineers
Jacksonville District**



# Syllabus

Port Manatee was constructed by the Manatee County Port Authority, and began operations in 1970. The project consisted of a 400-ft wide by 40-ft deep channel from the Port Manatee facilities to its intersection with the Tampa Bay Ship Channel, a distance of approximately 3 miles. Since 1970, the Port has undertaken extensive capital improvements including the construction of warehouses, wharves and berths, railroad, offices, roads, stevedoring facilities and other related infrastructure.

Federal interest in navigation at Port Manatee started in 1974 through a House resolution to study navigation and related water resource problems and adopt the local project for Federal maintenance. A Feasibility Report and Environmental Impact Statement were completed in 1978, which recommended maintenance of the channel as originally dredged, with the addition of an enlarged channel entrance and turning basin for safety and navigation.

Congress authorized the Manatee Harbor Navigation Project in Section 202(a) of the Water Resources Development Act of 1986, modified by Section 102(j) of WRDA 1990 and Section 156 of the FY2004 Energy and Water Appropriations Act (PL108-137). The authorized project provides for Federal maintenance of the access channel and associated general navigation features to a controlling depth of 40 feet and a width of 400 feet.

Phase I of the Federal project was completed in 1997 (maintenance dredging of the 15,850-foot long access channel from the Tampa Bay Shipping Channel to the Port). Maintenance dredging occurred in 1992 and 1999. Phase II of the Federal project (widened entrance channel and construction of a ship turning basin), was completed in late 2005.

## Project Under Consideration

The investigations described in this report address the feasibility of constructing an access channel to a new berthing area intended to reduce severe problems of vessel traffic congestion at Port Manatee. Construction of the access channel and berthing area are referred to as Phase III of the Manatee Harbor Navigation Project.

## National Economic Development Plan

Results of this evaluation recommend that construction and maintenance of a side channel extension (1,590 feet long, 275 feet wide, 40 feet deep) to Berth 12 is the National Economic Development (NED) Plan for Phase III. Construction of the NED Plan would result in impacts to approximately 11.92 acres of shallow bay bottoms (10.7 acres in the Federal channel plus 1.22 acres in the berth area), with varying coverage of seagrass, which includes about one acre of intertidal mangrove and salt-water marsh. Previously, the Sponsor has constructed mitigation for Phase II and Phase III port improvements per Florida Department of Environmental Protection (FDEP) and Department of Army (DOA) permit requirements.

Construction of the NED Plan would result in total average annual costs of $1,602,300, total average annual benefits of $6,143,000, a benefit-to-cost ratio of 3.83 to 1, and annual net benefits of $4,540,700.

## Dredged Material Management Plan

The recommended Manatee Harbor Dredged Material Management Plan places material from Phase III construction at the Tampa Ocean Dredged Material Disposal Site (ODMDS), located in

the Gulf of Mexico approximately 27 miles west-southwest of Manatee Harbor.  Given a projected maintenance requirement of 300,000 CY for each 3-year maintenance cycle (combined projected maintenance for Phases I, II, and III), material from each maintenance cycle would be split between the ODMDS and the Port's Dredged Material Management Area (DMMA).  The DMMA would be expanded for receipt of maintenance material.  The split of material going to each placement site is based on the percentage of material expected to be suitable for ODMDS placement.  Currently, 43 percent of maintenance material is expected to be suitable for ODMDS placement, which would leave 57 percent of maintenance material required to be placed in an upland facility.

At each maintenance dredging cycle, 171,000 CY of material would be placed in the expanded DMMA, which would be constructed prior to Year 3 (the first maintenance cycle year).  The ODMDS would receive 129,000 CY of maintenance material at each maintenance dredging cycle.  Through the end of the 20-year planning period, a total of 1,197,000 CY of material would be placed in the expanded DMMA (well within its capacity constraint of 1,800,000 CY), and 903,000 CY of material suitable for open-water placement would be placed at the ODMDS.

### Locally Preferred Plan

The non-Federal sponsor's preference for a harbor improvement plan is identical to that of the NED Plan, which provides the maximum net benefits of all plans analyzed.  The sponsor's preference for disposal of dredged material for Phase III construction and on-going maintenance (which differs from that of the NED Plan) is to avoid the placement of dredged material in open waters.  Their commitment to avoid this disposal method is evidenced through the development of detailed plans for construction of the expanded upland disposal area, and the development of plans (including legal agreements) for the direct pumping of dredged material to the Piney Point site.  Between these two upland placement alternatives, the Port's preference is to pump dredged material directly to Piney Point.

The Locally Preferred Plan (LPP) is construction and maintenance of a side channel extension (1,590 feet long, 275 feet wide, 40 feet deep) – dimensions identical to the NED Plan - with placement of dredged material from Phase III construction pumped directly to the Piney Point site.

The LPP has total average annual costs of $1,979,500, provides average annual benefits of $6,143,000, a benefit-to-cost ratio of 3.1 to 1, and annual net benefits of $4,163,500

### Rejection of the Locally Preferred Plan

The LPP cannot be recommended for implementation.  While the LPP is economically justified, significant issues relating to the use of Piney Point as a dredged material placement facility must be resolved before the LPP can be recommended as an acceptable plan.  These issues are summarized below.

### Structural Uncertainties Associated with Use of the Piney Point Site

The Corps of Engineers would need to perform analyses to determine if the disposal facility meets the design and construction criteria established in Corps of Engineers guidance such as EM 1110-2-5027 and others as appropriate.  In the case of the Piney Point site, there is a heightened level of concern with regard to the integrity of the gypsum stack which forms the foundation of the dredged material handling facility.  The heightened level of concern follows from the following considerations:

- The gypsum stack itself is not an engineered structure. There are no design plans and specifications, nor as built drawings, nor construction documentation to support the assertion of structural integrity of the stack for the purpose of supporting a material handling facility to be constructed on top of the stack.

- The gypsum stack itself contains hazardous and toxic material.

- There is documentation of past slope stability and piping issues experienced at the site.

The local sponsor, the site owner, and the State of Florida Department of Environmental Protection (DEP) have supplied data and have asserted that the site is approved for the use intended. However, the Corps of Engineers has found the data to be inconclusive. Therefore, the Corps would need to undertake a full scale analysis and verification of the structural integrity of the site and material handling facility. If the analysis determined that the facility met the criteria established in appropriate Corps guidance, then the Corps would sign a certification to that effect and the site could be used to support the Phase III Construction project as well as future Federal maintenance dredging of the channel.

## Environmental Risks Associated with Use of the Piney Point Site

This particular alternative for the project presents some unique challenges with the use of the Piney Point disposal site. The project contemplates as an alternative using a phosphogypsum stack for the disposal of dredged material. The Piney Point phosphogypsum surface impoundment formerly held up to 1.2 billion gallons of acidic water. The wastewater came from the manufacturing of phosphoric acid from the mining of calcium phosphate. Piney Point surface impoundment was used to store the acidic process water and the by-products of calcium sulfate, plus traces of heavy metals and radio nuclides. The process wastewater from phosphoric acid production is excluded from hazardous waste regulation, if the plant stores the material with the intention of recycle and/or reuse in the process, and not declaring it has been discarded.

A problem occurred when Mulberry Corporation, the owner of Piney Point Phosphates, went bankrupt. The corporation ceased operations and abandoned their properties leaving over 1 billion gallons of acidic wastewater in the Piney Point surface impoundment. The wastewater became abandoned changing its definition from RCRA excluded hazardous waste to RCRA regulated hazardous waste at the time of disposal. The State of Florida DEP took care of treating and disposing the wastewater at a cost of over $1 million dollars.

The worst case scenario for Piney Point being used as dredged material disposal facility would be a breach in the liner. Such a breach would allow water to saturate and cause a failure to the gypsum stack, enabling the mixing of large volumes of dredged material with large volumes of phosphogypsum.

Phosphogypsum from phosphoric acid production is a hazardous waste excluded from RCRA Subtitle C regulation under 40 CFR 261.4 (b)(7). Process wastewater from phosphoric acid production is a hazardous waste excluded from RCRA Subtitle C regulation under 40 CFR 261.4 (b)(7).

Dredged material is not regulated by RCRA because is not a solid waste under the statutory definition. Phosphogypsum is not regulated by RCRA Subtitle C because is not a hazardous waste under the statutory definition. Water from rain and the placement of dredged slurry could percolate into phosphogypsum stack releasing a leachate that could be corrosive and toxic. If

HRK 002643

leachate meets the characteristics according to 40 CFR 261.22 and 40 CFR 261.24, then the leachate would be designated as hazardous waste. Then the mixture of a solid waste, with hazardous waste is considered a hazardous waste. The addition of dredged material to a hazardous waste will increase the probability of contaminating the surrounding surface and groundwater.

## Corps Policy Issues Associated with Use of the Piney Point Site

CECW-PA/OD Memorandum for Major Subordinate Commands and District Commands(dated 19 May 1999) paragraph 3 defines the Base Disposal Plan as follows: "Base Plan. The Federal interest in continued operation and maintenance of an existing Federal project for its navigation purpose is defined as the least cost plan for dredged material management that is consistent with sound engineering practice and meeting the environmental standards established by Section 404 of the Clean Water Act of 172 or Section 103 of the Marine protection, Research, and Sanctuaries Act of 1972, as amended…"

ER 1105-2-100 allows for recommendation of a LPP "if requested by the non-Federal sponsor and approved by ASA (CW)". ER 1105-2-100 further states that "If the sponsor prefers a plan more costly than the NED Plan or the combined NED/NER plans, and the increased scope of the plan is not enough to warrant full Federal participation, ASA (CW) may grant an exception as long as the sponsor pays the difference in cost between those plans and the locally preferred plan. The LPP, in this case must have outputs similar in-kind, and equal to or greater than the outputs of the Federal plan".

The Locally Preferred Plan for new work (Berth 12 construction) includes all of the same channel and berth construction features of the NED plan, but substitutes Base Plan disposal into the ODMDS for disposal of dredged materials directly into Piney Point.

## Issues to be Resolved Before the LPP Can Be Recommended for Implementation

a.   Least Cost Plan for Dredged Material Management

The LPP plan is more expensive than the NED plan. Per ER 1105-2-100 the Sponsor will have to pay the additional amount above the cost of the NED plan. The Sponsor has agreed to this.

b.   Consistent with Sound Engineering Practice

CESAJ has worked diligently with the Port, the State, and their consultants in order to address engineering and operational issues associated with use of the Piney Point site for disposal of dredged material. Issues discussed include ability of the Piney Point liner or modification thereof to accommodate placement of dredged material, integrity of the gypsum stack which forms the foundation of Piney Point disposal area to be build on top of the stack, avoidance of rainwater or return water interaction with HTRW pore water contained within the Piney Point stacks, etc. Currently CESAJ is not satisfied with these engineering and operations concerns. CESAJ has proposed a "reduced liability option" whereby the Port, State, and/or HRK operate and maintain the Piney Point disposal area, leaving the Corps contractor to simply hook up its dredge pipe to a pipe provided by the Port, State, and/or HRK. The Port, State, and/or HRK would operate Piney Point disposal and return water operation. This plan would be similar to doing upland construction where excess material is sent to a private or public landfill; therefore it would theoretically reduce the Corps' (and its maintenance dredging contractor's) exposure to liability associated with Piney Point.

HRK 002644

c.  Meets Environmental Standards -

ER 1165-2-132 Hazardous, Toxic, and Radioactive Waste (HTRW) Guidance for Civil Works Projects, Section 6 states "Construction of Civil Works projects in HTRW-contaminated areas should be avoided where practicable." The ER further states "Where HTRW contaminated areas or impacts cannot be avoided, response actions must be acceptable to EPA and applicable state regulatory agencies." The risk of HTRW impacts associated with Piney Point can be avoided through recommendation of the NED Base Disposal Plan that involves disposal in the Tampa Bay ODMDS.

The CESAJ Hazardous, Toxic, and Radioactive Waste Assessment, Manatee Harbor, Piney Point Disposal Area Appendix to the Environmental Assessment indicates that "There is sufficient evidence to indicate that Corps dredging activities would disturb or otherwise release hazardous waste substances contained in the calcium sulfate. Therefore, it is recommended not to utilize the Piney Point Disposal area for dredge material disposal, but to secure another disposal site."

A preliminary draft Environmental Assessment (EA) has been prepared for the alternative disposal options discussed in the GRR. Based on the EA, it is likely to proceed with a Finding of No Significant Impact (FONSI) on using the Tampa ODMDS for dredged material. This finding is pending completion of, and EPA's approval of, the Site Management and Monitoring Plan (SMMP) for the Tampa ODMDS. The SMMP is currently under a 30 day public notice ending August 14, 2008.

The EA evaluation on the Piney Point has led to findings that may not conclude with a FONSI. If the final environmental analysis result in significant impacts and the Piney Point disposal option is recommended as a locally preferred plan (LPP) then the Corps would need to proceed with an Environmental Impact Statement.

Should the Corps be responsible for a NEPA document allowing for operation and maintenance of Piney Point, an EIS will have to be prepared and coordinated by CESAJ.

Other Issues

There are legal issues associated with the use of the Piney Point site. Those issues are as follows. There must be a Certification from the State of Florida Regulation (FDEP) that certified Piney Point as a Dredged Material Disposal Site. There must be adequate documentation of the arrangements for use of Piney Point for a Dredged Material Disposal Site. There must be a Hold Harmless issued from the non-Federal Sponsor. All material that is to be placed into the Piney Point site must be tested extensively to ensure that there is no hazardous material that will enter the site. The owner of the site, HRK, must be responsible for managing, which includes all operations and obtaining all permits including those for the return water. These issues must be resolved in order for the Locally Preferred Plan to be recommended.

HRK 002645

# Table of Contents

1    INTRODUCTION .................................................................................................. 1

   1.1    Study and Project Authorizations 1986 through 2004 ................................... 1

   1.2    History of the Project and Phase III Investigation ....................................... 2

      1.2.1    Initial Project Authorization .................................................. 2

      1.2.2    Separation of Project into Phases ............................................. 4

      1.2.3    Evaluation of Phase III .......................................................... 4

      1.2.4    Changes to Existing Conditions Since 2002 GRR ..................... 4

   1.3    Prior Reports ............................................................................................. 5

   1.4    Purpose and Scope of Study ........................................................................ 7

      1.4.1    Plans for Navigation Improvements ........................................ 7

      1.4.2    Dredged Material Management Plan ........................................ 7

2    STUDY AREA BASELINE CONDITIONS ......................................................... 9

   2.1    General Environmental Setting .................................................................. 9

   2.2    Vegetation ................................................................................................. 9

   2.3    Threatened and Endangered Species .......................................................... 9

      2.3.1    Sea Turtles .......................................................................... 9

      2.3.2    Right Whales ....................................................................... 10

      2.3.3    West Indian Manatee ........................................................... 10

   2.4    Fish and Wildlife Resources ..................................................................... 10

      2.4.1    Migratory Birds .................................................................. 11

   2.5    Essential Fish Habitat................................................................................ 12

   2.6    Coastal Barrier Resources ......................................................................... 12

   2.7    Water Quality ........................................................................................... 12

   2.8    Hazardous, Toxic And Radioactive Waste ................................................ 12

   2.9    Air Quality ............................................................................................... 12

   2.10   Noise ........................................................................................................ 12

   2.11   Aesthetic Resources .................................................................................. 13

   2.12   Recreation Resources ............................................................................... 13

   2.13   Navigation ................................................................................................ 13

   2.14   Historic Properties.................................................................................... 13

3    PLAN FORMULATION ..................................................................................... 14

   3.1    Existing and Without-Project Vessel Congestion ...................................... 14

      3.1.1    Port Configuration .............................................................. 14

      3.1.2    Vessel Processing and Operating Rules.................................. 17

      3.1.3    Tidal Influences .................................................................. 18

   3.2    Harbor Expansion Problems and Opportunities.........................................18

      3.2.1    Increased Demand for Port Facilities..................................... 19

HRK 002646

3.2.2    Opportunities to Alleviate Congestion.................................................. 20
3.3       Harbor Expansion Planning Objectives ..................................................20
3.4       Harbor Expansion Planning Constraints ..................................................21
3.4.1    Technical Constraints............................................................... 21
3.4.2    Economic Constraints .............................................................. 21
3.4.3    Environmental Constraints ......................................................... 21
3.4.4    Institutional Constraints ............................................................ 21
3.5       Key Assumptions Guiding Harbor Expansion Plan Formulation and Evaluation........22
3.6       Harbor Expansion Plan Alternatives Development ......................................22
3.6.1    Consideration of Larger Scaled Plans ............................................. 22
3.6.2    Alternative Harbor Expansion Plans............................................... 23
3.6.3    No Action Alternative (A1) ........................................................ 23
3.6.4    Non-Structural Alternative (A2) ................................................... 25
3.6.5    Structural Alternatives, 950 feet (B) and 1,590 feet (C)......................... 25
3.7       Evaluation of Alternative Harbor Expansion Plans .....................................25
3.7.1    No Action Alternative (A1) ........................................................ 25
3.7.2    Non-Structural Alternative (A2) ................................................... 26
3.7.3    Structural Alternatives (B and C) .................................................. 26
3.7.4    Elimination of 30-foot depth Alternatives (B1 and C1) ......................... 26
3.7.5    Economic Benefits Analysis ....................................................... 26
3.7.6    Economic Benefits of Alternative Harbor Expansion Plans..................... 27
3.7.7    Contribution of Harbor Expansion Alternatives to Planning Objectives............. 28
3.8       Existing Conditions – Dredged Material Management..................................29
3.9       Future Conditions – Dredged Material Management.....................................29
3.10     Material Management Problems, Opportunities, and Constraints .....................29
3.10.1  Material Management Measures and Objectives................................... 30
3.10.2  Material Management Planning Constraints........................................ 30
3.11     Development of Alternative Dredged Material Placement Sites .......................31
3.11.1  Existing Port Manatee Dredged Material Management Area (DMMA) ............. 31
3.11.2  Ocean Dredged Material Disposal Site (ODMDS)................................. 33
3.11.3  Offload Dewatered Material from Existing DMMA to Piney Point Site ............ 34
3.11.4  Direct Placement at Piney Point Site .............................................. 34
3.11.5  Expanded Port Manatee DMMA .................................................... 38
3.12     Identification of the Least Cost Dredged Material Disposal Option............................40
3.12.1  Construction Cost Estimates ....................................................... 40
3.12.2  Maintenance Dredging Cost Analysis ............................................. 41
3.12.3  Summary of Dredged Material Management Option Costs ...................... 46
3.13     Economic Comparison of Harbor Expansion Alternatives............................46
3.14     NED Plan Identification...............................................................47
3.15     Locally Preferred Plan Identification .................................................49
3.16     Plan Selection...........................................................................50
3.17     Rejection of the Locally Preferred Plan ..............................................50
3.17.1  Structural Uncertainties Associated with Use of the Piney Point Site................. 50

HRK 002647

    3.17.2   Environmental Risks Associated with Use of the Piney Point Site ......................50
    3.17.3   Corps Policy Issues Associated with Use of the Piney Point Site ......................51

**4    THE RECOMMENDED PLAN** ................................................................................54

4.1    Dredged Material Management ................................................................................54

4.2    Volume of Material ................................................................................................54

4.3    Dredged Material Management Plan .......................................................................55

4.4    Economics of the Recommended Plan ....................................................................56

4.5    Environmental Mitigation .......................................................................................57
    4.5.1   Mitigation Plan History ................................................................................58
    4.5.2   Allocation of Mitigation Costs .....................................................................59

4.6    Section 902 Limit Calculations ...............................................................................59

4.7    Environmental Effects of the Recommended Plan ...................................................60
    4.7.1   Vegetation ....................................................................................................60
    4.7.2   Threatened and Endangered Species .............................................................60
    4.7.3   Hardgrounds .................................................................................................61
    4.7.4   Fish And Wildlife Resources ........................................................................61
    4.7.5   Essential Fish Habitat ...................................................................................61
    4.7.6   Historic Properties .......................................................................................62
    4.7.7   Aesthetics ....................................................................................................62
    4.7.8   Recreation ....................................................................................................62
    4.7.9   Coastal Barrier Resources ............................................................................62
    4.7.10  Water Quality ...............................................................................................62
    4.7.11  Hazardous, Toxic, And Radioactive Waste ..................................................63
    4.7.12  Air Quality ..................................................................................................63
    4.7.13  Noise ...........................................................................................................63

**5    PLAN IMPLEMENTATION** ...................................................................................64

5.1    Implementation Schedule of the Sponsor .................................................................64

5.2    Project Cooperation Agreement ..............................................................................64

5.3    Financial Analysis .................................................................................................65

5.4    Cost Sharing ..........................................................................................................65

5.5    Permits, Licenses, and Entitlements ........................................................................66

5.6    Comparison of Project With 2002 GRR And Section 156 Authorization ...................67

**6    PERTINENT CORRESPONDENCE & PUBLIC INVOLVEMENT** .........................68

6.1    Agency Coordination .............................................................................................68

**7    RECOMMENDATIONS** .........................................................................................69

## Environmental Assessment Addendum and Appendices
no appendix letter designation – included with Main Report

# Appendices

A:  Engineering

B:  Dredged Material Management Plan

C:  Economic Benefits

D:  Section 156 Mitigation Credit for Phase II and Phase III

E:  Real Estate Plan

F:  Pertinent Correspondence

G:  Study Issue Checklist

# List of Tables

Table 2-1 Invertebrate Species Observed ........................................................................ 11

Table 3-1 Port Manatee Existing and Without-Project Berth Characteristics ............................. 15

Table 3-2 Benefits Summary of Alternative Harbor Expansion Plans ........................................ 28

Table 3-3 MCACES Cost Estimates for Alternative Construction Material
        Placement Options October 2007 Price Level ............................................................ 40

Table 3-4 Costs for Placement of 2,907,000 CY in Upland Facilities .......................................... 43

Table 3-5 Average Annual Costs of Dredged Material Placement Alternatives .......................... 46

Table 3-6 Harbor Expansion Plans Economic Summary October 2007 Price Level ................... 47

Table 3-7 NED Plan Economic Summary  October 2007 Price Level, 4.875%
        Discount Rate, 50-Year Period of Analysis ................................................................. 48

Table 3-8 LPP Economic Summary:  Direct Pumping to Piney Point October
        2007 Price Level, 4.875% Discount Rate, 50-Year Period of Analysis ...................... 49

Table 4-1 NED Project Dimensions ................................................................................. 54

Table 4-2 Recommended Dredged Material Management Plan for O&M .................................... 56

Table 4-3 NED Plan MCACES Cost Estimate Summary (Cost Plus
        Contingencies) ........................................................................................................ 57

Table 4-4 NED Plan Economic Summary October 2007 Price Level, 4.875%
        Discount Rate, 50-Year Period of Analysis ................................................................. 57

Table 4-5 Port Manatee Mitigation Plan Features ................................................................... 58

Table 5-1 Cost Allocation for NED Plan Implementation .......................................................... 66

HRK 002649

# List of Figures

Figure 1-1:  Port Manatee Project Location Map ........................................................................ 3

Figure 3-1 Port Manatee Overview – Existing Conditions............................................................ 16

Figure 3-2 With-Project Alternative Berth 12 Lengths ................................................................ 24

Figure 3-3 Existing DMMA Location ........................................................................................... 32

Figure 3-4 Offload DMMA to Piney Point Truck Route.............................................................. 35

Figure 3-5 Piney Point Direct Placement Overview..................................................................... 36

Figure 3-6 Area for Expansion of Existing DMMA ..................................................................... 39

HRK 002650

# Manatee Harbor Federal Navigation Project
# Draft Phase III General Reevaluation Report

## 1   INTRODUCTION

The U.S. Army Corps of Engineers, Jacksonville District, is investigating navigation improvements at Port Manatee, located on Florida's west central coast near Manatee County's northern boundary within the southern portion of the Tampa Bay estuary (see Figure 1-1). The Port is situated at the nexus of two interstate highways and operates its own railroad. Since 1970, the Port has undergone capital improvements including the construction of warehouses, wharves and berths, railroad, offices, roads, stevedoring facilities and related infrastructure.

The Federally-authorized Manatee Harbor Project[1] provides for Federal maintenance of an existing entrance channel and turning basin. Maintenance of the channel is authorized to a depth of -40 feet and a bottom width of 400 feet. The entrance channel extends approximately 15,850 feet from the turning basin to the channel's intersection with the Tampa Harbor Main Channel (often referred to as Cut B). The investigations described in this report address the feasibility of constructing an access channel to a new berthing area intended to reduce severe problems of vessel traffic congestion at Port Manatee. Construction of the access channel and berthing area are referred to as Phase III of the Manatee Harbor Navigation Project.

### 1.1   Study and Project Authorizations 1986 through 2004

The Manatee Harbor Federal Navigation Project was initially authorized through the Water Resources Development Act (WRDA) of 1986, and modified by WRDA of 1990 and the FY 2004 Energy and Water Appropriation Act. The full text of the three authorizations appears below.

**Water Resources Development Act (WRDA) 1986 (PL 99-662) Title II, Section 202:**

> *"The project for navigation, Manatee Harbor, Florida: Report of the Chief of Engineers, dated May 12, 1980, at a total cost of $16,400,000 with an estimated first Federal cost of $9,500,000 and an estimated first non-Federal cost of $6,900,000 including such modifications as the Secretary determines to be necessary and appropriate to mitigate the adverse effects of construction, operation, and maintenance of the project on the benthic environment of the area to be dredged.*
>
> *The Secretary, in consultation with appropriate Federal, State, and local agencies, shall study the effects that construction, operation, and maintenance of the proposed project will have on the benthic environment of the area to be dredged. Not later than one year after the date of enactment of this Act, the Secretary shall transmit to the Committee on Environment and Public Works and Transportation of the House of Representatives and the Committee on Environment and Public Works of the Senate a report on the results of such study. The*

---

[1]   The names "Manatee Harbor" and "Port Manatee" are used somewhat interchangeably throughout this report. "Manatee Harbor" is the Federally authorized project name, as used in Congressional documents, while the Port is known more as "Port Manatee".

HRK 002651

*Secretary shall monitor the effects of construction, operation, and maintenance of the project on the benthic environment of the dredged area."*

**WRDA 1990 (PL 101-640) Title I, Section 102(j):**

*"The project for navigation, Manatee Harbor, Florida, authorized by section 202(a) of the Water Resources Development Act of 1986 (100 Stat. 4093), is modified to direct the Secretary to construct the project substantially in accordance with the post authorization change report, dated April 1990, at an estimated total cost of $27,589,000, with an estimated first Federal cost of $12,381,000 and an estimated first non-Federal cost of $15,208,000."*

**FY 2004 Energy and Water Appropriation Act, Section 156:**

*"The project for navigation, Manatee Harbor, Florida, authorized by Section 202(a) of the Water Resources Development Act of 1986 (100 Stat. 4093) and modified by section 102(j) of the Water Resources Development Act of 1990 (104 Stat. 4612) is further modified –*

*(1) to include the construction of an extension of the south channel a distance of approximately 1584 feet consistent with the general reevaluation report, dated April 2002, prepared by the Jacksonville District Corps of Engineers, at a total cost of $11,300,000, with an estimated Federal cost of $8,475,000 and an estimated non-Federal cost of $2,825,000;*

*(2) to direct the Secretary to credit toward the non-Federal share of the cost of the project the cost of in-kind services and materials provided for the project by the non-Federal interest;*

*(3) to direct the Secretary to credit toward the non-Federal share of the cost of the project the cost of the cost of planning, design, and construction work carried out by the non-Federal interest before the date of the partnership agreement for the project if the secretary determines that the work is integral to the project; and*

*(4) to authorize the secretary to carry out the project as modified at a total cost of $61,500,000."*

## 1.2   History of the Project and Phase III Investigation

Port Manatee was constructed by the Manatee County Port Authority, and began operations in 1970. A channel extending approximately 15,850 feet in length from Port Manatee to the Tampa Bay Ship Channel provided access for navigation.

Federal interest in navigation at Port Manatee started in 1974 through a House resolution to study navigation and related water resource problems and incorporate the local project for Federal maintenance. A Feasibility Report and Environmental Impact Statement were completed in 1978, which recommended maintenance of the channel as originally dredged, with the addition of an enlarged channel entrance and turning basin for safety and navigation.

### 1.2.1   Initial Project Authorization

Congress authorized the Manatee Harbor Federal navigation project in the Water Resources Development Act of 1986 (Public Law 99-662 dated 17 November 1986), based on the 1978

HRK 002652

Case 8:21-cv-01521-WFJ-CPT   Document 92-1   Filed 02/23/22   Page 15 of 84 PageID 1994

**Figure 1-1:  Port Manatee Project Location Map**



HRK 002653

Feasibility Report and in accordance with the Chief of Engineers Report, dated May 12, 1980. The selected plan in the Chief's Report recommended Federal assumption of the existing navigation project, which consisted of a 400-ft wide by 40-ft deep channel from the Port Manatee facilities to its intersection with the Tampa Harbor entrance channel (Cut B), a distance of approximately 3 miles.

## 1.2.2  Separation of Project into Phases

The 1990 Post Authorization Change Report (WRDA 1990, PL 101-640) separated the project work into two phases. Phase I would entail dredging of the access channel, and Phase II focused on construction of the entrance channel wideners and ship turning basin.

In 1997, Phase I construction of the Manatee Harbor Project was completed. The entrance channel was dredged to a controlling depth of 40 feet, 15,850 feet in length, and 400 feet in width. In addition, a 20-year comprehensive maintenance-dredging program on a 3-year cycle was developed to maintain channel and berth depths.

Phase II of the project, completed in late 2005, entailed:

1. widening the Manatee Harbor entrance channel from the Tampa Bay channel for ease of turning;

2. expansion of the ship turning basin to an effective size of 1,300 feet by 900 feet; and

3. modifications to the upland disposal facility (raising the dikes by 26 feet above the existing height of 29 feet).

In order to reduce the costs of dredge mobilization and demobilization, Berth 5 was dredged in the same work cycle as Phase II construction. Berth 5 was lengthened to 1,200 feet from existing 350 feet and deepened to a controlling depth of 40 feet from 20. Berth 5 dredging activity was a financial responsibility of Port Manatee.

## 1.2.3  Evaluation of Phase III

Phase III of the Manatee Harbor Project was first evaluated in 2002. A draft General Reevaluation Report (GRR) prepared in 2002 (never taken past the draft form) evaluated Phase III of the Manatee Harbor Project. The draft GRR recommended a channel extension of the Federally authorized access channel to Berth 12, with dimensions of 1,590 feet long and a controlling depth of 40 feet. The channel extension would have a width of 275 feet to be constructed alongside a 125-foot non-Federal berthing area of same depth and length. Dredged material was to be placed at the modified upland disposal facility on Port property.

The 2002 GRR was not completed because of differences between a revised turning basin design and the authorized turning basin (an element of Phase II) that had not been resolved. In 2003, a Limited Reevaluation Report and Post-Authorization Change document was finalized for Phase II, and established dimensions of a turning basin that was incorporated into without-project conditions for Phase III analyses contained in this report.

## 1.2.4  Changes to Existing Conditions Since 2002 GRR

In conjunction with Phase II construction, the non-Federal sponsor expanded Berth 5 (lengthened to 1,200 feet from existing 350 feet and deepened to a controlling depth of 40 feet from 20 feet).

HRK 002654

Dredged material was placed in the Port's dredged material management area (a 100-acre site). The 2002 GRR for Phase III determined that raising the dike height of the disposal site would provide ample capacity for the construction of Phases II and III and Phase I dredging on a 3-year cycle for 20 years. However, dredged material volumes from Berth 5 were not taken into account. During construction of Phase II, it became apparent that all capacity in the Port's dredged material management area would be exhausted after completion of construction. The site's capacity was expected to be exhausted even after the site's impoundment dikes were raised 26 feet above the existing height of 29 feet. The Port is now required to identify and provide additional capacity to accommodate material from construction of Phase III and continuing operation and maintenance (O&M) dredging of all Port channels, wideners, berthing areas, and the turning basin (i.e., maintenance of Phases I, II, and III).

The introduction of an expanded Berth 5, its contributions towards the alleviation of traffic congestion, and the exhausted capacity of the Port's dredged material management area, are the principal changes to existing conditions between the 2002 GRR and the current analysis.

## 1.3   Prior Reports

### 1978 Feasibility Report and Environmental Impact Statement

The 1978 Feasibility Report and Environmental Impact Statement recommended maintenance of the channel as originally dredged, with the addition of an enlarged channel entrance and turning basin for safety and navigation. Dredged materials from initial and subsequent maintenance operations were to be placed in an upland disposal area on Port property.

### 1983 General Design Memorandum (GDM)

The GDM detailed the design of the Feasibility Report Recommended Plan and contained a more accurate estimate of the shoaling rate leading to an increased maintenance-dredging schedule.

### 1989 Waterways Experiment Station (WES) Ship Simulation Study

A ship simulation to evaluate the proposed channel improvement for safe, efficient vessel use was undertaken. The design vessel was the *El Gaucho*, a 775-foot long cargo ship, with 106-foot beam, and a 36-foot draft. The improved navigation features simulated for this vessel were expanded entrance turning wideners at the Tampa Harbor and a ship's turning basin. A GDM, prepared in 1990, modified the project design in accordance with the WES study.

### 1990 Post Authorization Change (PAC) Report

WRDA 1990, PL 101-640, divided the project work into two sequential phases rather than a single contract. Phase I dredging of the access channel and Phase II entrance channel wideners and ship turning basin. The report further recommended changing the maintenance dredging cycle from five to three years.

HRK 002655

### 1994 Limited Reevaluation Report (LRR)

In 1994, an LRR was prepared to update the economic analysis of the project as two phases of construction to accommodate the financial capabilities of the non-Federal project partner.

### 1999 WES Ship Simulation Study

A second ship simulation study was conducted to investigate harbor channel improvements for the turning basin introducing the possibility of a new vessel call for a large cruise ship. The study analyzed a 1,400-foot diameter turning basin using two design vessels; the *El Gaucho* and the *Disney Magic*, a 965-foot long cruise ship with a 106-foot beam, and a 26-foot draft.

### 2002 Engineering Design Report (EDR) and Environmental Assessment (EA) for Phase II

An EDR revised engineering design and construction cost estimates, while the EA was developed to document environmental issues including revisions to the turning basin to reduce impacts to seagrass.

### 2002 General Reevaluation Report (GRR) for Phase III

A GRR was prepared in August 2002 to address Phase III navigational improvements of a channel extension south of Berth 11, to be designated as Berth 12. Construction and maintenance of the side channel extension (1,590 feet long, 275 feet wide, 40 feet deep) to further address vessel traffic congestion at Port Manatee, was determined to be the NED plan.[2]

### 2003 Letter Report

In March 2003, a Letter Report was approved to raise the dikes for the upland disposal area facility 26 feet above the previous height of 29 feet. The additional capacity was justified on the basis of accommodating the maintenance material for Phase I on a 3-year cycle for 20 years and to accommodate for the disposal of dredge material from Phase II work. It was recognized that additional capacity or alternative disposal options would be required to meet future disposal needs for Phase II. Port Manatee owns the upland disposal area located on the Port property.

### 2003 Limited Reevaluation Report / Post Authorization Change Report for Phase II

In May 2003, the LRR/PAC adopted the following as the NED plan for Phase II (1) the turning basin, (2) the channel entrance wideners, and (3) a completed disposal site dike

---

[2]  The 2002 GRR is actually a prior version of this document (Phase III General Reevaluation Report & Environmental Assessment). While it is outside of normal convention to reference a prior version of a report in the report itself, the 2002 version of the GRR played a major role in the justification of Section 156 of the FY2004 Energy and Water Appropriation Act (See Section 1.1 above). As such, the 2002 GRR is duly referenced as a prior study.

HRK 002656

height of 55 feet to provide ample capacity to handle the Phase II construction dredge material and 20 years of upland disposal for Phase I maintenance. The design vessel for simulation was the *Nelvana*, (LOA 797.0 feet, beam 105.6 feet, and a draft of 45 feet "light loaded to 40 feet").

### 2005 Section 156 Mitigation Credit for Phases I, II, and III

The purpose of the analyses provided in the Section 156 Mitigation Credit report is to document the sponsor's credit for mitigation that is integral to the project based upon applicable Federal laws, policies, and procedures. Costs associated with planning, design, and construction of mitigation that is integral to the Phase II and III projects is evaluated, and appropriate cost sharing is described. Because of its importance to this GRR, the Section 156 Mitigation Credit for Phases I, II, and III report is included in its entirety as an appendix to this document.

## 1.4   Purpose and Scope of Study

The purpose of this study is to develop and evaluate alternative plans for construction of an access channel to a new berthing area intended to reduce severe problems of vessel traffic congestion at Port Manatee. Because this report is a General Reevaluation Report, the results of analyses either will affirm the previously selected plan; reformulate and modify the selected plan, as appropriate; or find that no plan is currently feasible.

### 1.4.1   Plans for Navigation Improvements

The evaluation of alternatives focuses on the contributions of the alternative plans to National Economic Development (NED). Although the Port is an important contributor to the regional economy, Federal decision making regarding infrastructure improvements is primarily based on anticipated NED effects. The NED effects of the alternative plans include reduced transportation costs for commodities carried on commercial vessels with consequent increases in the value of the national output of goods and services.

Procedures for estimating NED effects are specified in the Economic and Environmental Principles and Guidelines for Water and Related Land Resources Implementation Studies (U.S. Water Resources Council, 10 May 1983), the Planning Guidance Notebook Engineering Regulation (ER) 1105-2-100 (22 April 2000), and other Corps guidance, such as the National Economic Development Procedures Manual: Deep Draft Navigation (IWR Report 91-R-13, November 1991).

### 1.4.2   Dredged Material Management Plan

At the completion of Phase II construction, the Port's existing Dredged Material Management Area (DMMA) was left with insufficient capacity to accommodate the volume of material that would be produced by any additional Phase III construction. As such, the Port needs to provide additional capacity to accommodate disposal needs of Phase III construction, and continuing Operation and Maintenance (O&M) dredging of all the Port's facilities (Phases I, II, and III).

A Dredged Material Management Plan (DMMP) for the Manatee Harbor Project, presented as an appendix to this report, evaluates dredged material management alternatives to provide a cost-

HRK 002657

effective and environmentally acceptable plan for the management of all material produced by the construction of Phase III and continuing maintenance of Phases I, II and III.  In addition, a major portion of this report (Section 3, Plan Formulation) focuses on alternatives for placement of Phase III construction material, and material from maintenance dredging operations.

HRK 002658

## 2   STUDY AREA BASELINE CONDITIONS

Baseline conditions describe existing resources of study area.  This section describes only those resources that are relevant to the decision to be made.  It does not describe the entire existing environment, but only those resources that would affect or that would be affected by the alternatives if they were implemented.

### 2.1   General Environmental Setting

Tampa Bay is the largest estuary in Florida.  It is a complex network of creeks, rivers, and bays that drains some 2,200 square miles of Florida's west central peninsular coast.  Port Manatee is located within the southern portion of the Tampa Bay estuary approximately 25 channel-miles from Tampa.  Although the surrounding area is densely populated, the port is located in a relatively unpopulated area.  Port Manatee is located between two Aquatic Preserves.  Located to the north of the Port is the Cockroach Bay Aquatic Preserve.  To the south is the Terra Ceia Aquatic Preserve.

### 2.2   Vegetation

Sea grass beds in Tampa Bay are extremely productive and used by a wide range of species as feeding grounds, nurseries, and refuges from predation.  Five species of seagrasses are found in the shallow areas of Tampa Bay: turtlegrass (*Thallasia testudinum*), manatee grass (*Syringodium filiforme*), shoal grass (*Halodule wrightii*), widgeon grass (*Ruppia maritima*), and star grass (*Halophila engelmanii*) (USCOE 1992).  Turtlegrass is the predominate species of seagrass found in the proposed work area along with shoalgrass, and a mix of widgeon grass, can also be found.

Mangrove and salt marsh communities occur along the saltwater edges of land at Port Manatee.  These wetland communities provide cover and spawning areas for fish and shrimp.  The mature mangroves provide nesting areas for birds such as the pelican.  Not only are mangroves an integral part of esturine food chains, they also provide shoreline stabilization.  The most abundant mangrove found at Port Manatee is the black mangrove (*Avicennia germinans*), followed by the white mangrove (*Laguncularia racemosa*), red mangrove (*Rhizophora mangle*), and buttonwood (*Conocarpus erectus*) (Port Manatee 1991).  Approximately nine acres of upland habitat would be impacted by the proposed project.  The upland habitat consists mainly of grasses and the invasive Brazilian pepper.

### 2.3   Threatened and Endangered Species

#### 2.3.1   Sea Turtles

Marine turtles are common in Tampa Bay.  The loggerhead sea turtle (*Caretta caretta*) and Kemp's ridley sea turtle (*Lepidochelys kempii*) are year-round residents (TBNEP 1996).  Loggerhead sea turtles annually nest on coastal beaches north and south of Tampa Bay.  In 1994, a green sea turtle (*Chelonia mydas*) nest was reported at Ft. Desoto County Park in Pinellas County.  Additionally, in 1994, a Kemp's ridley sea turtle nest was reported on a north Pinellas

HRK 002659

County beach. A Kemp's ridley nest was also reported on a mid Pinellas County beach in 1989 (Meylan, Schroeder and Moser 1995 and FDEP 1998).

### 2.3.2   Right Whales

Although rare, north Atlantic right whales have been reported in the Gulf of Mexico. North Atlantic right whales spend most of the year off the coast of New England and Canada. From November to April, females migrate down to the south Atlantic coast of the U.S. to calve or give birth. In 1963, a confirmed right whale sighting off Longboat Key was reported. Right whales are a protected species and are further protected under the Marine Mammal Protection Act of 1972.

### 2.3.3   West Indian Manatee

The population and distribution of manatees in Tampa Bay varies throughout the year. Approximately 50-60 manatees live in Tampa Bay during the summer and about 200 may be found in the bay during the winter (USFWS 1999). The Tampa Electric Company's Big Bend Power Plant located approximately 6 miles north of Manatee Harbor is a winter refuge for manatees. This is the closest winter refuge to Manatee Harbor. The Little Manatee River is recognized as a preferred calving site for Tampa Bay. It empties into the bay about 1 mile north of the action area for the project (USFWS 1999). Although the project area is not within designated critical habitat for the manatee, they still may use the area for travel, rest and feeding.

## 2.4   Fish and Wildlife Resources

Fish and wildlife resources in the project area are typical of those in Tampa Bay. Tampa Bay is classified as a subtropical estuary although the project is in an area of overlap between subtropical marine species and temperate marine species. Resources in the Manatee Harbor area include seagrass meadows, tidal marshes, mangrove stands, developed and undeveloped uplands, unvegetated and vegetated shallow bay bottom, a material disposal island and open water; however, the resources within the impact area of the proposed work consist of seagrass meadows, mangrove stands, unvegetated and vegetated shallow bay bottom, open water, and undeveloped uplands.

The Tampa Bay area supports both commercial and recreational fisheries. Many commercially important fish are present in grass beds as juveniles obtaining both food and shelter (Ogden 1980). Fish of commercial and recreational significance include striped mullet (*Mugil cephalus*), spotted seatrout (*Cynoscion nebulosus*), grouper (*Mycteroperca sp. and Epinephelus sp.*), tarpon (*Megalops atlanticus*), snook (*Centropomus undecimalis*), red drum (*Sciaenops ocellatus*), cobia (*Rachycentron canadum*), and sand seatrout (*Cynoscion arenarius*). However, the ten dominant fish species in Tampa Bay in order of abundance are tidewater silverside (*Menidia peninsulae*), bay anchovy (*Anchoa mitchilli*), scaled sardine (*Harengula jaguana*), striped mullet (*Mugal cephalus*), pinfish (*Lagodon rhomboides*), longnose killifish (*Fundulus similis*), silver perch (*Bairdiella chrysoura*), silver jenny (*Eucinostomus gula*), and code goby (*Gobiosoma robustum*) (USACE 1992).

Several studies dealing with Florida Seagrass beds and their associated animal communities show that diversity and abundance of fish and invertebrates are usually higher in grass beds than in unvegetated habitats. Mobile invertebrate epifauna, including several species of echinoids,

HRK 002660

asteroid and gastropods, feed upon the seagrasses and associated epiphytes. Other invertebrates such as some crabs, shrimp and gastropods are carnivorous, feeding on smaller herbivores and detritus feeders (Lewis, Durako, Moffler and Phillips 1985). Very scattered individual colonies of colonial tunicates and soft corals (*Leptogorgia virgulata*) may be found in the project area (Gee & Jenson, Inc. 1999).

Table 2-1 shows the results of the invertebrates observed during grassbed sampling by USFWS biologists during their onsite inspections.

### Table 2-1
### Invertebrate Species Observed

| Species | |
|---|---|
| Say's Mud Crab (*Neopanope texana*) | Crustaceans |
| Stone Crab (*Menippe mercenaria*) | |
| Scud (*Gammarus oceanicus*) | |
| Harford's Greedy Isopod (*Cirolana harfordi*) | |
| Mottled Tube-maker (*jassa Falcata*) | |
| Red-eyed Amphipod (*Ampithoe rubricata*) | |
| Michelin's Sand Dollar (*Encope michelini*) | Echinoderms |
| Lightning Whelk (*Busycon contrarium*) | Gastropod |
| Florida Horse Conch (*Pleuroploca gigantea*) | |
| Mottled Dog Whelk (*Nassarius vibex*) | |
| Broad-ribbed Cardita (*Carditamera floridana*) | Bivalves |
| Sunray Venus (*Macrocallista nimbosa*) | |
| Stiff Pen Shell (*Atrina rigida*) | |
| Mushroom Tunicate (*Distaplia stylifera*) | Tunicates |
| Striped Tunicate (*Styela plicata*) | |

### 2.4.1 Migratory Birds

Migratory birds are frequently found in the Tampa Bay area. Development has reduced the nesting areas available for birds. However, dredging and creation of dredged material disposal areas has recreated suitable areas for nesting. Gulls, terns, sandpipers, plovers, stilts, skimmers and oystercatchers are known to inhabit the Bay. Wading birds such as herons, egrets, and ibises use the interior wetland areas.

HRK 002661

## 2.5  Essential Fish Habitat

A separate request for Essential Fish Habitat (EFH) consultation and an EFH assessment was presented to the National Marine Fisheries Service (NMFS) by letter dated August 1, 2000 (see the appendices to the Environmental Assessment Addendum. In addition to the August 1, 2000 letter, a meeting was held with NMFS at the Manatee County Port Authority Offices on August 31, 2000 to discuss the EFH Assessment, the latest mitigation plan for the entire project, and how the mitigation plan addressed the EFH impacts. The NMFS provided the Corps with a written project evaluation by letter dated October 6, 2000, which included EFH conservation recommendations. These recommendations can be found in the appendices to the Environmental Assessment Addendum. In summary, the proposed dredging sites are located in an area identified by the National Marine Fisheries Service as Essential Fish Habitat (EFH) for juvenile pink shrimp (*Penaeus duorarum*); postlarval and juvenile red drum (*Sciaenops ocellatus*); postlarval , juvenile and adult gray snapper (*Lutjanus griseus*); and, juvenile bluefish (*Pomatomus saltatrix*), Spanish mackerel (*Scomberomerus maculatus*) and yellowtail snapper (*Ocyurus chrysurus*) and lane snapper (*Lutjanus synagris*). Categories of EFH, which would be affected by the project, include seagrasses, estuarine sand substrate and estuarine water column. Refer to the Environmental Assessment for a complete EFH analysis.

## 2.6  Coastal Barrier Resources

The project area, Manatee Harbor, is not part of the Coastal Barrier Resources System.

## 2.7  Water Quality

The waters surrounding Port Manatee are classified by the State of Florida as Class II Waters, prohibited for shellfish harvesting. Various protective measures and monitoring programs will be conducted during construction to ensure meeting State Water Quality criteria. Water Quality Certification has been obtained by the Manatee County Port Authority from the State of Florida.

## 2.8  Hazardous, Toxic And Radioactive Waste

The Hazardous, Toxic and Radioactive Waste (HTRW) assessment was conducted for this project in accordance with the requirements of ER-1165-2-123, HTRW Guidance For Civil Works Projects. The assessment indicated, no evidence of HTRW exists. During project construction HTRW awareness should be practiced.

## 2.9  Air Quality

Port Manatee air quality studies have indicated that air quality at Port Manatee is within established Local, State and Federal Standards (Port Manatee 1991).

## 2.10 Noise

Ambient noise around the project area is typical to that experienced in harbor environments.

## 2.11 Aesthetic Resources

Port Manatee is located within the southern portion of the Tampa Bay estuary and is surrounded by relatively undeveloped areas. To the north of the Port, is the Cockroach Bay Aquatic Preserve and to the south, is the Terra Ceia Aquatic Preserve. Both of these preserves are considered to be pristine. However, visual aesthetic resources found at Manatee Harbor are not of significant value. Commercial port activities are the main use of the facility.

## 2.12 Recreation Resources

The waters surrounding Manatee Harbor provide some recreational value for boaters. The seagrasses provide habitat for recreationally important fishes, and as a result, provide much value for recreational fishing.

## 2.13 Navigation

Construction and maintenance of the proposed project would result in temporary disruption of normal vessel traffic using the existing navigation channel and port facility. Completion of the project would have a favorable impact on navigation by allowing safe use of the facility regardless of tides.

## 2.14 Historic Properties

In February 2000, Mid-Atlantic Technology and Environmental Research, Inc. under contract with the Jacksonville District, Corps of Engineers, conducted a marine remote sensing survey and terrestrial survey of the Manatee Harbor project area. Investigations were conducted from the entrance channel off of Cut-B Channel to the areas at the port facility, including the widener, turning basin, and berthing area to the south. Historical research was included as part of the fieldwork. No shipwrecks have been reported lost in the Port Manatee area. The marine survey located thirteen magnetic and acoustic targets. Six of the targets were recommended for diver evaluations. A terrestrial survey was conducted for the harbor expansion to the south. Thirty-two shovel tests were conducted inland and along the shoreline. No cultural materials were observed. The State Historic Preservation Officer (SHPO) concurred with recommendations in letter dated August 7, 2001. In November 2001, Tidewater Atlantic Research Inc. conducted the diver evaluations on the six magnetic targets previously located. The results of the investigations revealed a scatter of modern debris at the locations. Coordination letters dated 28 September 2006, 1 August 2006, 8 April 2002, and 7 August 2001 are located in the appendices to the Environmental Assessment Addendum.

HRK 002663

# 3   PLAN FORMULATION

Plan formulation has been conducted in accordance with the six-step planning process described in *Economic and Environmental Principles and Guidelines for Water and Related Land Resources Implementation Studies* (1983) and the *Planning Guidance Notebook* (ER 1105-2-100, dated April 2000).  The six steps in the iterative plan formulation process are:

1. Specify water and related land resources problems and opportunities;
2. Inventory and forecast existing conditions;
3. Formulate alternative plans;
4. Evaluate alternative plans;
5. Compare alternative plans; and
6. Select the recommended plan.

Plan formulation for this particular project (extension channel to Berth 12) was conducted on two separate project elements:  harbor expansion, and disposal of dredged material.

Channel dimensions (i.e., length and depth) for a harbor expansion plan are first evaluated to determine the extension channel dimensions at which economic benefits would be maximized.

The analysis of dredged material disposal options follows the formulation of the benefit-maximizing harbor expansion plan.  Adequate capacity in Port Manatee's existing and permitted DMMA is not available for the disposal of construction or maintenance material.  For this reason, plans for the disposal of dredged material were evaluated separate from harbor expansion plans in a traditional plan formulation framework.

Given the parallel formulation that took place for this analysis, harbor expansion plans are evaluated in Sections 3.1 through 3.7, and the evaluation of plans for the disposal of dredged begins with Section 3.8.

The basis for selection of the recommended plan is fully documented below, including the logic used in the plan formulation and selection process.

## 3.1   Existing and Without-Project Vessel Congestion

Vessel congestion and queuing at Port Manatee result from the physical conditions at the Port in combination with current operating constraints.  Comments from Port personnel and Port tenants indicate that the Port is currently at operational capacity.  Port operations are extensively coordinated, requiring advance notification of vessel arrivals and departures, shifting vessels from one berth to another to accommodate arriving vessels, and use of secondary berths that are not the vessel's most productive berth at the Port.  Additional efficiency gains through further improvements in operating practices do not appear feasible.

### 3.1.1   Port Configuration

Port Manatee has roughly 7,000 linear feet of dock space and 7.2 miles of Port-owned rail track.  About 1,100 acres of upland acreage is developed with 500 acres available.  The Port has 781,000 square feet of warehouse space including over 200,000 square feet of chilled space and 30,000 square feet of frozen space.  Four general types of vessels regularly call at the Port:

HRK 002664

barges (tug assisted), liquid bulk vessels, general cargo vessels, and container ships.  Vessels typically carry a single commodity.

The current configuration of Port Manatee is shown on Figure 3-1, and facilities are profiled in Table 3-1.  As indicated in the figure and table, the Port has eight commercial berths with facilities for cruise ships and a wide variety of commodities.  The Port currently does not serve the cruise-ship industry. The Port has approximately ten major tenants plus a variety of smaller users.  The major tenants include large international entities, such as

- Arauco (wood products)
- Chiquita (fresh produce)
- TransMontaigne (petroleum products)
- Del Monte (fresh produce)
- Citrisuco (juice products)
- Eastern Portland Cement (finished cement)

- Vulcan Materials (stone aggregate)
- Martin Marietta (granite)
- Florida Rock (cement manufacturing)
- Kinder-Morgan (phosphate products)
- Gearbulk (wood products)
- FL Power & Light (petroleum products)

**Table 3-1**
**Port Manatee Existing and Without-Project Berth Characteristics**

| Berth No. | Length (feet) | Depth (feet) | Features | Cargo Handled |
|---|---|---|---|---|
| 12 | 1000 | 20 | Shallow Barges Only | Project cargo, misc. small vessels |
| 11 | 480 | 40 | Petroleum Pipeline | General Cargo, Break-Bulk Containers, Reefer, Liquid Bulk |
| 10 | 780 | 40 | Petroleum Pipeline | General Cargo, Containers, Liquid Bulk, Break-Bulk, Passengers |
| 9 | 747 | 40 | Petroleum pipeline RO/RO Ramp | RO/RO, Passengers, General Cargo, Break-Bulk, Containers, Liquid Bulk, Project Cargo |
| 8 | 650 | 40 | Petroleum Pipeline Pneumatic cement discharge system | General cargo, Containers, Break-Bulk, Freeze, Chill, RO/RO, Liquid Bulk, Project Cargo |
| 7 | 790 | 40 | Petroleum Pipeline Fixed gantry conveyor loaders | Dry Bulk, Liquid Bulk, Break-Bulk |
| 6 | 668 | 40 | Covered clinker conveyor system | Dry Bulk, Liquid Bulk, Break-Bulk, Containers |
| 5 | 1,200 | 40 | Completed Feb. 2004 Conveyor system completed 2004 | Dry Bulk, Juice |

Note:  Berth 4 is considered a component of Berth 5.
Berth 12 will be evaluated for deepening and lengthening during plan formulation.

HRK 002665

Figure 3-1
Port Manatee Overview – Existing Conditions

HRK 002666

The Port's access channel to the Tampa Bay Shipping Channel is approximately 3 miles in length (15,850 feet), 400 feet wide, with a controlling depth of 40 feet deep with 2-foot overdepth allowance. Relatively new features from Phase II construction were completed in 2005, and include:

- An expanded Port Entrance Channel with wideners along both sides of the Channel Entrance at the intersection with Tampa Harbor to provide ease of turning.

- A 900-foot turning basin alongside the 400-foot wide access channel, which created a 1300-foot x 900-foot turning basin.

- Expansion of Berth 5 to a length of 1,200 feet and a depth of 40 feet. A conveyor system and other handling facilities including a railed mounted Gantry Crane exist at Berth 5.

### 3.1.2  Vessel Processing and Operating Rules

Discussions with Port tenants and Port personnel, as well as observations of actual port operations revealed the operating restrictions and processing rules listed below. These vessel processing and operating rules were included as part of the formulation process, have been incorporated in the models developed for the economic analysis.

1. The order of priority for moving vessels into or out of Port Manatee follows the following basic structure: vessels carrying perishable items, vessels that require specific tidal conditions in order to move, vessels with highly restrictive berth preferences, and then all other Commercial vessels. Within each of these groups, priority is given to vessels that have been waiting the longest.

2. The combined length (LOA) of vessels being moved into Berths 4 and 5 may not exceed 1,000 feet (including a 50 ft gap between vessels).

3. The combined length (LOA) of vessels being moved into Berths 6 and 7 may not exceed 1,100 feet if Berth 8 is occupied, or 1,192 if not (including a 50 ft gap between vessels).

4. The length (LOA) of a vessel being moved into Berth 8 may not exceed 550 feet if Berths 7 and 9 are occupied, or 620 feet if either one is empty.

5. The combined length (LOA) of vessels being moved into Berths 9 and 10 may not exceed 1,200 feet (including a 50 ft gap between vessels).

6. The length (LOA) of a vessel being moved into Berth 11 may not exceed 775 feet.

7. The maximum allowed (LOA) of vessels being moved into Berth 12 changes under different with-project conditions. In certain scenarios, two vessels are allowed to use the Berth, and their combined LOA cannot exceed 1,590 feet (including a 50 ft gap between vessels). In other scenarios, only one vessel can use the Berth, and the LOA cannot exceed 950 feet. In certain scenarios, the draft of the vessel is restricted as well, from 35 to 40 feet

8. Self-propelled Cement vessels can dock only at Berth 8 because it is the only berth equipped with a pneumatic cement discharge system below the dock surface, which connects to four silos used for storage of cement.

HRK 002667

9. Self-propelled Clinker vessels can dock only at Berth 6 because it is the only berth equipped with a conveyor system to a cement mill with two storage silos that are used to unload self-propelled clinker vessels.

10. Fertilizer vessels can dock only at Berth 7 because it is the only berth equipped with two fixed gantry conveyor loaders required in the loading of self-propelled fertilizer vessels.

The combined effects of congestion, due to increasing traffic and the lack of redundant facilities, has required Port Manatee officials to shift vessels from their preferred berths in an attempt to accommodate the greatest number of vessels and maximize the use of harbor facilities. However, in the absence of significant improvements to berths and dockside facilities, problems associated with in-port delays and slowed cargo transfers are expected to continue and to grow more severe in the future. Interviews with Port Manatee personnel, shipping agents, and carriers indicate that delays are a relatively common occurrence. Interviews also indicate that diversions occur less frequently than delays. The decision to divert to another port is made on an *ad hoc* basis that is dependent on a number of factors including anticipated length of delay at Port Manatee, berth availability at the alternate port, and coordination with landside transportation.

### 3.1.3 Tidal Influences

The access channel into Port Manatee runs perpendicular to local tidal currents. The shifting tidal influence plays an important role in dictating the timing of vessel movements in and out of the Port. Tampa Bay has irregular tides and there can be two to four slack tides per day. In general, the pilots of the deeper-draft vessels attempt to transit the channel during slack tides to take advantage of low tidal current during peaks and troughs of the tidal cycle. Navigation of shallower draft vessels is less constrained. The time that is required for a vessel to travel up and down the channel is approximately one hour.

For safe navigation at Port Manatee, the Tampa pilots must adhere to the following when entering and exiting the channel, which contributes to the overall queuing problems at the Port.

- Fruit vessels, which are small and highly maneuverable, can enter or exit the Port at any time (assuming berth availability).

- For all other vessels, there can be no more than one vessel movement into or out of Port during a given hour.

- Vessels with sailing drafts greater than 33 feet or LOA greater than 800 feet require slack tide conditions to enter or exit Port.

- Vessels with sailing drafts greater than 36 feet are assumed to occupy one entire slack tide cycle. Therefore, when one of these vessels moves into or out of Port, there can actually be no more than one vessel movement during a two-hour period.

## 3.2 Harbor Expansion Problems and Opportunities

The once small terminal of Port Manatee has, over time, increased its operations to be now one of the busiest full-service U.S. deepwater seaports boosting geographical, intermodal, and commercial advantages to economies outside of the U.S. Landside transportation infrastructure development projects are being planned and constructed to better link Port manatee to the

nation's landside transport system. The Port Manatee Connector would provide an enhanced roadway connection between Port Manatee and Interstate 75. The Florida Department of Transportation and the Federal Highway Administration initiated a Project Development and Environment study in May 2008. CSX Transportation, in partnership with the City of Winter Haven, is developing 1,250 into a inter-modal logistics center. The project's first phase includes a 300 acre rail to truck hub, which is projected to be in operation in 2009. CSX has a direct rail link to Port Manatee.

Problems relating to vessel congestion and queuing from traffic at the Port result from the physical conditions at the Port in combination with current operating procedures. Congestion in the berthing areas is on the rise due to the increase in number and size of vessels and diverse commodity types they carry in conjunction with a lack of redundant berthing facilities, tidal influences, and Port processing rules. Traffic congestion has required Port Manatee officials to shift vessels from their preferred berths in an attempt to accommodate the greatest number of vessels and maximize the use of harbor facilities. Off loading operations may need to be stopped in order to shift a vessel to another berth in order to accommodate new arrivals. In the absence of significant improvements to berths and dockside facilities, problems associated with in-port delays and slowed cargo transfer are expected to continue and to grow more severe in the future. In its current state, Berth 12 contributes little to the alleviation of the problems related to vessel shifting and congestion at the Port. The existing channel leading to Berth 12 does not accommodate deep draft vessels.

### 3.2.1 Increased Demand for Port Facilities

In recent years, increased numbers of vessel calls have come about from: (1) upgrades in Port facilities, expansion of Berth 5, and the Phase II turning basin and channel improvements, which have allowed the maximum vessel size to be increased from 800 feet length overall (LOA) to 900 (LOA) (2) the convenient geographic location, (3) superior highway and rail access development, (4) rapidly developing commerce, and (5) ensured and maintained commercial navigation access to the harbor with controlling depths of 40 feet. According to the Port, approximately $124 million has been invested in expansion of state-of-the-art improvements such as available chilled, ambient, and dry warehouses, docks and berths, railroad system, roads, harbor, offices, related infrastructure, and recent channel improvements. The $3.9 million Gottwald mobile harbor container crane started operations at Port manatee in December 2007. Del Monte's planned warehouse consolidation combined with the mobile harbor crane will greatly increase the efficiency of that operation. Vulcan Materials has invested $3.4 million in a conveyor system for offloading aggregate materials, which began operations in 2008.

Among the largest new facility developments at Port Canaveral is the new fuel tank farm planned for the former Reeder property adjacent to the port. The purchase of 240 acres was completed by Vecenergy in April 2008. Vevenery is a petroleum and bio-fuels tank farm operator with operations in the US, Europe, and the Caribbean. Vecenergy currently offloads all petroleum products landed at Port Everglades. The first phase of development includes 13 125,000 barrel fuel tanks with a combined storage capacity of 1.63 million barrels. Customer commitments are already in place for phase one. The second phase of development includes the addition of 11 more storage tanks.

Additionally, a juice tank farm is being developed for the corner between berths 5 and 6 to accommodate increased tonnage from Tropicana, Fisher, and Citrisuco. In 2004, the Port began

HRK 002669

using Berth 5 to handle stone products and juice, however additional berthing space to accommodate these and other commodities is required.  Because of improvements, the Port anticipates an increase in future commodity growth handling of Petroleum products, Aggregate/Crushed Stone, Granite/Limestone, chilled fruit and containerized cargo. A new container service by Sea Bridge has commenced operations between Brownsville, Texas and Port Manatee. A new aggregate conveyor system is being planned for berth 8, with 10 acres of lay-down area located adjacent to the cement silos. Plans have also been developed for a new cement silo and pneumatic offloading system at berth 8, which would double the current capacity.  As commodity growth increases, the inner-harbor movements will trigger additional congestion and delays, possible lost markets, and ultimately, increased costs of doing business at the Port.

### 3.2.2  Opportunities to Alleviate Congestion

With the improved channel entrance and ship turning basin, increased and new commodity flow into Port Manatee is expected.  Berth 12 currently handles only shallow draft vessels, which are only a minor presence at Port Manatee.  It is the opinion of the non-Federal sponsor that extending the access channel to Berth 12 would allow for larger ships transporting other commodities to utilize Berth 12, further alleviating traffic congestion in the harbor, and opening opportunities for new services.  Expected opportunities for the primary usage of Berth 12 is to handle commodities such as petroleum products, and containerized cargo,  Secondary usage of Berth 12 would be from ships handling Forest Products and Fruit when Berth 9 and 11, respectively, are occupied.  For such usage, infrastructure related to the handling of such commodities at Berth 12 is readily available at the Port.  It is not expected that the construction of rail mounted cranes, fuel and rail line spurs, harbor cranes, conveyor systems, chilled warehouses, and other storage facilities will be required to accrue benefits from construction of a new berthing area.

With a channel extension, a new berthing area, and expansion of available stevedoring and landside facilities, there is an opportunity to alter the present operating rules and more efficiently process vessels to their preferred berths, thereby reducing in-harbor related traffic delays and congestion.  The analysis contained within this report develops and analyzes all practicable alternatives, from no-action to the identification of an appropriately-sized access channel extension to Berth 12.  The economic impacts of extending the channel as it relates to maximizing its net primary benefits are quantified in this report.  The alternative plan selected will provide benefits in excess of costs and offer greater net benefits than all smaller scale plans to justify Federal participation.  Safety, environmental sustainability issues, and available disposal site options associated with the channel extension will also be evaluated.  The channel extension would warrant Federal and non-Federal cost sharing arrangements if found economically justified under current U.S. Army policy and regulations.

## 3.3  Harbor Expansion Planning Objectives

The fundamental planning objective is to develop an optimal plan that can accommodate existing and future vessel traffic.  The optimal plan must also be acceptable from the National Economic Development (NED) perspective, as directed by the *Planning Guidance Notebook*, as well as from Environmental Quality (EQ) and Regional Economic Development (RED) perspectives, and to account for Other Social Effects (OSE).  Plans were formulated to be complete, effective,

HRK 002670

efficient and acceptable, and to reasonably maximize net benefits.  In summary, these objectives are:

- Recommend an alternative that is in the nation's interest and supported by Port Manatee.
- Increase navigational efficiency for current navigation traffic using Port Manatee.
- Facilitate the safe and efficient movement of traffic into and out of the Port Manatee to the level of demand projected during the economic life of the project.

## 3.4   Harbor Expansion Planning Constraints

The formulation and evaluation of alternative plans for channel dimensions was constrained by a variety of technical, economic, environmental, and institutional considerations.  Technical, economic, environmental, and institutional planning constraints were developed to guide the formulation of alternative plans, and are provided below.

### 3.4.1   Technical Constraints

- Plans must be sound, safe, and acceptable to Port Manatee.
- Plans must be in compliance with sound engineering practice.
- Impacts to operations at existing deepwater berthing areas must be minimized.
- Plans must be consistent with Port Manatee's plans for expansion and development, utilizing existing areas prepared for further development.
- Plans must be complete and not dependent on future projects.

### 3.4.2   Economic Constraints

- Plans must be justifiable, that is, plan benefits must exceed plan costs (there must be net excess benefits).
- Plans must be efficient in scale.  They must represent near optimal use of resources in an overall sense.  Accomplishment of one economic purpose cannot unreasonably impact another economic system.
- Project economic benefits are to begin accruing in 2010, and cannot accrue during construction.

### 3.4.3   Environmental Constraints

- Plans cannot unreasonably impact environmental resources, and must minimize impacts to seagrass and other Florida Manatee habitat areas .
- Where a substantial impact is established, plans must consider mitigation or replacement and should adopt such measures, if justified.

### 3.4.4   Institutional Constraints

- Plans must be consistent with existing Federal, state, and local laws.

HRK 002671

- Plans must be supported by Port Manatee to the extent that the Port must guarantee local pier, berths, and other works necessary to realize benefits since the Federal government is constrained from construction of these works.

- Plans cannot be recommended for Federal cost participation, establishment or expansion of a Federal navigation project where the improvement would serve only property owned by a single firm, corporation, or individual.

## 3.5   Key Assumptions Guiding Harbor Expansion Plan Formulation and Evaluation

Based on the project goals objectives, and constraints the following key assumptions were developed to guide the formulation and evaluation of navigation improvement features.

- Evaluation and comparison of costs of alternative plans will be based on preliminary layouts, estimates of quantities, and October 2007 dollars.

- The base year of the economic analysis (the year in which benefits begin to accrue) is 2010 with a 50-year period of analysis, using the FY 2008 discount rate of 4.875 percent.

- Each separable navigation feature or item of improvement must be incrementally justified with benefits greater than or equal to costs.

- There is no opportunity for benefits to accrue during construction due to the nature of the construction activities influencing the utilization of a single facility. During construction of the channel extension or the remaining 590 feet of Berth 12, there would not be ample room for regularly scheduled navigation activities that would benefit the Port.

- Feasibility study costs and completed landside improvement expenditures made prior to initiation of Phase III construction activities were considered sunk costs and were not included in the cost estimate used in the cost-benefit analysis. Future landside improvements at Berth 12 are non-Federal associated costs.

## 3.6   Harbor Expansion Plan Alternatives Development

The alternative plans considered include the no-action plan, a non-structural plan, and seven different channel extension plans. The first two structural alternatives, which incorporate a 950-foot channel extension, accommodate the design vessel length (the El Gaucho, a 775-foot long cargo ship, with 106-foot beam) with adequate safety clearance at both ends of the vessel. The remaining four structural alternatives, which include a 1,590-foot channel extension, accommodate the design vessel (with safety clearances at the bow and stern) and a smaller sized vessel from the existing fleet with adequate safety clearances.

### 3.6.1   Consideration of Larger Scaled Plans

Early in the formulation process, a larger scale (length) plan was considered, but then eliminated because of anticipated environmental impacts and their associated increases in mitigation costs.

The minimization of impacts to seagrass is a major constraint in the formulation of alternatives. In response to the denial of the state water quality permit for Phase II construction, the turning basin component of Phase II had been redesigned to minimize impacts to seagrass. Channel

extension alternatives currently being evaluated also are located amidst seagrass and mangrove habitats.  To upscale the 1,590-foot alternative, an incremental length of 650 feet would be necessary to accommodate another average sized vessel within the fleet.  The total length of the channel and berthing area would them be 2,240 feet.  Dredging this additional length would extend the construction activities into large mangrove habitat uplands, and result in increased environmental degradation and an escalation of construction costs.  In addition, <u>a portion of the mangrove habitat that would be impacted by a 2,240-foot channel and berthing area was previously constructed for mitigation purposes.</u>

For these reasons, it was decided that costs and benefits for channel extensions in excess of 1,590 feet would be neither developed nor fully evaluated.

### 3.6.2  Alternative Harbor Expansion Plans

The designation of the alternatives evaluated and a detailed description of each are as follows:

- Alternative A1 (No Action)
- Alternative A2 (Non-structural)

- Alternative B1 (950 ft. length x 30 ft. depth)
- Alternative B2 (950 ft. length x 35 ft. depth)
- Alternative B3 (950 ft. length x 40 ft. depth)

- Alternative C1 (1590 ft. length x 30 ft. depth)
- Alternative C2 (1590 ft. length x 35 ft. depth)
- Alternative C3 (1590 ft. length x 39 ft. depth)
- Alternative C4 (1590 ft. length x 40 ft. depth)

Alternatives B and C are shown on Figure 3-2.

### 3.6.3  No Action Alternative (A1)

The no-action plan is the "do nothing" alternative and is also referred to as the without-project condition.  No-action is considered to be the most likely situation expected to exist in the future in the absence of the Federal navigation improvements or changes in law or public policy.  The without-project condition serves as the baseline against which alternatives are evaluated.  Relative to this investigation, existing waterway construction projects and those under or

HRK 002673

Figure 3-2
With-Project Alternative Berth 12 Lengths



authorized for construction (including continued maintenance) is considered as part of this plan over the period of analysis.

### 3.6.4  Non-Structural Alternative (A2)

The Non-Structural Plan evaluates other potential means of economically transporting the excess existing and future demand in commodity flows in and out of Port Manatee. An example of this approach would be to implement traffic scheduling of shipments to alleviate Port congestion or transporting commodities by alternate waterway routes.

### 3.6.5  Structural Alternatives, 950 feet (B) and 1,590 feet (C)

The proposed channel extension was configured with a width of 275 feet to be constructed along side a 125-foot non-Federal berthing area with varying depths as determined through the economic analysis. The 275-foot channel extension in combination with the 125-foot berth was chosen since it coincides with the navigational design of the Manatee main access channel (400-foot width). Structural alternatives considered are for two different lengths of side channel access to Berth 12 with widths of 275 feet and depths between 30 and 40 feet. The alternative B channel extension, 950 feet in length, was based on accommodating the design vessel length (775 feet) with adequate safety clearance at both ends of the vessel. The alternative C channel extension, with a length of 1,590 linear feet, was based on accommodating the design vessel and a smaller sized vessel from the existing fleet with adequate safety clearances at both ends of the vessels. An additional incremental depth of 39 feet was analyzed for Alternative C to assure that benefits did not maximize at a lower scale. Construction of the berthing area adjacent to the channel extension is not a Federal responsibility. Under Alternative B or C, Port Manatee would complete Berth 12 in accordance with the Department of the Army[3] permit conditions.

## 3.7  Evaluation of Alternative Harbor Expansion Plans

The No-Action plan, and eight alternative plans (Plans A2, B1, B2, B3, C1, C2, C3, and C4) are evaluated and compared in this section of the report. Specifically, this section provides discussions on the project economics, contributions to the planning objectives, and concludes with the identification of the National Economic Development (NED) Plan.

### 3.7.1  No Action Alternative (A1)

Under the No-Action plan, foreseeable undesirable effects associated with construction of a selected plan are avoided. Seagrass and mangrove impacts at Berth 12 would not occur. However, without any improvements, combined effects of congestion, due to increasing traffic, and the lack of redundant facilities, would persist. Port delays and inefficiencies would perpetuate as a common occurrence and safety issues would increase. Port Manatee would not expand cruise and cargo operations at Berth 12. According to Port Manatee staff, even with the recent improvements at Berth 5, continuation of shifting vessels from their preferred berths is necessary to accommodate the greatest number of vessels and maximize utilization of harbor

---

[3] In 2001, Port Manatee was issued a Department of the Army (DA) Permit No. 1998-01210 to dredge the berth to 1,590 feet in length with a 40-foot depth. Also, during construction of the Phase II mitigation plan, Port Manatee went forward and completed the Phase III mitigation, since the mitigation locations are within the same sites.

HRK 002675

facilities. With no-action, problems associated with in-Port delays and slowed cargo transfer is expected to continue and grow more severe in the future, preventing increased waterway commerce. Also, at some point in the future, commercial shippers would be forced to move their shipping operations to other ports further away at a higher cost and to the detriment of Port Manatee.

### 3.7.2  Non-Structural Alternative (A2)

Commodity movement at the Port is dependent upon barge and ship transportation. For this reason, stand-alone overland transportation plans were not considered. With respect to intermodal non-structural plans, consideration was given to transporting commodities by alternate waterway routes in combination with overland transportation routes to their ultimate destination. Determinations were evaluated as to whether particular commodities could be economically by alternate transportation routes. In this case, the nearest seaport in the area is Tampa Harbor located about 30 miles further up Tampa Bay. The longer sea journey and increased land distances to final destinations from Tampa would result in higher overall costs. Other routes with longer distances would result in higher transportation costs as well.

Both the No-Action and Non-Structural plans fail to address and solve the navigational problems in Manatee Harbor. For these reasons, the option to do nothing, or use Tampa, other harbors, and overland routes in lieu of Port Manatee was eliminated from further consideration. It has been determined that a structural approach in the form of a channel expansion is necessary for the continuation of available lower cost imported and exported commodities and will therefore be investigated from this point forward.

### 3.7.3  Structural Alternatives (B and C)

The evaluation of Phase III channel extension alternatives B and C are is provided on the following pages. The appropriate scale of the channel improvement at Berth 12 is dependent on these interrelationships and was incorporated into this comprehensive evaluation process to determine the recommended plan.

### 3.7.4  Elimination of 30-foot depth Alternatives (B1 and C1)

During the early phases of the economic analysis of the structural alternatives, it was determined that a side channel extension with a controlling depth of 30 feet (Alternatives B1 and C1) would fail to address and solve the navigational problems within the study area and satisfy the needs of the non-Federal partner. The initial economic iterations revealed that costs greatly exceeded the benefits and further the information gained from the research of the problems revealed that a channel to handle the heavier loaded vessels would be required. Based on these findings, Alternatives B1 and C1 were eliminated from further consideration.

### 3.7.5  Economic Benefits Analysis

Transportation cost reductions result from: (1) the reduction of queuing delays as vessels wait for berth space, (2) the reduction of diversion costs, and (3) the reduction of in-Port costs. Over the years, Port Manatee has not maintained formal records depicting ship delays, the number of vessel calls diverted to other ports, and vessel in Port shifts due to berth congestion at the Port. This made it necessary to incorporate the frequency of vessel arrivals, berth preferences, berth

HRK 002676

availability, berth set-up and breakdown time, and potential vessel diversions into a simulation model to determine the transportation cost savings resulting from the proposed improvements to Berth 12. A brief discussion of the procedures used in the modeling and findings of the economic evaluation follows. For in-depth discussions of the economic analysis procedures and findings, see the Economic Benefits Appendix.

Economic Model Overview

A simulation model was developed to replicate the without- and with-project future conditions of vessel traffic congestion and related transportation costs anticipated at Port Manatee over a 12-year (2010-2021) forecast period. After Year 2 (year 5 of the forecasted period), there is no additional forecasted growth in the number of vessel calls, so any variation in model results from Years 3 through 12 are simply the result of random changes in the order of arrival, and not indicative of any expected change in costs. In order to avoid unnecessary benefits or penalties to the analysis arising from these random fluctuations, ten-year average costs were calculated (for Years 3 through 12), and these results were then held constant for Years 3 through 50 of the analysis. The main reason for limiting commodity and vessel call growth at the port is that planned short-term growth will severely strain port operations. Additional forecasted growth beyond current Port Authority and tenant plans does not have the same level of supporting capital investment and resource commitment as existing plans, and therefore was excluded from this analysis.

Without-project future conditions were analyzed using the Port's current port configuration. Two access channel alternatives serving Berth 12 were given consideration: a 950-foot and a 1,590-foot length by 275-foot wide, both analyzed at 5-foot incremental depths ranging from 35 to 40 feet. An additional incremental depth of 39 feet was analyzed for Alternative C to assure that benefits did not maximize at a lower scale. Since the model used data based on actual sailing draft, allowances for underkeel clearance were not incorporated into the analysis.

Model iterations that replicate vessel arrivals and departures were generated on an hourly incremental basis for the 12-year forecast period. Measurement factors depicting traffic congestion included: vessel delay, diversion, tug, pilot, port, and stevedoring costs. The model used identical commodity and vessel fleet forecast for the with- and without-project conditions. Fleet forecasts and related transportation costs; and portside costs were developed specifically for this analysis as inputs to the model. Overall Port constraints associated with- and without-Berth 12 improvements were derived by employing expected frequencies of vessel/commodity arrivals competing for preferred berthing areas with specific commodity handling capabilities. Forecasts of vessel calls, berthing preferences, berth setup and breakdown times, delay costs, and the likelihood of diversion costs were analyzed to determine transportation cost savings under with-project conditions.

## 3.7.6 Economic Benefits of Alternative Harbor Expansion Plans

Annual transportation cost savings for each alternative was calculated as the difference between the transportation costs for the without- and with-project conditions. Economic benefits were calculated for each year of the 50-year period of analysis, and discounted at the current FY08 Federal discount rate of 4.875 percent. Table 3-2 shows average annual benefits of each alternative plan.

HRK 002677

**Table 3-2**
**Benefits Summary of Alternative Harbor Expansion Plans**

| Harbor Expansion Alternative | Average Annual Benefits |
|---|---|
| Alternative B2   (950 ft. length x 35 ft. depth) | $ 3,890,000 |
| Alternative B3   (950 ft. length x 40 ft. depth) | $ 5,329,000 |
| Alternative C2 (1590 ft. length x 35 ft. depth) | $ 4,516,000 |
| Alternative C3 (1590 ft. length x 39 ft. depth) | $ 4,628,000 |
| Alternative C4 (1590 ft. length x 40 ft. depth) | $ 6,143,000 |

## 3.7.7   Contribution of Harbor Expansion Alternatives to Planning Objectives

The final set of alternatives were compared against the harbor expansion planning objectives set forth previously.

### A.       Increase navigational efficiency

Each of the harbor expansion alternatives investigated yielded reductions in total transportation costs, and would therefore increase navigational efficiency.

Alternative C4, (1,590-foot long by 40-foot deep channel), would produce the highest average annual benefits of $6,143,000, and provide the greatest contribution to this planning objective. Alternative B3 (950-foot long by 40-foot deep channel) would produce the second-highest average annual benefits of $5,329,000.

### B.       Facilitate safe and efficient movement of traffic

All alternatives evaluated were determined to increase the draft, width, and length available to deep-draft vessels at Berth 12 to some degree. Widening the access channel to meet the design standards will provide a safer, more efficient navigational use of Berth 12. Improving the access channel to Berth 12 would accommodate the projected vessels expected to utilize the berth and would further increase the port's navigational and landside efficiencies. With a wider and deeper navigation channel, more efficient use of the waterway will result in decreased traffic congestions in the harbor, compared to the future without-project. Comparatively less congestion also will reduce the potential for accidents, creating a safer navigable environment on the waterway. The highest ranking, however, would be assigned to Alternative C4, as it is the most efficient of the alternatives in terms of movement of traffic.

Benefits are maximized for a 40-foot deep channel 1,590 feet in length. Four separate MCACES cost estimates for the construction of this harbor expansion plan were developed as part of this study. The costs are provided below within the context of the formulation of dredged material disposal options. A discussion of overall economic performance (i.e., benefit-to-cost ratios and net benefits) for all plan scales using the least-cost dredged material placement option follows the formulation of dredged material disposal options.

HRK 002678

## 3.8   Existing Conditions – Dredged Material Management

Existing conditions for dredged material management include the disposal of all construction and maintenance material attributable to the project to date. This includes material associated with Phase II of the Port's Capital Improvement Program:  1) the construction of widening cuts at the northwest end of the entrance channel, and 2) enlarging the turning basin to 900 ft x 1,300 ft tangential to the northeastern edge of the Manatee Harbor Project Channel at its southeastern end.  In addition to these Phase II construction features, the non-Federal sponsor also included the expansion of Berth 5 to a length of 1,200 ft and a depth of –40 ft MLLW.  Material management considerations for Phase II also included increasing the capacity of the Port's existing DMMA within its present footprint by raising the dike crest elevation from its previous +29 ft (NGVD) to +55 ft.

Dredged material was placed in the Port's 100-acre dredged material management area, and it was believed that the disposal site would provide ample capacity for the construction of Phases II and III, and continued maintenance dredging on a 3-year cycle for 20 years.  However, dredged material volumes from construction of Berth 5 were not taken into account.  During construction of Phase II, it became apparent that all capacity in the Port's dredged material management area would be exhausted after the completion of construction.  The site's capacity was exhausted even after the site's impoundment dikes were raised 26 feet above the existing height of 29 feet.  The identification of additional dredged material disposal capacity is now required to accommodate material from construction of Phase III and 20 years of continuing operation and maintenance (O&M) dredging of all Port channels, wideners, berthing areas, and the turning basin (i.e., maintenance of Phases I, II, and III).

## 3.9   Future Conditions – Dredged Material Management

Phase III calls for the construction of a channel extension to Berth 12 with a length of 1,590 ft and a depth of -40 ft MWWL.  Constructing the channel extension and Berth 12 itself to this geometry and associated entrance channels is projected to produce approximately 1,170,000 CY of dredged material.

Given that each O&M cycle within Phases I, II, and III is projected to produce an estimated 300,000 CY of material based on a three-year maintenance cycle, 20 years of O&M (i.e., seven O&M cycles) following the completion of Phase III construction will produce 2,100,000 CY of material.  This results in a in a total material storage capacity requirement of 3,270,000 CY over the required 20-year planning period.

Failure to establish a plan to provide additional material storage capacity required to accommodate construction of Phase III and the continuing needs for O&M dredging will limit the Port's ability to expand, vessel congestion will worsen dramatically, and continued shoaling in the project's existing channels and berthing areas would reduce the allowable draft of vessels entering the Port's facilities and, in turn, reduce the Port's net economic benefits from current levels.

## 3.10 Material Management Problems, Opportunities, and Constraints

With a channel extension and a new berthing area, there is an opportunity to further reduce harbor-related traffic delays and congestion at Port Manatee.  The economic impacts of

HRK 002679

extending the channel as it relates to maximizing benefits have been quantified in the preceding sections. It has been established that the selected dimensions for channel and berth expansion will offer greater benefits than all smaller scale plans.

This opportunity can be realized only if adequate and cost-effective capacity for dredged material placement is identified. Of paramount importance is that the most environmentally sensitive and cost-effective strategies are pursued, especially in regard to long-range dredged material placement. Ultimately, however, the analysis is constrained by Engineer Regulation 1130-2-307, which stipulates that construction and maintenance dredging of Federal navigation projects shall be accomplished in the least costly manner possible.

### 3.10.1 Material Management Measures and Objectives

Dredged material placement is categorized as open-water placement, confined (diked) placement, or placement for beneficial use. Open-water placement occurs in rivers, lakes, estuaries, or oceans. Some types of open-water placement are submerged discharge, lateral containment, thin-layer placement, and capping and contained aquatic placement. Confined placement occurs in diked areas located nearshore or upland.

Beneficial uses of dredged material must be fully considered in the range of plan alternatives as potential fill sites. Beneficial use placement is intended to serve a productive use, and can take the form of open-water, confined, or unconfined placement. Examples of beneficial use placement are beach nourishment, habitat restoration/enhancement (wetland, upland, island, aquatic sites for use by waterfowl and other birds), aquaculture, parks and recreation, agriculture, forestry, and horticulture, strip mine reclamation, landfill cover, shoreline stabilization and erosion control (fills, artificial reefs, nearshore berms), construction and industrial use (port development, airports, urban, and residential), and material transfer (fill, dikes, levees, parking lots, roads).

### 3.10.2 Material Management Planning Constraints

The formulation and evaluation of alternative plans for dredged material management took place within a framework that was constrained by technical, economic, environmental, and institutional considerations. These considerations, or constraints, guided the formulation of alternative disposal plans, and are outlined below.

Technical Constraints
- Plans must be consistent with sound engineering practice.
- Plans must comply with capacity constraints and dredged material suitability requirements for the option under consideration.

Economic Constraints
- Plans must be efficient, and must represent near optimal use of resources.

Environmental Constraints
- Plans cannot unreasonably impact environmental resources, and must minimize impacts to seagrass areas.

HRK 002680

- Plans must meet the environmental standards established by Section 404 of the Clean Water Act of 172 or Section 103 of the Marine protection, Research, and Sanctuaries Act of 1972, as amended

**Institutional Constraints**

- Plans must be consistent with existing Federal, state, and local laws.

## 3.11 Development of Alternative Dredged Material Placement Sites

Alternatives for placement of dredged material were developed through an identification of existing regional placement areas, and development of new local placement areas.  The following alternatives placement sites were analyzed:

1. Existing Port Manatee Dredged Material Management Area (DMMA)

2. Ocean Dredged Material Disposal Site (ODMDS)

3. Offload Dewatered Material from Existing DMMA to Piney Point Site

4. Direct Placement at Piney Point Site

5. Direct Placement at an expanded Port Manatee DMMA

The following paragraphs discuss each alternative placement site in more detail.

### 3.11.1 Existing Port Manatee Dredged Material Management Area (DMMA)

The Port owns a 95-acre containment basin constructed on the north side of Piney Point Road approximately 0.9 mile ENE of the Port's easternmost berthing area (see Figure 3-3)

The DMMA was previously used to receive and dewater material dredged from the Port's access channel during maintenance operations, and was redeveloped to increase its capacity within its original footprint.  Originally constructed with a dike crest elevation of +29 ft NGVD, the dike crest elevation was raised an additional 26 ft to +55 ft NGVD using material previously placed within the basin.  To maximize the additional capacity achievable within the existing DMMA footprint, the dike-raising design featured the extensive use of geotextiles to support significantly steeper slopes than the original DMMA dikes.  Specifically, the original DMMA dikes were constructed with side slopes of approximately 1 vertical on 4 horizontal (1V:4H).  The dike-raising design included interior slopes of 1V:2H and exterior slopes of 1V:1.5H.  The material stored within the basin was to provide all required construction material.  However, much of the material stored within the basin, previously thought to be well-graded sands, was shown to contain a significant component of silt and clays and therefore was unsuitable for dike construction.   Material from the Port's Phase II construction provided sufficient suitable construction material to complete the dikes to the design +55 ft crest elevation.

Material is pumped directly from the dredging site to the existing DMMA via pipeline. As the dredged slurry flows from the dredge discharge outfall to the basin's outlet structures, the solids settle out of suspension and are retained within the basin.  A parallel system of four weir stacks then releases the clarified surface water from the basin to an adjacent ditch.  This ditch, in turn, drains the return water (effluent) to Tampa Bay.

The basin's existing capacity was fully depleted at the completion Phase II construction.

Figure 3-3
Existing DMMA Location



Existing DMMA

### 3.11.2 Ocean Dredged Material Disposal Site (ODMDS)

Located in the Gulf of Mexico approximately 27 miles west-southwest of Manatee Harbor, this site typically receives material dredged from Federal channels near the lower end of Tampa Bay (i.e., seaward of Cut G). Designated as a U.S. Environmental Protection Agency-approved ocean placement site in 1995, the ODMDS remains jointly administered by the EPA and the U.S. Army Corps of Engineers (USACE). With dredged material placement within the ODMDS authorized by the USACE on a case-by-case basis, using EPA's environmental criteria and subject to EPA's concurrence, the site's potential capacity remains undetermined.

#### Material Suitability

The suitability of dredged material for ocean disposal must be verified by the Corps and agreed to by EPA prior to each disposal event. Verification will be valid for three years from the time last verified. Approval may be given by EPA for an additional two years if conditions have not changed and no adverse impacts have occurred or are expected. Verification will involve: 1) a case-specific evaluation against the exclusion criteria (40 CFR 227.13(b)), 2) a determination of the necessity for bioassay(toxicity and bioaccumulation) testing for non-excluded material based on the potential for contamination of the sediment since last tested, and 3) carrying out the testing and determining that the non-excluded, tested material is suitable for ocean disposal.

Recent estimates have established that 57 percent of material from maintenance dredging operations are unsuitable for placement at the ODMDS because of ammonia and mercury contaminant levels. It also has been established that 100 percent of material generated during construction of Phase III would be suitable for placement at the ODMDS.

#### Season / Time of Placement

At present no restrictions have been determined to be necessary for disposal related to seasonal variations in ocean current or biotic activity. As monitoring results are compiled, should any such restrictions appear necessary, disposal activities will be scheduled so as to avoid adverse impacts. Additionally, if new information indicates that endangered or threatened species are being adversely impacted, restrictions may be incurred.

#### Disposal Technique

No specific disposal technique is required for this site.

#### Disposal Monitoring

For all disposal activities, the dredging contractor will be required to prepare and operate under an approved electronic verification plan for all disposal operations. As part of this plan, the contractor will provide an automated system that will continuously track the horizontal location and draft condition (vertical) of the disposal vessel from the point of dredging to the disposal area, and return to the point of dredging. Required digital data are: Date; Time; Vessel Name;

HRK 002683

Dump Number; Map Number on which dump is plotted; Beginning and ending coordinates of the dredging area for each load, and the beginning and ending coordinates for each dump and the compass heading at the beginning of each dump;  Shoal Number from which dredged material came; and Volume and brief description of material disposed.

## Costs

Costs associated with placement of material in the Tampa ODMDS assume that the material will be dredged mechanically (e.g., clamshell) and barged to the ODMDS.  The costs inherent in this process include mobilization/demobilization, turbidity monitoring, and a unit cost for mechanically excavating and transporting the material by barge to the disposal site.  In addition, the costs also include the estimated cost for obtaining Section 203 approval from the EPA for use of the ODMDS.  It has been assumed that the ODMDS has an unlimited capacity for the purposes of this analysis (verified by *Tampa ODMDS Site Management and Monitoring Plan*, June 1, 1995).

### 3.11.3 Offload Dewatered Material from Existing DMMA to Piney Point Site

Additional capacity can be created in the Port's existing DMMA through the excavation of dewatered material, transport to, and disposal at the Piney Point site.  Under this alternative, large earth moving equipment would excavate dewatered material and grade the existing DMMA to contours suitable for receipt of output slurry from a pipeline dredge termination point.  The dewatered material would be loaded onto a hauling truck, and transported approximately 1.5 miles across the CSX Railroad line and U.S. 41 to the OGS-South and OGS North sites at Piney Point.  The anticipated route for the hauling trucks is depicted in Figure 3-4.  Once the material is transported to Piney Point, a low-ground pressure D-6 class dozer would spread and compact the material in the OGS-South and OGS-North sites.

It is anticipated that 1.75 million cubic yards of dewatered material can be transported to the OGS-North and OGS-South sites before the capacity of these sites is exhausted.  The additional capacity created by off-loading dewatered material from the Port's DMMA to Piney Point is expected to accommodate 1,170,000 cubic yards of material for construction of Berth 12 and its access channel, and nearly two full cycles of maintenance material for the entire Port Manatee project.  It is assumed that the full capacity of Piney Point (a total of approximately 6.9 million CY) could be made available for the receipt of dewatered material.

Once the additional capacity is created, material would be pumped directly from the dredging site to the existing DMMA via pipeline.  As the dredged slurry flows from the dredge discharge outfall to the basin's outlet structures, the solids settle out of suspension and are retained within the basin.  A parallel system of four weir stacks then releases the clarified surface water from the basin to an adjacent ditch.  This ditch, in turn, drains the return water (effluent) to Tampa Bay.

### 3.11.4 Direct Placement at Piney Point Site

The Piney Point Site (Piney Point) was formerly known as the Piney Point Phosphates, Inc. fertilizer manufacturing facility, and is currently owned by HRK Holdings, LLC (HRK).  The site consists of 670 acres, and is located on U.S. Highway 41 in Manatee County, Florida, adjacent to Port Manatee (see Figure 3-5).  Ponds, water management features, administrative

HRK 002684

Figure 3-4
Offload DMMA to Piney Point Truck Route



Figure 3-5
Piney Point Direct Placement Overview



HRK 002686

facilities, undeveloped open property, and inactive phosphogypsum storage stacks are all located on the property.

The site was developed by Borden Chemical in the mid 1960s for the manufacture of fertilizers. The site then went through a series of ownerships prior to Piney Point Phosphates, Inc. in 1993. Piney Point Phosphates, Inc. was a wholly owned subsidiary of Mulberry Corporation. Mulberry Corporation filed a voluntary bankruptcy petition for re-organization (Chapter 11 filing) in U.S. Bankruptcy Court in February 2001. Mulberry notified the Florida Department of Environmental Protection (FDEP) in February 2001 that it could no longer manage the site as required by FDEP permits and regulations.

While the commercial operation of the site was underway, rainwater coming into contact with the phosphogypsum storage stacks was consumed in the operation. With the cessation of the commercial operation the rainwater ceased being consumed, but was unsuitable for discharge due to the contact with the stacks. Further, accumulation of rainwater was creating a risk of overtopping.

During February and March 2001, FDEP managed the Site with an emergency response contractor.

In April of 2001, FDEP made a motion to the Circuit Court of Florida for an order to appoint a Receiver to manage the imminent environmental risks at the site. FDEP through the Receiver retained a contractor and an engineering company to manage the site and plan for closure of the Site. The Receiver's Order limited the Receiver's action at Site to the "Phosphogypsum Stack System" and associated equipment and systems. FDEP through its Receiver, engineer, and contractors determined the most efficient method to control the imminent environmental threat of the stack system was closure of the system.

FDEP's closure planning included placement of a High Density Polyethylene (HDPE) liner to serve as an impermeable topcover over the locations of stacks and cooling ponds. The closure design also included features to convert the closed stack compartments to lined impoundments capable of retaining water or other materials. FDEP included this aspect in the design in an effort to return the Site to future beneficial use.

HRK executed an Administrative Agreement with FDEP in August 2006 describing rights and obligations of HRK and FDEP at the site from the time of HRK's assuming ownership until March 2010. FDEP in that agreement retained the right to approve planned uses of the property by HRK, with an emphasis on activities utilizing the Stack System.

HRK's intent is to convert the property to beneficial and productive uses. HRK has further committed to seeking beneficial public uses for the portions of the property . Beneficial public uses such as drinking water reservoirs, reclaimed water reservoirs, or dredged spoil disposal have been considered.

## Piney Point as a Dredged Material Management Area

HRK reached an agreement with Port Manatee to store dredged materials in the closed and HDPE lined compartments of the stack system. Dredged materials would be hydraulically transported through pipelines at flow rates up to 40,000 gallons per minute (gpm) to the lined stacks, then seepage and decant waters from the dredged materials would be returned by pipelines to Port Manatee's water management system. Decant waters may be clarified through

the application of flocculants in one stack compartment if needed to meet Port Manatee's permitted water quality requirements.

Deposition of the materials would be performed in a manner designed for protection of the HDPE liner from the risk of puncture. Reinforced liner "target areas" would be installed at initial discharge locations. A soil cover would be carefully placed in the lined area to receive discharges.

### Additional Site Work

Transport of dredged material to Piney Point will require the construction of new pipeline crossings from Port Manatee's property under the CSX railroad and US Highway 41. Pipe sleeves will be placed under the CSX railroad by microtunneling and under US 41 by cut and cover.

Once the sleeve placements are completed, piping will be set in place. Slurry piping will transition across Piney Point, then up the stack side slopes to the top of the stacks near the northwest corner. Piping will then follow the northwest to southeast diagonal road between the two upper compartments. At the eastern end of the diagonal dike a valve arrangement will be located to allow for selective placement of slurry into the north or south upper compartment.

### 3.11.5 Expanded Port Manatee DMMA

Port Manatee owns an additional 54-acre parcel immediately north of the existing DMMA, the location of which is shown on Figure 3-6. Designated by the Port as available for expansion of the adjacent containment basin, the parcel is presently held under tenant-at-will lease for an aquaculture operation.

In August of 2006, detailed designs for the DMMA expansion were completed, and costs were developed by CH2M Hill International, Port Manatee's engineering contractor. The design for the expanded DMMA reflects the same basic design criteria (e.g., setback requirements, side slopes, dike crest width, etc.) contained in the design for raising the dikes within the existing DMMA footprint (previously executed). The detailed design assumes (on the basis of borings completed for the design phase) that material to construct the expanded basin will be obtained from the first 15 feet of the Berth12 and access channel area. No additional construction material will be obtained off-site. The final expanded DMMA provides a single cell with a uniform +55 ft NGVD dike crest height within the expanded footprint. Given these design criteria, the expanded DMMA can provide a potential capacity of 1,800,000 CY (which includes the 200,000 CY used for basin construction).

Dredged material would be transported from the dredging site to the expanded DMMA via pipeline following the same route as presently used to access the existing DMMA. Similarly, effluent released over the weirs would drain to Tampa Bay via the same ditch system presently used by the existing DMMA.

HRK 002688

Figure 3-6
Area for Expansion of Existing DMMA

Existing DMMA

Expansion
Area

HRK 002689

## 3.12 Identification of the Least Cost Dredged Material Disposal Option

Cost estimates for dredge material disposal alternatives were based on calculated quantities and unit prices.  MCACES design cost estimates used in the analysis were comprised of mobilization and demobilization costs, channel extension excavation, berthing area excavation, real estate, environmental mitigation, engineering, construction management, and materials testing.

### 3.12.1 Construction Cost Estimates

Cost estimates for the four alternatives outlined above are compared against one another in Table 3-3.  Major differences among the alternative disposal methods are detailed in the accompanying MCACES cost estimate, and are reflected in the table.

**Table 3-3**
**MCACES Cost Estimates for Alternative Construction Material Placement Options**
**October 2007 Price Level**

| Item Description | ODMDS | Offload to Piney Point | Direct Pump to Piney Point | Expanded DMMA |
|---|---|---|---|---|
| Dredging, Mobilization & Demobilization | | | | |
| Channel and Widener Dredging | 16,274,900 | 10,117,100 | 14,383,500 | 10,117,100 |
| Berth 12 Dredging | 2,834,000 | 1,630,600 | 2,563,800 | 1,630,600 |
| Mob, Demob, and Prep Work | 1,355,300 | 2,538,400 | 2,850,500 | 2,538,400 |
| Offloading Port DMMA to Piney Point | | 10,027,700 | | |
| Piney Point Site Work (Direct Pump) | | | 3,659,300 | |
| Piney Point Tip Fee | | 3,135,600 | 3,135,600 | |
| Expanded DMMA Site Work | | | | 10,497,200 |
| Turbidity Monitoring | 54,700 | 96,000 | 96,000 | 96,000 |
| **TOTAL CONSTRUCTION FIRST COSTS** | **20,341,400** | **27,545,400** | **26,688,700** | **24,879,300** |
| Lands & Damages | 1,934,900 | 1,934,900 | 1,934,900 | 6,146,900 |
| Fish and Wildlife Facilities (Mitigation) | 1,633,400 | 1,633,400 | 1,633,400 | 1,633,400 |
| Planning, Engineering, and Design | 900,000 | 735,000 | 735,000 | 735,000 |
| Construction Management | 1,729,000 | 1,832,800 | 2,452,300 | 2,293,200 |
| Aids to Navigation | 50,000 | 50,000 | 50,000 | 50,000 |
| **TOTAL PROJECT FIRST COSTS** | **26,588,700** | **33,731,500** | **33,494,300** | **35,737,800** |

Two differences between the numbers provided in the MCACES cost estimate provided in the Engineering Appendix and the numbers shown in Table 3-3 require clarification.  First, escalation was removed from the MCACES cost estimate, as required by ER1105-2-100.

Second, the cost to offload dewatered material from the existing DMMA was adjusted in order to make construction volumes consistent across all alternatives[4].

As shown in the table, the least cost alternative for the placement of dredged material from construction is the Ocean Dredged Material Disposal Site at a cost of $26.6 million, followed by Direct Placement in Piney Point at a cost of $33.5 million, Offload to Piney Point at a cost of $33.7 million, and Expansion of the DMMA at a cost of $35.7 million.

## 3.12.2 Maintenance Dredging Cost Analysis

Maintenance dredging plans were developed for each of the four disposal options listed above. Plans were developed based upon the maintenance quantity disposal requirements for the entire Port Manatee project (Phases I, II, and III).   An estimate of 300,000 CY per three-year maintenance cycle for Phases I, II, and III was used to establish the total volume of maintenance material capacity required for the entire Port Manatee project over the period of analysis.

A total of 12,900 CY of material per three-year cycle is attributable to the Phase III portion of the project.  Therefore, while disposal options were formulated to handle the entire maintenance dredging volumes from Phases I, II, and III, only the incremental maintenance costs attributable to Phase III (12,900 / 300,000, or 4.3 percent of total project maintenance costs) were allocated to Phase III project costs in order to compute incremental Phase III project costs and benefits.

A 50-year period of analysis was used, which corresponds to 17 three-year maintenance dredging cycles, and a total maintenance requirement of 5,100,000 CY (300,000 CY x 17 maintenance cycles).

Constraints on the selection of dredge disposal areas includes the requirement that 57 percent of maintenance material is expected to be unsuitable for ODMDS placement because of unacceptable ammonia and mercury contaminant levels.   This restriction translates to a requirement for placement of 2,907,000 CY in the least-cost upland placement facilities, and a maximum of 2,193,000 CY placed in ODMDS over the 50-year period of analysis,.

Capacity constraints also were identified and incorporated into the analysis.  It is expected that the ODMDS can accommodate all of the material generated from Phase III construction (i.e., 1,170,000 CY ), plus all of the 2,193,000 CY of maintenance material that is assumed to be suitable for ODMDS placement (43 percent of 5,100,000 CY).  The remaining 2,907,000 CY of maintenance material (57 percent of  5,100,000 CY = 2,907,000 CY) would not be suitable for placement at the ODMDS and would need to be placed at the least-cost upland disposal site.

The capacity of the Piney Point site has been estimated at 6,900,000 CY, which can accommodate the full amount (1,170,000 CY) of construction material and the full amount (5,100,000 CY) of maintenance material.  There is no capacity constraint for this placement option.

Expansion of the Port's DMMA, however, is expected to provide only 1,800,000 CY of capacity. If this option is used for placement of Phase III construction material, capacity available for maintenance material would be 630,000 CY (slightly more than two full cycles of maintenance

---

[4]   The MCACES estimate provides for the removal of 1,750,000 CY of material from the existing DMMA. Capacity required to accommodate construction material is 1,170,000 CY.

dredging). The remaining 4,470,000 of maintenance material would not be accommodated at the expanded DMMA and would need to be placed at other disposal sites.

Maintenance dredging plan costs were identified for each of the four placement options. For each option analyzed, it was assumed that the option was first used for placement of material generated from Phase III construction (i.e., 1,170,000 CY). In the next step, the least-cost option for material placement over the 50-year period of analysis was identified. A two step process was used to determine the least-cost maintenance dredging and disposal plan. In the first step, dredging and placement costs for each option were determined for placement of dredge material from Phase III construction activities. In the second step, dredging and disposal costs were determined for 50 years of maintenance material under each scenario generated in step 1. Upon completion of steps 1 and 2, initial construction and O&M costs can be annualized, added, and then compared to determine the overall least cost plan for dredged material disposal.

Understanding this two step process is important because each maintenance placement option is analyzed separately under the assumption that it had or had not initially been used for construction. For example, when the ODMDS placement option is analyzed for both construction and O&M, material not suitable for ocean disposal (2,907,000 CY) would need to bear the full cost of the site work required for direct pumping to Piney Point and expansion of the Port's DMMA. This is because these site costs would have not already have been incurred under the scenario where ODMDS is used for construction, and as a result, these capital costs are included in the maintenance dredging analysis.

Similarly, when direct placement at Piney Point is analyzed under the assumption that it had been used for construction, the cost of site work for this placement option is not included in the maintenance dredging analysis, as those costs would have been incurred (i.e., the infrastructure would have been constructed) as part of Phase III construction.

The following discussion presents the results of this two step process, analyzing each disposal alternative first for construction material, and then subsequently analyzing options for disposal of maintenance material.

## Maintenance Dredging Costs – ODMDS Placement Used in Construction

When the ODMDS option is used for the placement of construction material, the capital costs to develop the Expanded DMMA and Direct Placement at Piney Point must be included as part of the O&M cost analysis. Placement of maintenance material in an upland site is required in the evaluation of this placement option because, while 100 percent of the initial construction material is assumed to be suitable for ODMDS placement, only 43 percent of maintenance material has been assumed to be suitable for ODMDS placement.

Under this option, 129,000 CY of material (43 percent of 300,000 CY) would be placed at the ODMDS at every three-year cycle. Over 17 three-year cycles in the 50-year period of analysis, a total of 2,193,000 CY would be placed at the ODMDS at a total cost of $56,281,400[5]. The discounted value (FY08 discount rate of 4.875 percent) of the cost for the portion of material

---

[5] Detailed cost sheets for all alternatives analyzed are provided in the Dredged Material Management Plan, which is an appendix to this report.

HRK 002692

suitable for ODMDS placement is $20,623,700, which corresponds to an annualized value of $1,108,000.

The remaining 171,000 CY of material from each three-year maintenance dredging cycle would be placed in the least-cost upland alternative site. A total of 2,907,000 CY (17 cycles x 171,000 CY per cycle) would be required to be placed in upland facilities in each of the 17 three-year cycles. The total constant dollar (undiscounted), discounted, and annualized costs for the placement of 2,907,000 CY of material in each of the upland facilities over 17 O&M cycles are provided in Table 3-4 below.

### Table 3-4
### Costs for Placement of 2,907,000 CY in Upland Facilities

| Upland Placement Option | Total Cost | Total Discounted Cost | Discounted Cost Per CY | Annualized Cost |
|---|---|---|---|---|
| Offload DMMA to Piney Point | 86,397,900 | 31,569,600 | $10.86 | 1,700,800 |
| Piney Point Direct Disposal | 81,422,400 | 31,903,500 | $10.97 | 1,713,900 |
| Expanded DMMA | 78,926,600 | 34,427,000 | $11.84 | 1,849,500 |

The table shows that the least cost upland alternative for placement of 57 percent of maintenance material on a present value basis (assuming the ODMDS is used for construction) is Offload to Piney Point, with an annualized cost of $1,700,800.

The table also shows that the total (undiscounted) costs of the alternatives yields a different least-cost option (Expanded DMMA). When discounting procedures are applied to the cost streams, up-front costs (i.e., $14.7 million for expansion of the DMMA and $3.7 million infrastructure costs for direct placement at Piney Point) are discounted to a much lower degree, and thus receive a higher "weighting" in the total of discounted costs.

When selecting the least-cost alternative, however, discounted costs must be used. As a result, the least cost maintenance dredging plan when ODMDS is used for placement of Phase III construction material is ODMDS placement of 2,193,000 CY and placement of 2,907,000 CY in the port's DMMA after offloading material to Piney Point.

| | |
|---|---|
| ODMDS Placement Costs (2,193,000 CY) | $ 20,623,700 |
| Cost per CY | $ 9.40 |
| Offload to Piney Point Costs (2,907,000 CY) | $ 31,569,600 |
| Cost per CY | $ 10.86 |
| | |
| Total O&M Costs | $ 52,283,300 |
| Annualized O&M Costs | $ 2,808,800 |
| Phase III portion of Annual O&M Costs | $ 121,000 |

HRK 002693

Incremental maintenance costs attributable to Phase III are 4.3 percent of total project maintenance costs (12,900 CY Phase III per cycle / 300,000 CY total project maintenance per cycle). Given a portion of 4.3 percent, annual maintenance costs of Phase III if ODMDS were used for construction would be equal to $121,000.

## Maintenance Dredging Costs – Offload to Piney Point Used in Construction

In a manner identical to the use of ODMDS for construction, when Offload to Piney Point is used for the placement of construction material, the capital costs to develop the Expanded DMMA and Direct Pumping to Piney Point are be included in the analysis of O&M expenditures.

Because the upland facilities would not be developed as part of construction under this option, the analysis of maintenance costs is identical to the ODMDS construction option discussed above. The same plan for placement of maintenance material is yielded from the analysis, as well, with 2,193,000 CY placed at the ODMDS and 2,907,000 CY placed in the DMMA after offloading material to Piney Point. Maintenance dredging costs for the Phase III portion of the project would be $121,000 per year.

## Maintenance Dredging Costs – Direct Placement in Piney Point Used for Construction

Under this scenario, capital costs for sitework at Piney Point would have been incurred during the construction phase, and are not included as part of the maintenance dredging cost analysis. However, costs for development of the expanded DMMA are included in the analysis.

The costs of direct placement of all maintenance material (5,100,000 CY over 17 cycles) at Piney Point if the site were used for construction are provided below.

| | |
|---|---|
| Total Cost | $ 136,427,000 |
| Total Discounted Cost | $ 49,992,200 |
| Discounted Cost per CY | $ 9.80 |
| Annualized Cost | $ 2,685,700 |

With capital costs incurred as part of Phase III construction, the unit cost of direct placement at Piney Point is reduced from $10.97 per CY to $9.80 per CY. This reduction in costs makes direct placement at Piney Point the least cost upland placement option in this scenario.

ODMDS placement of maintenance material has a total unit cost $9.40 per CY (see discussion above), which is less than the unit cost of direct placement at Piney Point ($9.80 in this scenario). Given this cost differential, placement of the maximum amount of maintenance material at the ODMDS be a component of the least-cost maintenance dredging plan.

Under the least-cost 50-year maintenance dredging plan for this scenario, 2,193,000 CY of maintenance material would placed at the ODMDS, and 2,907,000 CY would be directly placed in Piney Point. The cost of this plan is provided below.

HRK 002694

| | |
|---|---|
| ODMDS Placement Costs (2,193,000 CY) | $ 20,623,700 |
| Cost per CY | $ 9.40 |
| Direct Placement in Piney Point Costs (2,907,000 CY) | $ 28,495,400 |
| Cost per CY | $ 9.80 |
| | |
| Total O&M Costs | $ 49,119,100 |
| Annualized O&M Costs | $ 2,638,800 |
| Phase III portion of Annual O&M Costs | $ 113,500 |

## Maintenance Dredging Costs – Expanded DMMA Used for Construction

Capital costs for expansion of the DMMA would have occurred during construction under this scenario, and are not included in the analysis of maintenance dredging costs. Costs for development of the Piney Point site for direct placement, however, are included in the analysis.

When the expanded DMMA is used for placement of Phase III construction material (1,170,000 CY), the facility's 1,800,000 CY capacity would be reduced to 630,000 CY available for placement of maintenance material. Additional capacity for upland placement of material would be provided by offloading material from the expanded DMMA and trucking the material to Piney Point.

The costs of placement of 630,000 CY of maintenance material at the expanded DMMA, followed by offloading 4,470,000 CY of material to Piney Point are provided below.

| | |
|---|---|
| Total Cost | $ 143,811,200 |
| Total Discounted Cost | $ 49,156,200 |
| Discounted Cost per CY | $ 9.64 |
| Annualized Cost | $ 2,640,800 |

With capital costs of expanding the DMMA occurring during Phase III construction, unit costs of this maintenance placement option are reduced to $9.64 per CY.

Unit costs of ODMDS placement are lower, at $9.40 per CY. Again, the least-cost maintenance dredging plan must utilize the ODMDS to the maximum extent possible.

The least-cost 50-year maintenance dredging plan for this scenario includes the placement of 2,193,000 CY of maintenance material at the ODMDS, 630,000 CY of maintenance material in the expanded DMMA, and the remaining 2,277,000 CY placed in the DMMA after offloading to Piney Point. The cost of this plan is provided below.

| | |
|---|---|
| ODMDS Placement Costs (2,193,000 CY) | $ 20,623,700 |
| Cost per CY | $ 9.40 |
| Expanded DMMA Placement with Additional Capacity Provided through Off-Load to Piney Point (2,907,000 CY) | $ 23,046,700 |
| Cost per CY | $ 7.93 |
| Total Present Value O&M Costs | $ 43,670,400 |
| Annualized O&M Costs | $ 2,346,100 |
| Phase III portion of Annual O&M Costs | $ 100,900 |

### 3.12.3 Summary of Dredged Material Management Option Costs

A summary of project costs for each of the four dredged material placement options is provided below in Table 3-5. As shown in the table, the least cost disposal option is placement of dredged material from Phase III construction at the ODMDS, with 43 percent of maintenance material placed in the ODMDS and 57 percent of maintenance material placed in the existing DMMA with capacity created by offloading dewatered material to Piney Point. The total investment cost of the least-cost material placement plan (ODMDS) is $27,572,500, with a corresponding average annual cost (discounted at 4.875 percent over a 50-year period) of $1,602,300.

**Table 3-5**
**Average Annual Costs of Dredged Material Placement Alternatives**

| Costs | ODMDS | Offload to Piney Point | Direct Placement at Piney Point | Expanded DMMA |
|---|---|---|---|---|
| Total Project Costs | $ 26,588,700 | $ 33,731,500 | $ 33,494,300 | $ 35,737,800 |
| Interest During Construction | $ 983,800 | $ 1,248,100 | $ 1,239,300 | $ 1,322,300 |
| **Total Investment Costs** | $ 27,572,500 | $ 34,979,600 | $ 34,733,600 | $ 37,060,100 |
| Annualized Investment Costs | $ 1,481,300 | $ 1,879,200 | $ 1,866,000 | $ 1,991,000 |
| Annual Operations & Maintenance Costs | $ 121,000 | $ 121,000 | $ 113,500 | $ 100,900 |
| **Total Average Annual Costs** | $ 1,602,300 | $ 2,000,200 | $ 1,979,500 | $ 2,091,900 |

## 3.13 Economic Comparison of Harbor Expansion Alternatives

Annual transportation cost savings for each alternative were compared to the cost of constructing Harbor Expansion Alternatives B2, B3, C2, C3, and C4. Project costs used in the analysis are based on construction of the harbor expansion alternatives using the least-cost dredged material placement option, which is ODMDS placement. Economic benefits were calculated for each year of the 50-year period of analysis, and discounted at the current FY08 Federal discount rate of 4.875 percent. Table 3-6 shows project implementation costs and benefits for Harbor Expansion Alternatives B2, B3, C2, C3, and C4.

As shown on the table, all of the structural alternatives are economically justified, with BCRs exceeding one. Alternative B3 (Berth 12 at 950-foot length, depth at 40 feet MLW) shows the highest BCR at 5.3 to one, followed by Alternative B2 (Berth 12 at 950-foot length, depth at 35 feet MLW) at 4.7 to one, and Alternative C4 (Berth 12 at 1590-foot length, depth at 40 feet MLW) with a BCR of 3.8 to one.

Average annual benefits produced by Alternative C4 (Berth 12 at 1590-foot length, depth at 40 feet MLW) as are the highest among all alternatives considered, at $4,540,700.

**Table 3-6**
**Harbor Expansion Plans Economic Summary**
**October 2007 Price Level**

| | B2 950Lx35D | B3 950Lx40D | C2 1590Lx35D | C3 1590Lx39D | C4 1590Lx40D |
|---|---|---|---|---|---|
| **PROJECT FIRST COSTS** | | | | | |
| Channel and Widener Dredging | 7,292,900 | 9,723,900 | 12,205,900 | 15,460,600 | 16,274,900 |
| Berth 12 Dredging | 1,190,400 | 1,587,200 | 1,992,400 | 2,523,700 | 2,656,500 |
| Mob, Demob, and Prep Work | 1,355,300 | 1,355,300 | 1,355,300 | 1,355,300 | 1,355,300 |
| Turbidity Monitoring | 54,700 | 54,700 | 54,700 | 54,700 | 54,700 |
| Lands & Damages | 1,155,800 | 1,155,800 | 1,934,900 | 1,934,900 | 1,934,900 |
| Fish and Wildlife Facilities | 975,800 | 975,800 | 1,633,400 | 1,633,400 | 1,633,400 |
| ODMDS Materials Test | 241,000 | 244,000 | 338,000 | 391,000 | 400,000 |
| Planning, Engineering, and Design | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 |
| Construction Management | 865,800 | 1,066,300 | 1,390,500 | 1,661,300 | 1,729,000 |
| Aids to Navigation | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| **TOTAL PROJECT FIRST COST** | **13,681,700** | **16,713,000** | **21,455,100** | **25,564,900** | **26,588,700** |
| Interest During Construction | 501,100 | 617,200 | 794,400 | 947,100 | 983,800 |
| Total Investment Costs | 14,182,800 | 17,330,200 | 22,249,500 | 26,512,000 | 27,572,500 |
| Average Annual Equivalent | 761,900 | 931,000 | 1,195,300 | 1,424,300 | 1,481,300 |
| Annual O&M Costs | 62,200 | 76,100 | 97,600 | 116,300 | 121,000 |
| **AVERAGE ANNUAL COST** | **$ 824,100** | **$ 1,007,100** | **$ 1,292,900** | **$ 1,540,600** | **$ 1,602,300** |
| **AVERAGE ANNUAL BENEFITS** | **$ 3,890,000** | **$ 5,329,000** | **$ 4,516,000** | **$ 4,628,000** | **$ 6,143,000** |
| **BENEFIT-TO-COST RATIO** | **4.7** | **5.3** | **3.5** | **3.0** | **3.8** |
| **NET BENEFITS** | **$ 3,065,900** | **$ 4,321,900** | **$ 3,223,100** | **$ 3,087,400** | **$ 4,540,700** |

## 3.14 NED Plan Identification

Economic analyses conducted as part of this evaluation determined that Harbor Improvement Alternative C4 (channel depth: 40 feet, channel length: 1,590 feet) provides the maximum net benefits among all plans considered. Alternative C4 is the NED Harbor expansion plan. While

HRK 002697

longer channel lengths were not evaluated in the analysis of alternative plans, it can be stated with certainty that the incremental costs of larger scale plans would out-pace the economic benefits achieved through extending the channel length past a 1,590 feet.  To upscale the 1,590-foot channel length alternative, an incremental length of 650 feet would have been necessary to accommodate another average sized vessel within the fleet for a total channel length of 2,240 feet.  Dredging an additional 650 feet in length would extend construction into a large upland mangrove habitat, resulting in increased environmental degradation and a radical escalation of construction and mitigation costs.  In addition, a portion of this area of mangrove habitat was previously constructed for mitigation purposes.

Economic analyses also determined that the least-cost dredged material management option for construction of Phase III would be placement at the ODMDS.  The NED plan for Phase III is development of a 1,590-foot extension channel with material from construction of Phase III placed in the ODMDS.  Table 3-7 provides an economic summary of the NED plan.

### Table 3-7
### NED Plan Economic Summary
### October 2007 Price Level, 4.875% Discount Rate, 50-Year Period of Analysis

| | |
|---|---:|
| **PROJECT COSTS** | |
| Dredging, Mobilization & Demobilization | |
| Channel and Widener Dredging | 16,274,900 |
| Berth 12 Dredging | 2,834,000 |
| Mob, Demob, and Prep Work | 1,355,300 |
| Turbidity Monitoring | 54,700 |
| Lands & Damages | 1,934,900 |
| Fish and Wildlife Facilities (Mitigation) | 1,633,400 |
| Planning, Engineering, and Design | 900,000 |
| Construction Management | 1,729,000 |
| Aids to Navigation | 50,000 |
| Interest During Construction | 983,800 |
| **Total Investment Costs** | **$ 27,572,500** |
| Annualized Investment Costs | 1,481,300 |
| Annual Operations & Maintenance Costs | 121,000 |
| **Total Average Annual Costs** | **$ 1,602,300** |
| | |
| **PROJECT BENEFITS** | |
| **Average Annual Transportation Cost Savings** | **$ 6,143,000** |
| **Benefit to Cost Ratio** | **3.8** |
| **Net Benefits** | **$ 4,540,700** |

HRK 002698

## 3.15 Locally Preferred Plan Identification

The non-Federal sponsor's preference for a harbor improvement plan is Alternative C4, which provides the maximum net benefits of all plans analyzed. Port Manatee's preference is to avoid the placement of dredged material in open waters. Their commitment to avoid use of the ODMDS is evidenced through the development of detailed plans for construction of the expanded upland disposal area, and the development of plans (including legal agreements) for the direct pumping of dredged material to the Piney Point site. Between these two upland placement alternatives, the Port's preference is to pump dredged material directly to Piney Point.

The Locally Preferred Plan (LPP) is construction of Harbor Improvement Alternative C4 (channel depth: 40 feet, channel length: 1,590 feet), with placement of dredged material from Phase III construction pumped directly to the Piney Point site. The economic summary of the LPP is shown below in Table 3-8. As shown in the table, the LPP is economically justified with a benefit-to-cost ratio of 3.1, and net average annual benefits of 4,163,500.

### Table 3-8
### LPP Economic Summary:  Direct Pumping to Piney Point
### October 2007 Price Level, 4.875% Discount Rate, 50-Year Period of Analysis

| PROJECT COSTS | |
|---|---:|
| Dredging, Mobilization & Demobilization | |
|     Channel and Widener Dredging | 14,383,500 |
|     Berth 12 Dredging | 2,563,800 |
|     Mob, Demob, and Prep Work | 2,850,500 |
| Piney Point Site Work (Direct Pump) | 3,659,300 |
| Piney Point Tip Fee | 3,135,600 |
| Turbidity Monitoring | 96,000 |
| Lands & Damages | 1,934,900 |
| Fish and Wildlife Facilities (Mitigation) | 1,633,400 |
| Planning, Engineering, and Design | 735,000 |
| Construction Management | 2,452,300 |
| Aids to Navigation | 50,000 |
| Interest During Construction | 1,239,300 |
| **Total Investment Costs** | **$ 34,733,600** |
| Annualized Investment Costs | $ 1,866,000 |
| Annual Operations & Maintenance Costs | 113,500 |
| **Total Average Annual Costs** | **$ 1,979,500** |
| | |
| **PROJECT BENEFITS** | |
| **Average Annual Transportation Cost Savings** | **$ 6,143,000** |
| **Benefit to Cost Ratio** | **3.1** |
| **Net Benefits** | **$ 4,163,500** |

HRK 002699

## 3.16 Plan Selection

The plan selected for implementation is the NED Plan: development of a 1,590-foot extension channel with dredged material from construction of Phase III placed in the ODMDS.

## 3.17 Rejection of the Locally Preferred Plan

The LPP cannot be recommended for implementation. While the LPP is economically justified, significant issues relating to the use of Piney Point as a dredged material placement facility must be resolved before the LPP can be recommended as an acceptable plan. These issues are summarized below.

### 3.17.1 Structural Uncertainties Associated with Use of the Piney Point Site

The Corps of Engineers would need to perform analyses to determine if the disposal facility meets the design and construction criteria established in Corps of Engineers guidance such as EM 1110-2-5027 and others as appropriate. In the case of the Piney Point site, there is a heightened level of concern with regard to the integrity of the gypsum stack which forms the foundation of the dredged material handling facility. The heightened level of concern follows from the following considerations:

- The gypsum stack itself is not an engineered structure. There are no design plans and specifications, nor as built drawings, nor construction documentation to support the assertion of structural integrity of the stack for the purpose of supporting a material handling facility to be constructed on top of the stack.

- The gypsum stack itself contains hazardous and toxic material.

- There is documentation of past slope stability and piping issues experienced at the site.

The local sponsor, the site owner, and the State of Florida Department of Environmental Protection (DEP) have supplied data and have asserted that the site is approved for the use intended. However, the Corps of Engineers has found the data to be inconclusive. Therefore, the Corps would need to undertake a full scale analysis and verification of the structural integrity of the site and material handling facility. If the analysis determined that the facility met the criteria established in appropriate Corps guidance, then the Corps would sign a certification to that effect and the site could be used to support the Phase III Construction project as well as future Federal maintenance dredging of the channel.

### 3.17.2 Environmental Risks Associated with Use of the Piney Point Site

This particular alternative for the project presents some unique challenges with the use of the Piney Point disposal site. The project contemplates as an alternative using a phosphogypsum stack for the disposal of dredged material. The Piney Point phosphogypsum surface impoundment formerly held up to 1.2 billion gallons of acidic water. The wastewater came from the manufacturing of phosphoric acid from the mining of calcium phosphate. Piney Point surface impoundment was used to store the acidic process water and the by-products of calcium sulfate, plus traces of heavy metals and radio nuclides. The process wastewater from phosphoric acid production is excluded from hazardous waste regulation, if the plant stores the material with the intention of recycle and/or reuse in the process, and not declaring it has been discarded.

A problem occurred when Mulberry Corporation, the owner of Piney Point Phosphates, went bankrupt. The corporation ceased operations and abandoned their properties leaving over 1 billion gallons of acidic wastewater in the Piney Point surface impoundment. The wastewater became abandoned changing its definition from RCRA excluded hazardous waste to RCRA regulated hazardous waste at the time of disposal. The State of Florida DEP took care of treating and disposing the wastewater at a cost of over $1 million dollars.

The worst case scenario for Piney Point being used as dredged material disposal facility would be a breach in the liner. Such a breach would allow water to saturate and cause a failure to the gypsum stack, enabling the mixing of large volumes of dredged material with large volumes of phosphogypsum.

Phosphogypsum from phosphoric acid production is a hazardous waste excluded from RCRA Subtitle C regulation under 40 CFR 261.4 (b)(7). Process wastewater from phosphoric acid production is a hazardous waste excluded from RCRA Subtitle C regulation under 40 CFR 261.4 (b)(7).

Dredged material is not regulated by RCRA because is not a solid waste under the statutory definition. Phosphogypsum is not regulated by RCRA Subtitle C because is not a hazardous waste under the statutory definition. Water from rain and the placement of dredged slurry could percolate into phosphogypsum stack releasing a leachate that could be corrosive and toxic. If leachate meets the characteristics according to 40 CFR 261.22 and 40 CFR 261.24, then the leachate would be designated as hazardous waste. Then the mixture of a solid waste, with hazardous waste is considered a hazardous waste. The addition of dredged material to a hazardous waste will increase the probability of contaminating the surrounding surface and groundwater.

### 3.17.3 Corps Policy Issues Associated with Use of the Piney Point Site

CECW-PA/OD Memorandum for Major Subordinate Commands and District Commands(dated 19 May 1999) paragraph 3 defines the Base Disposal Plan as follows: "Base Plan. The Federal interest in continued operation and maintenance of an existing Federal project for its navigation purpose is defined as the least cost plan for dredged material management that is consistent with sound engineering practice and meeting the environmental standards established by Section 404 of the Clean Water Act of 172 or Section 103 of the Marine protection, Research, and Sanctuaries Act of 1972, as amended…"

ER 1105-2-100 allows for recommendation of a LPP "if requested by the non-Federal sponsor and approved by ASA (CW)". ER 1105-2-100 further states that "If the sponsor prefers a plan more costly than the NED Plan or the combined NED/NER plans, and the increased scope of the plan is not enough to warrant full Federal participation, ASA (CW) may grant an exception as long as the sponsor pays the difference in cost between those plans and the locally preferred plan. The LPP, in this case must have outputs similar in-kind, and equal to or greater than the outputs of the Federal plan".

The Locally Preferred Plan for new work (Berth 12 construction) includes all of the same channel and berth construction features of the NED plan, but substitutes Base Plan disposal into the ODMDS for disposal of dredged materials directly into Piney Point.

HRK 002701

Issues to be Resolved Before the LPP Can Be Recommended for Implementation

a.  Least Cost Plan for Dredged Material Management

The LPP plan is more expensive than the NED plan.  Per ER 1105-2-100 the Sponsor will have to pay the additional amount above the cost of the NED plan.  The Sponsor has agreed to this.

b.  Consistent with Sound Engineering Practice

CESAJ has worked diligently with the Port, the State, and their consultants in order to address engineering and operational issues associated with use of the Piney Point site for disposal of dredged material.  Issues discussed include ability of the Piney Point liner or modification thereof to accommodate placement of dredged material, integrity of the gypsum stack which forms the foundation of Piney Point disposal area to be build on top of the stack, avoidance of rainwater or return water interaction with HTRW pore water contained within the Piney Point stacks, etc.  Currently CESAJ is not satisfied with these engineering and operations concerns.  CESAJ has proposed a "reduced liability option" whereby the Port, State, and/or HRK operate and maintain the Piney Point disposal area, leaving the Corps contractor to simply hook up its dredge pipe to a pipe provided by the Port, State, and/or HRK.  The Port, State, and/or HRK would operate Piney Point disposal and return water operation.  This plan would be similar to doing upland construction where excess material is sent to a private or public landfill; therefore it would theoretically reduce the Corps' (and its maintenance dredging contractor's) exposure to liability associated with Piney Point.

c.  Meets Environmental Standards

ER 1165-2-132 Hazardous, Toxic, and Radioactive Waste (HTRW) Guidance for Civil Works Projects, Section 6 states "Construction of Civil Works projects in HTRW-contaminated areas should be avoided where practicable."  The ER further states "Where HTRW contaminated areas or impacts cannot be avoided, response actions must be acceptable to EPA and applicable state regulatory agencies."  The risk of HTRW impacts associated with Piney Point can be avoided through recommendation of the NED Base Disposal Plan that involves disposal in the Tampa Bay ODMDS.

The CESAJ Hazardous, Toxic, and Radioactive Waste Assessment, Manatee Harbor, Piney Point Disposal Area Appendix to the Environmental Assessment Addendum indicates that "There is sufficient evidence to indicate that Corps dredging activities would disturb or otherwise release hazardous waste substances contained in the calcium sulfate.  Therefore, it is recommended not to utilize the Piney Point Disposal area for dredge material disposal, but to secure another disposal site."

A preliminary draft Environmental Assessment (EA) has been prepared for the alternative disposal options discussed in the GRR.  Based on the EA, it is likely to proceed with a Finding of No Significant Impact (FONSI) on using the Tampa ODMDS for dredged material.  This finding is pending completion of, and EPA's approval of, the Site Management and Monitoring Plan (SMMP) for the Tampa ODMDS.  The SMMP is currently under a 30 day public notice ending August 14, 2008.

The EA evaluation on the Piney Point has led to findings that may not conclude with a FONSI.  If the final environmental analysis result in significant impacts and the Piney Point disposal

option is recommended as a locally preferred plan (LPP) then the Corps would need to proceed with an Environmental Impact Statement.

Should the Corps be responsible for a NEPA document allowing for operation and maintenance of Piney Point, an EIS will have to be prepared and coordinated by CESAJ.

<u>d.  Other Issues</u>

There are legal issues associated with the use of the Piney Point site.  Those issues are as follows.  There must be a Certification from the State of Florida Regulation (FDEP) that certified Piney Point as a Dredged Material Disposal Site.  There must be adequate documentation of the arrangements for use of Piney Point for a Dredged Material Disposal Site.  There must be a Hold Harmless issued from the non-Federal Sponsor.  All material that is to be placed into the Piney Point site must be tested extensively to ensure that there is no hazardous material that will enter the site.  The owner of the site, HRK, must be responsible for managing, which includes all operations and obtaining all permits including those for the return water.  These issues must be resolved in order for the Locally Preferred Plan to be recommended.

<u>e.  Summary</u>

In summary, the LPP disposal plan provides potentially increased risks to the Federal government vs. the ODMDS Base Disposal Plan, for the same Federal cost (additional Piney Point disposal cost will be borne by the Port).  Acceptance of the LPP is predicated upon resolution of the policy, legal, and possibly engineering, operations, and environmental issues.

HRK 002703

# 4   THE RECOMMENDED PLAN

This section of the report describes the design, project costs, and benefits of the recommended plan. The recommended plan for Phase III is Alternative C4, the NED Plan. The NED Plan provides for a channel extension of 1,590 feet in length, 275 feet in width, and 40 feet in depth located adjacent to and alongside Berth 12. Dredged material generated as a result of constructing the NED Plan will be placed at the Tampa ODMDS.

Transportation cost reduction benefits from decreases in vessel delays and vessel diversions of calls credited specifically to Berth 12 and associated with the overall increased efficiency in operations of Port Manatee will be realized. Improvements of this nature would reduce the present cost of transporting commodities and offset escalating future cost resulting from increased traffic delays and congestion.

Deepening and maintaining the access channel depths would assure vessel operators a reliable channel draft entering Berth 12 thereby increasing the Port's efficient handling of commodity flows. Table 4-1 shows the channel dimensions of the LPP in comparison to the existing Federal project.

### Table 4-1
### NED Project Dimensions

| Feature | Existing Federal Project | Federal Channel Extension | Non-Federal (Berth 12) |
|---|---|---|---|
| Width | 400 feet | 275 feet | 125 feet |
| Authorized Depth | 40 feet | 40 feet | 40 feet |
| Advanced Maintenance | None | None | None |
| Required Overdepth | 1 foot | 1 foot | 1 foot |
| Allowable Overdepth | 1 foot | 1 foot | 1 foot |

## 4.1   Dredged Material Management

It had been previously assumed that relatively minor modifications to the Port's existing upland dredged material management area would provide ample capacity for the construction of Phases II and III. For various reasons (including the construction of Berth 5 and its access channel to a depth of 40 feet), adequate disposal capacity for construction of Phase III is no longer available.

The identification of additional dredged material disposal capacity is now required to accommodate material from construction of Phase III and 20 years of continuing operation and maintenance (O&M) dredging of all Port channels, wideners, berthing areas, and the turning basin (i.e., maintenance of Phases I, II, and III).

## 4.2   Volume of Material

Phase III calls for the construction of a channel extension to Berth 12 with a length of 1,590 ft and a depth of -40 ft MWWL. Constructing the channel extension and Berth 12 itself to this

geometry and associated entrance channels is projected to produce approximately 1,170,000 CY of dredged material.

Each O&M cycle within Phases I, II, and III is projected to produce an estimated 300,000 CY of material to be dredged at each three-year maintenance cycle. Over a 20-year planning period (i.e., seven O&M cycles) following the completion of Phase III construction, 2,100,000 CY of material would be dredged from the entire project. When added to the material generated from construction (1,170,000 CY), the total material storage capacity requirement over the 20-year planning period is 3,270,000 CY.

## 4.3 Dredged Material Management Plan

The Dredged Material Management Plan (DMMP), which is an appendix to this GRR, provides detailed discussions on the formulation of alternative dredged material placement plans. In the final analysis, four alternative sites were evaluated for the placement of dredged material:

- Ocean Dredged Material Disposal Site (ODMDS)
- Offload Dewatered Material from Existing DMMA to Piney Point Site
- Direct Placement at Piney Point Site
- Direct Placement at an expanded Port Manatee DMMA

The DMMP calls for Phase III construction material to be placed at the ODMDS, 43% of maintenance material placed at the ODMDS, and 57% of maintenance material placed in the expanded DMMA. The expanded DMMA would be developed for receipt of maintenance O&M material.

Given a projected maintenance requirement of 300,000 CY per 3-year O&M cycle (combined projected O&M for Phases I, II, and III), material from each O&M cycle would be split between the ODMDS and the expanded DMMA. The split of material going to each placement site is based on the percentage of material expected to be suitable for ODMDS placement. Currently, 43 percent of maintenance material is expected to be suitable for ODMDS placement, which would leave 57 percent of maintenance material required to be placed in an upland facility.

At each maintenance dredging cycle, 171,000 CY of material would be placed in the expanded DMMA, which would be constructed prior to Year 3 (the first maintenance cycle year). The ODMDS would receive 129,000 CY of maintenance material at each maintenance dredging cycle. Through the end of the 20-year planning period, a total of 1,197,000 CY of material would be placed in the expanded DMMA (well within its capacity constraint of 1,800,000 CY), and 903,000 CY of material suitable for open-water placement would be placed at the ODMDS.

At the end of the 20-year planning period, the expanded DMMA would have a remaining capacity of 603,000 CY. Table 4-2 summarizes the O&M dredging schedule and placement plan.

## Table 4-2
## Recommended Dredged Material Management Plan for O&M

| | Disposal Requirements for 20-years | Disposal Sites | | Volume per O&M Cycle |
| | | Expanded DMMA | ODMDS | |
| | | Initial Capacities (CY) | | |
| | | 1,800,000 | n/a | |
| Cycle | End of Year | CY Req | CY Placed | CY Placed | Tot Placed |
|---|---|---|---|---|---|
| 1 | 3 | 300,000 | 171,000 | 129,000 | 300,000 |
| 2 | 6 | 300,000 | 171,000 | 129,000 | 300,000 |
| 3 | 9 | 300,000 | 171,000 | 129,000 | 300,000 |
| 4 | 12 | 300,000 | 171,000 | 129,000 | 300,000 |
| 5 | 15 | 300,000 | 171,000 | 129,000 | 300,000 |
| 6 | 18 | 300,000 | 171,000 | 129,000 | 300,000 |
| 7 | 21 | 300,000 | 171,000 | 129,000 | 300,000 |
| Totals | | 2,100,000 | 1,197,000 | 903,000 | 2,100,000 |

## 4.4  Economics of the Recommended Plan

Detailed cost estimates were developed for the recommended plan using the Microcomputer Aided Cost Estimating System (MCACES) software program (full detail of the cost estimates is available in the Engineering Appendix).   Project implementation costs include: planning, engineering and design; real estate acquisition; project construction; construction management / supervision and administration; mitigation; and contingencies.  The MCACES estimates are for constructing Alternative C4, with an additional 1 foot of required over depth and 1 foot of allowable over depths is included in the estimated excavation quantities.  Summary output from the MCACES estimate for the NED Plan is shown on Table 4-3.  The table shows that the total project cost (with contingencies) is approximately $26.6 million.

Table 4-4 shows the project economic summary for the recommended plan.  As shown in the table, the recommended plan has total average annual costs of $1,380,000, total average annual benefits of $1,602,300, a benefit-to-cost ratio of 3.83 to 1, and annual net benefits of $4,540,700.

HRK 002706

**Table 4-3**
**NED Plan MCACES Cost Estimate Summary (Cost Plus Contingencies)**

| PROJECT COSTS | |
|---|---:|
| Dredging, Mobilization & Demobilization | |
|     Channel and Widener Dredging | 16,274,900 |
|     Berth 12 Dredging | 2,834,000 |
|     Mob, Demob, and Prep Work | 1,355,300 |
| Turbidity Monitoring | 54,700 |
| Lands & Damages | 1,934,900 |
| Fish and Wildlife Facilities (Mitigation) | 1,633,400 |
| Planning, Engineering, and Design | 900,000 |
| Construction Management | 1,729,000 |
| Aids to Navigation | 50,000 |
| Interest During Construction | 983,800 |
| **Total Investment Costs** | **$ 26,588,700** |

**Table 4-4**
**NED Plan Economic Summary**
**October 2007 Price Level, 4.875% Discount Rate, 50-Year Period of Analysis**

| Costs | |
|---|---:|
| Total Project Costs | $ 26,588,700 |
| Interest During Construction | $ 983,800 |
| **Total Investment Costs** | **$ 27,572,500** |
| Annualized Investment Costs | $ 1,481,300 |
| Annual Operations & Maintenance Costs | $ 121,000 |
| **Total Average Annual Costs** | **$ 1,602,300** |
| **Benefits** | |
| **Average Annual Transportation Cost Savings** | **$ 6,143,000** |
| **Benefit to Cost Ratio** | **3.83** |
| **Net Benefits** | **$ 4,540,700** |

## 4.5  Environmental Mitigation

Environmental mitigation for Phase III of the Manatee Harbor Project (i.e., the navigation features evaluated in this GRR) has already been designed, permitted, constructed, and approved. The completed mitigation project for Phase III was constructed between September 2001 and December 2003, and is monitored on a yearly basis.

HRK 002707

### 4.5.1  Mitigation Plan History

From 1999 through 2004 the Sponsor obtained a series of permits for proposed Phase II and III project modifications from the Florida Department of Environmental Protection (DEP). The mitigation plan was based upon the array of alternatives for Phases II and III under consideration at the time. In 2001 the Sponsor obtained a Department of Army (DOA) permit for the berthing areas associated with the proposed Phase II and III improvements. The Sponsor sought and obtained DEP approval for mitigation using a "comprehensive ecosystem" approach. The mitigation program was required by both permits to provide a package of features that, in total, benefit the environment as much as the project impacts the environment.

The Sponsor then proceeded with the mitigation design and construction at their cost -- Federal funds were not used in the design or construction of the mitigation project. The mitigation project included transplanting seagrass from the future impacted areas to the mitigation site. The full suite of features provided in the mitigation plan is provided in Table 4-5.

### Table 4-5
### Port Manatee Mitigation Plan Features

| Mitigation | Acres |
|---|---|
| Transplant Seagrass | 12.70 |
| Historical fill removal and transplant of seagrass | 12.82 |
| Piney Point Seagrass salvage | 0.32 |
| Bird Island | |
|     Mangrove enhancement 3.93 ac | |
|     Mangrove creation 6.89 ac | |
|     Tidal creek restoration 2.02 ac | |
|     Salt barren creation 3.21 ac | |
|     Total Bird Island | 16.06 |
| Little Redfish Creek Restoration[3] | |
|     Tidal creek restoration 13.25 ac | |
|     Mangrove/tidal marsh restoration 13.43 ac | |
|     Hydrologic enhancement 73.62 ac | 100.30 |
| Piney Point Scrape Down | 0.15 |
| Bird Island Part 2 | |
|     Upland Management 23.77 acres | |
|     Hammock creation 14.56 acres | |
|     Tern nesting area 7.96 acres | |
|     Laughing gull nesting area 3.05 acres | 49.34 |
|     395 acres less 12.7 acres of restored seagrass | 382.30 |
| **Total** | **573.99** |
| **Land Transfers** | **13.00** |

HRK 002708

### 4.5.2   Allocation of Mitigation Costs

It is clear that no new environmental mitigation will take place as a result of Phase III construction. At issue, however, is whether the cost of the mitigation attributed to Phase III construction is reasonable, allowable, integral, and allocable, per ER 1165-2-131. To answer this question, the Defense Contract Audit Agency (DCAA) completed an audit on 19 July 2004 to verify incurred mitigation construction costs. The audit verified a total of $5,654,480 in mitigation construction costs submitted by Port Manatee (see Appendix D for additional audit details). The audit was conducted for the entire mitigation project, and costs were apportioned to Phase II and Phase III based on resource impacts attributable to each phase.

The test for reasonable was addressed by the EA completed for the Department of the Army permit process. The EA concluded that the mitigation was adequate to offset the project impacts, and the permit provided by the DEP supported this finding. The test for allocable was addressed by allocating the mitigation costs by resource impacts between Phase II and III. Costs were then further allocated between general navigation features and non-Federal impacts. A total of $1,584,000 was allocated to cost-shared Phase III environmental mitigation[6] based on the analyses. The test for whether the mitigation performed is integral to the project was addressed in the same manner as the reasonable test. The permit provided by the DEP again supported the findings of the EA completed for the Department of the Army permit process, which concluded that the mitigation was adequate to offset project impacts. Again, the sponsor-constructed mitigation plan is the Federal mitigation plan. The test for allowable is a sum of the previous three tests. The appropriate plan was constructed and is considered the Federal mitigation plan. The plan has been successful, and monitoring will continue. The mitigation plan costs have been audited by DCAA and reviewed for USACE policy compliance.

These findings, which appear in detail of Appendix D (Section 156 Mitigation Credit for Phase II and Phase III) were confirmed by the Assistant Secretary of the Army (Civil Works) in a letter of 1 September 2005 (included in Appendix F), which reads in part:

> *"Given that mitigation is a feature of the authorized project, and the mitigation work has been accepted as adequate by the state and Federal resource agencies and the Corps as necessary and adequate to mitigate for the impacts of Phases II and III, the work is therefore, compatible with and integral to the authorized project. Further, the costs have been allocated and determined to be reasonable, allowable, and auditable. Therefore, I approve the request for credit as identified in the Corps September 2005 Manatee Harbor Section 156 Report."*

## 4.6   Section 902 Limit Calculations

Section 156 authorized a new cost of $61,500,000 for the Manatee Harbor project. The Section 902 limit or maximum authorized project cost is $77,884,000.

---

[6] Environmental mitigation costs of 1,617,000 shown in Tables 4-3 and 4-4 includes an additional $33,000 in non-Federal mitigation costs for the berthing area extending 125 feet outward from the Berth 12 wharf. The apportionment of these costs is shown in Section 6 of this document.

HRK 002709

## 4.7   Environmental Effects of the Recommended Plan

The project would directly impact seagrasses and mangroves, and shallow bay bottom would be lost. There would be a temporary impact on the marine environment as a result of the dredging operations. This is associated with the degradation of water quality in the channel area. Dredging would result in the destruction of benthic populations, as well as temporary disruption of fish populations, aquatic ecosystems and food chains in the area.

Utilizing the ODMDS placement alternative for Phase III construction material would not result in significant direct impacts to the environment.

### 4.7.1   Vegetation

This harbor expansion alternative would directly impact approximately 10.70 acres[7] of shallow bay bottom less than -6 ft. (MLW) deep which is appropriate substrate for seagrasses, but has a varying coverage of seagrass ranging from 3.00 to 6.00 acres. Since 1999, several seagrass surveys have been conducted and each has resulted in different acres depending on the methodology of the survey and/or the time of year the survey was conducted. The shallow bay bottom impacts totaling 10.70 acres includes approximately 1-acre of intertidal shoreline mangrove impacts. Grassbeds and mangrove habitat provide food, cover, and attachment surfaces for fish and invertebrates. Loss of seagrasses, shallow bay bottom and mangrove habitat would have an adverse effect on these resources if not mitigated. A mitigation plan (see Section 4.3 and Appendix D) has been developed and concurred with by Federal and State resource agencies. Dredging may also indirectly impact surrounding seagrass beds by clouding the water, inhibiting light penetration. Invertebrate fauna as well as fish fauna and higher vertebrates inhabit the sea grass communities surrounding Port Manatee. This alternative would impact approximately 9.00-acres of upland habitat consisting mainly of grasses and the invasive Brazilian pepper.

Impacts to vegetation from use of the ODMDS are not expected to occur. The management plan for the ODMDS cites that disposal would occur no less than 330 feet (100 meters) inside the site boundaries. The depth at which vegetation such as seagrass is found is limited by water clarity because they require light to grow. It is not likely vegetation would grow at the depth in the ODMDS where the dredged material would be deposited.

### 4.7.2   Threatened and Endangered Species

Vessel traffic and dredge operations present a potential threat to endangered and threatened species. Compliance with the Biological Opinion from the USFWS would reduce this potential threat. The proposed project was coordinated with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service in accordance with the Endangered Species Act (coordination letters can be found in the appendices to the Environmental Assessment Addendum). The agencies agreed that the proposed work would not adversely affect listed species under their jurisdiction. However, if a hopper dredge or explosives are used to excavate navigation channels, the potential to adversely affect sea turtles and/or manatees exists. If blasting were

---

[7]  It is important to note that slightly more acreage would be impacted from a channel depth of 40 feet versus a channel depth of 35 feet. This is because channel width is measured at the channel bottom, and the sides of the channel are sloped at a rate of 3 to 1. All impacts discussed assume a maximum channel depth of 40 feet.

HRK 002710

required, the Corps would abide by the manatee protection measures for manatees' set forth by the U.S. Fish and Wildlife Service to prevent injury to manatees and sea turtles. If it is decided that a hopper dredge would be used, further coordination with the National Marine Fisheries Service would be required.

Sea turtles may be in the vicinity of the ODMDS. The potential for whales in the vicinity of the ODMDS is not likely. It is not expected that any of these endangered or threatened species would be affected by the deposition of dredged material at the ODMDS. A management plan has been developed to protect the marine environment and document the disposal activities occurring at the ODMDS.

### 4.7.3  Hardgrounds

No impact to hardground habitat expected in the harbor expansion area.

It is not expected that hardgrounds would be adversely impacted by placing material at the EPA approved Tampa ODMDS. Prior to placement of material from the Manatee Harbor dredging operations, a bathymetric survey of the ODMDS would be require 2-3 months prior to disposal and following completion of disposal event. The survey would assist in determining the existence of hardgrounds where deposition of material would take place.

### 4.7.4  Fish And Wildlife Resources

The channel extension would result in loss of 10.70 acres of unvegetated and vegetated shallow bay bottom habitats including intertidal mangroves, which are important in the life cycle of fish and invertebrates. Seagrasses, in particular, provide food, cover, and attachment surfaces for fish and invertebrates. The loss of seagrasses would have an adverse effect on these resources if not mitigated. Motile species such as fish and crustaceans may experience some short-term impacts. However, these organisms should be able to vacate the dredging site during construction activities. The short-term adverse ecological impact is more likely to be to non-motile species such as filter feeding, burrowing and attached organisms. Many of the species that are not able to escape the construction area are expected to recolonize within 6 months to a year after project completion.

It is not likely that fish and wildlife resources would be adversely affected at the ODMDS. The reason for this determination is due to the extensive monitoring that is required prior to, during, and after disposal of material. The ODMDS is sectioned so that different types of materials will be placed at different locations to avoid potential impacts to resources. The suitability of dredged material for ocean disposal must be verified by the Corps and agreed to by EPA prior to each disposal event. Many surveys and studies, including a fish assessment, bathymetric survey, and live/hard bottom assessment, were conducted on the ODMDS prior to is designation as a disposal site. Detailed results of these studies provide a baseline and are presented in an EIS (EPA, 1995). To avoid significant adverse impacts a disposal site monitoring program has been established as part of the Site Management Plan.

### 4.7.5  Essential Fish Habitat

Categories of EFH that would be impacted by the proposed dredging include seagrasses, mangrove wetlands, estuarine sand substrate and estuarine water column. Impacts to this habitat and the federally managed species associated with this habitat are addressed in the EFH analysis

in the appendices to the Environmental Assessment Addendum. It has been determined that EFH impacts would occur in the proposed work area.

Appropriate ecological assessments were performed at the ODMDS site prior to its designation. Site-specific information regarding fish and wildlife resources, fish assessments, and other pertinent survey results is presented in an EIS prepared for the site's use. Coordination with NMFS for Section 103 Concurrence and approval of the site management plan was conducted through the public notice process. Through this coordination process, there is no indication that essential fish habitat would be adversely impacted if dredged material is deposited at the EPA approved ODMDS.

### 4.7.6  Historic Properties

No impacts are expected in the harbor expansion area. The use of ODMDS has been fully coordinated with the State Historic Preservation Officer (SHPO). Coordination letters dated 28 September 2006, 1 August 2006, 8 April 2002, and 7 August 2001 are located in the appendices to the Environmental Assessment Addendum.

### 4.7.7  Aesthetics

The proposed work would not adversely affect aesthetic resources at the port facility. Aesthetic resources in the general area of Tampa Bay would be temporarily impacted by the presence of the dredge and other construction equipment.

### 4.7.8  Recreation

There would be a temporary adverse affect on recreational fishing in the immediate project area due to construction activities and turbidity. Long-term adverse effects are not expected from this project.

### 4.7.9  Coastal Barrier Resources

No coastal barrier resources have been identified at either the harbor expansion area or the ODMDS area.

### 4.7.10 Water Quality

Water quality conditions would be degraded during dredging operations. The work would result in elevated turbidity and suspended solids at the dredge site, and at the Tampa ODMDS during the dredging operations. Turbidity would be controlled during dredging by using extensive use of turbidity monitoring and use of floating turbidity screens as necessary between dredging operations and sensitive resources designated as not to be disturbed. Conditions within the dredging area and the ODMDS site should return to normal shortly after the work is completed. Work would be required to comply with conditions specified in a Water Quality Certificate (permit), issued by the State of Florida, and Section 103(c) of the Marine Protection, Research, and Sanctuaries Act (MPRSA) concurrence from EPA.

HRK 002712

### 4.7.11 Hazardous, Toxic, And Radioactive Waste

The preliminary assessment indicated that no hazardous, toxic, radioactive waste, or other harmful substances are impacting the project area.  However, if contaminants are found during project construction, the site must be remedied.  Contamination chemicals if not detected during the site assessment, may be disturbed or released by the project.  Past experience has shown that the highly permeable ground substrate of the area results in rapid dilution of the residual contaminants.

No HTRW impacts have been identified for use of the ODMDS.

### 4.7.12 Air Quality

The short-term impact from emissions by construction equipment associated with the project would not significantly impact air quality.

### 4.7.13 Noise

With the implementation of the proposed action there would be a temporary increase in the noise level during construction.  Construction equipment would be properly maintained to minimize the effects of noise.

HRK 002713

# 5   PLAN IMPLEMENTATION

The Phase III recommended plan is construction of a 275-foot wide side channel extension alongside the 125-foot berthing area (Berth 12) extending 1,590 feet in length and 40 feet in depth, which is consistent with the Manatee Harbor main channel.  Excavation for a tapering transition into the harbor's channel is also included.

The recommended plan also includes placement of all material from Phase III construction at the Tampa ODMDS.

## 5.1   Implementation Schedule of the Sponsor

Port Manatee has notified the Jacksonville District that it intends to initiate dredging of Phase III project elements as soon as possible.  Section 156 of the Energy and Water Appropriations Act of 2004 authorizes the construction of an extension of the south channel a distance of approximately 1,584 feet.  In his letter of 6 September 2005 (included in the Pertinent Correspondence Appendix), the Secretary had determined that mitigation work already completed for Phase III by Port Manatee was compatible with and integral to the authorized project.  Further, the Secretary established that costs of the mitigation work completed for Phase III in the amount of approximately $1,888,000 were determined to be reasonable, allowable, and auditable.

## 5.2   Project Cooperation Agreement

As of July 1994, there is no longer a requirement to include an initial draft Project Cooperation Agreement (PCA) when submitting draft GRR reports.  The model PCA and possible deviations based on the recommended plan have been fully discussed with the non-Federal sponsor.  The non-Federal sponsor indicated by letter dated November 18, 2004 a full understanding of the type of agreement expected to sign prior to starting construction and that they must provide non-Federal items of cooperation.   The terms of non-Federal cooperation are in the Recommendations section of this report.  No Federal commitments relating to a construction schedule or specific provisions of the PCA can be made to the non-Federal sponsor on any aspect of this project or separable element until completing the following actions:

1. The Headquarters of the USACE approves the General Reevaluation Report;

2. The project is budgeted as a new construction start, or construction funds are added by Congress, apportioned by the Office of Management and Budget, and their allocation is approved by the Assistant Secretary of the Army for Civil Works, ASA(CW); and

3. The draft PCA has been reviewed and approved by the office of the ASA(CW).

The Manatee Harbor PCA will not be executed nor will construction start until NEPA, the CWA, the Coastal Zone Management Act, the Endangered Species Act, the Fish and Wildlife Coordination Act, and the National Historic Preservation Act requirements are met.  In the case of this project, these requirements have been met with the completion of an EA, the signing of a Finding of No Significant Impact, and the Final EA having been submitted to EPA for filing.

Once the GRR is approved and the project is budgeted for construction final PCA negotiations with the non-Federal sponsor may be conducted and the draft PCA package submitted through USACE higher authority for review and approval by the ASA(CW).  The PCA for this project

will be executed only after approval of the GRR and an Appropriations Bill containing funds for the project is enacted into Law. The Chief of Engineers will not allocate Federal funds for construction of a project until the ASA(CW) approves and executes the PCA.

## 5.3  Financial Analysis

Financial analysis is required for any plan being considered for implementation involving non-Federal cost sharing. The purpose of the financial analysis is to ensure the non-Federal sponsor understands the financial commitment involved and has a reasonable plan for meeting that commitment. The financial analysis shall include the non-Federal sponsor's statement of financial capability, the non-Federal sponsor's financing plan, and an assessment of the sponsor's financial capability. These plans and analyses are part of the draft PCA package submitted to higher authority for review and approval once the GRR is approved and the project is budgeted for construction.

## 5.4  Cost Sharing

Under Section 101 of WRDA 1986, amended by Section 201 of WRDA 1996, Federal participation in navigation projects is limited to sharing costs for design and construction of the general navigation features (GNF). These features can consist of entrance and primary access channels, anchorage areas, turning basins, jetties, breakwaters, shoreline erosion protection structures, land-based and aquatic dredged material disposal areas, and mitigation. GNF for Phase III is the side channel extension, future maintenance dredging, the DMMA, and mitigation. Non-Federal interests are responsible for and bear all costs for provisions of the necessary LERR and dredged material disposal areas necessary for the project, though all of these costs are typically credited toward the sponsor's share of total project costs. In addition, the non-Federal interest is responsible for providing local service facilities such as terminal facilities, dredging berthing areas and interior access channels to those berthing areas as well as operation, maintenance, repair, and replacement of these facilities.

Section 101 (a)(1)(a) of WRDA 1986 specifies that for commercial navigation projects with an overall depth in excess of 20 feet but not in excess of 45 feet, cost sharing for construction of the project's GNF is 75 percent Federal and 25 percent non-Federal. The recommended plan has a depth of 40 feet, which fits this criterion. Further, the non-Federal partner will pay an additional 10 percent of the GNF cost in cash over a period not to exceed 30 years, at an interest rate determined pursuant to Section 106 of WRDA 1986. The value of lands, easements, and rights-of-way (LERRs) necessary for the project are credited toward this 30-year cash payment. For commercial navigation projects with an overall depth greater than 20 feet, cost sharing for operation and maintenance of GNFs including aids to navigation is 100 percent Federal.

The breakdown of individual cost items on a Federal / non-Federal cost sharing basis are shown in Table 5-1. The table shows that the dollar amount used for cost sharing calculations is $26,588,700 (disposal of construction material in the ODMDS). The table shows that the sponsor's financial responsibility for Phase III construction is $10,353,400, and the Federal financial responsibility of total costs are $16,235,300. Construction cost items that are cost shared include mobilization and demobilization, excavation and dredging, turbidity monitoring, environmental mitigation, construction management, engineering and design, and materials testing.

HRK 002715

*Manatee Harbor Federal Navigation Project*

**Table 5-1**
**Cost Allocation for NED Plan Implementation**

| | Total Costs | Federal Share | Non-Federal Share |
|---|---|---|---|
| **General Navigation Feature Cost Items:** | | | |
| Mobilization/Demobilization | $ 1,355,300 | $ 1,016,500 | $ 338,800 |
| Excavation/Dredging | 16,274,900 | 12,206,200 | 4,068,700 |
| Turbidity Monitoring | 54,700 | 41,000 | 13,700 |
| Environmental Mitigation: Federal Channel | 1,584,000 | 1,188,200 | 396,000 |
| Construction Management | 1,729,000 | 1,296,700 | 432,300 |
| Planning, Engineering, & Design | 500,000 | 375,000 | 125,000 |
| ODMDS Material Test | 400,000 | 300,000 | 100,000 |
| **Subtotal General Navigation Features** | **$ 21,898,100** | **$ 16,423,600** | **$ 5,474,500** |
| Aids to Navigation (100% Federal) | 50,000 | 50,000 | |
| Lands, Easements, Rights of Way and Relocations (100% Non-Federal) Lands: 1-Acre Wetland, 9-Acre Upland Mitigation Site for Federal Access Channel | 1,934,900 16,600 | | 1,934,900 16,600 |
| Associated Non-Federal Costs | | | |
| Dredging of Berthing Area | 2,656,500 | | 2,656,500 |
| Mitigation for Phase III: Non-Federal Berth 12 | 32,600 | | 32,600 |
| **Subtotal Other Costs** | **$ 4,690,600** | **$ 50,000** | **$ 5,171,000** |
| **Additional non-Federal Funding Requirements** | | | |
| 10% of GNF | | (2,189,800) | 2,189,800 |
| Adjustment for LERRD Credit | | 1,951,500 | (1,951,500) |
| **Net 10% GNF Requirement** | | **(238,300)** | **238,300** |
| **Total Cost Sharing** | **$ 26,588,700** | **$ 16,235,300** | **$ 10,353,400** |

## 5.5   Permits, Licenses, and Entitlements

Pursuant to Section 103 (c) of the Marine Protection, Research, and Sanctuaries Act, as amended (MPRSA), concurrence from EPA on the project's dredged material meets the criteria for ocean disposal (see EPA letter dated September 4, 2007 in the appendices to the Environmental Assessment Addendum). A Site Management and Monitoring Plan (SMMP) has been prepared as part of the Section 103 concurrence from EPA, and coordinated for public review, by public notice dated July 15, 2008. The SMMP describes the details for placing the proposed Manatee

HRK 002716

Harbor dredged material at the Tampa Ocean Dredged Material Disposal Site (ODMDS).   The SMMP provisions shall be requirements for all dredged material disposal activities at the site. All Section 103 (MPRSA) ocean disposal permits or approvals shall be conditioned as necessary to ensure consistency with the SMMP.

## 5.6   Comparison of Project With 2002 GRR And Section 156 Authorization

This GRR recommends an extension channel of 1,590 feet in length, 275 feet wide, at a depth of 40 feet with associated widener.   Modifications to the authorized project are selected herein based on their economic justification and environmental merit.   The GRR dated April 2002 (upon which the Section 156 Authorization is based) shows estimated project costs of $11,300,000.   The final cost allocation resulted in a Federal cost of $8,475,000 and a non-Federal cost of $2,825,000.

Table 5-1, above, shows a project cost of $26,588,700.   The final cost allocation results in a Federal cost limited to $16,235,300 and a non-Federal cost of $10,353,400.   The project costs differ because dredged material from construction had been expected to be placed in Port Manatee's existing DMMA in 2002.   As described in previous sections of this report, all available capacity in the existing DMMA has been exhausted – all new options for managing dredged material are more costly than assumed in the 2002 report.

The recommendations for navigation improvements outlined by the NED Plan described in this report do not deviate in any other way from the project features outlined in the Section 156 Authorization.

HRK 002717

# 6   PERTINENT CORRESPONDENCE & PUBLIC INVOLVEMENT

Public involvement and citizen participation are an integral part of the planning process. Coordination by the U.S. Army Corps of Engineers and Port Manatee, as well as the Florida DEP, other agencies, and interested parties has occurred on a regular basis since the beginning of the study.

The purpose of carrying out coordination with officials, citizens and other interested parties is to ensure that the study addresses all pertinent questions from the public, is of the highest quality, and ultimately meets the needs of the people it will serve.

## 6.1   Agency Coordination

The proposed project has been coordinated with the following agencies:  U.S. Fish and Wildlife Service, National Marine Fisheries Service, U.S. Environmental Protection Agency, Florida State Clearinghouse, Florida Fish and Wildlife Conservation Commission, Florida Department of Environmental Protection, and Florida State Historic Preservation Officer.  Agency coordination letters can be found in the Pertinent Correspondence Appendix, and in appendices to the Environmental Assessment Addendum.

HRK 002718

# 7 RECOMMENDATIONS

I concur with the findings presented in this report. The recommended plan developed is technically sound, economically justified, and socially and environmentally acceptable. The recommended plan conforms to the essential elements of the U.S. Water Resources Council's Economic and Environmental Principles and Guidelines for Water and Related Land Resources Implementation Studies and complies with other Administration and legislative policies and guidelines on project development. If the project were to receive funds for Federal implementation, it would be implemented subject to the cost sharing, financing, and other applicable requirements for navigation projects. These requirements were established by WRDA 1986, as amended, and would be implemented with such modifications, as the Chief of Engineers deems advisable within his discretionary authority.

Federal implementation is contingent upon the non-Federal sponsor agreeing to comply with applicable Federal laws and policies. Prior to implementation, the non-Federal sponsor would enter into a written PCA, to include the following non-Federal responsibilities:

1. During first year of construction, provide non-Federal share of the project design costs;

2. Provide all lands, easements, and rights-of-way, and perform or ensure performance of all relocations determined by the Federal Government to be necessary for the construction, operation, maintenance, repair, replacement, and rehabilitation of the general navigation features (including all lands, easements, and rights-of-way, and relocations necessary for dredged material disposal facilities);

3. Provide, during construction, a cash contribution equal to the following percentages of the total cost of construction of the general navigation features (which include the construction of land-based and aquatic dredged material disposal facilities that are necessary for the disposal of dredged material required for project construction, operation, and maintenance, and, for which a contract for the federal facility's construction or improvement was not awarded on or before October 12, 1996):

   a. 10 percent of the costs attributable to dredging to a depth not in excess of 20 feet; plus

   b. 25 percent of the costs attributable to dredging to a depth in excess of 20 feet but not in excess of 45 feet; plus

   c. 50 percent of the costs attributable to dredging to a depth in excess of 45 feet;

4. Pay with interest, over a period not to exceed 30 years following completion of the period of construction of the project, up to an additional 10 percent of the total cost of construction of general navigation features. The value of lands, easements, rights-of-way, and relocations provided by the non-Federal sponsor for the GNF may be credited toward this required payment. If the amount of credit exceeds 10 percent of the total cost of construction of the general navigation features, the non-Federal sponsor shall not be required to make any contribution under this paragraph, nor shall it be entitled to any refund for the value of lands, easements, rights-of-way, and relocations in excess of 10 percent of the total cost of construction of the GNF;

5.  Assume responsibility for operating, maintaining, replacing, repairing, and rehabilitating all features of the project allocated to local service facilities and mitigation features, in a manner compatible with the project's authorized purpose and in accordance with applicable Federal and State laws;

6.  Accomplish all removals determined necessary by the Federal Government other than those removals specifically assigned to the Government;

7.  Grant the Federal Government a right to enter, at reasonable times and in a reasonable manner, upon property that the non-Federal sponsor owns or controls for access to the general navigation and mitigation features for the purpose of inspection, and, if necessary, for the purpose of operating, maintaining, repairing, replacing, and rehabilitating the GNF or mitigation features;

8.  Hold and save the Government free from all damages arising from the construction, operation, maintenance, repair, replacement, and rehabilitation of the project, any betterment, and the local service facilities, except for damages due to the fault or negligence of the Government or its contractors;

9.  Keep and maintain books, records, documents, and other evidence pertaining to costs and expenses incurred pursuant to the project, for a minimum of three years after completion of the accounting for which such books, records, documents, and other evidence is required, to the extent and in such detail as will properly reflect total cost of construction of the general navigation features, and in accordance with the standards for financial management systems set forth in the Uniform Administrative Requirements for Grants and Cooperative Agreements to State and local governments at 32 CFR, Section 33.20;

10. Perform, or cause to be performed, any investigations for hazardous substances as are determined necessary to identify the existence and extent of any hazardous substances. As regulated under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C.  9601-9675, that may exist in, on, or under lands, easements, or rights-of-way the Federal Government determines necessary for the construction, operation, maintenance, repair, replacement, or rehabilitation of the general navigation features.  However, for lands the Government determines subject to the navigation servitude, only the Government shall perform such investigation unless the Federal Government provides the non-Federal sponsor with prior specific written direction, in which case the non-Federal sponsor shall perform such investigations in accordance with such written direction;

11. Assume complete financial responsibility, as between the Government and the non-Federal sponsor, for all necessary cleanup and response costs of any CERCLA regulated materials located in, on, or under lands, easements, or rights-of-way that the Government determines necessary for the construction, operation, maintenance, repair, replacement, and rehabilitation of the GNF;

12. To the maximum extent practicable, perform its obligations in a manner that will not cause liability to arise under CERCLA;

HRK 002720

13. Comply with the applicable provisions of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, PL 91-646, as amended by Title IV of the Surface Transportation and Uniform Relocation Assistance Act of 1987, and the Uniform Regulations contained in 49 CFR Part 24, in acquiring lands, easements, and rights-of-way, required for construction, operation, maintenance, repair, replacement, and rehabilitation of the general navigation features, and inform all affected persons of applicable benefits, policies, and procedures in connection with said act;

14. Comply with all applicable Federal and State laws and regulations, including, but not limited to, Section 601 of the Civil Rights Act of 1964, PL 88-352 (42 U.S.C. 2000d), and Department of Defense Directive 5500.11 issued pursuant thereto, as well as Army Regulation 600-7, entitled "Nondiscrimination on the Basis of Handicap in Programs and Activities Assisted or Conducted by the Department of the Army", and all applicable Federal labor standards and requirements, including but not limited to 40 U.S.C. 3141-3148 and 40 U.S.C.3701-3708 (revising, codifying, and enacting without substantive change the provisions of the Davis-Bacon Act (formerly 40 U.S.C. 276a et seq.), the Contract Work Hours and Safety Standards Act (formerly 40 U.S.C. 327 et seq.) and the Copeland Anti-Kickback Act (formerly 40 U.S.C. 276c et seq.);

15. Provide the non-Federal share of that portion of the costs of data recovery activities associated with historic preservation, that are in excess of 1 percent of the total amount authorized to be appropriated for the project, in accordance with the cost sharing provisions of the agreement;

16. Do not use Federal funds to meet the non-Federal sponsor's share of total project costs unless the Federal granting agency verifies in writing that the expenditure of such funds is expressly authorized by statute;

17. Maintain a properly constituted and competent nonprofit public body empowered to cooperate financially and to provide and operate essential local facilities for navigation at Manatee Harbor open to all on equal terms;

18. Comply with Section 221 of Public Law 91-611, Flood Control Act of 1970, as amended, (42 U.S.C. 1962d-5), Section 103 of the Water Resources Development Act of 1986, Public Law 99-662, as amended (33 U.S.C. 2213), which provides that the Secretary of the Army shall not commence the construction of any water resources project or separable element thereof, until the non-Federal sponsor has entered into a written agreement to furnish its required cooperation for the project or separable element.

19. Prepare and implement a harbor management plan to be coordinated with local interests. The harbor management plan shall incorporate best management practices to control water pollution at the project site.

The recommendations contained herein reflect the information available at this time and current Department policies governing formulation of individual projects. They do not reflect program and budgeting priorities inherent in the formulation of a national Civil Works construction program nor the perspective of higher review levels within the Executive Branch. Consequently,

HRK 002721

Case 8:21-cv-01521-WFJ-CPT   Document 92-1   Filed 02/23/22   Page 84 of 84 PageID 2063

the recommendations may be modified before proposals are made for authorization and implementation funding.   However, prior to transmittal to the Congress, the non-Federal Sponsor, the State, interested Federal agencies, and other parties will be advised of any changes and will be afforded the opportunity to comment further.


Paul L. Grosskruger
Colonel, U.S. Army
District Engineer

HRK 002722