IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CENTER FOR BIOLOGICAL
DIVERSITY, TAMPA BAY
WATERKEEPER, SUNCOAST
WATERKEEPER, MANASOTA-88, *and*
OUR CHILDREN'S EARTH
FOUNDATION,

       *Plaintiffs*,

       *v.*

GOVERNOR RON DeSANTIS,

*and* SHAWN HAMILTON, *in his official capacity as* SECRETARY, FLORIDA
DEPARTMENT OF
ENVIRONMENTAL PROTECTION,
*and* HRK HOLDINGS, LLC, *and*
MANATEE COUNTY PORT
AUTHORITY,

       *Defendants*.

Case No. 8:21-cv-1521-WFJ-CPT

EXHIBIT A

*To*

DECLARATION OF DANIEL C. SNYDER
IN SUPPORT OF PLAINTIFFS'
SUPPLEMENTAL BRIEF CONCERNING
REGULATION OF PINEY POINT UNDER
THE FEDERAL WATER POLLUTION
CONTROL ACT



# Department of
# Environmental Protection

Jeb Bush
Governor

October 6, 1999

David B. Struhs
Secretary

Mr. Roosevelt Childress
Chief, Surface Water Permits Section
U.S. Environmental Protection Agency, Region IV
61 Forsyth Street, Southwest
Atlanta, Georgia  30303-3104

Dear Mr. Childress:

Enclosed is a copy of the final permit on the following:

> **Piney Point Phosphates, Inc.**
> **Manatee County**
> **Permit No. FL0000124**

If there are any questions concerning this facility, please contact Mr. Vishwas Sathe at telephone number (813)744-6100, extension 137.

Sincerely,

Mimi Drew
Director
Water Resource Management

Enclosures

cc:   Elsa A. Potts, P.E., FDEP-WM/TLH
      John Coates, P.E., FDEP-WPMS/TLH

Reply:  Phosphate Mgmt., 8413 Laurel Fair Circle, Tampa, FL 33610-7355
*"Protect, Conserve and Manage Florida's Environment and Natural Resources"*

Printed on recycled paper.



# Department of
# Environmental Protection

Jeb Bush
Governor

David B. Struhs
Secretary

## INDUSTRIAL WASTEWATER FACILITY PERMIT

**PERMITTEE:**

PINEY POINT PHOSPHATES, INC.
13300 Highway 41 North
Palmetto, FL 34221

**PERMIT NUMBER:** FL0000124
**DEP FILE NO.:** IO41-177441
**EFFECTIVE DATE:** October 6, 1999
**EXPIRATION DATE:** March 25, 2001
**PERMIT WRITER:** Vishwas Sathe

Attn: Mr. Ivan Nance
Corporate Environmental Manager

**FACILITY:**

PINEY POINT PHOSPHATES, INC.
13300 Highway 41 North
Palmetto, Polk County, Florida

Latitude: 27° 37' 24" N    Longitude: 82° 31' 54" W

This permit is issued under the provisions of Chapter 403, Florida Statutes, and applicable rules of the Florida Administrative Code and constitutes authorization to discharge to waters of the state under the National Pollutant Discharge Elimination System. The above named permittee is hereby authorized to operate the facilities shown on the application and other documents attached hereto or on file with the Department and made a part hereof and specifically described as follows:

**WASTEWATER TREATMENT:**

The facility manufactures sulfuric acid, phosphoric acid, and phosphate based fertilizers. Phosphogypsum is generated as a waste by-product in the manufacture of phosphoric acid. It is slurried with hot acidic process water and pumped to a disposal area on site, where it is deposited creating a phosphogypsum stack. The process water is ponded for cooling on top of the phosphogypsum stack as well as in cooling ponds and ditches adjacent to it. This process water is finally returned to the facility for reuse, to the extent possible. Any excess process wastewater which cannot be recycled is authorized for double-lime treatment, followed

by ammonia removal prior to discharge. Non-process wastewater consisting of non-contact cooling water and contaminated stormwater runoff is treated by settling and occasional pH adjustment.

## EFFLUENT DISPOSAL:

**Surface Water Discharge**: The permittee is authorized to discharge treated process wastewater via Outfall 003 into Buckeye Road ditch. Buckeye Road ditch in turn discharges into Bishops Harbor. Treated non-process wastewater is discharged via Outfall 002 into Piney Point Creek which empties into Tampa Bay. Outfall 001 shall be no longer used for discharge of contaminated stormwater. Contaminated stormwater previously authorized for discharge through Outfall 001 shall be routed via the cooling ponds to undergo the required treatment and discharged through Outfall 003. Both Buckeye Road ditch and Piney Point Creek are Class III surface water bodies of the State. Outfall locations are depicted on Figure 1.

| OUTFALL | LATITUDE | LONGITUDE | CLASS |
|---------|----------|-----------|-------|
| 002 | 27 ° 53 ' 30 " N | 81° 57' 30" W | III |
| 003 | 27 ° 53 ' 00 " N | 81° 56' 45" W | III |

**Ground Water Discharge**: The facility has the potential for impacts to ground water resulting from operation of the unlined phosphogypsum stack and process water cooling ponds. Monitor wells have been installed in accordance with an approved Ground Water Monitoring Plan (GWMP) for the purpose of determining compliance with applicable water quality standards and criteria. The permittee will be required to perform a ground water investigation in accordance with the requirements of the Amendment to Consent Order No. 94-3751. Upon completion of this investigation the existing GWMP may be modified, if necessary. Monitor well locations are depicted on Figure 2.

IN ACCORDANCE WITH: The limitations, monitoring requirements and other conditions set forth in Part I, Part II, Part III, Part IV, Part V, Part VI, Part VII, and Part VIII, of this permit.

## I.   Effluent Limitations and Monitoring Requirements

A.   Surface Water Discharges

1.   Outfall 002 - During the period beginning on the effective date and lasting through the expiration date of this permit, the permittee is authorized to discharge treated non-process wastewater and stormwater from Outfall 002. Such discharge shall be limited and monitored, when discharging, by the permittee as specified below: [62-302.520, 62-302.530, F.A.C.]

| Parameters (units) | Discharge Limitations | | | Monitoring Requirements | |
|--------------------|------------------|--------------------|------------------|------------|------------------|
| | Daily Minimum | Monthly Average | Daily Maximum | Frequency | Sample Type |
| Flow (MGD) | N/A | Report | Report | Continuous | Recorder |
| Temperature (° C) | N/A | Report | Report | 1/ week | Grab |
| Total Phosphorus as P, (mg/l) | N/A | See I.A.15 | See I.A.15 | 1/ week | 24-hr composite |

Piney Point Phosphates, Inc.
Page 3

Permit No.: FL0000124

I.A.1. (continued)

| Parameters (units) | Discharge Limitations | | | Monitoring Requirements | |
|---|---|---|---|---|---|
| | Daily Minimum | Monthly Average | Daily Maximum | Frequency | Sample Type |
| Total Phosphorus as P, (lb/day) (See I.A.15) | N/A | Report | Report | 1/ week | Calculation |
| Total Fluoride as F, (mg/l) | N/A | Report | 10.0 | 1/ week | 24-hr composite |
| Dissolved Oxygen (mg/l) | 5.0 | Report | N/A | 1/ week | Grab |
| Total Nitrogen (mg/l) (See I.A.15) | N/A | Report | Report | 1/ week | Grab |
| Total Nitrogen (lb/day) (See I.A.15) | N/A | Report | Report | 1/ week | Calculation |
| Total Ammonia as N, (mg/l) | N/A | Report | Report | 1/ week | Grab |
| Un-ionized Ammonia (as $NH_3$) (mg/l) | N/A | Report | 0.02 | 1/ week | Calculation |
| Specific Conductance (µmhos/cm) | N/A | Report | 1275.0 (See I.A.4) | 1/ week | Grab |
| Total Suspended Solids (mg/l) | N/A | Report | Report | 1/ week | 24-hr composite |
| pH  (standard units) (See I.A.8) | 6.0 | Report | 8.5 | Continuous | Recorder |
| Toxicity | See I.A.(12 and 13) | | | | |

2.  Outfall 003 - During the period beginning on the effective date and lasting through the expiration date of this permit, the permittee is authorized to discharge treated process wastewater from Outfall 003. Such discharge shall be limited and monitored, when discharging, by the permittee as specified below: [62-302.530, F.A.C.]

| Parameters (units) | Discharge Limitations | | | Monitoring Requirements | |
|---|---|---|---|---|---|
| | Daily Minimum | Monthly Average | Daily Maximum | Frequency | Sample Type |
| Flow  (MGD) | N/A | Report | See I.A.15 | Continuous | Recorder |
| Temperature (° C) | N/A | Report | Report | 1/ week | Grab |
| Total Phosphorus as P, (mg/l) | N/A | See I.A.15 | Report | 1/ week | 24-hr composite |
| Total Phosphorus as P, (lb/day) | N/A | See I.A.15 | Report | 1/ week | Calculation |
| Total Fluoride as F, (mg/l) | N/A | Report | 10.0 | 1/ week | 24-hr composite |
| Dissolved Oxygen (mg/l) | 5.0 | Report | N/A | 1/ week | Grab |
| Total Nitrogen (mg/l) | N/A | See I.A.15 | Report | 1/ week | Grab |
| Total Nitrogen (lb/day) | N/A | See I.A.15 | Report | 1/ week | Calculation |
| Total Ammonia as N, (mg/l) | N/A | 5.0 | See I.A.11 | 1/ week | Grab |

Piney Point Phosphates, Inc.
Page 4

Permit No.: FL0000124

I.A.2. (continued)

| Parameters (units) | Discharge Limitations | | | Monitoring Requirements | |
|---|---|---|---|---|---|
| | Daily Minimum | Monthly Average | Daily Maximum | Frequency | Sample Type |
| Un-ionized Ammonia as NH₃, (mg/l) | N/A | Report | 0.02 | 1/ week | Calculation |
| NO3 + NO2 as N, mg/l | N/A | 1.0 | Report | 1/ week | Grab |
| Organic Nitrogen as N, mg/l | N/A | 4.0 | Report | 1 / week | Grab |
| Specific Conductance (μmhos/cm) | N/A | Report | 6000.0 (See I.A.4) | 1/ week | Grab |
| Combined Radium 226 and 228 (pCi/l) (See I.A.7) | N/A | N/A | 5.0 | 1/ month | 24-hr composite |
| Gross Alpha Activity (pCi/l) | N/A | N/A | 15.0 | 1/ month | 24-hr composite |
| Total Suspended Solids (mg/l) | N/A | Report | See I.A.11 | 1/ week | 24-hr composite |
| pH (standard units) (See I.A.8) | 6.0 | 6.1 - 6.7 | 8.5 | Continuous | Recorder |
| Toxicity | See I.A.(12 & 13) | | | | |

3. The permittee shall ensure that the process water recirculation system will be operated to maintain a surge capacity equal to the runoff from a 25-year, 24-hour rainfall event. The permittee may discharge treated process water when chronic or catastrophic precipitation causes the recirculation system's water inventory to encroach into this surge capacity. The permittee must treat and discharge the excess process water, after treatment, whenever the process water inventory equals or exceeds the mid-point of the surge capacity. The permittee is not authorized to discharge treated process water from Outfall 003, or any other permitted discharge location, if the required surge capacity is available within the approved process water impoundment areas. The maximum allowable discharge rate for treated process wastewater via Outfall 003 is based upon the recommendations of a Level II WQBEL study performed for this discharge, and is specified under I.A.15.

4. Specific Conductance of the discharge shall be limited in accordance with Rule 62-302.530(23), F.A.C., for Class III fresh waters of the State.
   a) Based upon information submitted by the permittee pursuant to a WQBEL study, a mixing zone has been granted for specific conductance pursuant to the provisions of Rule 62-4.244, F.A.C., for discharges from Outfall 003 which shall extend from the point of discharge 800 meters downstream in Buckeye Road Ditch. The effluent limitation for specific conductance at the outfall shall be 6000 umhos/cm based upon the following conditions:

   1. Upstream flow measured at the background station (X1 in WQBEL document) is 6.6 cfs or greater.
   2. Maximum upstream specific conductance at Station X1 is 1400 umhos/cm.

iney Point Phosphates, Inc.
Page 5

Permit No.: FL0000124

b) The facility has been granted a variance under Section 403.201(1)(a), F.S., for the limitation of specific conductance of the discharge from Outfall 003, as described in the final order of agency action, OGC Case # 98-0204, which is attached as Exhibit I. The variance limits the maximum specific conductance of the effluent at the outfall to 6000 umhos/cm, and is applicable only when flow measured at the background station (X1 in WQBEL document) is less than 6.6 cfs.

5. There shall be no discharge of floating solids or visible foam in other than trace amounts. [62-302.500, F.A.C.]

6. The discharge shall not cause a visible sheen on the receiving water. [62-302.500, F.A.C.]

7. The concentration of combined radium 226 & 228, as well as gross alpha particle activity in the discharge shall be limited in accordance with Rules 62-302(58)(a), and 62-302(58)(b), F.A.C., respectively. During any sampling event performed in accordance with the monitoring requirements of I.A.2 above, a properly preserved sample must be taken for the determination of gross alpha activity as well as combined radium (Ra 226 & 228). The sample must be first analysed for gross alpha activity. If the value of gross alpha activity equals or exceeds the MCL of 15 pCi/l, the same sample shall be analyzed for combined radium.

8. The pH of the discharge shall be limited in accordance with the provisions of 62-302.530(52)(c), F.A.C., for Class III fresh waters of the State. The monthly average range of pH for treated process wastewater via Outfall 003 is based upon the recommendations of a Level II WQBEL study performed for this discharge.

9. Effluent samples for pH and temperature shall be taken simultaneously with each total ammonia grab sample. Un-ionized ammonia shall be calculated in accordance with Table I (attached). All measured values for pH, temperature, and total ammonia used to calculate an un-ionized ammonia value shall be reported as an attachment to the Discharge Monitoring Report (DMR). All calculated un-ionized ammonia values shall also be reported on the attachment. The daily maximum and monthly average values for un-ionized ammonia for each reporting period shall be reported on the DMR.

10. Unless specified elsewhere in the permit, approved sampling stations shall be at the designated outfall structures. Samples shall be taken at the nearest accessible point after final treatment but prior to the actual mixing with the receiving water to achieve compliance with the monitoring requirements specified in Conditions I.A.1. and I.A.2.

11. The discharge of nutrients shall be limited in accordance with Rule 62.302.530(48) a and b, F.A.C. The limitation for nutrients at Outfalls 002 and 003 are as specified in I.A.15. The permittee shall limit the daily maximum concentration of ammonia nitrogen in the discharge to be in compliance with the limitation of 0.02 mg/l for un-ionized ammonia, (as NH3), in accordance with Rule 62-302.530(3), F.A.C., for Class III fresh waters of the State. The limitation for total suspended solids (TSS) is waived for discharges of treated process wastewater (calcium sulfate transport/runoff wastewater) based upon 40 CFR Section 418.12(c), Subpart A for the phosphate industry.

12. The permittee shall initiate the series of tests described below beginning in with the first discharge event from the date of this permit to evaluate whole effluent toxicity of the discharge from Outfalls 002, and 003. All test species, procedures and quality assurance criteria used shall be in accordance with Short-term methods for Estimating the Chronic Toxicity of Effluents and Receiving Waters to Freshwater Organisms, EPA/600/4-91/002, or the most current edition. The control and dilution water will be moderately hard water as described in EPA/600/4-91/002, Table 3. A standard reference toxicant quality assurance chronic toxicity test shall be conducted concurrently with each species used in the toxicity tests and the results submitted with the bioassay report or if monthly QA/QC reference toxicant tests are conducted, these results must be submitted. Any deviation from the bioassay procedures outlined herein shall be submitted in writing to the Department for review and approval prior to use.

a. (1) The permittee shall conduct a daphnid, **Ceriodaphnia dubia**, Survival and Reproduction test and a fathead minnow, **Pimephales promelas,** Larval Survival and Growth Test. These tests shall be conducted using a control (0% effluent) and one test concentration of **100%** effluent. A no observed effect concentration (NOEC) less than **100%** effluent will constitute a violation of this permit and Chapter 62-302.530(62), F.A.C. All test results shall be statistically analyzed according the Appendix in EPA/600/4-91-002, or the most current edition.

(2) For each set of tests conducted, a 24-hour composite sample of final effluent shall be collected and used per the sampling schedule discussed in EPA/600/4-91/002, Section 8. Two additional composite samples shall be collected according to the protocol and used as renewal solutions on Day 3 (48 hours) and Day 5 (96 hours) of the test.

(3) If control mortality exceeds 20% for either species in any test, the test(s) for that species (including the control) shall be repeated. A test will be considered valid only if control mortality does not exceed 20% for either species. If, in any separate test, 100% mortality occurs prior to the end of the test, and control mortality is less than 20% at that time, that test (including the control) shall be terminated with the conclusion that the sample demonstrates unacceptable toxicity. Additionally, the test must meet the acceptability criteria for each species as defined in EPA/600/4-91/002 Section 13.11 and Section 11.11, respectively.

b. (1) The toxicity tests specified above shall be conducted within 60 days following the issuance of this permit or the first discharge event if no discharge occurs within the 60 day time frame. The tests shall be performed once for the life of this permit, unless they indicate unacceptable toxicity. If unacceptable toxicity has been found in the routine tests, the permit may be revised to increase the frequency of testing.

(2) Results from "routine" tests shall be reported according to EPA/600/4-91/002, Section 10, Report Preparation (or the most current edition), and shall be submitted in accordance with I.E.2 below.

Additionally, all results shall be recorded and submitted on the Discharge Monitoring Report (DMR) in the following manner:

For the chronic test results, if the NOEC of a test species is less than 100% effluent, "<100%" should be entered on the DMR for that species. If the NOEC of a test species is greater than or equal to 100% effluent, ">100%" should be entered.

c. (1) An NOEC of less than 100% effluent in any "routine" test or in any additional test as described below, will be a violation of these permit conditions and Rule 62-302.530(62) and Rule 62-4.244(3)(a), F. A. C.

(2) If unacceptable toxicity (an NOEC of less than 100% effluent) is found in a "routine" test, the permittee shall conduct three additional tests on the specie(s) indicating unacceptable toxicity.

(3) The first additional test shall be conducted using a control (0% effluent) and a minimum of five dilutions: 100%, 50%, 25%, 12.5% and 6.25% effluent and a control (0% effluent). The dilution series may be modified in the second and third test to more accurately identify the toxicity, such that at least two dilutions above (not to exceed 100% effluent) and two dilutions below the target toxicity and a control (0% effluent) are run.

(4) For each additional test, the sample collection requirements and the test acceptability criteria as specified above must be met for the test to be considered valid. The first test shall begin within two weeks of the end of the "routine" tests, and shall be conducted weekly thereafter until three additional, valid tests are completed. The additional tests will be used to determine if the toxicity found in the "routine" test is still present.

(5) If after the completion of a failed routine test, the facility is not discharging, the additional toxicity sampling and testing described in C.3. above, shall be performed upon resumption of the discharge.

(6) Results from additional tests, required due to a chronic toxicity violation in the "routine" tests, shall be submitted in a single report prepared according to EPA/600/4-91/002, Section 10, or the most current edition and submitted within 45 days of completion of the third additional, valid test. Upon the completion of the additional tests, the permittee will meet with the Department within 30 days of the report submittal to identify corrective actions necessary to remedy the observed chronic toxicity.

13. The permittee shall initiate the series of tests described below to evaluate whole effluent toxicity of the discharge from Outfalls 002 and 003. All test species, procedures and quality assurance criteria used shall be in accordance with Methods for Measuring Acute Toxicity of Effluents to Freshwater and Marine Organisms, EPA/600/4-90/027F, or the most current edition. The control water and dilution water used will be moderately hard water as described in EPA/600/4-90/027F, Table 6, or the most current edition. A standard reference toxicant (SRT) quality assurance (QA) acute toxicity test shall be conducted concurrently or no greater than 30 days before the date of the "routine" test, with each species used in the toxicity tests. The results of all toxicity tests shall be submitted with the discharge monitoring report (DMR). Any deviation of the bioassay procedures outlined herein shall be submitted in writing to the Department for review and approval prior to use.

ₐey Point Phosphates, Inc.
Page 8

Permit No.: FL0000124

a. (1) The permittee shall conduct 96-hour acute static renewal toxicity tests using the daphnid, **Ceriodaphnia dubia**, and the bannerfin shiner, **Cyprinella leedsi**. All tests will be conducted on four separate grab samples collected at evenly-spaced (6-hr) intervals over a 24-hour period and used in four separate tests in order to catch any peaks of toxicity and to account for daily variations in effluent quality.

(2) If control mortality exceeds 10% for either species in any test, the test(s) for that species (including the control) shall be repeated. A test will be considered valid only if control mortality does not exceed 10% for either species. If, in any separate grab sample test, 100% mortality occurs prior to the end of the test, and control mortality is less than 10% at that time, that test (including the control) shall be terminated with the conclusion that the sample demonstrates unacceptable acute toxicity.

b. (1) The routine tests shall be performed on a bi-annual basis, once during the wet season (July through September) and once during the dry season (December through February).These tests are referred to as routine tests.

(2) Results from routine tests shall be reported according to EPA/600/4-90/027F, Section 12, Report Preparation (or the most current edition), and shall be submitted in accordance with I.E.3. below.

c. (1) All routine test shall be conducted using a control (0% effluent) and a test concentration of 100% final effluent.

(2) Mortalities of greater than 50% in a 100% effluent in any routine sample or an LC50 of less than 100% effluent in any additional definitive test will constitute a violation of these permit conditions, and Rule 62-302.200(1), Rule 62-302.500(1)(d) and Rule 62-4.244(3)(a), F. A. C.

d. (1) If unacceptable acute toxicity (greater than 20% mortality of either test species in any grab sample test) is found in a routine test, the permittee shall conduct three additional tests on each species indicating unacceptable toxicity. The first additional definitive test will include four grab samples taken as described in 1.a. and run as four separate definitive analyses. The second and third additional definitive tests will be run on a single grab sample collected on the day and time when the greatest toxicity was identified in the first additional definitive test. Results for each additional test will include the determination of LC50 values with 95% confidence limits.

(2) The first additional test shall be conducted using a control (0% effluent) and a minimum of five dilutions: 100%, 50%, 25%, 12.5% and 6.25% effluent. The dilution series may be modified in the second and third test to more accurately identify the toxicity, such that at least two dilutions above and two dilutions below the target toxicity and a control (0% effluent) are run.

(3) For each additional test, the sample collection requirements and the test acceptability criteria specified in Section 1 above must be met for the test to be considered valid. The first test shall begin within two weeks of the end of the routine tests, and shall be conducted weekly thereafter until 3 additional, valid tests are completed. The additional tests will be used to determine if the toxicity found in the routine test is still present.

ey Point Phosphates, Inc.
Page 9

(4) Results from additional tests, required due to unacceptable acute toxicity in the routine tests, shall be submitted in a single report prepared according to EPA/600/4-90/027F, Section 12, or the most current edition and submitted within 45 days of completion of the additional, valid tests. Upon completion of the third additional test, the permittee will meet with the Department within 30 days of the report submittal to identify corrective actions necessary to remedy the unacceptable acute toxicity.

14. The permittee shall limit the concentration of total fluoride in its discharge in accordance with Rule 62-302.530(33), F.A.C.

15. a) The nutrient waste load allocation for Outfall 003 has been calculated based upon the Level II WQBEL limitations of flow, and the maximum 30 day average nitrogen and phosphorus concentration for the discharge. The limitations are as follows:

1) Total nitrogen limitations for background flows greater than 0.5 cfs, but less than or equal to 1.1 cfs:

| | | |
|---|---|---|
| Maximum effluent flow, MGD | - | 0.5 |
| Maximum 30 day average total nitrogen, mg/l | - | 8.0 |
| Total nitrogen loading based upon 30 day average discharge quality data, lb/day | - | 33.3 |

2) Total nitrogen limitations for background flows greater than 1.1 cfs:

| | | |
|---|---|---|
| Maximum effluent flow, MGD | - | 1.0 |
| Maximum 30 day average total nitrogen, mg/l | - | 10.0 |
| Total nitrogen loading based upon 30 day average discharge quality data, lb/day | - | 83.3 |

3) Total phosphorus limitations for background flows greater than 0.5 cfs, but less than or equal to 1.1 cfs:

| | | |
|---|---|---|
| Maximum effluent flow, MGD | - | 0.5 |
| Maximum 30 day average total phosphorus, mg/l | - | 10.0 |
| Total phosphorus loading based upon 30 day average discharge quality data, lb/day | - | 33.3 |

4) Total phosphorus limitations for background flows greater than 1.1 cfs:

| | | |
|---|---|---|
| Maximum effluent flow, MGD | - | 1.0 |
| Maximum 30 day average total phosphorus, mg/l | - | 10.0 |
| Total phosphorus loading based upon 30 day average discharge quality data, lb/day | - | 83.3 |

...ney Point Phosphates, Inc.                                              Permit No.: FL0000124
Page 10

b) Notwithstanding the daily mass loading limitations for total nitrogen as specified under item a above, the facility shall the limit the total nitrogen load from Outfall 003, to 10,014 lbs during any calender year during which a discharge is necessary. Discharge from Outfall 003 can only occur provided the requirements of I.A.3. are met. The annual load has been calculated based upon the estimated discharge volume of 120 MG/year, and the maximum 30 day average nitrogen concentration of 10 mg/l. Based upon historical data, the frequency of treated process water discharge is not expected to occur more than once in 5 years. The nitrogen loading for a 5 year period is therefore also limited to 10,014 lbs. The permittee shall notify the Department's Phosphate Management program whenever nitrogen loads from Outfall 003 have reached a level equal to 75% of the annual or 5 year limit, and propose measures to be taken to ensure compliance with the established nitrogen limits.

c) A WQBEL plan of study has been approved for Outfall 002. Compliance requirements for completion of this study are specified under Part VI.2.b. An interim mass load for total nitrogen of 2729 lbs/year has been calculated based upon historical water quality and estimated flow of 109 MG/year. The nitrogen loading for a 5 year period shall be limited to 13,645 lbs. The permittee shall notify the Department's Phosphate Management program whenever nitrogen loads from Outfall 002 have reached a level equal to 75% of the annual or 5 year limit, and propose measures to be taken to ensure compliance with the established nitrogen limits.

16. When Outfall 003 is discharging, the permittee shall collect water samples from Stations A and B (WQBEL stations X1 and X4, respectively) as shown in Figure 3, located upstream and down stream respectively from Outfall 003, and monitor as described below:

| Parameters (units) | Discharge Limitations | | | Monitoring Requirements | |
|---|---|---|---|---|---|
| | Daily Minimum | Monthly Average | Daily Maximum | Frequency | Sample Type |
| Flow, cfs (at X1 only) | N/A | Report | Report | 1/ week | Calculation |
| Total Nitrogen, mg/l | N/A | Report | Report | 1/ week | Grab |
| Total Phosphorus, mg/l | N/A | Report | Report | 1/ week | Grab |
| pH, SU | Report | Report | Report | 1/ week | Grab |
| Specific Conductivity, umhos/cm | N/A | Report | Report | 1/ week | Grab |

17. When Outfall 002 is discharging, the permittee shall collect water samples from Stations C and D (see figure 4), located upstream and down stream respectively from Outfall 002. Since the location of C is yet to be determined (see item VI.2.a.), monitoring at this location shall begin within 30 days upon receipt of written departmental approval. The stations shall be monitored as described below:

Permit No.: FL0000124

I.A.17. (continued)

| Parameters (units) | Discharge Limitations | | | Monitoring Requirements | |
|---|---|---|---|---|---|
| | Daily Minimum | Monthly Average | Daily Maximum | Frequency | Sample Type |
| Total Nitrogen, mg/l | N/A | Report | Report | 1/ week | Grab |
| Total Phosphorus, mg/l | N/A | Report | Report | 1/ week | Grab |
| pH, SU | Report | Report | Report | 1/ week | Grab |
| Specific Conductivity, umhos/cm | N/A | Report | Report | 1/ week | Grab |

B.   Underground Injection Control Systems: N/A

C.   Land Application Systems: NA.

D.   Other Methods of Disposal or Recycling

1.   There shall be no discharge of industrial wastewater from this facility to ground or surface waters, except as authorized by this permit.[62-620.300, F.A.C.]

E.   Other Limitations and Monitoring and Reporting Requirements

1.   Monitoring results obtained for each calendar sampling period (monthly, quarterly, annually, or as required otherwise) shall be summarized for that period and reported on a Discharge Monitoring Report (DMR) Form 62-620.910(10), postmarked no later than the 28th day of the month following the completed sampling period. For example, data for January shall be submitted by February 28. Signed copies of the DMR shall be submitted to the address specified below:

> Florida Department of Environmental Protection
> Wastewater Program Management Section, Mail Station 3551
> Twin Towers Office Building
> 2600 Blair Stone Road
> Tallahassee, Florida 32399-2400

If, during the term period of this permit, the facility ceases operations which includes the discharge, the Department's Phosphate Management Administrator shall be notified immediately upon such cessation and include an estimate of how long the shut-down will last. Such notification shall be in writing.

All DMR forms for surface water reporting, including toxicity DMR forms, must be submitted every month. If an analysis is not required by condition of this permit for that reporting period, "NODI=9" is to be entered in the space provided for that result. If no discharge occurs during the reporting period, sampling requirements of this permit do not apply. In that case, the DMR form must be submitted with

ney Point Phosphates, Inc.
Page 12

Permit No.: FL0000124

"NODI=9" indicated in the blank for each parameter that is to be reported for the period. All analytical result reporting spaces/blanks on the DMR forms must be completed.

2. Unless specified otherwise in this permit, all other reports and notifications required by this permit, including twenty-four hour notifications, shall be submitted to or reported to, as appropriate, the Department's Phosphate Management office at the address specified below:

> Florida Department of Environmental Protection
> Bureau of Mine Reclamation
> Phosphate Management
> 8407 Laurel Fair Circle,
> Tampa, FL 33610-7355

3. The permittee shall provide safe access points for obtaining representative samples which are required by this permit.

4. The permittee shall ensure that all laboratory analytical data submitted to the department as required by this permit is from a laboratory which has a currently valid and Department-approved Comprehensive Quality Assurance Plan (ComQAP) [or a ComQAP pending approval] for all parameters being reported as required by Chapter 62-160, Florida Administrative Code.

5. If there is no discharge from the facility on a day scheduled for sampling, the sample shall be collected on the day of the next discharge.

6. Any bypass of the treatment facility which is not included in the monitoring specified I.A.2, is to be monitored for flow and all other required parameters. For parameters other than flow, at least one grab sample per day shall be monitored. Daily flow shall be monitored or estimated, as appropriate., to obtain reasonable data. All monitoring results shall be reported on the appropriate DMR.

**II. Industrial Sludge Management Requirements: N/A**

**III. Groundwater Monitoring Requirements**

1. During the period of operation authorized by this permit, the permittee shall sample ground water in accordance with this permit and the approved ground water monitoring plan prepared under Rule 62-522.600, F.A.C.

2. The following monitoring wells are included in the ground water monitoring plan (Figure 2). [62-522.600(6), F.A.C.]

III.2. (continued)

| Well Name | DEP WAFR ID | Depth (Feet) | Aquifer Monitored | Well Type | New or Existing |
|-----------|-------------|--------------|-------------------|-----------|-----------------|
| MW-1 | 13251 | 12.0 | Surficial | Background | Existing |
| MW-2* | 13250 | 22.0 | Surficial | Compliance | Existing |
| MW-3 | 13249 | 20.0 | Surficial | Intermediate | Existing |
| MW-4A | 13248 | 20.0 | Surficial | Compliance | Existing |
| MW-5* | 13247 | 13.0 | Surficial | Compliance | Existing |
| MW-6A | 13246 | 66.0 | Intermediate | Compliance | Existing |
| MW-7 | 13245 | 90.0 | Intermediate | Background | Existing |
| MW-8** | 30705 | 18.0 | Surficial | Compliance | New |
| MW-9** | 30761 | 17.0 | Surficial | Compliance | New |
| MW-10** | 30762 | 15.0 | Surficial | Background | New |
| MW-11*** | | | Intermediate | Compliance | Proposed |
| MW-12*** | | | Intermediate | Background | Proposed |
| MW-13**** | | | Intermediate | Compliance | Proposed |
| MW-14**** | | | Intermediate | Background | Proposed |

\* These wells shall be monitored in accordance with the requirements of Condition III.3. below, until appropriate locations are established to monitor for compliance along the south property boundary.

\*\* These wells have been installed as part of a ground water investigation pursuant to Consent Order 94-3751. Well construction data has been submitted.

\*\*\*   1. Vertical zone of discharge wells for all parameters besides sodium.

2. The permit will be revised to reflect the actual well depth upon well installation.

3. The wells shall be installed with a 10 foot screen interval such the shallowest ten foot screen interval below the vertical zone of discharge (25 feet msl) with sufficient hydraulic properties to collect representative ground water samples.

4. Installation location of MW-I1 and MW-I2 to be downgradient and upgradient respectively of the stack system.

\*\*\*\*   1. Vertical zone of discharge wells for sodium only.

2. The permit will be revised to reflect the actual well depth upon well installation.

3. The wells shall be installed with a 10 foot screen interval such the shallowest ten foot screen interval below the vertical zone of discharge (90 feet msl) with sufficient hydraulic properties to collect representative ground water samples.

4. Installation location of MW-I3 and MW-I4 to be downgradient and upgradient respectively of the stack system.

3.   The wells included in the ground water monitoring plan (Condition III.2., above) shall be sampled for the parameters, and at the frequencies listed below:     [62-522.600(10)(a), F.A.C.]

ney Point Phosphates, Inc.
Page 14

Permit No.: FL0000124

| Parameters (units) | Monitoring Requirements | |
|---|---|---|
| | Frequency | Sample Type |
| Water Level (MSL) | Quarterly | In-situ (See III. 4 below) |
| Water Temperature (° C) | Quarterly | Grab |
| pH (Standard Units) | Quarterly | Grab |
| Turbidity (NTU) | Quarterly | Grab |
| Specific Conductance (umhos/cm) | Quarterly | Grab |
| Total Dissolved Solids (mg/l) | Quarterly | Grab |
| Chloride (mg/l) | Quarterly | Grab |
| Total Recoverable Arsenic (ug/l) | Quarterly | Grab |
| Total Recoverable Cadmium (ug/l) | Quarterly | Grab |
| Total Recoverable Chromium (ug/l) | Quarterly | Grab |
| Total Recoverable Copper (ug/l) | Quarterly | Grab |
| Total Recoverable Lead (ug/l) | Quarterly | Grab |
| Total Recoverable Sodium (mg/l) | Quarterly | Grab |
| Total Fluoride mg/l) | Quarterly | Grab |
| Total Recoverable Manganese (ug/l) | Quarterly | Grab |
| Total Sulfate (mg/l) | Quarterly | Grab |
| Orthophosphate as PO4 (mg/l) | Quarterly | Grab |
| Gross Alpha Activity (pCi/l) | Quarterly | Grab |
| Combined Radium 226 + 228 (pCi/l) * | Quarterly | Grab |

* Radium analyses must be performed when gross alpha activity equals or exceeds 15 pCi/l.

4. Water levels shall be recorded prior to evacuating the well for sample collection. Measurements, referenced to mean sea level, shall include the top of the well casing, depth to ground water, and the calculated ground water elevation at a precision of plus or minus 0.1 feet. [62-160.400, F.A.C.]

5. Ground water monitoring wells shall be evacuated or purged prior to sampling to obtain a representative sample. All sampling procedures shall be in accordance with the Department-approved Comprehensive Quality Assurance Plan (ComQAP). [62-160.400, F.A.C.]

6. Analyses shall be conducted on un-filtered samples, unless filtered samples have been approved by the Department as being more representative of ground water conditions. [62-160.400, F.A.C.]

7. If a monitoring well becomes damaged or cannot be sampled for some reason, the permittee shall notify the Department with a written report within seven days detailing the circumstances and remedial

Permit No.: FL0000124

measures taken or proposed. Replacement of monitoring wells shall be approved in advance by the Department. [62-620.610(7), F.A.C.]

8.  Ground water monitoring test results shall be submitted on the attached Department forms and shall be submitted in conjunction with the DMR in accordance with Condition I.E.2.

## IV. Other Ground Water Discharge Requirements

1.  The permittee's discharge to ground water shall not cause a violation of water quality standards for Class G-II ground waters at the boundary of the zone of discharge in accordance with rules 62-520.400 and 62-520.420, F.A.C.

2.  The permittee's discharge to ground water shall not cause a violation of the minimum criteria for ground water specified in rule 62-520.400, F.A.C., within the zone of discharge.

3.  The zone of ground water discharge in the surficial aquifer shall extend horizontally along the ground surface to the property line, as depicted in Figure 2. Based on the Department's review of information submitted by the permitee, the vertical zone of discharge (VZOD) for all parameters besides sodium extends to the base of the intermediate aquifer within the Undifferentiated Arcadia Formation no deeper than minus 25 feet MSL, and the VZOD for sodium extends to the base of the intermediate aquifer within the Undifferentiated Arcadia Formation no deeper than minus 90 feet MSL [62-520.200(23), 62-522.410, and 62-673.320(6), F.A.C.].

## V. Operation and Maintenance Requirements

### A. Operation of Treatment and Disposal Facilities

1.  The permittee shall operate the phosphogypsum stack system in accordance with the requirements of Rules 62-620.300(5), 62-672, and 62-673.500, F.A.C., as applicable. The operation plan described under Rule 62-673.500(1), F.A.C., shall be made available to Department staff when requested.

2.  The permittee shall ensure that the operation of the pollution control facilities described in this permit shall be under the supervision of a person who is qualified by formal training and/or practical experience in the field of water pollution control.

3.  The permittee shall notify the Department's Phosphate Management Program no later than 24-hours following the initiation of process water treatment. Such notification shall be submitted in writing by facsimile as specified in Condition I.E.2.

4.  The permittee shall assure that all above grade wastewater impoundment systems are operated, maintained and inspected in accordance with Rule 62-672, F.A.C., as applicable, or any applicable Memorandum of Agreement (MOA), and/or any additional specific permit conditions developed and adopted for the operation, maintenance and inspection of wastewater impoundment systems.

ey Point Phosphates, Inc.
Page 16

Permit No.: FL0000124

5.  The permittee shall inspect all process water impoundment areas within the phosphogypsum stack system weekly unless a defect has been disclosed, in which event, the defective area shall be inspected daily until corrective maintenance has remediated the defect. [Section 62-4.070(1), 4-30-95]

6.  The permittee shall develop and maintain an emergency contingency plan which demonstrates the ability to mobilize equipment and manpower to respond to a major spill event from the phosphogypsum system. The plan shall be kept on-site and is to be available to Department personnel when requested.

7.  The permittee shall provide annual training to all dam inspection personnel by a Florida registered engineer experienced in dam design, construction, operation, and inspection. The permittee will maintain records documenting such annual training.

8.  An inspection of all above grade impoundment dams shall be conducted annually, during the months of January, February or March, by a professional engineer registered in the State of Florida and experienced in the field of construction and maintenance of dams. A copy of the inspection report, signed and sealed by the inspecting engineer, shall be furnished to the Department on or before April 30th of each year.

9.  The permittee shall assure that all annual inspections required by Condition V.A.8. above, are performed by an independent, third-party Florida registered professional engineer who is not an employee of the permittee. The annual inspection report shall include recommendations and corrective measures to be taken. If corrective measures are not completed by the time of annual submittal, then follow-up inspections shall be conducted by the Florida registered professional engineer with quarterly project reports submitted until completion of all corrective measures.

10. The permittee shall ensure that a vegetative cover adequate to inhibit wind and water erosion shall be established and maintained on all exposed, above grade earthen dam surfaces. Such vegetation shall be maintained by the permittee, sufficiently low to permit visual inspection of the soil surfaces.

11. The permittee is authorized to deposit in or on the phosphogypsum stack, in addition to phosphogypsum and cooling pond water, all solid waste materials related to the production and conveyance of phosphogypsum and cooling pond water, including radioactive solid waste materials subject to licensure by the Department of Health. The permittee shall maintain records of all solid waste deposits, other than phosphogypsum, including the type, amount, date of deposit, and location. These records shall be made available to Department personnel upon request. Unless as authorized above, disposal of non-phosphogypsum related materials within the phosphogypsum stack system is prohibited without prior written authorization from the Department. The disposal of all other solid waste materials at this facility shall be in accordance with the Department's regulations as contained in F.A.C. Rule 62-701.

12. The permittee shall have an aerial photograph of the complete phosphogypsum stack system, including process water impoundments and conveyance systems, taken annually during the months of January or February, for submittal to the Department on or before April 30th of each year.

y Point Phosphates, Inc.
age 17

Permit No.: FL0000124

13. The permittee shall report to the Department annually the average height of the phosphogypsum stack. The average height shall be determined between January 1st and February 28th of each year and reported in the previous years Annual Dam Report. [Section 62-4.070(1), 4-30-95]

B. Record keeping Requirements: [62-620.350, F.A.C., 11-29-94]

The permittee shall maintain the following records on the site of the permitted facility or other Department approved location, and make them available for inspection:

1. Records of all compliance monitoring information, including all calibration and maintenance records and all original strip chart recordings for continuous monitoring instrumentation, including, if applicable, a copy of the laboratory certification showing the certification number of the laboratory, for at least three years from the date the sample or measurement was taken.

2. Copies of all reports, other than those required in Condition V.B.1 above, required by the permit for at least three years from the date the report was prepared, unless otherwise specified by Department rule.

3. Records of all data, including reports and documents used to complete the application for the permit for at least three years from the date the application was filed, unless otherwise specified by Department rule.

4. A copy of the current permit.

5. A copy of any required record drawings.

6. Copies of the logs and schedules showing plant operations and equipment maintenance for three years from the date on the logs or schedule

VI. Compliance Schedules and Self-imposed Improvement Schedules:

1. The permittee shall perform the activities in accordance with the requirements of Consent Order No. 94-3751, and any amendments to this Order. This permit may be revoked if the permittee fails to comply with the terms of Consent Order No. 94-3751 and any amendments to it.

2. Compliance activities for Outfall 002:

a. The permittee shall submit an appropriate background monitoring station (Station C) for discharges from Outfall 002, within 30 days of final issuance of this permit. Upon review and approval of the location by the Department, it shall be monitored in accordance with the requirements of I.A.17, of this permit.

b. The permittee shall implement the WQBEL Plan of Study (POS) for Outfall 002 dated March 16, 1993, as submitted to the Department on April 27, 1993, upon final issuance of this permit and

_ey Point Phosphates, Inc.                                                   Permit No.: FL0000124
Page 18

resumption of discharge at Outfall 002. Upon implementing the WQBEL POS, a report on its results shall be submitted within 60 days of completion of all required field work.

c. The permittee shall perform a biological assessment study of the effects of the discharge from Outfall 002 on the receiving water, as proposed in the document entitled "Revised Proposal for Biology Assessment Study" prepared by Delta Environmental Consultants, Inc., dated November 3, 1992. The project shall comprise 3 phases to be implemented in the time-frames as follows:

    1. Phase 1 - Site visit with FDEP    -------    within 30 days of final permit issuance.
    2. Phase 2 - Submit Biology Plan of Study (BPOS) to FDEP  ---  within 60 days of final permit issuance.
    3. Phase 3 - Submit report on results of the biological assessment to FDEP ---  within 90 days of FDEP approval of the BPOS or within 90 days of discharge from Outfall 002, whichever occurs later.

d. The results of the WQBEL study and the biological assessment shall be incorporated into this permit, as appropriate.

3.    The permittee must provide relevant information as required under Departmental notice dated October 17, 1996, to demonstrate compliance with applicable rules of 62-673, F.A.C., to justify continued operation of the phosphogypsum stack system beyond March 25, 2001. The permittee shall submit a request for permit revision, with the appropriate fee, to extend the life of the permit at least 180 days prior to its expiration date. Any submittals by the permittee prior to or along with the request for permit revision will be treated as information necessary for processing the request in accordance with and subject to the rights and remedies set forth in Chapter 120, Florida Statutes. The Department will notify the permittee, in writing, of its determination upon review of the submitted information. If the Department determines that the permittee is justified to continue operation of the unlined phosphogypsum stack system beyond March 25, 2001, the permit will be revised to extend its expiration date to no more than 5 years from the date of issuance.

4.    Outfall 001 shall be maintained in working order but is not authorized for discharge of wastewater or contaminated stormwater under normal operating conditions. The structure may be used in emergency situations where the integrity of the process water impoundments are threatened and will require Departmental approval prior to use. Contaminated stormwater collected in the retention area west of the cooling ponds shall be pumped into the cooling pond system to undergo the treatment required for process wastewater prior to discharge from Outfall 003.

3.    <u>VZOD Compliance Issues</u>:

a.    The Respondent shall submit to the Department within 90 days from the effective date of this permit, the proposed well locations for monitoring the vertical zone of discharge (VZOD), and detailed monitor well construction and development methodologies. These wells shall be installed within 30 days of receipt of written Departmental approval.

ey Point Phosphates, Inc.
Page 19 ·

Permit No.: FL0000124

b. Within 30 days of well installation, details of monitor well construction descriptions, with accompanying construction diagrams and lithologic logs, shall be submitted to the Department.

c. Within 30 days of the installation of the new monitor wells identified in above, the Respondent shall sample the new monitor wells for the parameters listed below in paragraph 6. Thereafter, monitoring and submittal of analysis results for these wells shall be performed on a quarterly basis to coincide with the existing groundwater monitoring requirements.

5. Operational level achieved --- Effective date of the permit.

## VII. Other Specific Conditions

A. Specific Conditions Applicable to all permits

1. Drawings, plans, documents or specifications submitted by the permittee, not attached hereto, but retained on file at the Southwest District office, are made a part hereof.

2. If significant historical or archaeological artifacts are discovered at any time within the project site, the permittee shall immediately notify the District Office and the Bureau of Historic Preservation, Division of Archives, History and Records Management, R.A. Gray Building, Tallahassee, Florida 32301.

3. Where required by Chapter 471 (P.E.) or Chapter 492 (P.G.) Florida Statutes, applicable portions of reports to be submitted under this permit, shall be signed and sealed by the professional(s) who prepared them.

4. This permit satisfies Phosphate Management permitting requirements only and does not authorize operation of this facility prior to obtaining any other permits required by local, state or federal agencies.

5. In accordance with Rule 62-620.325, F.A.C., this permit may be revised to comply with any newly adopted rules and regulations adopted by the Department, that are applicable to this facility. If such a revision occurs, the Department shall allow the permittee a reasonable amount of time to come into compliance with such conditions.

B. Specific Conditions Related to Construction

1. Within thirty days of completion of construction, the permittee shall submit to the Department a completed "Certification of Completion of Construction" (DEP form 62-620.910(12)) signed and sealed by the engineer of record.

2. Record drawings shall be prepared and made available in accordance with 62-620.410(10) F.A.C. within six months of placing the facilities into operation.

C. Duty to Reapply

ey Point Phosphates, Inc.                                    Permit No.: FL0000124
Page 20

1. The permittee shall submit an application to renew this permit at least 180 days before the expiration date of this permit. [62-620.335, F.A.C., 11-29-94]

2. The permittee shall apply on the appropriate form listed in Rule 62-620.910, F.A.C., and in the manner established in Rules 62-620.400 through 62-620.460, F.A.C., including submittal of the appropriate processing fee set forth in Rule 62-4.050, F.A.C.

3. An application filed in accordance with Conditions VII.C.1. and VII.C.2., above shall be considered timely and sufficient. When an application for renewal of a permit is timely and sufficient, the existing permit shall not expire until the Department has taken final action on the application for renewal or until the last day for seeking judicial review of the agency order or a later date fixed by order of the reviewing court. [62-620.335, F.A.C., 11-29-94]

4. The late submittal of a renewal application shall be considered timely and sufficient for the purpose of extending the effectiveness of the expiring permit only if it is submitted and made complete before the expiration date. [62-620.335, F.A.C., 11-29-94]

D. Specific Conditions Related to Best Management Practices Condition:

1. BMP Plan:
   For purposes of this part, the terms "pollutant" or "pollutants" refer to any substance listed as toxic under Section 307(a)(1) of the Clean Water Act (the "Act"), oil, as defined in Section 311(a)(1) of the Act, and any substance listed as hazardous under Section 311 of the act. The permittee shall develop and implement a best Management Practices (BMP) plan which prevents, or minimizes the potential for, the release of pollutants from ancillary activities, including material storage areas; plant site runoff; in-plant transfer, process and material handling areas; loading and unloading operations; and sludge and waste disposal areas, to the waters of the State through plant site runoff; spillage or leaks; sludge or waste disposal; or drainage from raw material storage.

2. Implementation:
   The plan shall be developed and submitted to the Department for review within 180 days after the effective date of this permit. It shall be implemented immediately upon receipt of written approval from the Department.

3. General Requirements:
   The BMP plan shall:
   (a) Be documented in narrative form, and shall include any necessary plot plans, drawings or maps.
   (b) Establish specific objectives for the control of pollutants such as:
      (1) Each facility component or system shall be examined for its potential for causing a release of significant amounts of pollutants to waters of the State due to equipment failure, improper operation, natural phenomena such as rain or snowfall, etc.
      (2) Where experience indicates a reasonable potential for equipment failure (e.g., a tank overflow or leakage), natural conditions (e.g., precipitation), or other circumstances to result in significant amounts

of pollutants reaching surface waters, the plan should include a prediction of the direction, rate of flow, and total quantity of pollutants which could be discharged from the facility as a result of each condition or circumstance.

(c) Establish specific best management practices to meet the objectives identified under paragraph b of this subsection, addressing each component or system capable of causing a release of significant amounts of pollutants to the waters of the State, and identifying specific preventative or remedial measures to be implemented.

(d) Include any special conditions established in Section B of this part.

(e) Be reviewed by plant engineering staff and plant manager.

4. Documentation:
The permittee shall maintain the BMP plan at the facility and shall make the plan available to the Department upon request.

5. BMP Plan Modification:
The permittee shall amend the BMP plan whenever there is a change in the facility or change in the operation of the facility which materially increases the potential for the ancillary activities to result in a discharge of significant amounts of pollutants.

6. Modification for Ineffectiveness:
If the BMP plan proves to be ineffective in achieving the general objective of preventing the release of significant amounts of pollutants to surface waters and the specific objectives and requirements under paragraphs b and c of item 3., the permit shall be subject to modification pursuant to Rule 62-620.325, F.A.C., to incorporate revised BMP requirements.

E. Specific Conditions Related to Existing Manufacturing, Commercial, Mining, and Silviculture Wastewater Facilities or Activities: N/A

F. Specific Conditions Related to Financial Responsibility Requirements:

1. The permittee shall comply with the financial responsibility requirements of Section 62-673.640, Florida Administrative Code.

## VIII. General Conditions

1. The terms, conditions, requirements, limitations and restrictions set forth in this permit are binding and enforceable pursuant to Chapter 403, Florida Statutes. Any permit noncompliance constitutes a violation of Chapter 403, Florida Statutes, and is grounds for enforcement action, permit termination, permit revocation and reissuance, or permit revision.
[62-620.610(1), F.A.C.]

2. This permit is valid only for the specific processes and operations applied for and indicated in the approved drawings or exhibits. Any unauthorized deviations from the approved drawings, exhibits,

ey Point Phosphates, Inc.                                                          Permit No.: FL0000124
Page 22

specifications or conditions of this permit constitutes grounds for revocation and enforcement action by the Department. [62-620.610(2), F.A.C.]

3. As provided in Subsection 403.087(6), F.S., the issuance of this permit does not convey any vested rights or any exclusive privileges. Neither does it authorize any injury to public or private property or any invasion of personal rights, nor authorize any infringement of federal, state, or local laws or regulations. This permit is not a waiver of or approval of any other Department permit or authorization that may be required for other aspects of the total project which are not addressed in this permit. [62-620.610(3), F.A.C.]

4. This permit conveys no title to land or water, does not constitute state recognition or acknowledgment of title, and does not constitute authority for the use of submerged lands unless herein provided and the necessary title or leasehold interests have been obtained from the State. Only the Trustees of the Internal Improvement Trust Fund may express State opinion as to title. [62-620.610(4), F.A.C.]

5. This permit does not relieve the permittee from liability and penalties for harm or injury to human health or welfare, animal or plant life, or property caused by the construction or operation of this permitted source; nor does it allow the permittee to cause pollution in contravention of Florida Statutes and Department rules, unless specifically authorized by an order from the Department. The permittee shall take all reasonable steps to minimize or prevent any discharge, reuse of reclaimed water, or residuals use or disposal in violation of this permit which has a reasonable likelihood of adversely affecting human health or the environment. It shall not be a defense for a permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of this permit.
[62-620.610(5), F.A.C.]

6. If the permittee wishes to continue an activity regulated by this permit after its expiration date, the permittee shall apply for and obtain a new permit. [62-620.610(6), F.A.C.]

7. The permittee shall at all times properly operate and maintain the facility and systems of treatment and control, and related appurtenances, that are installed and used by the permittee to achieve compliance with the conditions of this permit. This provision includes the operation of backup or auxiliary facilities or similar systems when necessary to maintain or achieve compliance with the conditions of the permit. [62-620.610(7), F.A.C.]

8. This permit may be modified, revoked and reissued, or terminated for cause. The filing of a request by the permittee for a permit revision, revocation and reissuance, or termination, or a notification of planned changes or anticipated noncompliance does not stay any permit condition. [62-620.610(8), F.A.C.]

9. The permittee, by accepting this permit, specifically agrees to allow authorized Department personnel, including an authorized representative of the Department and authorized EPA personnel, when applicable, upon presentation of credentials or other documents as may be required by law, and at reasonable times, depending upon the nature of the concern being investigated, to

ey Point Phosphates, Inc.                                    Permit No.: FL0000124
Page 23

   a. Enter upon the permittee's premises where a regulated facility, system, or activity is located or conducted, or where records shall be kept under the conditions of this permit;

   b. Have access to and copy any records that shall be kept under the conditions of this permit;

   c. Inspect the facilities, equipment, practices, or operations regulated or required under this permit; and

   d. Sample or monitor any substances or parameters at any location necessary to assure compliance with this permit or Department rules.

   [62-620.610(9), F.A.C.]

10. In accepting this permit, the permittee understands and agrees that all records, notes, monitoring data, and other information relating to the construction or operation of this permitted source which are submitted to the Department may be used by the Department as evidence in any enforcement case involving the permitted source arising under the Florida Statutes or Department rules, except as such use is proscribed by Section 403.111, Florida Statutes, or Rule 62-620..302, Florida Administrative Code. Such evidence shall only be used to the extent that it is consistent with the Florida Rules of Civil Procedure and applicable evidentiary rules. [62-620.610(10), F.A.C.]

11. When requested by the Department, the permittee shall within a reasonable time provide any information required by law which is needed to determine whether there is cause for revising, revoking and reissuing, or terminating this permit, or to determine compliance with the permit. The permittee shall also provide to the Department upon request copies of records required by this permit to be kept. If the permittee becomes aware of relevant facts that were not submitted or were incorrect in the permit application or in any report to the Department, such facts or information shall be promptly submitted or corrections promptly reported to the Department. [62-620.610(11), F.A.C.]

12. Unless specifically stated otherwise in Department rules, the permittee, in accepting this permit, agrees to comply with changes in Department rules and Florida Statutes after a reasonable time for compliance; provided, however, the permittee does not waive any other rights granted by Florida Statutes or Department rules. A reasonable time for compliance with a new or amended surface water quality standard, other than those standards addressed in Rule 62-302.500, F.A.C., shall include a reasonable time to obtain or be denied a mixing zone for the new or amended standard. [62-620.610(12), F.A.C.]

13. The permittee, in accepting this permit, agrees to pay the applicable regulatory program and surveillance fee in accordance with Rule 62-5.052, F.A.C. [62-620.610(13), F.A.C.]

14. This permit is transferable only upon Department approval in accordance with Rule 62-620.340, F.A.C. The permittee shall be liable for any noncompliance of the permitted activity until the transfer is approved by the Department. [62-620.610(14), F.A.C.]

15. The permittee shall give the Department written notice at least 60 days before inactivation or abandonment of a wastewater facility and shall specify what steps will be taken to safeguard public health and safety during and following inactivation or abandonment. [62-620.610(15), F.A.C.]

ey Point Phosphates, Inc.
Page 24

Permit No.: FL0000124

16. The permittee shall apply for a revision to the Department permit in accordance with Rules 62.620.450, F.A.C., as applicable, at least 90 days before construction of any planned substantial modifications to the permitted facility is to commence or with Rule 62-620.300 for minor modifications to the permitted facility. A revised permit shall be obtained before construction begins except as provided in Rule 62-620.300, F.A.C. [62-620.610(16), F.A.C.]

17. The permittee shall give advance notice to the Department of any planned changes in the permitted facility or activity which may result in noncompliance with permit requirements. The permittee shall be responsible for any and all damages which may result from the changes and may be subject to enforcement action by the Department for penalties or revocation of this permit. The notice shall include the following information:
   a. A description of the anticipated noncompliance;
   b. The period of the anticipated noncompliance, including dates and times; and
   c. Steps being taken to prevent future occurrence of the noncompliance.
   [62-620.610(17), F.A.C.]

18. Sampling and monitoring data shall be collected and analyzed in accordance with Rule 62-4.246, Chapter 62-160 and 62-601, F.A.C., and 40 CFR 136, as appropriate.
   a. Monitoring results shall be reported at the intervals specified elsewhere in this permit and shall be reported on a Discharge Monitoring Report (DMR), DEP Form 62-620.910(10).
   b. If the permittee monitors any contaminate more frequently than required by the permit, using Department approved test procedures, the results of this monitoring shall be included in the calculation and reporting of the data submitted in the DMR.
   c. Calculations for all limitations which require averaging of measurements shall use an arithmetic mean unless otherwise specified in this permit.
   d. Any laboratory test required by this permit for domestic wastewater facilities shall be performed by a laboratory that has been certified by the Department of Health and Rehabilitative Services (DHRS) under Chapter 10D41, F.A.C., to perform the test. In domestic wastewater facilities, on-site tests for dissolved oxygen, pH, and total chlorine residual shall be performed by a laboratory certified to test for those parameters or under the direction of an operator certified under Chapter 61E12-41, F.A.C.
   e. Under Chapter 62-160, F.A.C., sample collection shall be performed by following the protocols outlined in "DER Standard Operating Procedures for Laboratory Operations and Sample Collection Activities" (DER-QA-001/92). Alternatively, sample collection may be performed by an organization who has an approved Comprehensive Quality Assurance Plan (CompQAP) on file with the Department. The CompQAP shall be approved for collection of samples from the required matrices and for the required tests. [62-620.610(18), F.A.C.]

19. Reports of compliance or noncompliance with, or any progress reports on, interim and final requirements contained in any compliance schedule detailed elsewhere in this permit shall be submitted no later than 14 days following each schedule date. [62-620.610(19), F.A.C.]

20. The permittee shall report to the Department any noncompliance which may endanger health or the environment. Any information shall be provided orally within 24 hours from the time the permittee becomes aware of the circumstances. A written submission shall also be provided within five days of

ney Point Phosphates, Inc.
Page 25

Permit No.: FL0000124

the time the permittee becomes aware of the circumstances.  The written submission shall contain: a description of the noncompliance and its cause; the period of noncompliance including exact dates and time, and if the noncompliance has not been corrected, the anticipated time it is expected to continue; and steps taken or planned to reduce, eliminate, and prevent recurrence of the noncompliance.

a. The following shall be included as information which must be reported within 24 hours under this condition:

1.  Any unanticipated bypass which causes any reclaimed water or the effluent to exceed any permit limitation or results in an unpermitted discharge,

2.  Any upset which causes any reclaimed water or the effluent to exceed any limitation in the permit,

3.  Violation of a maximum daily discharge limitation for any of the pollutants specifically listed in the permit for such notice, and

4.  Any unauthorized discharge to surface or ground waters.

b. If the oral report has been received within 24 hours, the noncompliance has been corrected, and the noncompliance did not endanger health or the environment, the Department shall waive the written report.

[62-620.610(20), F.A.C.]

21.  The permittee shall report all instances of noncompliance not reported under Conditions VIII. A. 18. and 19. of this permit at the time monitoring reports are submitted.  This report shall contain the same information required by Condition VIII. A. 20. of this permit.  [62-620.610(21), F.A.C.]

22.  Bypass Provisions.

a. Bypass is prohibited, and the Department may take enforcement action against a permittee for bypass, unless the permittee affirmatively demonstrates that:

1.  Bypass was unavoidable to prevent loss of life, personal injury, or severe property damage; and

2.  There were no feasible alternatives to the bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal periods of equipment downtime.  This condition is not satisfied if adequate back-up equipment should have been installed in the exercise of reasonable engineering judgment to prevent a bypass which occurred during normal periods of equipment downtime or preventive maintenance; and

3.  The permittee submitted notices as required under Condition VIII. A. 22. b. of this permit.

b. If the permittee knows in advance of the need for a bypass, it shall submit prior notice to the Department, if possible at least 10 days before the date of the bypass.  The permittee shall submit notice of an unanticipated bypass within 24 hours of learning about the bypass as required in Condition VIII. A. 20. of this permit.  A notice shall include a description of the bypass and its cause; the period of the bypass, including exact dates and times; if the bypass has not been corrected, the anticipated time it is expected to continue; and the steps taken or planned to reduce, eliminate, and prevent  recurrence of the bypass.

c. The Department shall approve an anticipated bypass, after considering its adverse effect, if the permittee demonstrates that it will meet the three conditions listed in Condition VIII. A. 22. a. through 3. of this permit.

...ney Point Phosphates, Inc.      Permit No.: FL0000124
Page 26

  d. A permittee may allow any bypass to occur which does not cause reclaimed water or effluent limitations to be exceeded if it is for essential maintenance to assure efficient operation. These bypasses are not subject to the provision of Condition VIII. A. 22. a. through c. of this permit.
  [62-620.610(22), F.A.C.]

23. Upset Provisions
  a. A permittee who wishes to establish the affirmative defense of upset shall demonstrate, through properly signed contemporaneous operating logs, or other relevant evidence that:
   1. An upset occurred and that the permittee can identify the cause(s) of the upset;
   2. The permitted facility was at the time being properly operated;
   3. The permittee submitted notice of the upset as required in Condition VIII. A. 20. of this permit; and
   4. The permittee complied with any remedial measures required under Condition VIII. A. 5. of this permit.
  b. In any enforcement proceeding, the permittee seeking to establish the occurrence of an upset has the burden of proof.
  c. Before an enforcement proceeding is instituted, no representation made during the Department review of a claim that noncompliance was caused by an upset is final agency action subject to judicial review.
  [62-620.610(23), F.A.C.]

    Executed in Tallahassee, Florida.

         STATE OF FLORIDA DEPARTMENT
         OF ENVIRONMENTAL PROTECTION

_for_         Mimi Drew
         Director
         Division of Water Facilities