UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CENTER FOR BIOLOGICAL
DIVERSITY, TAMPA BAY
WATERKEEPER, SUNCOAST
WATERKEEPER, MANASOTA-88,
and OUR CHILDREN'S EARTH
FOUNDATION,

      Plaintiffs,

v.                                         Case No: 8:21-cv-1521-WFJ-CPT

GOVERNOR RON DESANTIS,
SHAWN HAMILTON, in his
official capacity as ACTING
SECRETARY, FLORIDA
DEPARTMENT OF ENVIRONMENTAL
PROTECTION, HRK HOLDINGS, LLC,
and MANATEE COUNTY PORT
AUTHORITY,

      Defendants.
_____/

## ORDER

Plaintiffs Center for Biological Diversity, Tampa Bay Waterkeeper, ManaSota-88, Suncoast Waterkeeper, and Our Children's Earth Foundation (collectively, "Plaintiffs") brought this case to abate potential environmental damage from the Piney Point Phosphate Facility ("Piney Point")—an old fertilizer manufacturing plant that now houses "stacks" of phosphogypsum and process

wastewater. The stack system has experienced a series of leaks and near-miss catastrophes, the most recent of which occurred in March and April 2021.

Before the Court today is a Motion to Stay filed by Defendant Shawn Hamilton, in his official capacity as the Acting Secretary of the Florida Department of Environmental Protection. Dkt. 53. Defendants Governor Ron DeSantis and Manatee County Port Authority joined the motion. Dkts. 55, 68. Plaintiffs filed a response, Dkt. 70, to which Defendants replied, Dkts. 77, 80. The parties presented oral arguments during an in-person hearing on February 15, 2022.

For the reasons explained below, the Court stays this federal action for a period of six months while a related state-court action proceeds.

## BACKGROUND

### I.     Factual Background

The Court recites these facts as alleged in Plaintiffs' Second Amended Complaint. Dkt. 50. Piney Point was a plant in Manatee County, Florida that manufactured phosphate fertilizer until 1999. *Id.* at 29. This manufacturing process produced phosphogypsum as a byproduct—a radioactive waste that may contain carcinogens and heavy toxic metals. *Id.* at 31. Another byproduct of the manufacturing process was "process wastewater," which is radioactive, highly acidic, and possibly carcinogenic. *Id.*

In 1989, the U.S. Environmental Protection Agency promulgated a rule requiring all phosphogypsum be disposed into "stacks" to reduce health risks associated with phosphogypsum radon emissions. *Id.* at 30. Pursuant to this rule, the former operator of Piney Point constructed several large stacks to contain the site's waste from almost forty years of fertilizer manufacturing. *Id.* at 30. These stacks rose as high as eighty feet. *Id.* At the top of the stacks were "ponds" of process wastewater. *Id.* at 31. Also within the stacks were millions of gallons of "pore" process wastewater—a type of process wastewater that contains gypsum. *Id.*

In 2001, the former owner of Piney Point filed for bankruptcy and abandoned the property. *Id.* at 32. The Florida Department of Environmental Protection ("FDEP") then became the owner and operator of Piney Point through a court-ordered receivership in February 2001. *Id.* FDEP hired experts to investigate how the remaining process wastewater should be treated and what should be done with the phosphogypsum stacks. *Id.* Ultimately, FDEP determined it would convert the stacks into impoundments capable of storing precipitation that fell onto the site. *Id.* It also placed a High Density Polyethylene ("HDPE") liner over the stacks. *Id.* at 32–33.

Plaintiffs allege FDEP discharged approximately 1.1 billion gallons of stormwater and process wastewater from Piney Point into Bishop Harbor and

3

Tampa Bay between February 2002 and February 2004. *Id.* at 33. Plaintiffs say these discharges contributed to algae blooms that hurt the surrounding environment. *Id.*

In August 2006, FDEP transferred ownership of Piney Point to HRK Holdings LLC. *Id.* at 34. As part of this sale, FDEP and HRK entered into an agreement (the "Administrative Agreement") requiring FDEP to continue working to close the site and address the "imminent hazard related to the Phosphogypsum Stack System[.]" *Id.* HRK agreed to provide $2.5 million for the long-term operation and maintenance of Piney Point. *Id.* at 35.

In 2005, the Manatee County Port Authority ("MCPA") developed a plan to construct a new access channel for large shipping vessels. *Id.* Experts estimated the project would create about 3.2 million cubic yards of dredging waste over a twenty-year period. *Id.* at 35–36. FDEP agreed to let MCPA dispose the dredging waste into Piney Point's HDPE-lined stacks. *Id.* at 36. The Army Corps of Engineers warned in August 2008 and again in April 2010 that storage of the dredged materials in the stacks could breach the liner and cause the stacks to fail. *Id.* at 38–39, 41.

In early 2011, as Defendants prepared Piney Point for the dredging disposal operation, a contractor discovered a tear in the HDPE liner. *Id.* at 42. FDEP and MCPA nevertheless began the dredging project in April 2011. *Id.* at 43. Issues

arose a few weeks later. *Id.* Holes in the HDPE liner had created pressure on the gypsum walls of the impoundments, which threatened catastrophic failure. *Id.* at 44. In May 2011, FDEP issued an emergency order directing HRK to help prevent the collapse of the phosphogypsum stack system and its impoundments. *Id.* at 43. FDEP also ordered HRK to perform controlled breaches that discharged millions of gallons of wastewater into Tampa Bay. *Id.* at 44–45. FDEP inspected the liner after the breach and identified twenty-nine cracks in it. *Id.* at 45. HRK grouted the cracks by July 2011, and the dredging project resumed thereafter. *Id.* at 46.

Workers discovered five additional stress cracks in the HDPE liner in October 2011. *Id.* at 45. The dredging project was completed this same month. *Id.* at 46. Plaintiffs allege the dredged material passed through tears in the liner and mixed with the phosphogypsum and process wastewater to create hazardous waste. *Id.* at 46–47.

Trouble brewed again in March 2021 when FDEP found new leaks and pressure began to mount. *Id.* at 49–50. These leaks caused polluted wastewater to discharge into Piney Point Creek, which releases directly into Tampa Bay. *Id.* at 52. HRK drilled holes through the liner to relieve some of the pressure on the stacks, but the pressure continued to build. *Id.* at 52–53.  HRK then began discharging wastewater into Port Manatee to relieve the pressure and prevent total failure of the stacks. *Id.* at 53.

5

On April 2, 2021, Manatee County ordered mandatory evacuations in areas surrounding Piney Point. *Id.* at 56. FDEP and HRK evacuated Piney Point one day later. *Id.* at 57. Plaintiffs allege the "total amount of wastewater discharged from Piney Point to Tampa Bay is approximately 215 million gallons." *Id.* at 58. Red tide conditions appeared in lower Tampa Bay on April 22, 2021. *Id.* at 59.

FDEP has made several efforts to stop the leakage. First, FDEP relocated water among the lined storage basins to "safely manage water, respond to rainfall events and prepare for water treatment." *Id.* at 60. Second, FDEP placed a layer of geo-composite material over an impoundment to "further stabilize the liner seam-separation." *Id.* FDEP then added sand around the liner separation to minimize leakage from an impoundment. *Id.* at 61.

Florida's state government has also tried to alleviate the risk. The Florida legislature appropriated $100 million for remediation and closure efforts. Dkt. 52, Ex. K.  In April 2021, Governor DeSantis proclaimed that the "problems at Piney Point must end." Dkt. 52, Ex. J. He directed FDEP to "develop a plan to close Piney Point," and he committed "$15.4 million for innovative technologies to pre-treat water at the site." Dkt. 52, Ex. J.

## II.   State-Court Proceedings

There are two applicable state-court proceedings here, but the second is more important for present purposes. The first began on August 5, 2021, when

6

FDEP filed a petition in state court seeking: (1) judicial enforcement of a 2014 consent order that required HRK to develop a plan to empty certain reservoirs and provide long-term care and financial assurance for the facility, (2) enforcement of the 2011 Administrative Agreement between FDEP and HRK, and (3) appointment of a receiver to close the Facility. This case—*FDEP v. HRK Holdings, LLC*, Case No. 2021-CA-003192-AX (Fla. 12th Cir. Ct. Aug. 5, 2021)—will be referred to as the "Enforcement Action."

The second state-court proceeding—*Fortress 2020 Landco, LLC v. HRK Holdings, LLC et al.*, Case No. 2020-CA-04459-AX (Fla. 12th Cir. Ct. Nov. 17, 2020)—will be referred to as the "Foreclosure Action." HRK's ownership of the Piney Point property is subject to a mortgage held by Fortress 2020 Landco LLC, as assignee of Regions Bank. In November 2020, Fortress filed the Foreclosure Action against HRK, FDEP, and others in state court, seeking to take possession of certain parts of the property. Dkt. 52, Ex. A. FDEP filed a motion in this action for the appointment of a receiver to close the facility. Dkt. 52, Ex. B. On August 25, 2021, the state court appointed a receiver (the "Receiver") to take control of the facility and oversee its closure. Dkt. 52, Ex. C. The state court's order charges the Receiver to "maintain, manage and close as efficiently and expeditiously as possible the Facility in accordance with all applicable State and Federal laws." Dkt. 52, Ex. C at 13. Furthermore, the order states: "the Receiver shall have the

7

following specific powers and authority: (a) to provide and maintain the Facility, including making structural changes, for as long as necessary to complete closure; (b) to make extensions, expansions, repairs, replacements, and improvements to the Facility as necessary to complete closure." *Id.* at 7.

The Receiver filed a status report on November 2, 2021, that outlined the work completed thus far, including site visits, the preparation of property inventories, and meetings with stake holders. Dkt. 52, Ex. G. The Receiver reported that he was negotiating the assignment of FDEP's contract with an engineering firm. *Id.* at 5. This contract called for the preparation of design drawings, the beginning of the bidding process, reviews of proposal submissions, and assistance selecting contracts. *Id.* The Receiver stated that once this contract was assigned, he would "solicit bids pursuant to appropriate procurement rules for the final construction phase of the project." *Id.*

The Receiver filed another status report in December 2021. Dkt. 81, Ex. A. Since the last report, the Receiver took several more actions to close Piney Point, including but not limited to negotiating the assignment of FDEP's engineering contracts, conducting several meetings with the site manager and engineers, and meeting with officials from Manatee County regarding deep injection wells and water treatment. *Id.* at 4–6. The Receiver also continued working with a contractor on an "innovative water treatment process," which has reduced the levels of

nitrogen and phosphorus in a stack by over 90 percent, thereby reducing the risk of red tide outbreaks. *Id.* at 6. To date, the Receiver continues working to close Piney Point.

### III.   This Case

Plaintiffs are public interest organizations focused on safeguarding Florida's environment. Dkt. 50 at 2. They filed the operative Second Amended Complaint in November 2021, which brings three claims against Defendants: one under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a); and two under the Federal Water Pollution Control Act, which is commonly referred to as the Clean Water Act ("CWA"), 33 U.S.C. § 1365(a).

All Defendants have moved to dismiss this case. Dkts. 51, 54, 55, 56. Defendant FDEP also filed a Motion to Stay, which advances two theories. Dkt. 53. First, FDEP argues this Court should abstain from the case pursuant to *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976) ("*Colorado River*") because the state Foreclosure Action and the state Enforcement Action constitute parallel proceedings with this federal action and the applicable factors weigh in favor of abstention.[1] In the event the Court declines to abstain

---

[1] In the Eleventh Circuit, a stay—not a dismissal—is the proper procedural mechanism for a district court to employ when deferring to a parallel state-court proceeding under the *Colorado River* doctrine. *See Moorer v. Demopolis Waterworks & Sewer Bd.*, 374 F.3d 994, 998 (11th Cir. 2004).

pursuant to *Colorado River*, FDEP next argues this Court should stay the case pursuant to the Court's inherent authority to manage its docket. As an accompaniment to the Motion to Stay, FDEP filed motions requesting this Court judicially notice several documents. Dkts. 52, 81. Plaintiffs do not oppose these motions, *see* Dkt. 71 at 1, so the Court will consider these documents when analyzing the Motion to Stay below.

## ANALYSIS

### I.     *Colorado River* Abstention Is Not Appropriate Here.

The *Colorado River* doctrine "addresses the circumstances in which federal courts should abstain from exercising their jurisdiction because a parallel lawsuit is proceeding in one or more state courts." *Ambrosia Coal & Constr. Co. v. Pagés Morales*, 368 F.3d 1320, 1327 (11th Cir. 2004). The purpose of this doctrine is to conserve judicial resources and promote the comprehensive disposition of litigation. *Moorer*, 374 F.3d at 997 (quoting *Colorado River*, 424 U.S. at 817).

Ordinarily, federal courts have a "virtually unflagging obligation" to exercise the jurisdiction given to them. *Colorado River*, 424 U.S. at 817. The general rule is that a state-court proceeding is no bar to a federal court exercising jurisdiction over a proceeding concerning the same matter. *Id.* "And while abstention as a general matter is rare, *Colorado River* abstention is particularly rare, permissible in fewer circumstances than are the other abstention doctrines."

*Jackson–Platts v. Gen. Elec. Cap. Corp.*, 727 F.3d 1127, 1140 (11th Cir. 2013) (cleaned up). Federal courts may dismiss actions because of parallel state-court litigation only under "exceptional" circumstances. *Am. Bankers Ins. Co. of Fla. v. First State Ins. Co.*, 891 F.2d 882, 884 (11th Cir. 1990) (citing *Colorado River*, 424 U.S. at 818). Indeed, only the clearest of justifications will warrant abstention. *Id.* (citing *Colorado River*, 424 U.S. at 819).

There are two steps in determining whether *Colorado River* abstention applies. First, the Court must determine whether the federal action and the state action are "parallel proceedings." *See Gold-Fogel v. Fogel*, 16 F.4th 790, 600 (11th Cir. 2021); *see also Ambrosia Coal*, 368 F.3d at 1330–32. Parallel proceedings are defined as federal and state proceedings that involve substantially the same parties and substantially the same issues. *See Gold-Fogel*, 16 F.4th at 800; *see also Ambrosia Coal*, 368 F.3d at 1330. Although there is no clear test for deciding whether two cases contain substantially similar parties and issues, the balance of this analysis tilts heavily in favor of the federal court exercising its jurisdiction. *Acosta v. James A. Gustino, P.A.*, 478 F. App'x 620, 622 (11th Cir. 2012). In fact, if the federal court has any substantial doubt about whether the two cases are parallel, *Colorado River* abstention is not appropriate. *Id.*

Here, the Court holds that the Piney Point state and federal proceedings do not involve substantially similar parties. No Plaintiff in the federal case is a party

11

to the state Foreclosure Action or the state Enforcement Action. Defendants DeSantis and MCPA are also absent from the state Foreclosure Action and the state Enforcement Action. *Compare* Dkt. 50 at 1 *with* Dkt. 52, Ex. A & Dkt. 52, Ex. D. Moreover, there are several companies who are parties to the state Foreclosure Action but not present here. *Compare* Dkt. 50 at 1 *with* Dkt. 52, Ex. A at 1. The Court therefore doubts that the state cases contain parties who are substantially similar to those in this case.

  The cases are insufficiently similar for *Colorado River* consideration. To be sure, there is overlap between the issues to be litigated in this case and the state Foreclosure Action. Plaintiffs here are seeking an injunction requiring Defendants "to abate the present imminent and substantial endangerment to health and/or the environment at Piney Point." Dkt. 50 at 93. And the state-court receiver is charged with closing Piney Point as expeditiously as possible "in accordance with all applicable State and Federal laws." Dkt. 52, Ex. C at 13. But the cases are not "virtually identical" as Defendant FDEP contends. Dkt. 53 at 9. One is a property foreclosure action, and the other is brought pursuant to the CWA and RCRA—two federal causes of action that are not specifically contemplated in the state cases. The state cases present issues that are different than those presented in the federal case. The Foreclosure Action deals with the ownership of the Piney Point property, bankruptcy liens, and other security interests. Dkt. 52, Ex. A. The Enforcement

Action deals with whether HRK satisfied its contractual obligation to provide money for the long-term maintenance of Piney Point. Dkt. 52, Ex. D at 5. Simply put, there are too many differences between the cases for this Court to hold that they are parallel proceedings.

This ends the analysis; the Court need not address the second step because the threshold requirement of substantially similar parallel proceedings is not satisfied. *See Gold-Fogel*, 16 F.4th at 800–01 (describing this first step as the "threshold" step). The Court therefore declines to abstain this case pursuant to *Colorado River.*

## II.     The Court Exercises Its Inherent Authority To Stay This Case.

In the event the Court did not abstain under *Colorado River*, Defendants argue this Court should nevertheless stay the federal case for six months pursuant to the Court's inherent powers. Dkt. 53 at 14. The Court agrees.

A federal district court has broad discretion to stay litigation pending the outcome of related proceedings in another forum. *CTI-Container Leasing Corp. v. Uiterwyk Corp.*, 685 F.2d 1284, 1288 (11th Cir. 1982) (stating that such discretion "is not questioned"). This authority is incident to the Court's power to control its own docket. *See Clinton v. Jones*, 520 U.S. 681, 706 (1997); *see also Ortega Trujillo v. Conover & Co. Commc'ns, Inc.*, 221 F.3d 1262, 1264 (11th Cir. 2000) ("[A] district court stay pending the resolution of a related case in another court

13

[may be justified] simply as a means of controlling the district court's docket and of managing cases before the district court."). Such a stay may be proper even if the case does not qualify for abstention under *Colorado River*. *See Cottrell v. Duke*, 737 F.3d 1238, 1249 (8th Cir. 2013) ("Post *Colorado River*, our precedent has recognized that a district court retains its inherent power to control its docket when facing concurrent state and federal litigation.").

Although both abstention and inherent authority may permit a stay of federal litigation in light of state litigation, the circumstances justifying such stays vary depending on the doctrine. Abstention is the more extreme remedy, in that it sanctions "abdication of the obligation to decide cases" that are "properly before" the federal court. *Colorado River*, 424 U.S. at 813 (cleaned up); *accord Ambrosia Coal*, 368 F.3d at 1328 (abstention permits federal courts to "yield jurisdiction" to state courts); *see also Cottrell*, 737 F.3d at 1249 (*Colorado River* applies when the stay "amounts to a complete refusal to exercise jurisdiction"). That is, under *Colorado River* abstention, the federal court essentially permits a state court to resolve the federal case despite the existence of federal jurisdiction. *See F Fam. S., LLC v. Baldwin Cnty., Ala.*, Case No. 20-0612-WS-N, 2021 WL 6052922, at *3–4 (S.D. Ala. Oct. 4, 2021). Thus, before a case may be stayed under *Colorado River* abstention, the state and federal proceedings must involve "substantially the same parties and substantially the same issues," and abstention must be supported by

"exceptional circumstances." *Ambrosia Coal*, 368 F.3d at 1328, 1330 (internal quotes omitted).

In contrast, a stay pursuant to inherent judicial authority does not contemplate abdication of the federal court's duty to resolve a case properly before it. Rather, it represents a pause in that resolution while another forum determines an issue that promises to simplify or otherwise assist the federal litigation. *See, e.g.*, *Tarpon Transp. Servs., Inc. v. Total Quality Logistics, LLC*, Case No. 8:20-cv-2656-VMC-CPT, 2021 WL 3855952, at *2 (M.D. Fla. Aug. 30, 2021) (granting a stay when certain determinations in the state litigation "will likely streamline the [federal] proceedings"); *see also Cottrell*, 737 F.3d at 1249 (explaining that while a federal court may not effectively dismiss the federal proceeding in favor of concurrent state litigation without satisfying *Colorado River*, it "may impose a more finite and less comprehensive stay, if it concludes that such a stay properly balances the rights of the parties and serves the interests of judicial economy").

The following factors help determine whether the Court should exercise its inherent authority to stay a case in light of proceedings in another forum: (1) whether the federal litigation is at an early stage; (2) whether a stay will unduly prejudice or tactically disadvantage the non-movant; and (3) whether a stay will simplify the issues in question and streamline the trial. *See Roblor Mktg. Grp., Inc.*

15

*v. GPS Indus., Inc.*, 633 F. Supp. 2d 1341, 1347 (S.D. Fla. 2008). The Court holds that these factors favor a stay in this case.

First, the federal case is at an early stage. The parties are still at the pleading stage; they have exchanged briefing only on motions to dismiss and motions to stay. No significant discovery or trial preparation has yet taken place. And although Plaintiffs filed the first complaint eight months ago in June 2021, Dkt. 1, they filed the operative Second Amended Complaint in November 2021, Dkt. 50. Both sides have also requested numerous extensions of time to file their responses. Dkts. 9, 20, 22, 25, 30, 58, 60, 72.

Second, a stay will not unduly prejudice Plaintiffs. The state system already has a running start on the closure of Piney Point. The legislature appropriated over $100 million to close Piney Point and remediate potential environmental damage. And the state-court Receiver is charged with closing Piney Point "as efficiently and expeditiously as possible" in a manner that complies with "all applicable State and Federal laws." Dkt. 52, Ex. C at 13. As Plaintiffs admitted at oral argument, there is no evidence the Receiver is operating in bad faith. So long as it appears the state actors continue to operate in good faith, this federal Court is reluctant to interfere with these ongoing state endeavors.

Finally, a stay may simplify the issues of this case. The state-court Receiver has already taken over daily operations of the site and is working to assemble a

16

team of experts. His reports will shed light on the scope of the alleged environmental damage, as well as the best ways to remediate it. This information may elucidate several of Plaintiffs' arguments in this case, including their somewhat novel claim that the conditions at Piney Point created a new type of hazardous waste actionable under RCRA. As such, a stay here will serve judicial economy and help avoid the risk of inconsistent state and federal determinations. The Court therefore orders a limited stay of this case pursuant to the Court's inherent authority to manage its docket.

The Court must properly limit the scope of a stay and ensure that the stay is not "immoderate." *Ortega Trujillo*, 221 F.3d at 1264. When determining whether a stay is immoderate, the Court must examine the potential duration of the stay and the reasons supporting it. *Id.*

Here, Defendants propose a stay of six months. Dkt. 53 at 14. The Court agrees this is a reasonable timeframe. *See F Fam. S., LLC*, 2021 WL 6052922, at *3–4 (holding that six-month stay was not immoderate). This duration gives the state-court Receiver sufficient time to continue planning for the closure of Piney Point and any potential environmental remediation. The Court therefore orders that this case is stayed for a duration of six months.

## CONCLUSION

The Court **GRANTS** Defendant FDEP's Motion to Stay, Dkt. 53. The parties are ordered to submit periodic status reports every sixty days. A status conference is set for October 15, 2022.

The Court also **DENIES AS MOOT** all the pending Motions to Dismiss and the pending Motion for Sanctions. Dkts. 51, 54, 55, 56, 67. Should the Court lift the stay and Plaintiffs continue seeking their claims, the parties are entitled to refile these motions at that time.

**DONE AND ORDERED** at Tampa, Florida, on March 25, 2022.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record